**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VIAMEDIA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 5486 |
| | ) | |
| v. | ) | Honorable Amy J. St. Eve |
| | ) | |
| COMCAST CORPORATION and | ) | |
| COMCAST SPOTLIGHT, LP, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

## TABLE OF CONTENTS

PAGE

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND..............................................................................................3

ARGUMENT .......................................................................................................................6

I.      VIAMEDIA'S FEDERAL ANTITRUST
        CLAIMS FAIL AS A MATTER OF LAW...............................................................7

        A.      Comcast Has No Duty to Deal with Viamedia. ...........................................7

        B.      No "Exception" to the *Trinko* Rule Is Warranted in This Case. .................8

        C.      The NCC Claim Is Not Ripe. ....................................................................12

        D.      Viamedia Fails to Allege Harm to Competition and
                Lacks Antitrust Standing to Assert Claims for MVPDs. ...........................12

II.     VIAMEDIA'S STATE LAW CLAIMS SHOULD ALSO BE DISMISSED. .......15

CONCLUSION...................................................................................................................15

## TABLE OF AUTHORITIES

PAGE

CASES

*Am. Council of Certified Podiatric Physicians & Surgeons v.*
*Am. Bd. of Podiatric Surgery, Inc.,*
185 F.3d 606 (6th Cir. 1999) ..................................................................................... 15

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................. 6, 13

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985) .................................................................................................. 2, 9

*Associated Gen. Contractors of Cal., Inc. v. Carpenters,*
459 U.S. 519 (1983) ..................................................................................................... 13

*Ball Mem'l Hosp. Inc. v. Mutual Hosp. Ins., Inc.,*
784 F.2d 1325 (7th Cir. 1986) ...................................................................................... 8

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ....................................................................................................... 7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977) ...................................................................................................... 14

*Burris v. Panhandle E. Pipe Line Co.,*
935 F.2d 1469 (7th Cir. 1991) .................................................................................... 15

*Chic. Prof'l Sports Ltd. P'ship v. NBA,*
961 F.2d 667 (7th Cir. 1992) ...................................................................................... 13

*Chic. Prof'l Sports Ltd. P'ship v. NBA,*
95 F.3d 593 (7th Cir. 1996) ........................................................................................... 7

*Christy Sports, LLC v. Deer Valley Resort Co.,*
555 F.3d 1188 (10th Cir. 2009) ............................................................................. 7, 11

*In re Elevator Antitrust Litig.,*
502 F.3d 47 (2d Cir. 2007) ......................................................................................... 10

*Goldwasser v. Ameritech Corp.,*
222 F.3d 390 (7th Cir. 2000) ........................................................................................ 6

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ........................................................ 5

*Institutional Foods Packing, Inc., v. Creative Prods., Inc.*,
  1992 WL 111133 (N.D. Ill. May 12, 1992) ................................. 14

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*,
  737 F.2d 698 (7th Cir. 1984) ...................................................... 14

*Lima LS PLC v. PHL Variable Ins. Co.*,
  2013 WL 3327038 (D. Conn. July 1, 2013) ............................... 15

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ...................................................... 11

*Pac. Bell. Tel. v. Linkline Comm.*,
  555 U.S. 438 (2009) ........................................................ 8, 9, 11, 12

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007) ........................................................ 14

*Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.*,
  2005 WL 3557947 (N.D. Ill. Dec. 26, 2005) ............................. 12

*Schor v. Abbott Labs.*,
  457 F.3d 608 (7th Cir. 2006) ..................................................... 2, 7

*S. Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*,
  1999 WL 955910 (N.D. Ill. Jan. 26, 1999), *aff'd*,
  191 F.3d 842 (7th Cir. 1999) ...................................................... 12

*Sterling Fed. Bank, F.S.B. v. Countrywide Fin. Corp.*,
  2012 WL 2368821 (N.D. Ill. June 21, 2012) ............................... 5

*Sterling Merch., Inc. v. Nestle S.A.*,
  656 F.3d 112 (1st Cir. 2011) ...................................................... 13

*Underwood v. City of Chicago*,
  779 F.3d 461 (7th Cir. 2015). ..................................................... 15

*United States v. Colgate & Co.*,
  250 U.S. 300 (1919) ................................................................... 2, 7

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
  2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ..................... 6, 10, 13

*Verizon Commc'ns, Inc. v. Trinko*,
  540 U.S. 398 (2004) .............................................................................. *passim*

*Weber-Stephen Prods. LLC v. Sears Holding Corp.*,
  2014 WL 656753 (N.D. Ill. Feb. 20, 2014) .................................................. 6, 9, 13, 14

*WHDH-TV v. Comcast Corp.*,
  __ F. Supp. 3d __, 2016 WL 2858780 (D. Mass. May 16, 2016)............................. 6, 10


OTHER AUTHORITIES

Areeda & Hovenkamp, *Antitrust Law* (4th ed. 2015) ........................................ 15

Richard D. Cudahy & Alan Devlin, *Anticompetitive Effect*,
  95 Minn. L. Rev. 59 (2010) ........................................................................ 8

Frank H. Easterbrook, *The Chicago School and Exclusionary Conduct*,
  31 Harv. J.L. & Pub. Pol'y 439 (2008) ............................................................ 8

Richard A. Posner, *Antitrust Law* 242 (2d ed. 2001) ........................................ 8

## INTRODUCTION

Defendants Comcast Corporation and Comcast Spotlight, LP ("Comcast Spotlight," together with Comcast Corporation, "Comcast") respectfully submit this memorandum in support of their Motion to Dismiss plaintiff Viamedia, Inc.'s ("Viamedia") complaint in its entirety because it rests on a legally untenable theory that Comcast violated the antitrust laws by *unilaterally* refusing to deal with a competitor. As numerous courts have recognized, refusal to deal claims contradict the most basic objective of the antitrust laws—promoting *competition*, rather than cooperation, among competitors.

Viamedia and Comcast compete throughout the United States to represent cable and satellite companies in selling advertising. The parties previously had a contract under which they cooperated in limited fashion: Comcast supported the advertising representation services that Viamedia provided to two of its cable clients in Chicago and Detroit, by contracting with Viamedia to serve as the "sole and exclusive" seller of these clients' advertising inventory to regional and national advertisers.[1] That contract expired by its own terms on May 31, 2012. In the contract, Viamedia acknowledged that Comcast was its competitor and *expressly agreed* that Comcast had the right to compete for business from those two clients in Chicago and Detroit after the contract expired. Following the contract's expiration, Comcast offered to continue the relationship with Viamedia, but Viamedia rejected the proposed terms. With the contract no longer in effect, Comcast exercised its right to compete for those two cable companies' business—just as Viamedia had agreed Comcast was entitled to do.

Now, nearly four years after the contract expired and days before the statute of limitations ran, Viamedia sued, claiming that Comcast violated the antitrust laws by declining to

---

[1] The Court may consider the contract, which the complaint fails to mention, on this motion. *See infra* n.3.

renew the contract on terms acceptable to Viamedia. That claim fails as a matter of law. It long has been settled that the antitrust laws do not compel a business to deal with its competitors. *See Verizon Commc'ns, Inc. v. Trinko*, 540 U.S. 398, 409 (2004) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). As the Seventh Circuit put it, "[c]ooperation is a *problem* in antitrust, not one of its obligations." *Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006).

The Supreme Court recognized a "limited exception" to this principle on the unique facts of *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), but has stressed that the exception lies "at or near the outer boundary of Section 2 liability." *Trinko*, 540 U.S. at 408. The facts alleged here, even viewed in the light most favorable to Viamedia, do not come close to meeting the requirements of that narrow exception. At a minimum, *Aspen Skiing* requires an antitrust plaintiff to plead that the defendant terminated a prior profitable business venture under circumstances showing that the termination was irrational but for any anticompetitive effect. Here, the parties had a contract under which Comcast supported the services that Viamedia provided to two of Viamedia's cable clients in Chicago and Detroit for nine years. Unlike in *Aspen Skiing*, Viamedia *agreed* that this limited cooperative relationship would have a finite duration, and expressly allowed Comcast to compete for business from Viamedia's two clients after the contract expired. And Comcast and Viamedia indisputably had an established pattern of competing, not cooperating, outside of Chicago and Detroit.

In short, the allegations of the complaint establish that Comcast engaged in conduct that (i) Viamedia *expressly agreed* it had the right to engage in and (ii) was consistent with Comcast's conduct *everywhere else in the country*. Viamedia asks this Court to rewrite its expired contract with Comcast to grant Viamedia something that it never bargained for: a

2

contract *in perpetuity*. But the antitrust laws require no such result, which would plainly reward complacency rather than industry.

Viamedia further fails to adequately plead injury to competition or antitrust standing, which are independent bases for dismissal. In order to state an antitrust claim, a plaintiff must plead some harm to the *competitive process*, rather than simply a parochial harm to its own business. Viamedia does not allege that Comcast's conduct has increased prices or reduced output—the essence of harm to competition. Instead, Viamedia alleges only harm to itself. Because the antitrust laws exist to protect *competition*, not individual competitors like Viamedia, Viamedia's claims based on its alleged lost profits fail as a matter of law.

Because the complaint fails to state a claim for refusal to deal, and because it fails to allege any harm to competition, Viamedia's federal antitrust claims should be dismissed. Viamedia's state law antitrust claims should be dismissed for the same reasons, and the Court should decline to exercise supplemental jurisdiction over the state law tortious interference clam.

## FACTUAL BACKGROUND[2]

This case involves the spot cable advertising business. Subscription television providers (known in the industry as multichannel video programming distributors or "MVPDs") distribute programming supplied by cable networks. Each network typically grants MVPDs approximately two minutes of advertising inventory per hour (referred to as "availabilities" or "avails"). Compl. ¶ 27. MVPDs sell this inventory, which is referred to as "spot cable advertising," to advertisers. *Id.* For example, a car dealership in Chicago can purchase spot cable advertising on USA Network from Comcast to reach Comcast cable subscribers in Chicago. *Id.* ¶ 33. Some MVPDs, like those affiliated with Comcast Corporation, employ their own teams to market, sell, and

---

[2] Solely for purposes of this motion, Comcast assumes that the complaint's allegations are true.

deliver their spot cable advertising inventory to advertisers. *Id.* ¶¶ 70-71. Comcast Spotlight is the division of Comcast Corporation responsible for selling spot cable advertising. *Id.* ¶ 85.

Other MVPDs contract with cable advertising representation firms to act as sales agents for the MVPDs' advertising inventory. Compl. ¶¶ 71-72. Comcast Spotlight and Viamedia are cable advertising representation firms that compete against each other to represent MVPDs. *Id.* ¶¶ 72, 79, 85. Viamedia has no advertising inventory of its own to sell. *Id.* ¶¶ 72, 81.

MVPDs developed "Interconnects" to sell spot cable advertising to advertisers seeking to reach entire metropolitan areas or "Designated Market Areas" ("DMAs"). Compl. ¶¶ 4, 35. Interconnects pool advertising inventories from multiple MVPDs so advertisers can purchase availabilities across a DMA, and Interconnects employ the technological infrastructure necessary for advertisers to place "DMA-wide advertisements across all of the MVPDs in a DMA at once." *Id.* ¶¶ 2, 36-37. One MVPD in each DMA typically develops the business and technological infrastructure to operate and manage an Interconnect. *Id.* ¶¶ 2, 36-37, 44. MVPDs pay a representation fee to the MVPD that operates the Interconnect and sells advertising on their behalf. *Id.* ¶¶ 35, 44. Comcast manages and operates the Interconnects in several DMAs, including Chicago and Detroit. *Id.* ¶¶ 86, 87.

Similarly, NCC Media ("NCC"), which is partially owned by Comcast and other MVPDs, "aggregat[es]" spot cable advertising "from MVPDs across multiple DMAs simultaneously" and sells it to national and multi-regional advertisers. Compl. ¶¶ 50-51.

Viamedia alleges that it had "access" to the Comcast-managed Interconnects in Chicago and Detroit until Comcast "unilaterally ended" that access on June 1, 2012. Compl. ¶ 110. While Viamedia attributes this "access" to a commercial relationship with Comcast, it fails to explain that this relationship was the product of a nine-year contract between Comcast Spotlight

and Viamedia.  That contract *expired* by its own terms on May 31, 2012.  *See* Exhibit 1 (the "Agreement" or "Agmt.").[3]

The Agreement sets forth the terms of Viamedia's "access" to the Chicago and Detroit Interconnects during the contractual period.  Viamedia had contracts with two cable companies (RCN and WOW) authorizing Viamedia to sell advertising on their cable systems in those DMAs.  Agmt. at 1; *see also* Compl. ¶ 103.  Viamedia in turn granted Comcast the "sole and exclusive" right to sell all regional and national advertising on those cable systems directly to advertisers.  Agmt. § 2(a).  Comcast billed advertisers and inserted the advertisements into programming on those cable systems.  Agmt §§ 1.4, 4.3(a).  Viamedia (Agmt. Ex. C; Compl. ¶¶ 72, 161) and Comcast (Compl. ¶ 110) each earned a fee for its respective role.  The Agreement had an express nine-year term, and did not provide for renewal or otherwise afford Viamedia any rights beyond the expiration of that agreed term.  Agmt. § 3.1.  The Agreement expired by its own terms on May 31, 2012, and it was not renewed.  *Id.*; Compl. ¶ 110.  Comcast, however, subsequently offered to provide Viamedia access to the Chicago and Detroit Interconnects.  Compl. ¶ 122.  Viamedia rejected Comcast's terms.  *Id.* ¶¶ 122-23.

In the Agreement, Viamedia expressly acknowledged:

> Comcast shall have the right to contact RCN and WOW for the purpose of selling their advertising availabilities in the Chicago and Detroit DMAs in the event this Agreement terminates or expires . . . .  [N]othing shall preclude Comcast from negotiating with RCN or WOW to sell their advertising in the Chicago or Detroit DMAs if either RCN or WOW initiates such negotiations.  This Non-Solicitation section shall not prevent Comcast from negotiating with RCN or WOW to sell

---

[3] Viamedia fails to mention the Agreement explicitly, but the Court may consider the Agreement on this motion because the complaint refers to its end date (Compl. ¶ 110), it is central to Viamedia's allegations (in that Viamedia essentially asks the Court to extend its terms), and it is authentic.  *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009); *Sterling Fed. Bank, F.S.B. v. Countrywide Fin. Corp.*, 2012 WL 2368821, at *7 (N.D. Ill. June 21, 2012) (St. Eve., J.).  Comcast Spotlight is the corporate successor to the contract signatory (Comcast Advertising Sales, Inc.).

their advertising availabilities in any other geographic locations or designated market areas.

Agmt. § 9.10. When the contract expired, Comcast did precisely what Viamedia had agreed Comcast had the right to do: it successfully bid for representation business from RCN and WOW in Chicago and Detroit, as well as in other DMAs. Compl. ¶¶ 124-31.

Faced with the loss of RCN and WOW business to a competitor, Viamedia brought this lawsuit claiming that Comcast violated Section 2 of the Sherman Act by unilaterally "refusing to deal" with Viamedia by denying it "access" to the Interconnects in Chicago, Detroit and other DMAs where Comcast lawfully manages and operates Interconnects. Compl. ¶ 168. Viamedia acknowledges that it has not previously had "access" to those other Interconnects. *See id.* ¶ 11.

The complaint also alleges that Comcast controls NCC, and that Comcast has violated the antitrust laws by causing NCC to refuse to offer Viamedia a long-term contract extending its access to NCC. Compl. ¶ 145. But the complaint acknowledges that Viamedia has and will continue to have access to NCC through at least the end of 2017. *See* Compl. ¶ 145.

## ARGUMENT

Viamedia's claims are based on a legally invalid "unilateral refusal to deal" theory, which courts routinely dismiss on the pleadings.[4] Indeed, a federal court in Boston recently dismissed on the pleadings a comparable claim against Comcast for a unilateral refusal to deal. *See WHDH-TV v. Comcast Corp.*, __ F. Supp. 3d __, 2016 WL 2858780 (D. Mass. May 16, 2016). Accordingly, Viamedia's complaint fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissing legally meritless cases on the pleadings

---

[4] *See, e.g., Trinko*, 540 U.S. at 416 (dismissal on the pleadings of claim for unilateral refusal to deal); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000) (same); *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *7-9 (N.D. Ill. Sep. 28, 2015) (Dow, J.) (same); *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2014 WL 656753, at *7-8 (N.D. Ill. Feb. 20, 2014) (Chang, J.) (same).

is especially important in antitrust cases, as to which the Supreme Court has "warned particularly of the high costs and frequent abuses associated with antitrust discovery." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007)).

## I.     VIAMEDIA'S FEDERAL ANTITRUST CLAIMS FAIL AS A MATTER OF LAW.

To state a claim under Section 2 of the Sherman Act, a plaintiff must plead not only monopoly power or risk of monopolization, but also *anticompetitive conduct* that unreasonably excludes or limits competition. *Trinko*, 540 U.S. at 407. Viamedia's allegations of a unilateral refusal to deal, taken in the light most favorable to it, fail to meet this standard as a matter of law.

### A.     Comcast Has No Duty to Deal with Viamedia.

It is axiomatic that a firm has no legal duty to deal with its rivals. "[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408 (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)).

Antitrust liability for a unilateral refusal to deal is strongly disfavored for a number of reasons. Compelling a firm to deal with its competitors violates the fundamental premise of antitrust law: competitors should *compete*, not cooperate. Indeed, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Trinko*, 540 U.S. at 407; *Schor*, 457 F.3d at 610 ("[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete. Cooperation is a *problem* in antitrust, not one of its obligations."). Likewise, "[e]nforced sharing" between competitors requires courts to act as "central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Trinko*, 540 U.S. at 407; *see also Chic. Prof'l*

*Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("[T]he antitrust laws do not deputize district judges as one-man regulatory agencies."); *Ball Mem'l Hosp. Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1340 (7th Cir. 1986) (courts should not "become little versions of the Office of Price Administration"); Richard A. Posner, *Antitrust Law* 242 (2d ed. 2001) ("Where the refusal to deal is unilateral, the only effective remedy is an order that defendant do business with the victim of the refusal to deal.  The antitrust court becomes charged with the supervision of an ongoing commercial relationship, a function that courts are not equipped to perform effectively.").  Moreover, compelling a business to share the fruits of its investments with a competitor would create a disincentive to innovate.  *Trinko*, 540 U.S. at 408.

For these reasons, Judge Easterbrook has written that, post *Trinko*, duty-to-deal-with-rivals claims have "bit the dust."  Frank H. Easterbrook, *The Chicago School and Exclusionary Conduct*, 31 Harv. J.L. & Pub. Pol'y 439, 442 (2008); *see* Richard D. Cudahy & Alan Devlin, *Anticompetitive Effect*, 95 Minn. L. Rev. 59, 76 (2010) ("A dominant firm's obligation to deal with its rivals has been narrowed to the point that some question its ongoing relevance.").

### B.    No "Exception" to the *Trinko* Rule Is Warranted in This Case.

Each of the considerations in *Trinko* weighs heavily against the existence of any duty to deal here.  Nor does this case fit within the narrow, pre-*Trinko* exception to the absence of any duty to deal set forth in *Aspen Skiing*.  The Supreme Court has stressed that *Aspen Skiing* represents the "limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability," *Pac. Bell. Tel. v. Linkline Comm.*, 555 U.S. 438, 448 (2009), which lie "at or near the outer boundary of Section 2 liability." *Trinko*, 540 U.S. at 409.  Even if *Aspen Skiing* retains any viability beyond its unique facts, it has no force here.

*Aspen Skiing* involved the sale of ski passes in Aspen, Colorado.  For years, the defendant, which owned three of the four mountains in Aspen, sold a joint pass with the owner

of the fourth mountain, the plaintiff. 472 U.S. at 588-91. Eventually, the defendant terminated the joint pass, and refused even to sell lift tickets to the plaintiff at retail when the plaintiff tried to recreate the joint pass. *Id.* at 592-94. As the Court later explained in *Trinko*, the *Aspen Skiing* Court imposed liability because the "unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end" and "the defendant's unwillingness to renew the ticket even if compensated at retail price revealed a distinctly anticompetitive bent." *Trinko*, 540 U.S. at 409. The Seventh Circuit "has recognized that *Aspen*-like circumstances are a rare exception." *Weber-Stephen*, 2014 WL 656753, at *7; *accord Linkline*, 555 U.S. at 448.

Viamedia has not alleged facts falling within that "rare" exception. The complaint's allegations, together with the Agreement's terms, establish the following:

- In Chicago and Detroit, Comcast and Viamedia had a contract under which Comcast supported the advertising representation services that Viamedia provided to RCN and WOW. Viamedia agreed in that contract that it would expire on May 31, 2012. Agmt. § 3.1; Compl. ¶ 110.

- Aside from that single contract, Comcast has never agreed to help Viamedia represent its MVPD clients in any other DMA. Compl. ¶ 11. Thus, the relationship between Comcast and Viamedia has almost exclusively entailed competition, not cooperation.

- That contract expressly acknowledged Comcast had the right to compete for (i) RCN and WOW business outside of Chicago and Detroit at any time and (ii) RCN and WOW's business in Chicago and Detroit after May 31, 2012. Agmt. § 9.10.

- Comcast did, in fact, offer Viamedia access to the Chicago and Detroit Interconnects after the Agreement expired, and Viamedia rejected the offer. Compl. ¶¶ 122-23.

These facts show that Viamedia's claims fail as a matter of law for several reasons. *First*, to fall within *Aspen Skiing*, a plaintiff must show that the defendant discontinued a prior business relationship. *Trinko*, 540 U.S. at 409. That is not the case here, however. The parties' relationship existed only because of a commercially negotiated contract that expressly expired *by its own terms* and—following its expiration—expressly allowed Comcast to do exactly what it

has done consistently throughout the country: compete with Viamedia for RCN and WOW's business in the Detroit and Chicago DMAs. Agmt. § 9.10; *see WHDH-TV*, 2016 WL 2858780, at *6 ("Comcast's conduct—the non-renewal of WHDH's affiliation [contract]—cannot be construed as anticompetitive for the simple fact that WHDH had itself (years ago) bargained for a contract with an automatic expiration date and no right of first refusal."). Thus, in entering a contractual relationship with Comcast, Viamedia expressly agreed not only to its termination but also to the precise commercial competition that it now claims constitutes an antitrust violation. This key fact distinguishes this case from *Aspen Skiing*.[5]

*Second*, Viamedia does not and cannot plead facts showing that Comcast's decision was, like that of the defendant in *Aspen Skiing*, "irrational but for its anticompetitive effect." *VBR Tours*, 2015 WL 5693735, at *7. Viamedia concedes that Comcast has consistently declined to do business with it outside Chicago and Detroit. *See* Compl. ¶¶ 121, 136-37. Thus, the pleaded facts show that Comcast and Viamedia have a history of *competition*, not cooperation, as to all but two MVPDs in two DMAs. Moreover, Comcast's limited decision to "cooperate" was expressly conditioned on its right to continue competing in most DMAs and to resume competing in the Chicago and Detroit DMAs post-expiration. *See* Agmt. § 9.10. Thus, electing to compete with Viamedia in Chicago and Detroit is not evidence of any "anticompetitive" intent. To the contrary, it is consistent with Comcast's practices throughout the country and merely reflects Comcast's decision to compete in *more places*—which the antitrust laws encourage.

---

[5] Viamedia does not allege that, outside of Chicago and Detroit, Comcast and Viamedia *ever* had a cooperative business relationship. Thus, any claim based on allegations of Comcast's conduct outside of those DMAs fails as a matter of law. *See, e.g.*, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 54 (2d Cir. 2007) (affirming dismissal of claim for unilateral refusal to deal where the plaintiff did not allege that the defendant "terminated a prior relationship").

*Third*, the antitrust laws cannot be interpreted to compel a firm to deal with its competitor in perpetuity, especially when the prior dealing was pursuant to a contract with a finite duration. In *Christy Sports*, for example, the court upheld dismissal of a Section 2 claim premised on the defendant's decision to enforce a restrictive covenant, which resulted in the termination of the plaintiff's right to operate a rental business. *See* 555 F.3d at 1197. The court reasoned that "by using the restrictive covenant [the defendant] had explicitly informed its competitors that the relationship could change at any time . . . was temporary, and subject to [the defendant's] business judgment." *Id.* Here, similarly to *Christy Sports*, the express expiration date and absence of any renewal provision placed Viamedia on notice that renewal was not automatic and that Comcast had the option to compete in the relevant jurisdictions once the Agreement ended. Like the defendant in *Christy Sports*, Comcast "should not be forever locked into a business decision made in [2003], especially when it took an affirmative step to preserve its future flexibility." *Id.* at 1198; *see also Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 376 (7th Cir. 1986) ("If a monopolist does extend a helping hand, though not required to do so, and later withdraws it . . . does he incur antitrust liability? We think not.").

*Fourth*, Comcast did not refuse to deal with Viamedia: rather, it was Viamedia that declined to deal on the terms offered by Comcast. Viamedia insists that the offered terms were "commercially unreasonable." Compl. ¶ 122. But Comcast had no duty to deal with Viamedia in the first place: "Trinko holds that a defendant with no antitrust duty to deal with its rivals has no duty to deal under the terms and conditions preferred by those rivals." *Linkline*, 555 U.S. at 456. Further, in advancing that allegation, Viamedia presumably asks this Court to determine the "reasonable" terms. But that would require the Court to act as a "central planner," a role for which courts are "ill-suited," which is precisely what led the Supreme Court in *Trinko* to reject

the notion that courts should impose a duty to deal.  540 U.S. at 407; *see also Linkline*, 555 U.S. at 454 ("[H]ow is a judge or jury to determine a 'fair price'?") (quotation omitted).

### C. The NCC Claim Is Not Ripe.

Viamedia also alleges that Comcast has refused to deal with Viamedia by somehow causing NCC to not enter into a long-term contract extension with Viamedia.  Compl. ¶¶ 143-53. Even assuming the truth of that allegation, it fails to establish liability under Section 2 because, as shown, Comcast has no duty to deal with Viamedia.  *See supra* Point I.A-B.

In addition, any such claim is not ripe, and any asserted injury is too speculative. Viamedia admits that it has a contract providing access to NCC through December 2017 (Compl. ¶ 145), but complains that NCC has so far "refused to entertain a long-term extension."  *Id*. Conjecture about what *might* happen after that contract expires in December 2017 does not establish antitrust injury, so Viamedia lacks standing to bring a Section 2 claim.  The court in *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.*, 2005 WL 3557947, at *4 (N.D. Ill. Dec. 26, 2005), dismissed a similar Section 2 claim for lack of actual injury where the plaintiff alleged that the defendant "intends to terminate and will terminate" a contract.  For the same reasons, Viamedia's claim is not ripe.  *See also S. Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*, 1999 WL 955910, at *1-2 (N.D. Ill. Jan. 26, 1999) (Manning, J.) (dismissing Sherman Act claim as unripe where no existing injury was alleged), *aff'd*, 191 F.3d 842 (7th Cir. 1999).

### D. Viamedia Fails to Allege Harm to Competition and Lacks Antitrust Standing to Assert Claims for MVPDs.

To state a valid antitrust claim, Viamedia must plead both that (a) Comcast's conduct harmed competition and (b) it has antitrust standing.  Viamedia's failure to establish either of these essential elements provides independent bases to dismiss its claims, in addition to the non-existence, as a matter of law, of any duty to deal.

Harm to competition requires that a plaintiff allege harm to the *competitive process*, not merely to an individual competitor like itself. *See Chicago Prof'l Sports*, 961 F.2d at 669-70.[6] At the most fundamental level, Viamedia fails to allege the *sine qua non* of harm to competition: that Comcast's conduct has "either increased price or reduced output" in the market for spot cable advertising representation. *VBR Tours*, 2015 WL 5693735, at *15. Focusing on Comcast's Interconnect clients, Viamedia alleges only that Comcast "increasingly grows more *able* to impose higher prices and other onerous terms on MVPDs." Compl. ¶ 156 (emphasis added). But Viamedia fails to plead that Comcast has *in fact* caused any cognizable harm in the *four years* since Viamedia's contract with Comcast ended, and suggests only that *could* happen in the future.[7] Viamedia's allegations thus fail as a matter of law to establish harm to competition in the market it alleges. *See, e.g.*, *Iqbal*, 556 U.S. at 663; *see also Weber-Stephen*, 2014 WL 656753, at *7 (dismissing Section 2 refusal to deal claim where the plaintiff pleaded no non-conclusory allegations of harm to competition).

Beyond that, Viamedia's conclusory assertions of "foreclosure" fail on the facts as Viamedia itself alleges them. *See, e.g.*, Compl. ¶¶ 114. Contrary to those assertions, Viamedia's specific allegations show that RCN and WOW now *have access* to Comcast-managed

---

[6] Unlike consumers, competitors have incentives to bring antitrust suits for anticompetitive purposes, including to induce the defendant to moderate its competition. *See Sterling Merch., Inc. v. Nestle S.A.*, 656 F.3d 112, 121 (1st Cir. 2011). Courts should be skeptical of rivals' suits, "'particularly when the practices are not obviously 'exclusionary.'" *Id.*; *see also Chi. Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 670 (7th Cir. 1992) ("Whenever producers invoke the antitrust laws and consumers are silent, this inquiry becomes especially pressing.").

[7] Even if Viamedia had pleaded actual injury to MVPDs, Viamedia lacks standing to assert claims based on any alleged harm to MVPDs (or any other participant beside itself) in the alleged market for spot cable advertising representation or any other market. Instead, it would be the MVPDs, not Viamedia, that would have antitrust standing to assert claims based on any harm to them. *See Assoc. Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 541-42 (1983). No MVPD has brought suit. Because MVPDs clearly could, if they chose to do so, pursue their own antitrust claims, Viamedia has no standing to assert their claims indirectly in this case. *See id.*

Interconnects. *Id.* ¶¶ 124-27, 130-31. The allegations also show that Viamedia has continued to operate and sell advertising inventory on behalf of MVPDs. After the Agreement expired on May 31, 2012, Viamedia continued to sell advertising on behalf of RCN and WOW in the Chicago and Detroit DMAs. Compl. ¶¶ 74, 124-25, 128-30. In other words, Comcast's "refusal" to renew the Agreement with Viamedia did not even exclude Viamedia from such sales, *see id.*, nor did it prevent Viamedia from bidding to retain WOW's and RCN's cable representation business. Viamedia remains a vibrant competitor—the complaint alleges that Viamedia represents over 60 MVPDs that serve approximately 2.9 million subscribers. Compl. ¶¶ 9, 17; *see Weber-Stephen*, 2014 WL 656753, at *7 (distinguishing *Aspen Skiing* where defendant's refusal to deal did not eliminate the plaintiff's ability to compete or cause any product to be "withdrawn from the market").

Thus, Viamedia is left alleging nothing more than harm to itself. *See, e.g.*, Compl. ¶ 161 (asserting "lost profits to Viamedia of tens of millions of dollars"). Those allegations of lost profits do not establish harm to competition. *See, e.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (holding that loss of "profits [the plaintiffs] would have realized had competition been reduced" does not constitute antitrust injury).

Finally, there is simply no reason to infer that Comcast's decision to replace an intermediary with a direct relationship with MVPDs has an anticompetitive motive or effect. Such disintermediation is a "prototypical valid business purpose," *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 123-25 (2d Cir. 2007), and courts have long considered eliminating middlemen to be procompetitive rather than anticompetitive.[8]

---

[8] *See, e.g.*, *Institutional Foods Packing, Inc., v. Creative Prods., Inc.*, 1992 WL 111133, at *3 (N.D. Ill. May 12, 1992) (dismissing monopolization claim because eliminating intermediaries through vertical integration "is usually pro-competitive rather than anticompetitive" and "reduces costs and can mean a savings to the consumer") (citing *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698,

## II.   VIAMEDIA'S STATE LAW CLAIMS SHOULD ALSO BE DISMISSED.

There are no relevant differences between Viamedia's state and federal antitrust claims, so each of those state claims fails as a matter of law for the reasons set forth above. *See, e.g.*, *Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1479-80 (7th Cir. 1991) ("Illinois law provides that its courts should use the construction of federal antitrust law by federal courts to guide their construction of those state antitrust laws that are substantially similar to federal antitrust law."); *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 (6th Cir. 1999) ("Because Michigan antitrust law follows federal precedents, our reasoning regarding the federal antitrust claims applies equally to state antitrust claims."); *Lima LS PLC v. PHL Variable Ins. Co.*, 2013 WL 3327038, at \*4 (D. Conn. July 1, 2013) (Connecticut Antitrust Act is "patterned after Section 2 of the Sherman Act" and thus requires the same proof).

Moreover, if the Court dismisses the federal antitrust claims, it should relinquish supplemental jurisdiction over any remaining state law claims. *See Underwood v. City of Chicago*, 779 F.3d 461, 464-65 (7th Cir. 2015).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the federal and state antitrust claims (Counts I-V) with prejudice and dismiss Count VI without prejudice.

---

710-11 (7th Cir. 1984)); Areeda & Hovenkamp, *Antitrust Law*, ¶ 756 at 13 (4th ed. 2015) (eliminating middlemen is procompetitive because of, *inter alia*, the "lower costs and higher output" from eliminating transactional costs of "transferring" goods between different firms).

Dated:    July 22, 2016                    Respectfully submitted,

                                           COMCAST CORPORATION AND
                                           COMCAST SPOTLIGHT, LP


                                           /s/ Ross B. Bricker
                                           Ross B. Bricker
                                           Sally K. Sears Coder
                                           JENNER & BLOCK LLP
                                           353 N. Clark Street
                                           Chicago, Illinois 60654
                                           Tel: (312) 222-9350
                                           Fax: (312) 527-0484
                                           rbricker@jenner.com
                                           ssearscoder@jenner.com

                                           Arthur J. Burke (*pro hac vice*)
                                           David B. Toscano (*pro hac vice*)
                                           DAVIS POLK & WARDWELL LLP
                                           450 Lexington Avenue
                                           New York, New York  10017
                                           Tel: (212) 450-4000
                                           Fax: (212) 701-5800
                                           Arthur.Burke@davispolk.com
                                           David.Toscano@davispolk.com

                                           *Attorneys for Comcast Corporation &*
                                           *Comcast Spotlight LP*