**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VIAMEDIA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-5486 |
| | ) | |
| v. | ) | Hon. Amy J. St. Eve |
| | ) | |
| COMCAST CORPORATION and | ) | |
| COMCAST SPOTLIGHT, LP, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Defendants Comcast Corporation ("Comcast") and Comcast Spotlight, LP ("Comcast Spotlight")[1] have moved to dismiss Plaintiff Viamedia, Inc.'s ("Viamedia") complaint under Federal Rule of Civil Procedure 12(b)(6). (R. 22.) For the following reasons, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND[2]

This case concerns the spot cable advertising business, which generates approximately $5.4 billion annually in television advertising revenues. (R. 1, Compl., at ¶ 3.) Spot cable advertisements account for two-to-three minutes per hour of television programming and are sold by cable service providers—called, according to industry terminology, "multichannel video programming distributors" ("MVPDs")—like Comcast. (*Id.* at ¶¶ 23–25, 27, 30.) Viamedia, a

---

[1] The Court refers to Comcast and Comcast Spotlight collectively as "Defendants."

[2] The facts presented in the Background are taken from the complaint and are presumed true for the purpose of resolving the pending motion to dismiss under Rule 12(b)(6). *See Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014); *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

spot cable advertising representation company, "represents cable television companies in the sale, placement, and distribution of Spot Cable Advertising." (*Id.* at ¶¶ 1–2.) Comcast is "one of the largest" MVPDs in the United States with "more than 22 million cable and high-speed Internet subscribers." (*Id.* at ¶¶ 8, 24.) It also owns, among other assets, Comcast Spotlight, a direct competitor to Viamedia and "the country's largest Spot Cable Advertising Representative." (*Id.* at ¶¶ 8, 19.)

Broadly speaking, Viamedia alleges that "[t]hrough its control of technical and business infrastructure that is critical for the sale of Spot Cable Advertising time," Comcast has unlawfully "impaired the ability of Viamedia and other Spot Cable Advertising Representatives to compete with Comcast Spotlight." (*Id.* at ¶ 2.) To evaluate Viamedia's claim, the Court first describes how the spot cable advertising business functions and what role the parties play in the industry.

## I. The Spot Cable Advertising Market

### A. MVPDs

MVPDs—for example, Comcast, Wide Open West ("WOW"), and RCN Corporation ("RCN")—provide households across the United States with what is "colloquially referred to as 'cable television service.'" (*Id.* at ¶¶ 23, 25.) In some Designated Market Areas ("DMAs")—"a regional viewing area used to measure television ratings"—Comcast is the dominant MVPD. (*Id.* at ¶¶ 4, 24.) In the Chicago DMA (which encompasses Northeast Illinois and Northwest Indiana), for example, "approximately three out of every four cable households are Comcast subscribers." (*Id.* at ¶ 24.)

MVPDs enter into "carriage agreements" with cable networks (*e.g.*, ESPN and CNBC) under which (1) MVPDs pay the networks a fee to carry their programming, and (2) MVPDs

gain the right to sell a percentage of advertising time.  (*Id.* at ¶ 27.)  "This reserved advertising time is referred to as 'Spot Cable Advertising,'" and a "15-second, 30-second, or one-minute block of [spot cable advertising] inventory is described as a 'Spot Cable Advertising Avail' or a 'Spot Cable Avail.'"  (*Id.* at ¶¶ 27, 29.)  Spot cable advertising is one of the two key ways in which MVPDs generate revenue, the other being the collection of subscription fees from households in exchange for providing cable service.  (*Id.* at ¶ 26.)  Thus, "[t]he ability to sell Spot Cable Advertising is crucial to the economic survival" of an MVPD.  (*Id.* at ¶ 28.)

Spot cable advertising differs from traditional national advertising.  A cable network sells traditional advertising time directly to advertisers, and traditional advertisements air simultaneously on the network across the United States.  (*Id.* at ¶ 30.)  In contrast, MVPDs sell spot cable advertisements.  (*Id.*)  Consequently, a spot cable advertisement reaches only households that subscribe to the MVPD that sold the ad, while a traditional advertisement reaches any household watching the television network that sold the ad, irrespective of the MVPD providing cable service.  (*Id.*)

Spot cable advertising allows advertisers to "geo-target" customers, "meaning that the advertiser does not have to buy advertising on a cable network throughout the entire nation, but can instead select a particular geographic area to display the ad by buying Spot Cable Avails from an MVPD serving that area."  (*Id.* at ¶ 31.)  By purchasing spot advertising during a national broadcast like the World Series, for example, a Chicago-area car dealership can advertise only in the Chicago DMA while a Cleveland restaurant can simultaneously advertise exclusively in the Cleveland DMA.  (*See id.* at ¶¶ 31–33.)

## B.    The three mediums through which MVPDs sell Spot Cable Avails

"Spot Cable Avails are generally sold to advertisers in three ways," (*id.* at ¶ 34), each of which accounts for approximately one-third of an MVPD's Spot Cable Avail inventory, (*id.* at ¶¶ 41, 66–68).  The Court describes each in turn.

### 1.    Regional sales through an Interconnect

In the past, the market for regional spot cable advertising presented a problem for advertisers.  Because individual MVPDs sold spot cable advertising rather than television networks, and because multiple MVPDs could operate in a single DMA, an advertiser wishing to run a commercial in all households in a DMA at a particular time during a particular broadcast would have to separately negotiate with each MVPD.  (*Id.* at ¶ 36)  "[M]any advertisers found [this] difficult, if not impossible."  (*Id.*)

In the 1990s, however, competing MVPDs cooperated with one another to develop Interconnects in each DMA, "which act as a clearinghouse that aggregate Spot Cable Avails from the MVPDs in a DMA and sell packaged Avails to advertisers in such a way that the purchased advertisements will run on all MVPDs across a given DMA simultaneously."  (*Id.* at ¶¶ 35–37.)  Each DMA "has typically contained just one Interconnect, in which all of the MVPDs operating within that DMA have participated" by "making a portion of [their] Spot Cable Advertising inventory available through the Interconnect."  (*Id.* at ¶¶ 35, 37.)  In short, Interconnects "provide[] a business and technical interface that . . . provid[e] regional advertisers with a 'one-stop shop' where they can buy same-time Avails from all the MVPDs in the DMA."  (*Id.*)  They "[are] the only viable and efficient option for advertisers that wish to purchase Spot Cable Advertising across the entire DMA."  (*Id.* at ¶ 47.)  An Interconnect therefore has no competitors, "[n]or could a competing Interconnect be developed."  (*Id.* at ¶¶ 47–48.)

MVPDs "pay a fee to the Interconnect in exchange for its coordination services" and "receive the revenues generated from . . . regional sales on approximately a pro rata basis." (*Id.* at ¶ 35.) Because MVPDs compete with one another, "the Interconnects were originally designed to avoid giving preferential treatment to any single MVPD participant, and the dominant MVPD in the region was not able to exercise its influence over the Interconnect to the detriment of other participating MVPDs." (*Id.* at ¶ 41.) Thus, at least early on, Interconnect oversight "was performed by boards of directors that were elected by a vote of all the MVPD members of the Interconnect." (*Id.* at ¶ 42.) The boards would make decisions by majority vote "with the best interests of all MVPDs in mind." (*Id.*) "In form and practice, Interconnects avoided discriminating among or disadvantaging individual MVPD or representative members." (*Id.*)

Over time, industry consolidation has led to the largest MVPD managing and controlling the Interconnect in each DMA. (*Id.* at ¶ 44.) "Interconnects controlled by dominant MVPDs other than Comcast generally continue to treat all participating MVPDs equally by, for example, charging the same fees to all MVPDs and ensuring all MVPDs or their representatives have open and equal access to the Interconnect." (*Id.* at ¶ 45.) Comcast, however, controls the Interconnect in fifteen of the twenty-five largest television markets and twenty-six of the largest fifty markets, including, for example, the Chicago, Detroit, Philadelphia, Boston, Washington D.C., and Denver DMAs. (*Id.* at ¶¶ 44, 86–94.) Viamedia's allegations of illegality, which are described below, stem in part from Comcast's conduct in DMAs in which it is the dominant MVPD.

### 2. Multiregional sales through National Cable Communications

If an advertiser wishes to air a commercial at a particular time during a particular broadcast across more than one DMA, it can purchase Spot Cable Avails from National Cable

Communications LLC ("NCC"), a national clearinghouse that "historically functioned on a multi-DMA level in much the same way that the Interconnects have functioned on a single-DMA level." (*Id.* at ¶¶ 34, 49.) Thus, NCC collects fees from MVPDs, aggregates Spot Cable Avails from across multiple DMAs, and sells them to advertisers. (*Id.* at ¶¶ 51–52.) "Buying through NCC is the only practical option for advertisers that wish to purchase Spot Cable Advertising across multiple DMAs, and such advertisers have no choice but to use it. NCC has no competitors." (*Id.* at ¶ 54.)

NCC was created in 1981 "as a joint venture among the five largest MVPDs that existed at the time." (*Id.* at ¶ 50.) Through a series of acquisitions of other MVPDs, Comcast attained a 60% ownership stake in NCC, thereby gaining "the ability to effectively control NCC." (*Id.*) "Historically, NCC has had agreements in place with virtually every MVPD or its representative in all 210 DMAs across the United States . . . ." (*Id.* at ¶ 52.) Indeed, NCC says in its promotion materials that "its participating members cover 98 percent of all multichannel television households in the United States." (*Id.*) As described further below, Viamedia contends that Comcast has abused its control of NCC, altering how it has historically functioned in the service of Comcast's anticompetitive goals.

### 3. Local spot cable advertising without the involvement of an Interconnect or NCC

The final manner in which MVPDs sell spot cable advertising is "Local Spot Cable Advertising," which "do[es] not involve an Interconnect or NCC acting as an intermediary." (*Id.* at ¶ 59.) In this advertising sale method, "an advertiser deals directly with a single MVPD or its representative to purchase those Spot Cable Avails that run in a specific number of the MVPD's ad zones," which are subdivisions of a DMA that "allow[] advertisements to be displayed on a neighborhood-by-neighborhood or even a block-by-block basis." (*Id.* at ¶¶ 59–60.) Thus, a

business can use local spot cable advertising to reach "narrowly targeted geographic audiences" at a cost that is "generally less expensive . . . than regional or national Spot Cable Advertising through an Interconnect or NCC." (*Id.* at ¶¶ 61-62.)

C.    **Spot cable advertising representatives**

Viamedia fits into the spot cable advertising landscape by "representing MVPD clients for the purpose of selling their Spot Cable Avails." (*Id.* at ¶ 74.) More specifically, Viamedia provides MVPDs "sales, marketing, and technology expertise and support to sell their Spot Cable Avails to local, regional, and national advertisers, including by accessing and participating in the Interconnects and NCC." (*Id.*) While some large MVPDs like Comcast "devote entire subsidiary organizations to directing and organizing their Spot Cable Advertisement sales operations," smaller MVPDs do not have the resources to do this. (*Id.* at ¶ 71.) Consequently, these smaller MVPDs turn to companies like Viamedia for spot cable advertising representation. (*Id.* at ¶ 72.)

Viamedia represents more than sixty MVPDs across more than seventy DMAs, and each day, "Viamedia inserts about one million advertisements . . . for over 7,000 advertisers nationwide." (*Id.* at ¶¶ 76–77.) These numbers make Viamedia "the largest *independent* Spot Cable Advertising Representative in the United States, meaning that it is the largest representative firm that is not wholly owned and controlled by a cable television service provider such as Comcast." (*Id.* at ¶ 17 (emphasis in original).)

Comcast Spotlight directly competes with Viamedia to represent MVPDs to sell their Spot Cable Avails. (*Id.* ¶ 79.) It does this despite the fact that Comcast competes with other MVPDs for household cable subscriptions and advertising sales. (*Id.* at ¶¶ 78, 80.) Through its control of Comcast's Spot Cable Avails, which reach Comcast's twenty-two million subscriber

households, as well as its representation of other MVPDs that have more than 13 million subscribers combined, Comcast Spotlight "control[s] Spot Cable Advertising for . . . more than half of the entire cable industry." (*Id.* at ¶¶ 8, 85.) Comcast Spotlight's dominance is even greater in DMAs in which it controls the Interconnect. (*Id.* at ¶¶ 85–94.) In the Chicago, Detroit, Philadelphia, Boston, and Washington, D.C. DMAs, for example, Comcast Spotlight controls approximately 98–100% of all Spot Cable Advertising Avails available for sale. (*Id.* at ¶¶ 86–90.) Viamedia alleges that Comcast "has used its power to exclude independent MVPDs and their representatives [from accessing Interconnects that it controls] and to coerce them into behaviors that benefit Comcast." (*Id.* at ¶ 96.) The Court details the specifics of Viamedia's allegations below.

## II.     Viamedia's allegations of anticompetitive conduct

### A.     Conduct stemming from Comcast's control of the Interconnects

The crux of Viamedia's allegations is that Comcast has used its control over certain Interconnects to (1) exclude Viamedia from accessing the critical Interconnect infrastructure, and (2) force MVPDs to engage Comcast Spotlight as their spot cable advertising representatives instead of Viamedia or its competitors.

Viamedia's complaint focuses on Comcast's conduct in the Chicago and Detroit DMAs, where Comcast exercises unilateral control of regional advertising through the DMAs' respective Interconnects. (*Id.* at ¶ 102.) Between 2002 and 2012, Viamedia "participated in the Interconnects for Chicago and Detroit" in its representation of its "then most significant MVPD clients, WOW and RCN." (*Id.* at ¶ 103.) In 2011, Comcast Spotlight began to express its interest in representing WOW and RCN, but the MVPDs were not interested. (*Id.* at ¶¶ 104–06.) Indeed, RCN explained, "Comcast would prefer that RCN use Comcast Spotlight and not

Viamedia . . . .  [But] RCN is not comfortable having its largest and most formidable rival as its representative in the spot cable market and should be free to choose a representative for such services that does not present such an obvious conflict and competitive disadvantage."  (*Id.* at ¶ 108 (alterations in original).)  Then, between 2011 and early 2012, "Comcast repeatedly told advertising agencies that it would have sole control over all of WOW's and RCN's Spot Cable Advertising Avails 'by years end.'"  (*Id.* at ¶ 109.)

"On June 1, 2012, Comcast unilaterally ended Viamedia's access to the Chicago and Detroit Interconnects and removed WOW and RCN from participating in regional ad sales through the Interconnects."  (*Id.* at ¶ 110.)  This was, according to Viamedia, the first time a "third-party representation firm or MPVD had *ever* been excluded from an Interconnect for any reason."  (*Id.* at ¶ 116 (emphasis in original).)  Comcast's sudden closing of the doors to the Interconnect precluded Viamedia, WOW, and RCN "from selling any Spot Cable Advertising Avails through the Interconnects for Chicago and Detroit, two of the largest markets for regional Spot Cable Advertising sales in the country," causing "Viamedia and its MVPD clients [to lose] tens of millions of dollars in revenue."  (*Id.* at ¶¶ 114–15.)  Initially, Comcast did not give a reason for the exclusion, but later "acknowledged that the exclusion was motivated by Comcast Spotlight's desire to replace Viamedia as WOW's and RCN's Spot Cable Advertising Representative."  (*Id.* at ¶¶ 111–12.)

Although Viamedia requested that Comcast restore it and its clients' access to the Interconnect, Comcast did not oblige.  (*Id.* at ¶¶ 120–21.)  In Chicago and Detroit, for example, "Comcast said that it would be willing to consider Viamedia's readmission if, and only if, Viamedia agreed to certain commercially unreasonable terms, which would have prevented Viamedia from meaningfully competing with Comcast Spotlight."  (*Id.* at ¶ 122.)  Specifically,

"Comcast demanded that it be given the right to preempt, at its sole discretion and with virtually no advance notice, any of the Spot Cable Avails previously sold or controlled by Viamedia, whether such ads were sold through the Interconnect or not." (*Id.* at ¶ 123.) This, Viamedia alleges, "would have given Comcast the unilateral ability to assume control over the entire inventory of Viamedia's MVPD clients and to resell Avails that had already been sold by Viamedia to other advertisers." (*Id.* at ¶ 123.) Viamedia did not agree to these terms. (*Id.*)

In 2015, Comcast told WOW and RCN that they "could resume [their] participation in the Comcast-controlled Interconnects if they ended their relationship with Viamedia and retained Comcast Spotlight as their sole Spot Cable Advertising Representative." (*Id.* at ¶ 124.) In April of that year, WOW accepted a proposal from Defendants to replace Viamedia with Comcast Spotlight in the Detroit and Chicago DMAs in exchange for renewed access to those DMAs' Interconnects. (*Id.* at ¶ 126–28.) Accordingly, Comcast Spotlight gained control of "WOW's Spot Cable Advertising in Chicago and Detroit for national, regional, and local inventory." (*Id.* at ¶ 128.) "Going forward, no advertiser will be able to reach WOW's Chicago and Detroit subscribers without dealing with Comcast Spotlight." (*Id.*) Viamedia claims that it would have continued to represent WOW in the Chicago and Detroit DMAs but for Comcast's actions. (*Id.* at ¶ 129.) Indeed, Viamedia continues to represent WOW in DMAs where Comcast does not control the Interconnect. (*Id.*)

A similar course of events unfolded with respect to RCN in the Chicago, Detroit, New York, Philadelphia, Boston, and Washington, D.C. DMAs—which represent "*six* of the 11 largest DMAs in the United States (constituting all of the markets in which RCN operates)." (*Id.* at ¶¶ 130, 132.) Consequently, "Comcast now controls all of RCN's Spot Cable Advertising national, regional, and local inventory in [those DMAs]." (*Id.* at ¶ 131.)

Comcast has also used this practice to "gain control of other MVPDs' Avails, allowing Comcast to consolidate its control over Spot Cable Advertising in many of the largest DMAs in the United States." (*Id.* at ¶ 134.) In fact, "no MVPD is able to sell a Spot Cable Avail and no advertiser is able to purchase a Spot Cable Avail in five of the 10 largest DMAs in the United States without dealing exclusively with Comcast Spotlight." (*Id.* at ¶ 135.)

Comcast's conduct is not limited to only the largest media markets. In the Hartford DMA, for example, Comcast excluded the MVPD Frontier Communications—which had acquired a system operating in the DMA with over 200,000 subscribers—when it "transferred the Spot Cable Avails inventory for its newly acquired Connecticut subscribers to Viamedia." (*Id.* at ¶ 136.) Comcast, however, "intends to condition Frontier's re-admission to the Hartford Interconnect upon Frontier firing Viamedia as its sales representative and entering into an exclusive representation agreement with Comcast Spotlight." (*Id.* at ¶ 138.)

### B.    Conduct stemming from Comcast's control of NCC

Viamedia also claims that, "[a]s [Comcast] has done with the Interconnects, [it] now intends to shut Viamedia and its MVPD clients out of participating in national Spot Cable Advertising sales as a way of coercing independent MVPDs into transferring control of their Spot Cable Avails to Comcast Spotlight." (*Id.* at ¶ 147.) NCC and Comcast, for example, have approached some of Viamedia's clients and "have urged them to terminate their representation agreements with Viamedia if they wish to continue to have access to NCC." (*Id.* at ¶¶ 148–49.) Additionally, although Viamedia currently has an agreement with NCC to access NCC's services, that agreement expires in December 2017, and "NCC has refused to entertain a long-

term extension that would ensure Viamedia's continued access to NCC beyond that date." (*Id.* at ¶ 145.)[3]

### III. The impact of Defendants' conduct

Viamedia claims that "Comcast and Comcast Spotlight's exclusionary conduct harms competition in several ways." (*Id.* at ¶ 154.) First, Viamedia and other independent advertising representatives "cannot compete with Comcast Spotlight" because they will not have access to Comcast-controlled Interconnects or NCC, "which together represent more than two-thirds of the [revenue] generated annually from Spot Cable Advertising sales." (*Id.* at ¶ 155.) Second, MVPDs suffer because they are unable to choose their preferred advertising representative and "many do not want to cede control over their Spot Cable Avails to Comcast, their largest competitor," potentially being "forced to provide Comcast with sensitive business information." (*Id.* at ¶¶ 156, 158.) Moreover, if an MVPD does not acquiesce to Comcast's demands, it would limit its "ability to compete against Comcast for . . . subscribers because the MVPD[] will have to either increase [its] subscriber fees or reduce [its] promotional efforts in order to compensate for [its] losses in advertising revenue." (*Id.* at ¶ 157.)

As for Viamedia specifically, it has lost several clients as well as revenue from spot cable advertising sales through Interconnects. (*Id.* at ¶¶ 161–62.) In total, Viamedia claims it will lose no less than $75 million. (*Id.*)

---

[3] Defendants argue that Viamedia's "NCC claim is not ripe." (R. 23, Mem. Supp. Defs.' Mot. Dismiss, at 12.) Viamedia disavows that it has a separate NCC claim; instead, Viamedia says its allegations concerning NCC are "indicative of Comcast's pattern of conduct" and "part of its overall course of anticompetitive conduct." (R. 28 at 15.) Because Viamedia alleges that Comcast "intends" to close access to NCC in the future but has not yet done so, the Court will focus on Viamedia's allegations regarding the Interconnects. Nevertheless, because Comcast's conduct with respect to NCC mirrors its conduct with respect to the Interconnects, the Court's analysis of Comcast's conduct associated with the Interconnects would apply to Comcast's possible future conduct associated with NCC.

## IV.    Viamedia's Claims

Viamedia's complaint specifies six counts against Defendants.  In Count One, Viamedia asserts that Defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, through "unlawful monopolization in markets for spot cable advertising representation in DMAs where Comcast controls the Interconnect[]."  (*Id.* at 36, ¶¶ 164-73.)  For this claim, Viamedia alleges: (1) "[t]he provision of Spot Cable Advertising Representation services constitutes a relevant product market, (2) "the regional DMAs in which Comcast controls the Interconnect constitute relevant geographic markets," (3) "Comcast has monopoly power in Spot Cable Advertising Representation in each of the DMAs where it controls the Interconnect," (4) Comcast has excluded Viamedia and its clients from accessing Comcast-controlled Interconnects, and (5) "[b]y refusing to deal with Viamedia and MVPDs represented by Viamedia, by conditioning access to Interconnects upon an MVPD's agreement to deal with Comcast Spotlight, by requiring that MVPDs deal exclusively with Comcast Spotlight as a Spot Cable Advertising Representative, [and] by requiring NCC to refuse to commit to a long term arrangement with Viamedia and to otherwise offer []discriminatory terms to Viamedia . . . Comcast has unlawfully acquired and maintained its monopoly power in each of the markets where it controls the Interconnect."  (*Id.* at ¶¶ 165–68.)

Viamedia's second count is for attempted monopolization in violation of Section 2 of the Sherman Act based on the same conduct that it alleges in Count One.  (*Id.* at ¶¶ 174–82.)

Viamedia's third, fourth, and fifth counts allege violations of state antitrust laws in Illinois, Michigan, and Connecticut.  (*Id.* at ¶¶ 183–215.)  Finally, for its sixth claim, Viamedia alleges tortious interference with a business expectancy.  (*Id.* at ¶¶ 216–23.)

Viamedia seeks damages, costs, attorneys' fees, punitive damages, injunctive relief, and the "[o]rdering [of] such divestitures by Comcast as may be required to restore competition and to prevent the recurrence of future antitrust violations." (*Id.* at 46.)

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Put differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in [a plaintiff's] favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

## ANALYSIS

### I.    Documents considered

Defendants have attached a contract between Viamedia and Comcast that they contend the Court may consider. (R. 23, Mem. Supp. Defs.' Mot. Dismiss, at 1 & n.1, 4–5 & n.3, Ex. 1.) According to Defendants, the contract shows that Viamedia's access to the Detroit and Chicago

Interconnects resulted from a nine-year agreement that expired by its own terms on May 31, 2012—the day before Viamedia claims Comcast "unilaterally ended" its access to those Interconnects. (*Id.* at 4–5 (quoting R. 1 at ¶ 110).) Viamedia objects to Defendants' inclusion of this contract, arguing that the Court cannot properly consider it at this stage in the litigation. (R. 28, Pl.'s Opp., at 13 & n.6.) The Court agrees with Viamedia.

"In general, if 'matters outside the pleadings are presented to and not excluded by the court, the motion [to dismiss under Rule 12(b)(6)] must be treated as one for summary judgment under Rule 56.'" *United States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015) (quoting Fed. R. Civ. P. 12(d)); *see Serban v. Cargurus, Inc.*, No. 16 C 2531, 2016 WL 4709077, at *2 (N.D. Ill. Sept. 8, 2016); *F.D.I.C. v. Pantazelos*, No. 13 C 2246, 2013 WL 4734010, at *3 (N.D. Ill. Sept. 3, 2013). An exception to this rule exists, however, when the parties present documents "to which the Complaint ha[s] referred," that are "concededly authentic," and "central" to the plaintiff's claims. *Santana v. Cook Cty. Bd. of Review*, 679 F.3d 614, 619 (7th Cir. 2012) (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009)). A court may also consider materials that are attached to the complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002); *Pantazelos*, 2013 WL 4734010, at *3.

Defendants contend that although "Viamedia fails to mention the [contract] explicitly, . . . the complaint refers to its end date." (R. 23 at 5 n.3 (citing R.1 at ¶ 110).) Viamedia counters by arguing that it does not refer to the contract in its complaint. (*See* R. 28 at 13 n.6.) Viamedia has the better of the argument. It is too far of a stretch to say that Viamedia referenced the contract by merely noting the day upon which it claims Comcast barred it from accessing the Interconnects without making any reference to the agreement. This assertion is too

far from "the usual example" of a plaintiff failing to attach a contract in a suit for breach of contract. *Tierney*, 304 F.3d at 738; *cf., e.g.*, *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (considering an agreement that is "repeatedly quote[d]" in the complaint). The Court therefore excludes the contract. *See Sams v. City of Chicago*, No. 13 CV 7625, 2014 WL 6685809, at *2 n.5 (N.D. Ill. Nov. 25, 2014) (refusing to consider letters that were not referred to in the plaintiff's complaint).

The contract also is not "central" to Viamedia's claims. Defendants argue to the contrary, maintaining that "Viamedia essentially asks the Court to extend its terms." (R. 23 at 5 n.3.) The Court disagrees. Viamedia's claims center on the allegations that (1) Comcast excluded it and its clients from the Interconnects when no third-party representation firm or MVPD had ever been excluded before, and (2) Comcast forced MVPDs to hire Comcast Spotlight as their exclusive advertising representative. While perhaps the contract will ultimately be relevant to this case or even central to Defendants' defense, it is not central to Viamedia's allegations. *See Fleece v. Volvo Constr. Equip. N. Am.*, No. 10 C 4496, 2010 WL 4386866, at *1 (N.D. Ill. Oct. 27, 2010); *Lincoln Nat'l Life Ins. Co. v. Donaldson, Lufkin & Jenrette Sec. Corp*, 9 F. Supp. 2d 994, 999 (N.D. Ind. 1998) ("While [a certain document] . . . is clearly evidence that would be relevant at trial, and may very well be central to [the defendant's] defense, the court determines that it is not central to the claim asserted by the Plaintiffs.").[4]

---

[4] Because the Court concludes that the contract is not central to Viamedia's allegations, the Court also rejects Defendants' argument that it should consider the contract because Viamedia strategically avoided including the contract in its complaint and "courts consistently reject such artful pleading efforts." (R. 29, Defs.' Reply, at 2.) Moreover, the Court disagrees that Viamedia engaged in this sort of "artful pleading" given Viamedia's claims in this case.

Accordingly, the Court does not consider the contract because Viamedia does not refer to it in its complaint nor is it central to Viamedia's claims. Defendants are of course free to rely on the document at the appropriate procedural stage.

## II. Viamedia's Sherman Act Claims

Viamedia alleges that Defendants are liable for monopolization and attempted monopolization under Section 2 of the Sherman Act. To succeed in its monopolization claim, Viamedia must prove "(1) 'the possession of monopoly power in the relevant market[,]' . . . (2) 'the willful acquisition or maintenance of that power[,] as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident,'" and (3) the monopolization caused injury. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1438 (2013) (third alteration in original) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)); *Hannah's Boutique, Inc. v. Surdej*, No. 13 C 2564, 2013 WL 4553313, at *3 (N.D. Ill. 2013). To prove attempted monopolization, Viamedia must show (1) "[Comcast's] specific intent to achieve monopoly power in a relevant market; (2) predatory or anticompetitive conduct directed to accomplishing this purpose; and (3) a dangerous probability that the attempt at monopolization will succeed." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011); *Hannah's Boutique*, 2013 WL 4553313, at *3.

The second element of both monopolization and attempted monopolization requires proof of anticompetitive conduct. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." (emphasis in original)); *Mercatus*, 641 F.3d at 854 ("The second element of each claim can be met by showing that the Hospital engaged in predatory or anticompetitive conduct of

some kind."); *Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000) ("Under § 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power by anticompetitive means."); *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 14-cv-00804, 2015 WL 5693735, at *6 (N.D. Ill. Sept. 28, 2015).  Here, Viamedia alleges that Defendants violated Section 2 of the Sherman Act through tying, exclusive dealing, and refusing to deal.[5]  (*See* R. 1 at ¶ 168; R. 28 at 7–14.)

Defendants do not base their motion to dismiss on a failure to plead monopoly power in a relevant market or a dangerous probability that attempted monopolization will succeed.  (R. 29 at 3 n.3.)  Instead, Defendants contend that Viamedia failed to plead antitrust injury and anticompetitive conduct.[6]  The Court addresses these issues in turn.  First, however, it is necessary to address a preliminary matter regarding whether Viamedia's complaint places tying and exclusive dealing at issue.

### A.    Viamedia's complaint raises tying and exclusive dealing

Viamedia argues that Defendants failed to address in their opening brief Viamedia's tying and exclusive dealing claims, which Viamedia contends are "not hidden in the interstices of the

---

[5] Defendants argue that Viamedia also has a claim based on a monopoly-leveraging theory.  Viamedia, however, denies this.  The Court discusses this argument in Section II.C.2.

[6] Defendants contend that they "expressly argued that the Complaint does not establish that [they] acted with anticompetitive intent."  (R. 29 at 3 n.3 (citing R. 23 at 10).)  Defendants are referring to a passage of their brief in which they argue that they engaged in procompetitive conduct rather than an illegal refusal to deal, and therefore their actions are not evidence of anticompetitive intent.  It thus appears that Defendants' arguments regarding intent are intertwined with their arguments regarding a lack of anticompetitive conduct.  The Court therefore will consider and resolve those arguments together.  *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (explaining that anticompetitive conduct "may be sufficient to prove the necessary intent to monopolize"); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1130 (10th Cir. 2014) ("We have elsewhere concluded that the fact-finder could reasonably infer monopoly power and exclusionary conduct.  With these inferences, the jury could also find an intent to monopolize."); *M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992) ("Specific intent may be inferred from the defendant's anticompetitive practices."); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603 (1985) ("Improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." (quoting Robert Bork, The Antitrust Paradox 160 (1978))); 2-16 Earl W. Kinter et al., Federal Antitrust Law § 16.17 (2015) ("[I]n both monopolization and attempted monopolization cases, courts typically infer intent from the character of the practice.").

Complaint." (R. 28 at 9; *see also* R. 32, Pl.'s Surreply, at 1–2.) Defendants respond by contending that "[t]he word 'tying' appears nowhere in the Complaint," that Viamedia "d[id] not plead" tying or exclusive dealing claims, and that "Viamedia did not clearly allege tying or exclusive dealing claims." (R. 29 at 9–10 n.8.) Thus, Defendants contend, "[i]t is perfectly appropriate for [Defendants] to address for the first time on reply theories not clearly made in the complaint but asserted for the first time in an opposition brief." (*Id.*) The Court then gave Viamedia the opportunity to respond in a surreply to any new arguments Defendants raised in their reply in order to "allay any concerns that [Viamedia] would suffer prejudice." (R. 31, Order Oct. 6, 2016); *see Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 235 F.R.D. 435, 437 (N.D. Ill. 2006) ("To insure that the aggrieved party is not impermissibly affected, a court must either invoke the waiver doctrine or allow the filing of a surreply" when a party raises new matter in its reply brief); *see also Flory v. Mays*, No. 06 C 3523, 2007 WL 4232781, at *3 (N.D. Ill. Nov. 26, 2007) ("Since plaintiff was permitted to file a surreply, no argument of defendants will be treated as waived for failure to raise it in the opening brief.").

To the extent that Defendants contend that Viamedia hid the ball as to its tying and exclusive dealing claims so to require dismissal of those claims, Defendants' argument fails. First, "Plaintiffs need only plead facts, not legal theories, in their complaints." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014); *see also Polzin v. Ericksen*, 607 F. App'x 572, 574 (7th Cir. 2015) ("[F]ederal complaints need not cite law or develop legal theories."); *Collier v. City of Chicago*, No. 08-cv-5645, 2010 WL 476649, at *3 (N.D. Ill. Feb. 4, 2010) ("The plaintiff is not required to plead facts or legal theories or cases or statutes, but merely to describe his claim briefly and simply." (quoting *Shah v. Inter-Continental Hotel Chi. Operating Corp.*, 314 F.3d 278, 282 (7th Cir. 2002))). They need not invoke particular "magic

words" in their complaint.  *See Vance v. Bureau of Collection Recovery LLC*, No. 10-cv-06324, 2011 WL 881550, at *2 (N.D. Ill. Mar. 11, 2011) ("[P]leading certain 'magic words' that track the language of a legal theory 'is no more necessary than including other legal arguments in the complaint.'" (quoting *Gustafson v. Jones*, 117 F.3d 1015, 1018 (7th Cir. 1997))); *see also, e.g.*, *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016).  Accordingly, Defendants' argument that Viamedia failed to use the word "tying" in its complaint falls flat.

Second, the Court agrees with Viamedia that its claims "are not hidden in the interstices of the complaint."  (R. 28 at 9.)  In "Count I," for example, Viamedia says:

> By *refusing to deal* with Viamedia and MVPDs represented by Viamedia, by *conditioning access* to Interconnects upon an MVPD's agreement to deal with Comcast Spotlight, by requiring that MVPDs *deal exclusively* with Comcast Spotlight as a Spot Cable Advertising Representative, . . . Comcast has unlawfully acquired and maintained its monopoly power in each of the markets where it controls the Interconnect, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

(R. 1 at ¶ 168 (emphasis added).)  This paragraph plainly enumerates three anticompetitive acts through which Defendants allegedly acquired monopoly power in violation of the Sherman Act. Viamedia—though it is by no means required to do so—explicitly used the phrase "deal exclusively," indicating an exclusive dealing claim.  Additionally, Viamedia alleges that Defendants "condition[ed] access to Interconnects upon an MVPD's agreement to deal with Comcast Spotlight."  This assertion sufficiently refers to a tying claim.[7]  *See Sheridan v.*

---

[7] Other portions of Viamedia's complaint also reference its tying and exclusive dealing claims.  (*See, e.g.*, R. 1 at ¶ 2 ("Comcast has used its unilateral power to admit or deny competing cable television companies access to this infrastructure and condition access to this infrastructure upon those companies' exclusive use of Comcast Spotlight as their Spot Cable Advertising Representative.  Comcast has also banned any competing company that wishes to access this infrastructure from doing business with Viamedia."); *id.* at ¶ 95 (explaining that Comcast has used its power over the Interconnects to "forc[e] [MVPDs] to accept representation agreements with Comcast Spotlight"); *id.* at ¶ 153 ("Comcast's conditioning of access to the Interconnects and NCC on its rival MVPDs entering into exclusive dealing arrangements with Comcast Spotlight . . . is an anticompetitive means of acquiring and maintaining monopoly power in the market for Spot Cable Advertising Representation.").

*Marathon Petroleum Co.*, 530 F.3d 590, 592 (7th Cir. 2008) ("In a tying agreement, a seller conditions the sale of a product or service on the buyer's buying another product or service from . . . the seller."); *Rocha v. FedEx Corp.*, 15 F. Supp. 3d 796, 810 (N.D. Ill. 2014) ("A tying agreement is an 'agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product[.]'" (alteration in original) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958))).

In short, Viamedia's complaint raises tying and exclusive dealing claims. The question remains, however, whether those claims (as well as Viamedia's refusal-to-deal claim) pass muster under Rule 8. The Court turns to that question now.

### B.     Antitrust Injury

Defendants argue that all of Viamedia's Sherman Act claims fail because Viamedia does not plead harm to competition and therefore cannot establish antitrust injury and antitrust standing. (*See* R. 23 at 12–14; R. 29 at 8–9.) The Court disagrees.

Private antitrust plaintiffs seeking damages must plead more than mere injury; instead, they must plead antitrust injury—"injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see Alarm Detection Sys., Inc. v. Orland Fire Protection Dist.*, 129 F. Supp. 3d 614, 634 (N.D. Ill. 2015). Plaintiffs seeking injunctive relief must plead "threatened" antitrust injury. *Cargill, Inc. v. Monfort of Col., Inc.*, 479 U.S. 104, 113 (1986); *see Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 409 (6th Cir. 2012) ("The only difference between a claim for equitable relief and one for damages is that equitable relief is available at the mere threat of antitrust injury."); IIA Phillip E. Areeda et al., *Antitrust Law*

¶ 335b (4th ed. 2014). "The antitrust-injury doctrine was created to filter out complaints by competitors and others who may be hurt by productive efficiencies, higher output, and lower prices, all of which the antitrust laws are designed to encourage." *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003). It ensures that antitrust lawsuits carry out the purpose of the antitrust laws, which are "concern[ed] with the protection of competition, not competitors." *See Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962); *Alarm Detection*, 129 F. Supp. 3d at 634.

Viamedia can plead antitrust injury by sufficiently alleging that "its loss comes from acts that reduce output or raise prices to consumers." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, ALF-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006) (quoting *Stamatakis Indus. v. King*, 965 F.2d 469, 471 (7th Cir. 1992)). Additionally, the "[Seventh Circuit] has recognized that competitors can bring an antirust claim when they are excluded from the market and injured by defendants' actions." *Id.* at 1032; *see Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995) ("[The antitrust injury] test focuses on the connection between the purpose of the antitrust laws (protecting market competition) and the alleged injury. When the plaintiff's injury is linked to the injury inflicted upon the market, such as when consumers pay higher prices because of a market monopoly *or when a competitor is forced out of the market*, the compensation of the injured party promotes the designated purpose of the antitrust law—the preservation of competition." (emphasis added)); *Hannah's Boutique*, 2013 WL 4553313, at *4 (explaining that the plaintiff established antitrust injury because it "alleged conduct that affects the relevant market as a whole," including "forcing competitors out of the market"); William Holmes & Melissa Mangiaracina, *Antitrust Law Handbook* § 9:6 n.19 (2015) (describing *Tri-Gen* as setting out two paths to prove antitrust standing).

Viamedia alleges antitrust injury because it plausibly claims that it was "excluded from the market and injured by defendants' actions." *Tri-Gen*, 433 F.3d at 1032. By allegedly forcing customers—in this case, MVPDs—to accept Comcast Spotlight's representation services, Viamedia and representation firms like it cannot compete in the spot cable advertising market in areas where Comcast controls the Interconnect. Additionally, Viamedia alleges that Defendants' conduct could entirely foreclose competition in the spot cable advertising representation market nationwide due to firms' inability to generate revenue in the DMAs in which Comcast controls the Interconnect. (R. 1 at ¶¶ 155, 159.) In short, Viamedia's alleged injury is one that "harms both competitors *and* competition," *see Cargill*, 479 U.S. at 117 (emphasis in original), and the antitrust laws properly address such harm.

Viamedia also alleges that Defendants' conduct has diminished the quality of available spot cable advertising representation services, further demonstrating harm to competition. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1984) (explaining that the petitioner's conduct "does not have the obviously unreasonable impact on purchasers that has characterized the tying arrangements that [the Supreme Court] has branded unlawful," as "[t]here is no evidence that the price, *the quality*, or the supply or demand for either the 'tying product' or the 'tied product' involved in this case has been adversely affected" (emphasis added)), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (explaining that an act is anticompetitive when it, among other things, diminishes the quality of available goods); *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4473228, at *16 n.12 (E.D. Pa. Sept. 28, 2012) ("[A]n antirust plaintiff must allege that 'the challenged conducted affected the prices, quantity or quality of goods or services, not just his own welfare.'" (internal quotation marks omitted)

(quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)); *cf. VBR Tours*, 2015 WL 5693735, at *12 n.13 (explaining that a lower "quality-adjusted price to the consumer" may indicate procompetitive effects (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984))).  Specifically, Viamedia pleads facts indicating that MVPDs find Comcast Spotlight to be an inferior alternative to independent third-party representation.  (*See, e.g.*, R.1 at ¶ 108 (alleging that RCN said, "RCN is not comfortable having its largest and most formidable rival as its representative in the spot cable market and should be free to choose a representative for such services that does not present such an obvious conflict and competitive disadvantage"); *id.* at ¶ 129 (explaining that Viamedia still represents RCN and WOW in DMAs where Comcast does not control the Interconnect); *id.* at ¶ 156 (explaining that MVPDs "do not want to cede control over their Spot Cable Avails to Comcast, their largest competitor); *id.* at ¶ 158 (alleging that MVPDs "will be forced to provide Comcast with sensitive business information" if they must sign on with Comcast Spotlight, and that "[t]his sensitive business information will give Comcast an advantage over its rival MVPDs and limit the ability of independent MVPDs to compete for cable subscribers")).  Accordingly, Viamedia has plausibly alleged that Defendants engaged in conduct that lowered the quality of service available in the spot cable advertising representation market, and that this conduct resulted in harm to Viamedia. These allegations sufficiently plead antitrust injury.[8]

---

[8] Defendants present a brief argument in a footnote that Viamedia lacks antitrust standing because it cannot assert claims based on alleged harm to MVPDs.  (R. 23 at 13 n.7.)  Such cursory arguments are deemed waived.  *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013); *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009); *Keith v. Ferring Pharma., Inc.*, No. 15 FC 10381, 2016 WL 5391224, at *13 (N.D. Ill. Sept. 27, 2016); *see also Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 778 (7th Cir. 1994) ("[D]espite the suggestive terminology, 'antitrust standing' is not a jurisdictional requirement and is therefore waivable."); *ChampionsWorld, LLC v. U.S. Soccer Fed'n*, 890 F. Supp. 2d 912, 924 (N.D. Ill. 2012).  Moreover, while MVPDs are harmed by Comcast's alleged conduct, so is Viamedia based on its exclusion from the market.  Both consumers and competitors may have standing to enforce the antitrust laws.  *See Illinois ex rel. Ryan v. Brown*, 227 F.3d 1042, 1046 (7th Cir. 2000) (explaining that "normally only consumers or competitors have [antitrust] standing"); Areeda, *supra*, at ¶ 339d ("The mere fact that an antitrust violation produces two different classes of victims hardly entails that their

## C.     Anticompetitive Conduct

### 1.     Tying

"In a tying agreement, a seller conditions the sale of a product or service on the buyer's buying another product or service from . . . the seller." *Sheridan*, 530 F.3d at 592; *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992) ("A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" (quoting *N. Pac. Ry.*, 356 U.S. at 5–6)).  The Supreme Court teaches that the "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish*, 466 U.S. at 12.  As the parties agree, tying constitutes a type of anticompetitive conduct that can give rise to Section 2 liability.  (R. 29 at 12–14; R. 32 at 4 & n.3); *see, e.g.*,

---

victories are duplicative of one another.  For example, successful predatory pricing, exclusive dealing, or similar exclusionary practices injure rivals by destroying their profits or their business; it ultimately injures consumers as well through higher product prices.  There is no sense in which the lost-profit injury incurred by the competitors 'duplicates' that incurred by consumers, and awarding damages to one interest does nothing to make the other interest whole.").

Defendants also argue that there is no antitrust injury because "there is simply no reason to infer that Comcast's decision to replace an intermediary with a direct relationship with MVPDs has an anticompetitive motive or effect."  (R. 23 at 14.)  "Such disintermediation," Defendants say, "is a 'prototypical valid business purpose.'" (*Id.* (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007).)

This argument fails.  First, the Court has already found that Viamedia has alleged antitrust injury based on Defendants' exclusion of competition and the diminished quality of spot cable advertising representation in a market in which Comcast Spotlight is the only option.  Second, the cases Defendants cite deal with manufacturers vertically expanding to distribute their own product.  (*Id.* at 14 & n.8); *see Port Dock*, 507 F.3d at 124; *Jack Walters & Sons Corp v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984); *Institutional Foods Packing, Inc. v. Creative Prods., Inc.*, No. 89 C 4499, 1992 WL 111133, at *3 (N.D. Ill. May 12, 1992).  That sort of cutting out of a middleman "usually is procompetitive."  *Jack Walters*, 737 F.2d at 710.  It is for this reason, as explained further below, that Viamedia fails to state a claim based on Defendants' refusal to deal with Viamedia.  Nevertheless, at this stage of the litigation, Viamedia has adequately alleged that Defendants tying and exclusive dealing arrangements have done more than merely eliminate a middleman in the provision of Interconnect services.  Instead, Viamedia has alleged these arrangements have entirely foreclosed competition in the market for advertising representation even for ad sales that do not involve an Interconnect.  For these reasons, Viamedia has sufficiently pled antitrust injury.

*Sheridan*, 530 F.3d at 593 ("The Court has not discarded the tying rule, and we have no authority

to do so."); *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683–84 (4th Cir. 2016);

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63

F.3d 1540, 1550 (10th Cir. 1995) ("Illegal tie-ins . . . under section 1 may also qualify as

anticompetitive conduct for section 2 purposes."); *Great Escape, Inc. v. Union City Body Co.*,

791 F.2d 532, 541 (7th Cir. 1986) (noting that "[p]redatory conduct [under Section 2] may be

broadly defined as conduct that is in itself an independent violation of the antitrust laws); *Oracle*

*Am., Inc. v. Terix Comput. Co.*, 5:13-cv-03385-PSG, 2014 WL 5847532, at *7 (N.D. Cal. Nov. 7,

2014); *Hon Hai Precision Indus. Co., v. Molex, Inc.*, No. 08 C 5582, 2009 WL 310890, at *2

(N.D. Ill. Feb. 9, 2009).

A tying claim has four elements: (1) "the tying arrangement is between two distinct

products or services," (2) "the defendant has sufficient economic power in the tying market to

appreciably restrain free competition in the market for the tied product," (3) "a not insubstantial

amount of interstate commerce is affected," and (4) "the tying seller . . . has some economic

interest in the sales of the tied product." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 316–

17 (7th Cir. 2006) (quoting *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*,

758 F.2d 203, 207–08 (7th Cir. 1985)). Viamedia alleges that Comcast has conditioned access to

the Interconnects in which it exercises exclusive control to MVPDs' acceptance of Comcast

Spotlight's services. This arrangement, Viamedia contends, constitutes illegal tying because

MVPDs are forced to purchase a service they do not want—Comcast Spotlight's representation

services—in order to obtain something that they need—access to Interconnects to make regional

spot cable advertising sales. (*See* R. 1 at ¶ 2; R. 28 at 8; R. 32 at 3.)

Defendants argue that "Viamedia's tying claim is deficient as a matter of law because Viamedia's own allegations establish that [Interconnect services and spot cable advertising representation services] are part of the *same alleged product market*." (R. 29 at 13 (emphasis in original).) Defendants point to the complaint's description of the market for spot cable advertising representation, which "defin[es] the services provided by Spot Cable Advertising Representation firms as 'assum[ing] responsibility for [MVPDs'] Spot Cable Advertising for the purpose of marketing and selling their Spot Cable Avail inventory to national, regional, and local advertisers.'" (R. 29 at 13 (quoting R. 1 at ¶ 72).) Defendants contend that this is "*exactly* what Comcast does when it operates an Interconnect," according to Viamedia's complaint. (*Id.* at 13–14 (citing R.1 at ¶¶ 35, 48).)

A tying arrangement must be "between two distinct products or services." *Reifert*, 450 F.3d at 317 (quoting *Carl Sandburg*, 758 F.2d at 207); *see also Jefferson Parish*, 466 U.S. at 19–21. To determine if two products are separate, "the question . . . turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19; *see also, e.g.*, *In re Time Warner Inc. Set-Top Cable Television Box Antitrust Litig.*, Nos. 08 MDL 1995(PKC), 08 Civ. 7616(PKC), 2010 WL 882989, at *4 (S.D.N.Y. Mar. 5, 2010). In *Jefferson Parish*, the Supreme Court concluded that anesthesiological services and other hospital services were distinct products. 466 U.S. at 18–25. The Court looked to a number of factors to reach this conclusion, including the fact that (1) "the anesthesiological component of the package offered by the hospital could be provided separately and could be selected either by the individual patient or by one of the patient's doctors if the hospital did not insist on including anesthesiological services in the package it offers to its customers," (2) "anesthesiological services are billed separately from the hospital services

petitioners provide," and (3) "patients or surgeons often request specific anesthesiologists to come to a hospital and provide anesthesia." *Id.* at 22.

Similarly, in *Eastman Kodak Co. v. Image Technical Services, Inc.*, the Supreme Court considered the issue of whether the provision of service and the provision of parts for photocopiers and micrographic equipment constituted separate products. 504 U.S. at 456–57, 459, 462–63. The Supreme Court framed the test from *Jefferson Parish* as whether there was "sufficient consumer demand so that it is efficient for a firm to provide service separate from parts." *Id.* at 462. The Supreme Court concluded that "[e]nough doubt [was] cast on Kodak's claim of a unified market that it should be resolved by the trier of fact." *Id.* at 463. The Court noted "that service and parts have been sold separately in the past and still are sold separately to self-service equipment owners," and that "the development of the entire high-technology service industry is evidence of the efficiency of a separate market for service." *Id.* at 462. Moreover, the Court rejected the contention that because "there is no demand for parts separate from service, there cannot be separate markets for service and parts." *Id.* at 463.

Viamedia has plausibly alleged distinct markets for spot cable advertising representation services and Interconnect services. First, the complaint alleges that MVPDs have hired representation firms like Viamedia that do not provide Interconnect services themselves. Thus, similar to how patients could have purchased anesthesiology services separate from hospital services absent a tying arrangement in *Jefferson Parish*, 466 U.S. at 22, and how customers purchased parts and service separately in *Eastman Kodak*, 504 U.S. at 462, MVPDs have acquired Interconnect services and representation services separately. Second, similar to how "patients or surgeons often request[ed] specific anesthesiologists to come to a hospital and provide anesthesia" in *Jefferson Parish*, 466 U.S. at 22, Viamedia has alleged that MVPDs prefer

to engage independent third-party representatives like Viamedia to handle their entire spot cable advertising inventory. Finally, spot cable advertising representation concerns the sale of Spot Cable Avails "across the three tiers of the sales system"—sales through Interconnects, sales through NCC, and local sales directly to advertisers—while Interconnect services concern only one of the three tiers of the sales system. (R. 1 at ¶ 70.) Additionally, representation firms "[p]lan[] and coordinat[e] an MVPD's Spot Cable Advertising transactions," identify buyers and negotiate business terms, and provide "complete turn-key advertising sales, spot insertion, encoding, validation, IT, monitoring, traffic, billing, and collection services." (*Id.* at ¶¶ 70, 75.) In contrast, the complaint indicates that Interconnects merely "aggregate Spot Cable Avails . . . and sell packaged Avails to advertisers in such a way that the purchased advertisements will run on all MVPDs across a given DMA simultaneously." (*Id.* at ¶ 35.) Thus, while Interconnect services are related to spot cable advertising representation services in that *some* Spot Cable Avails are sold through an Interconnect, Viamedia has pled that advertising representation firms offer qualitatively different services than an Interconnect. Taking the allegations in the complaint as true, it is plausible that the demand for spot cable advertising representation services is distinct from the demand for Interconnect services. Viamedia therefore adequately alleges that there are two distinct products at issue.

Defendants also contend that "[t]he deficiency of Viamedia's purported tying claim is further underscored by its failure (in either the Complaint or opposition brief) to fully address the essential elements of such a claim." (R. 29 at 13.) Defendants, however, offer analysis only with respect to the element of whether there are two separate products at issue. As previously noted, Viamedia need not enumerate the elements of its claim. *See supra* § II.A. Additionally, "perfunctory and undeveloped legal arguments are waived." *Schaefer v. Universal Scaffolding*

& *Equip., LLC*, No. 15-2393, 2016 WL 5864513, at \*5 (7th Cir. Oct. 7, 2016) (published opinion); *see also United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008); *United States v. Key*, No. 13 CR 726, 2016 WL 6135666, at \*9 n.1 (N.D. Ill. Oct. 21, 2016).

Even putting waiver aside, however, Viamedia pleads all of the necessary elements of a tying claim.   As described above, Viamedia pleads the existence of two separate products.   It also alleges the existence of a tying arrangement that coerces MVPDs to purchase the tied product, Comcast Spotlight's services.   *See Jefferson Parish*, 466 U.S. at 12 ("Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.   When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated."); *It's My Party*, 811 F.3d at 684–85 (describing the importance of coercion to distinguish illegal tying from a legal package deal). With respect to the second element of market power in the tying product market, the complaint alleges that Comcast has total control of Interconnect services in the Chicago and Detroit DMAs, among other locations.   The third element—whether "a not substantial amount of interstate commerce is affected"—is adequately alleged because the complaint claims that competitors in the tied product market, including Viamedia, are being entirely excluded from competition. *Reifert*, 450 F.3d at 316–18.   Indeed, as noted above, the complaint specifically alleges that Defendants' tying arrangement forced WOW and RCN to drop Viamedia for Comcast Spotlight. Finally, with respect to the final element, Viamedia alleges Defendants' economic interest in the sales of the tied product—Comcast Spotlight's representation services.

In short, while Defendants may of course attempt later in the litigation to show why their conduct does not violate the Sherman Act, Viamedia's allegations of a tying arrangement sufficiently state a claim at this stage.

## 2. Monopoly Leveraging

Defendants argue that Viamedia bases its claims on a "monopoly leveraging" theory—the use of monopoly power in one market to gain a competitive advantage in a second market—that must fail under *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004), and *Schor v. Abbott Laboratories*, 457 F.3d 608 (7th Cir. 2006). (R. 29 at 11–12.) In *Trinko*, the Supreme Court, rejected a monopoly leveraging theory, explaining that "leveraging presupposes anticompetitive conduct, which in this case could only be the refusal-to-deal claim we have rejected." 540 U.S. at 415 n.4; *see also Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1222 (10th Cir. 2009) (citing *Trinko* and rejecting a monopoly leveraging theory where there is no viable claim for anticompetitive conduct like a refusal to deal). In *Schor*, as Defendants point out, the Seventh Circuit explained "that there is no Section 2 liability for a 'free-standing' monopoly leveraging theory that lacks any underlying anticompetitive conduct." (R. 29 at 12 (citing *Schor*, 457 F.3d at 611–13).)

Unlike in *Trinko* and *Schor*, however, Viamedia's claim is not "free-standing" because it alleges particular types of anticompetitive conduct—namely, tying, exclusive dealing, and refusing to deal. Viamedia's success turns on whether it states a claim based on those three classes of anticompetitive conduct, not whether a free-standing leveraging theory is independently viable. In *Schor*, in contrast, the Seventh Circuit took care to note that "Schor's complaint does not allege any of the normal exclusionary practices—tie-in sales (or another form of bundling), group boycotts, exclusive dealing and selective refusal to deal, or predatory

pricing." 457 F.3d at 610. Furthermore, in *Schor*, the defendant supposedly leveraged a monopoly in one market to gain a relative advantage in a second market, but did not foreclose all competition in that second market. *See id.* at 611 (explaining that without an allegation that the defendant would "knock[] out" rivals from the market, "[a]nd without any prospect of rivals' exit, there is . . . no antitrust worry"); *id.* at 613 (noting that "[a]s long as rivals continue to sell," monopoly leveraging theories fail). Here, in contrast, Viamedia alleges that Defendants have used specific anticompetitive practices—tying, exclusive dealing, and refusing to deal—to successfully eliminate all competition.

Defendants also argue in a sentence that Viamedia's claims fail because "based on *Schor*'s reasoning, . . . 'monopoly leveraging' cannot violate the antitrust laws because it cannot increase an alleged monopolist's profits." (R. 29 at 12 (quoting *VBR Tours*, 2015 WL 5693735, at \*11, \*13).) As noted above, perfunctory or undeveloped legal arguments are waived. *See Alden*, 527 F.3d at 664; *see also Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (explaining that arguments that "are undeveloped, conclusory, or unsupported by law" are waived). Defendants do not explain the economic principles at issue in *Schor* or how they apply in this case. Nor do they explain why *Schor* should control despite the factual differences between that case and the current one discussed in the preceding paragraph. In short, Defendants' one-sentence argument is insufficient to allow the Court to evaluate the strength of their contention. This invites the court to play "the role of advocate [rather] than judge"—an invitation that the Court must decline. *See Nichols v. Vilsack*, No. 13-01502 (RDM), 2015 WL 9581799, at \*1 (D.D.C. Dec. 30, 2015). Accordingly, while Defendants are free to develop this argument at the appropriate time, the Court will not evaluate it in resolving this motion to dismiss.

### 3. Exclusive Dealing

Exclusive dealing can violate Section 2 of the Sherman Act. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 69–71 (D.C. Cir. 2001) (per curiam); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 157–59 (3d Cir. 2003) (en banc); *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-cv-804, 2016 WL 4945015, at *3, *6 (N.D. Ill. Sept. 15, 2016). Courts "often approve" of exclusive dealing because of its "procompetitive benefits." *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004) (noting that exclusive dealing can "eliminate[] divided loyalties and reduce[] free riding" (citing *Roland Mach.*, 749 F.2d at 395)); *VBR Tours*, 2015 WL 5693735, at *12. "[E]xclusive dealings violate the Sherman Act 'only when they foreclose competition in a substantial share of the line of commerce at issue.'" *VBR Tours*, 2015 WL 5693735, at *12 (quoting *Republic Tobacco*, 381 F.3d at 738); *see also Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)); *Microsoft*, 253 F.3d at 69. This requirement exists to ensure that the exclusive dealing has "an adverse effect on competition." *Microsoft*, 253 F.3d at 69; *see Kolon*, 748 F.3d at 175; *Roland Mach.*, 749 F.2d at 394 (explaining that exclusive dealing is cause for antitrust concern only if there is injury to competition).

As Viamedia points out, Defendants "do[] not appear to genuinely dispute that the Complaint establishes exclusive dealing." (R. 32 at 5.) Instead, Defendants argue that Viamedia's exclusive dealing claim "fails because the Complaint establishes that exclusivity in the Spot Cable Advertising Representative business is the norm and Viamedia simply seeks to replace one allegedly exclusive deal (between an MVPD and Comcast) with another (between an

MVPD and Viamedia)." (R. 29 at 14.) Defendants go on to say "[t]hat exclusivity is the norm is consistent with it being efficient and with the presumption that it is procompetitive." (*Id.* at 15.)

Once again, Defendants' argument that exclusive dealing is the "norm" and therefore is "efficient" and "procompetitive" is conclusory and unaccompanied by citations to authority. The Court therefore need not consider it. *See Puffer*, 675 F.3d at 718; *Alden*, 527 F.3d at 664. Even if the Court considers the argument, however, it fails. As described above, the complaint alleges that Defendants' conduct harmed competition by excluding all competitors. Thus, although an exclusive dealing arrangement may be procompetitive when certain advertising representation firms engage in it, the complaint alleges that Defendants' exclusive dealing and unique position in the spot cable advertising business caused harm to competition. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011) (explaining that sometimes a monopolist may not engage in conduct in which nonmonopolists may engage); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). Viamedia does not assert that exclusive dealing is generally unlawful; instead, it contends that Defendants' exclusive dealing violates the Sherman Act. Accordingly, at this juncture, Defendants' argument does not persuade the Court to dismiss Viamedia's exclusive dealing claim.

### 4. Refusal to Deal

The Supreme Court has explained that, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Trinko*, 540 U.S. at 408 (emphasis in original) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). The Supreme Court enumerated three reasons why refusals to deal are generally not actionable. First, "[c]ompelling such firms to share the source of their

advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* at 407–08. Second, "[e]nforced sharing . . . requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Id.* at 408. Finally, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Id.*; *see also Schor*, 457 F.3d at 610 ("[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete. Cooperation is a *problem* in antitrust, not one of its obligations." (emphasis in original) (citation omitted)).

Pointing to these legal principles, Defendants contend that "[i]t is axiomatic that a firm has no legal duty to deal with its rivals." (R. 23 at 7.) While it is true that refusals to deal are *generally* legal, Defendants overstate the law. "[T]he high value that [the Supreme Court] ha[s] placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Trinko*, 540 U.S. at 408; *see also VBR Tours*, 2015 WL 5693735, at *7. The Supreme Court "ha[s] been very cautious in recognizing" exceptions to the general rule allowing refusals to deal, but one such exception comes from *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985). *Trinko*, 540 U.S. at 408–09; *VBR Tours*, 2015 WL 5693735, at *7. While the Supreme Court has said that "*Aspen Skiing* is at or near the outer boundary of § 2 liability," *Trinko*, 540 U.S. at 409, the Court has reaffirmed that *Aspen Skiing* provides a viable path to liability for a refusal to deal claim, *id.*; *see also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (citing *Aspen Skiing* for the proposition that "[t]here are also limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust

liability); *VBR Tours*, 2015 WL 5693735, at *7 (considering a refusal to deal claim based on *Aspen Skiing*).

Viamedia argues that, under *Aspen Skiing*, Defendants' refusal to provide access to its Interconnects violates the Sherman Act. (R. 28 at 10.) The Court therefore turns to that case. *Aspen Skiing* concerned the four mountains that constituted the Aspen ski area. 472 U.S. at 587– 95. The defendant owned three of the mountains, and the plaintiff owned the fourth. *Id.* at 589– 91. For a number of years, the owners cooperated by selling a joint ticket, providing customers access to all of the mountains. *Id.* Later, however, the defendant demanded an increasingly greater percentage of the revenue generated from the joint ticket until the cooperative relationship between the defendant and the plaintiff ended. *Id.* at 591–93; *see also Trinko*, 540 U.S. at 408–09 (analyzing *Aspen Skiing*). The plaintiff tried what the *Trinko* Court referred to as "a variety of increasingly desperate measures to re-create the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price." *Trinko*, 540 U.S. at 408–09 (citing *Aspen Skiing*, 472 U.S. at 593–94). The defendant rebuffed these efforts. *Aspen Skiing*, 472 U.S. at 592–94; *see also Trinko*, 540 U.S. at 408–09.

The Supreme Court affirmed a jury verdict for the plaintiff. *Aspen Skiing*, 472 U.S. at 610. As the *Trinko* Court described it, the *Aspen Skiing* Court "found significance in the defendant's decision to cease participation in a cooperative venture." *Trinko* at 540 U.S. at 409 (citing *Aspen Skiing*, 472 U.S. at 608, 610–11). "The unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* (emphasis in original) (citing *Aspen Skiing*, 472 U.S. at 608, 610–11). Additionally, "the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* Thus, "the evidence

suggested that the defendant's decision was 'irrational but for its anticompetitive effect.'" *VBR Tours*, 2015 WL 5693735, at *7 (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013)).  Accordingly, *Aspen Skiing* is a "narrow[]" opinion.  *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986).  Indeed, the Seventh Circuit has said that if *Aspen Skiing* "stands for any principle that goes beyond its unusual facts, it is that a monopolist may be guilty of monopolization if it refuses to cooperate with a competitor in circumstances where some cooperation is indispensable to effective competition."  *Id.*

Defendants argue that Viamedia has failed to plead facts showing that Defendants' decision was irrational but for its anticompetitive effects because "replac[ing] an intermediary with a direct relationship . . . is a 'prototypical valid business purpose.'"  (R. 29 at 8 (quoting *Port Dock & Stone Corp v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007)); *see also It's My Party*, 811 F.3d at 689 ("A single firm incorporating separate but closely related production processes can often be far more efficient than various independent entities transacting to produce the same good or bundle of goods."); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984) ("We just said that vertical integration is not an improper objective.  But this puts the matter too tepidly; vertical integration is usually procompetitive."); *Institutional Foods Packing, Inc. v. Creative Prods., Inc.*, No. 89 C 4499, 1992 WL 111133, at *3 (N.D. Ill. May 12, 1992).  The Court agrees.  Viamedia has not alleged or explained how Defendants' refusal to deal with it—separate from Defendants' other conduct like conditioning MVPDs' access to Interconnects on accepting Comcast Spotlight's services even for advertising sales that do not involve an Interconnect—has no rational procompetitive purpose.  *See VBR Tours*, 2015 WL 5693735, at *9 ("[T]he question is not whether [the defendant] chose the most competitive offer but whether it had *any* procompetitive purpose." (emphasis in original)); *see also Novell*,

731 F.3d at 1075–77.  Before Comcast's refusal to deal, MVPDs gave Viamedia control of their Spot Cable Avails and then Viamedia gave control over a portion of those Avails to the Interconnect.  After Comcast's refusal to deal, for the portion of Avails sold through an Interconnect, MVPDs simply deal with Comcast directly.  Consequently, at least with respect to the portion of advertising sales made through Interconnects, Defendants' refusing to deal with Viamedia offers potentially improved efficiency.  Given the Supreme Court's hesitancy to force "firms to share the source of their advantage," *Trinko*, 540 U.S. at 407–08, the administrability problems associated with forcing a company to deal with its rival, *see Novell*, 731 F.3d at 1073 (citing *Trinko*, 540 U.S. 407–08), and the principle that replacing intermediaries is a "prototypical valid business purpose," *Port Dock*, 507 F.3d at 124, Viamedia's current allegations of an illegal refusal to deal cannot proceed.

Viamedia's tying and exclusive dealing claims are distinct from the refusal to deal claim.  Unlike a unilateral refusal to deal, they involve "some assay . . . into the marketplace—to limit the abilities of third parties to deal with rivals (exclusive dealing), [or] to require third parties to purchase a bundle of goods rather than just the ones they really want (tying)."  *Novell*, 731 F.3d at 1072.  Refusing to provide Viamedia access to Interconnects is, for example, different than conditioning MVPDs' access to Interconnects on their acceptance of Comcast Spotlight's representation services even for advertising sales that are unrelated to the use of Interconnects (like local sales directly to advertisers).[9]

---

[9] At times it appears that Viamedia's refusal to deal claim also turns on Comcast refusing to provide Interconnect services to MVPDs.  This refusal, however, is simply part of the tying claim.  Indeed, Comcast has now provided WOW and RCN with access to the Interconnects at issue.  The potential problem with Comcast's conduct, however, is that it provided this access only after allegedly coercing the MVPDs to accept Comcast Spotlight's services.

Defendants argue, however, that Viamedia's exclusive dealing and tying claims are really just Viamedia's refusal to deal claim in disguise.  (R. 29 at 10–11.).  They point to *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013), where the Tenth Circuit rejected the plaintiff's attempt to "recast" the defendant's refusal to deal as an affirmative act of interference, (R. 29 (citing *Novell*, 731 F.3d at 1078–79)).  Here, however, Viamedia is not merely attempting to "recast" its refusal to deal claim.  Rather, it has alleged different claims involving distinct conduct: tying, exclusive dealing, and refusing to deal.  Indeed, as explained in the preceding paragraph, *Novell* specifically discusses the difference between unilateral refusals to deal and other anticompetitive conduct like exclusive dealing and tying.  *Novell*, 731 F.3d at 1072–74.  Accordingly, Viamedia's exclusive dealing and tying claims may proceed without the refusal to deal claim.[10]

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion in part and dismisses Viamedia's refusal to deal claim without prejudice.  The Court denies Defendants' motion with respect to Viamedia's other claims.

**DATED:  November 4, 2016**          **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge

---

[10] Viamedia also alleges various claims under state antitrust law as well as a state law claim for tortious interference with a business expectancy.  (R. 1 at ¶¶ 183–223.)  Comcast contends that there are "no relevant differences between Viamedia's state and federal antitrust claims."  (R. 23 at 15.)  The Court accordingly treats those claims just as it treats Viamedia's claims under the Sherman Act.  Comcast also argues that the Court should "relinquish supplemental jurisdiction over any remaining state law claims" if the Court dismisses the federal antitrust claims.  (*Id.*)  Because the Court does not dismiss the federal claims, it maintains supplemental jurisdiction.