## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| VIAMEDIA, INC., ) | |
| ) | Case No. 16-cv-5486 |
| *Plaintiff,* ) | |
| ) | Hon. Amy J. St. Eve |
| v. ) | |
| ) | FIRST AMENDED COMPLAINT |
| COMCAST CORPORATION, and ) | |
| COMCAST SPOTLIGHT, LP, ) | **JURY TRIAL DEMANDED** |
| ) | |
| *Defendants.* ) | |

## SUMMARY OF ACTION

1.     Plaintiff Viamedia, Inc. ("Viamedia") represents cable television companies in the sale, placement, and distribution of Spot Cable Advertising, an important source of revenue for cable television systems. In this business, Viamedia competes directly with Defendant Comcast Spotlight, L.P. ("Comcast Spotlight"), a wholly-owned subsidiary of Defendant Comcast Corporation ("Comcast"). This lawsuit arises from Comcast's and Comcast Spotlight's intentional and anticompetitive efforts to deny Viamedia the ability to compete and, thereby, to enable Comcast and Comcast Spotlight to acquire and maintain monopolies in the Spot Cable Advertising Representation market in geographic regions in which Comcast provides cable services.

2.     Through its control of technical and business infrastructure that is critical for the sale of Spot Cable Advertising time, Comcast has impaired the ability of Viamedia and other Spot Cable Advertising Representatives to compete with Comcast Spotlight. Comcast has used its unilateral power to admit or deny competing cable television companies access to this infrastructure and condition access to this infrastructure upon those companies' exclusive use of

1

Comcast Spotlight as their Spot Cable Advertising Representative. Comcast has also banned any competing company that wishes to access this infrastructure from doing business with Viamedia. This anticompetitive conduct has harmed not only Viamedia, but also competition in the Spot Cable Advertising Representation market more generally in areas in which Comcast provides cable services, as well as harmed small business advertisers and those cable television companies that compete with Comcast to provide cable television service.

3.      The Spot Cable Advertising industry generates over $5.4 billion in television advertising revenues annually through the sale of Spot Cable Advertising time during the two to three minute commercial breaks on cable networks that are reserved for sale by local cable television service providers.

4.      Cable operators in distinct regions of the country—known as Designated Market Areas ("DMAs")—have historically made use of critical technical and business infrastructure called "Interconnects" to market, organize, and sell Spot Cable Advertising time to regional and national advertisers. Interconnects were created to allow regional and national advertisers the ability to buy Spot Cable Advertising Availabilities ("Avails") on all cable television service providers within a DMA simultaneously. As such, the Interconnects function as the central marketplace around which regional Spot Cable Advertising purchases are conducted. Cable television service providers have also used critical infrastructure called NCC to market, organize, and sell national Spot Cable Advertising time to national advertisers.

5.      Maintaining open access to this critical infrastructure for all cable television service providers and their third-party sales representatives has been a longstanding practice in the industry, to enable ease of access for national and regional advertisers.

6.      Comcast has acknowledged that access to the Interconnects is crucial to efficient and effective competition. In 2014, a senior Comcast executive testified before a congressional committee during Comcast's failed attempt to acquire Time Warner Cable and, when pressed by the Committee Chairman to unequivocally state that Comcast would not "exclude competitors or advertising from the Interconnects," the Comcast executive unambiguously testified that it would not.

7.      In response to press reports that the U.S. Department of Justice has launched a formal investigation into whether Comcast's business practices have hindered competition in Spot Cable Advertising, a Comcast spokesperson was quoted as saying that Interconnects "increase efficiency and help keep costs down for advertisers" and that Interconnects are "good for advertisers and consumers."

8.      Comcast is the world's largest broadcast and cable television provider by revenue, with annual revenues of nearly $70 billion and a market capitalization valued at more than $155 billion. It serves more than 22 million cable and high-speed Internet subscribers. It owns Universal Studios and theme parks, the Fandango online ticketing service, the NBC and Telemundo television networks, 10 NBC affiliate television stations in different cities (including the six top television markets), 17 Telemundo affiliate television stations, nine regional sports networks, and 16 cable programming networks. Through Comcast Spotlight, Comcast is also the country's largest Spot Cable Advertising Representative, controlling Spot Cable Advertising for over 35 million cable subscriber households nationwide (or more than half of the entire cable industry) by virtue of its representation agreements with other cable television service providers.

9.      Viamedia is an independent third-party Spot Cable Advertising Representative, representing primarily small and medium-sized independent cable television service providers

that opt not to maintain their own in-house advertising sales organizations for purposes of selling and managing their Spot Cable Advertising. Viamedia employs roughly 360 people, has approximately 7,000 advertisers, and its clients collectively serve approximately 2.9 million subscriber households across the United States.

10.     Through a series of acquisitions, Comcast has gained control of the Interconnects in 15 of the 25 most populous DMAs (and 26 of the 50 most populous DMAs) in the United States. With that control, Comcast has undertaken to fundamentally and anticompetitively change how Interconnects operate by excluding competing third-party sales representatives like Viamedia and their clients from the Interconnects.

11.     Comcast has excluded Viamedia and its clients from the Interconnects in large DMAs, such as Chicago and Detroit, where Viamedia had previously participated in Interconnect sales for more than a decade. In other DMAs, Comcast has refused to allow Viamedia to participate in Comcast-controlled Interconnects for purposes of representing Viamedia's clients.

12.     Comcast has also used its control over the Interconnects—and its ability to selectively exclude or threaten to exclude others from the Interconnects—to coerce cable television service providers, such as RCN and WOW, to end their business relationships with Viamedia and transfer their business to Comcast Spotlight. In such cases, Comcast and Comcast Spotlight informed rival cable companies that they would only be permitted to access the Interconnects if they ceased transacting business with Viamedia.

13.     In the Hartford, CT, DMA, Comcast has refused to allow cable operators represented by Viamedia to access the Interconnect, even though the systems owned by these operators had, for years, freely accessed the Interconnect prior to their entering a business relationship with Viamedia.

4

14.    Comcast is unlawfully exercising its control over Interconnects in an attempt to drive Viamedia and other independent Spot Cable Advertising Representatives out of business by denying or threatening to deny cable television service providers access to Interconnects if those providers are represented by anyone other than Comcast Spotlight. Comcast has acted with the specific intent to monopolize the market for representing cable television service providers and with the specific intent to enable Comcast and Comcast Spotlight to control all Spot Cable Advertising sales in each of the DMAs where Comcast provides cable services.

15.    As is alleged further below, Comcast has employed other tactics along with its abuse of its power over Interconnects in furtherance of its anticompetitive agenda. For example, Comcast has used acquisitions to gain control of NCC, the lone national clearinghouse for Spot Cable Advertising sales. On information and belief, Comcast is in the process of leveraging its control over NCC to anticompetitively change the way that NCC operates and to embark on a strategy to exclude or threaten to exclude clients of Comcast Spotlight's competitors from NCC, much as Comcast has done with Interconnects.

16.    Comcast's and Comcast Spotlight's exclusionary conduct harms competition and continues to injure Viamedia, causing losses to Viamedia's business of tens of millions of dollars, and not less than $75 million, in violation of state and federal antitrust statutes and other laws.

## PARTIES

17.    Plaintiff Viamedia Inc. is a Pennsylvania corporation with offices in New York, New York, and Lexington, Kentucky. Viamedia is the largest *independent* Spot Cable Advertising Representative in the United States, meaning that it is the largest representative firm that is not wholly owned and controlled by a cable television service provider such as Comcast. At present, Viamedia sells Spot Cable Advertising inventory on behalf of more than 60 small and

independent cable television service providers that collectively serve approximately 2.9 million video subscribers across the United States.

18.     Defendant Comcast Corporation ("Comcast") is a Pennsylvania corporation with its headquarters and principal place of business in Philadelphia, Pennsylvania. Comcast operates across the United States and transacts a substantial amount of business in the Northern District of Illinois, where it is the dominant provider of paid television and broadband internet services.

19.     Defendant Comcast Spotlight LP ("Comcast Spotlight") is a Delaware corporation and a wholly owned subsidiary of Comcast, with offices in New York, New York. Comcast Spotlight operates across the United States and transacts a substantial amount of business in the Northern District of Illinois, where Comcast controls the Interconnect for the Chicago DMA. Through Comcast Spotlight, Comcast provides Spot Cable Advertising Representative services to other cable television service providers in the Northern District of Illinois and throughout the country. Based on its exclusive control of all Avails sold by Comcast and the competitor cable television providers it represents, Comcast Spotlight controls the Spot Cable Advertising for more than 35 million cable subscriber households across the United States. For the same reason, Comcast Spotlight today controls 100 percent of all Spot Cable Advertising sold in the Chicago DMA.

## JURISDICTION AND VENUE

20.     In this action, Viamedia asserts violations of federal antitrust laws, including Section 2 of the Sherman Act, 15 U.S.C. § 2, against Comcast. Viamedia seeks monetary and equitable relief under those laws and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. Viamedia also asserts claims for violations of state antitrust laws and tortious interference with a business expectancy against Defendants.

21.     This Court has subject matter jurisdiction over all claims herein, the bulk of which arise under federal law and present federal questions, pursuant to 28 U.S.C. §§ 1331, 1337(a), 1367(a), 2201-02, and 35 U.S.C. § 1, *et seq*.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because a substantial portion of the acts and omissions giving rise to Viamedia's claims occurred here.

## MULTI-CHANNEL VIDEO PROGRAMMING
## AND SPOT CABLE ADVERTISING SERVICES

23.     Tens of millions of households in the United States subscribe to in-home multi-channel cable video programming service, often colloquially referred to as "cable television service." Cable television service is provided by a number of multichannel video programming distributors ("MVPDs"), which range in size, geographic reach, and number of subscribers. "MVPD" is generally used to describe both conventional cable television companies and other types of video program providers, such as telecommunications and satellite-based companies that provide similar services.

24.     Of the MVPDs, Defendant Comcast is the one of the largest in the United States, and it dominates many DMAs. A DMA is a regional viewing area used to measure television ratings. Nielsen Market Research divides the United States into 210 separate DMAs, which represent distinct metropolitan areas. For example, the Chicago DMA—which includes all of Northeast Illinois and Northwest Indiana—is the third largest in the country, and includes more than 8.2 million households. In the Chicago DMA, approximately three out of every four cable households are Comcast subscribers.

25.     There are also smaller MVPDs that provide multi-channel video programming services. For example, Wide Open West ("WOW") and RCN Corporation ("RCN") are two

independent MVPDs that have historically competed with Comcast to supply cable television services to subscribers in many of the same DMAs, including the Chicago DMA.

26.     These smaller MVPDs generally generate revenue in two ways. First, they charge a subscription fee to their subscribers in exchange for providing cable (and related telecommunications and/or Internet) service; and second, they sell advertising time inventory to advertisers in the form of Spot Cable Advertising.

27.     MVPDs enter into carriage agreements with cable networks—familiar examples include, among many others, CNBC, ESPN, MTV, and Comedy Central—under which the MVPDs pay the cable networks a fee to carry their programming. As part of these carriage agreements, MVPDs are given the right to sell a certain designated percentage of advertising time, typically two to three minutes per hour on the network, to advertisers who wish to reach the MVPD's subscribers in a particular geographic area. This reserved advertising time is referred to as "Spot Cable Advertising."

28.     The ability to sell Spot Cable Advertising is crucial to the economic survival of independent MVPDs, which must pay increasingly high cable programming costs.

29.     For purposes of this Complaint (and consistent with industry usage), a 15-second, 30-second, or one-minute block of designated MVPD advertising inventory is described as a "Spot Cable Advertising Avail" or a "Spot Cable Avail."

30.     A Spot Cable Avail differs from traditional national cable advertising time, which is sold directly by the cable network to the advertiser. Advertising sold by the cable network airs simultaneously everywhere that the network is carried throughout the United States. For example, an advertisement sold by CNBC during a political debate will air simultaneously everywhere in the country that CNBC is aired. Spot Cable Avails on CNBC, on the other hand,

are separately controlled by each of the various MVPDs that carry the network and, therefore, are distributed only to the subscribers of that MVPD.

31.     Because of this local distribution, Spot Cable Advertising offers significant advantages to advertisers. It allows them to "geo-target" their prospective customers, meaning that the advertiser does not have to buy advertising on a cable network throughout the entire nation, but can instead select a particular geographic area to display the ad by buying Spot Cable Avails from an MVPD serving that area. This targeted area is sometimes called an "ad zone."

32.     Geo-targeting allows advertisers to take advantage of the effectiveness of cable television advertising while maximizing the efficient use of their advertising dollars by focusing on specific geographic targets for their message. Using the CNBC debate example, geo-targeting would allow an advertiser to reach viewers in a particular geographic area—such as early voting states like Iowa or New Hampshire or even a single congressional district—without having to advertise to the debate's entire national audience.

33.     Geo-targeting is particularly important to local and regional businesses (and to candidates for public office), whose consumer base (or target voter) does not fit the entire national footprint of a cable network. For example, a local grocery chain or auto dealer can effectively and efficiently advertise by purchasing Spot Cable Avails from MVPDs in the DMA where it operates, but will not generally purchase national advertising from a cable network.

34.     Spot Cable Avails are generally sold to advertisers in three ways. First, they are aggregated and sold on a regional basis through a central clearinghouse called an Interconnect, each of which covers an entire DMA. Second, they are aggregated and sold on a *multi*-regional basis through National Cable Communications LLC ("NCC"), which allows Spot Cable Avails to be combined among multiple MVPDs and aired in multiple DMAs simultaneously. Third,

they are sold in local transactions, in which individual Spot Cable Avails are purchased directly from a single MVPD or its representative by local businesses to be aired in a specific ad zone.

### A.     <u>Regional Spot Cable Advertising Through Interconnects</u>

35.     Regional Spot Cable Advertising refers to sales conducted through the Interconnects, which act as clearinghouses that aggregate Spot Cable Avails from the MVPDs in a DMA and sell packaged Avails to advertisers in such a way that the purchased advertisements will run on all MVPDs across a given DMA simultaneously. Each MVPD in a DMA has historically participated in that DMA's Interconnect by making a portion of its Spot Cable Advertising inventory available through the Interconnect. The MVPDs receive the revenues generated from such regional sales on approximately a pro rata basis and pay a fee to the Interconnect in exchange for its coordination services.

36.     Prior to the formation of Interconnects, many advertisers found it difficult, if not impossible, to negotiate separately with each individual MVPD in a DMA in order to coordinate their advertisements across multiple MVPDs and ensure that their advertisements would run at the same time on the same cable network across the entire DMA simultaneously. Interconnects were first developed in the 1990s as cooperative organizations among multiple MVPDs in order to solve this problem by providing the logistical and technical coordination necessary to run DMA-wide advertisements across all of the MVPDs in a DMA at once.

37.     In the absence of exclusionary conduct, the Interconnect functions as the central marketplace around which all regional Spot Cable Advertising sales in the DMA are transacted. Among other things, an Interconnect provides a business and technical interface that allows MVPDs to list and sell Spot Cable Avails in a single platform, providing regional advertisers with a "one-stop shop" where they can buy same-time Avails from all the MVPDs in the DMA.

As a result, each DMA has typically contained just one Interconnect, in which all of the MVPDs operating within that DMA have participated.

38.     Until Comcast began its anticompetitive campaign, Interconnects were open to all MVPDs and their representatives, and MVPDs were encouraged to participate in order to maximize the numbers of households advertisers could reach in that DMA. In this way, the Interconnects provided a service—a single point of access for broad-based regional Spot Cable Advertising—that did not exist prior to their creation.

39.     As Comcast itself has described the process, "interconnects were formed voluntarily by MVPDs in markets to pool their resources and offer DMA-wide selling of cable/MVPD advertising inventory . . . Otherwise, advertisers trying to cobble together a wide-footprint MVPD-based advertising campaign would have to go MVPD-by-MVPD." As Comcast further explained, "[t]he value of an interconnect increases as more MVPDs in an area participate, so our incentive is to have as many MVPDs participate as possible."

40.     Although they participate jointly in Interconnects for the purpose of facilitating regional sales, MVPD participants in a given Interconnect also compete with one another for cable subscribers as well as Spot Cable Advertising revenue.

41.     Historically, many independent MVPDs have allocated roughly a third of their Spot Cable Avail inventories to regional advertiser sales through Interconnects and have vigorously competed with Comcast and each other for Spot Cable Advertising sales. For this reason, the Interconnects were originally designed to avoid giving preferential treatment to any single MVPD participant, and the dominant MVPD in the region was not able to exercise its influence over the Interconnect to the detriment of other participating MVPDs.

42.     At the time of their formation, oversight of the Interconnects was performed by boards of directors that were elected by a vote of all the MVPD members of the Interconnect. Regular board meetings were held and decisions were based upon majority votes, with the best interests of all MVPDs in mind. In form and practice, Interconnects avoided discriminating among or disadvantaging individual MVPD or representative members.

43.     Access to Interconnects is critical for MVPDs, enabling them to participate in regional Spot Cable Advertising sales and to receive revenue generated from regional sales.

44.     Over time, and as a result of industry consolidation, regional advertising through the Interconnects in each given DMA has come to be managed and controlled by the largest MVPD in the DMA, which charges a fee to other participating MVPDs or their representatives. Due to its size, Comcast today controls the Interconnects in 15 of the nation's 25 largest television markets and 26 of the Interconnects in the nation's top 50 television markets.

45.     Interconnects controlled by dominant MVPDs other than Comcast generally continue to treat all participating MVPDs equally by, for example, charging the same fees to all MVPDs and ensuring all MVPDs or their representatives have open and equal access to the Interconnect.

46.     Interconnect managers—including Comcast—have promised Congress and federal regulators not to exclude their competitors from participating in Interconnects, acknowledging that the Interconnects constitute critical infrastructure that should be open to all participants. One senior Comcast executive testified before the House Subcommittee on Antitrust that Comcast would not exclude any competitor from any Interconnect that it controlled. Implicit in this commitment is the recognition that terms of access to and participation in the Interconnects ought to be applied by Interconnect managers in a nondiscriminatory manner,

12

allowing for open access to the Interconnects for all MVPDs and their sales representatives that wish to participate.

47.     In each DMA, the existing regional Interconnect is the only viable and efficient option for advertisers that wish to purchase Spot Cable Advertising across the entire DMA. Due to their historical position and wide participation, the Interconnects have no competitors that offer a similar ability to sell regional Spot Cable Avails across multiple MVPDs in a DMA.

48.     Nor could a competing Interconnect be developed. In each region, the existing Interconnect already controls all or close to all of the available Spot Cable Avail inventory, such that there would not be enough remaining inventory for a competitor to meaningfully compete for regional sales or to achieve simultaneity across multiple MVPDs in a DMA.

**B.     National Spot Cable Advertising Through NCC**

49.     National Spot Cable Advertising refers to sales conducted through NCC, the national clearinghouse that has historically functioned on a multi-DMA level in much the same way that the Interconnects have functioned on a single-DMA level.

50.     Formed in 1981 as a joint venture among the five largest MVPDs that existed at the time, NCC acts as the central clearinghouse for advertisers seeking to place Spot Cable Advertising in multiple DMAs simultaneously. As a result of its acquisitions of other MVPDs over the past 20 years, Comcast now owns 60 percent of NCC. By virtue of this majority ownership position, Comcast has the ability to effectively control NCC.

51.     NCC provides a "one-stop shop" for advertisers seeking to advertise on a national or multi-regional basis by aggregating Spot Cable Avails from MVPDs across multiple DMAs simultaneously. NCC, therefore, functions as the central marketplace around which all national and multi-regional Spot Cable Advertising sales are conducted.

52.     Historically, NCC has had agreements in place with virtually every MVPD or its representative in all 210 DMAs across the United States, including major markets such as Chicago. In its promotional materials, NCC states that its participating members cover 98 percent of all multichannel television households in the United States. Each participating MVPD or its representative pays a fee to NCC. Due to its broad participation base, which includes nearly all MVPDs and representatives across the country, NCC has become the lone point-of-contact for advertisers seeking to purchase Spot Cable Avails across multiple MVPDs in multiple DMAs simultaneously.

53.     NCC's aggregation of Spot Cable Avails from multiple MVPDs across the country allows advertisers to combine the broad reach of a national advertising campaign with the geo-targeting ability of Spot Cable Advertising. For example, an advertiser for a four-wheel-drive vehicle can use the NCC to simultaneously target multiple Northern DMAs—Chicago, Boston, New York—where snowy conditions are likely to make such a vehicle more attractive to potential buyers.

54.     Buying through NCC is the only practical option for advertisers that wish to purchase Spot Cable Advertising across multiple DMAs, and such advertisers have no choice but to use it. NCC has no competitors.

55.     To attempt to build such an inventory, a would-be competitor would have to simultaneously coordinate advertising purchases across multiple geographies and multiple MVPDs in each region, something which is impossible without NCC's existing infrastructure. Even if the would-be competitor could build the necessary infrastructure, NCC already controls so much of the available Spot Cable Advertising inventory—through its existing agreements with virtually every MVPD in the country—that there would not be enough remaining inventory

for a competitor to offer the ability to display ads simultaneously across multiple DMAs, which is one of the critical goals of national Spot Cable Advertising.

56.     For these reasons, NCC long ago became the only functional clearinghouse for all multi-DMA Spot Cable Advertising sales in the United States.

57.     There is a close technical and operational relationship between NCC and Interconnects.

58.     Access to NCC is critical for all MVPDs, enabling them to participate in national Spot Cable Advertising sales and to share in the revenue generated from national sales.

### C.     **Local Spot Cable Advertising**

59.     Local Spot Cable Advertising refers to Spot Cable Advertising sales that do not involve an Interconnect or NCC acting as an intermediary. In these local sales, an advertiser deals directly with a single MVPD or its representative to purchase those Spot Cable Avails that run in a specific number of the MVPD's ad zones.

60.     Each DMA is divided into dozens of different ad zones, allowing advertisements to be displayed on a neighborhood-by-neighborhood or even a block-by-block basis. The division of its service area into ad zones allows a single MVPD to run multiple advertisements at the same time in different areas within its own MVPD footprint.

61.     Local Spot Cable Advertising, therefore, is well-suited to small businesses and other advertisers with narrowly targeted geographic audiences. For example, a local hardware store might wish to advertise only to cable subscribers within a several-block radius of its location. Local Spot Cable Advertising sales would allow the store to purchase Avails in the desired ad zones directly from the MVPD at relatively low overall price.

62.     Because Local Spot Cable Advertisements reach the narrowest audience, they are generally less expensive to advertisers than regional or national Spot Cable Advertising through an Interconnect or NCC.

63.     From the perspective of local and small businesses, Local Spot Cable Advertisements are a cost-effective way to promote their businesses on television in parity with larger national and regional advertisers. By allowing small businesses—like the local hardware store—to purchase Avails on cable networks alongside national or regional chain competitors within a targeted ad zone, Local Spot Cable Advertising allows small businesses to more affordably and efficiently compete in those targeted zones in which they operate.

64.     Historically, local Spot Cable Advertising has been an area of significant competition among MVPDs. This competition has benefitted small business advertisers by reducing the price of local Spot Cable Advertising and giving them multiple opportunities to purchase local Spot Cable Advertising in specific ad zones. Such competition is eliminated when one MVPD is able to control its competitors' Spot Cable Avails.

### D.     The Need For Access To Regional, National, and Local Sales Platforms

65.     In order to have a meaningful opportunity to sell its entire inventory of Spot Cable Avails to advertisers, an MVPD or its representative must have access to all three tiers of the system described above.

66.     Regional sales through Interconnects can typically account for approximately one third to one half of a given MVPD's Spot Cable Advertising sales. These sales generate a significant portion of an MVPD's total advertising revenue. Interconnects, therefore, are important pieces of infrastructure for allowing MVPDs to maximize their Spot Cable Advertising revenue.

16

67.     National or multi-regional sales through NCC can typically fill up to one third of a given MVPD's Spot Cable Avail inventory. NCC, therefore, is also an important piece of infrastructure for allowing MVPDs to maximize their Spot Cable Advertising revenue.

68.     Local Spot Cable Advertising sales generally account for the remaining approximately one third of a given MVPD's Spot Cable Advertising sales.

69.     Independent MVPDs rely heavily on all three tiers of advertising revenue in order to remain competitive with large competitors like Comcast. These independent MVPDs experience a substantial loss of revenue when they are excluded from participating in the Interconnects, making access to the Interconnects crucial for their business.

## THE MARKET FOR SPOT CABLE ADVERTISING REPRESENTATION

70.     Planning and coordinating an MVPD's Spot Cable Advertising transactions across the three tiers of the sales system—including identifying the buyers and achieving favorable business terms for transactions in each of these tiers—is often complex and time consuming. Organizing, marketing, and selling Spot Cable Advertising on behalf of MVPDs, therefore, takes a substantial amount of specialized knowledge, infrastructure, resources, and technical ability.

71.     Some of the largest MVPDs—such as Comcast—devote entire subsidiary organizations to directing and organizing their Spot Cable Advertisement sales operations. But most independent MVPDs do not have the resources to invest in the highly-specialized infrastructure, equipment, staff, and expertise necessary to run their own in-house Spot Cable Advertising sales operations.

72.     As a result, there is a market for the provision of third-party Spot Cable Advertising Representation services to independent MVPDs, in which Viamedia participates. In this market, third-party representative firms contract with MVPDs to assume responsibility for

17

their Spot Cable Advertising for the purpose of marketing and selling their Spot Cable Avail inventory to national, regional, and local advertisers. After handling all aspects of such sales, the third-party representative firm generally retains a share of the revenue generated by the ad sales and pays the remaining portion to the MVPD client.

73.     In order to compete in this market and to sell Spot Cable Avails effectively, a representative firm must have access to the Interconnects and NCC on behalf of it clients, as these are the only existing infrastructure for advertisers who wish to place regional ads and the only points-of-contact for advertisers seeking to buy Spot Cable Avails on a regional basis.

74.     Viamedia is in the business of representing MVPD clients for the purpose of selling their Spot Cable Avails. In this regard, Viamedia has long provided its MVPD clients with the necessary sales, marketing, and technology expertise and support to sell their Spot Cable Avails to local, regional, and national advertisers, including by accessing and participating in the Interconnects and NCC.

75.     Viamedia offers its MVPD clients complete turn-key advertising sales, spot insertion, encoding, validation, IT, monitoring, traffic, billing, and collection services. These constitute all of the services that an independent MVPD would otherwise need to develop internally in order to sell, bill for, and insert Spot Cable Advertisements into its programming on its own.

76.     Viamedia operates in more than 70 DMAs across the United States, representing more than 60 distinct MVPD clients. These MVPDs vary in size and sophistication, and range from a few thousand subscribers to several hundred thousand. All of them have made a decision to outsource their Spot Cable Advertising sales functions to Viamedia rather than to invest in

such functions internally. Historically, many have also decided that they do not want to cede control of their Spot Cable Avails to a competitor such as Comcast.

77.     Viamedia inserts about one million advertisements per day for over 7,000 advertisers nationwide. However, Viamedia's MVPD clients often account for only a small percentage of Spot Cable Advertising Avails in any given DMA.

78.     Comcast is the dominant MVPD in many of the DMAs where Viamedia's MVPD clients operate. Viamedia's MVPD clients, therefore, have historically competed directly with Comcast to provide multi-channel video programming services to subscribers and to sell Spot Cable Avails to advertisers.

79.     Comcast Spotlight competes with Viamedia to represent independent MVPDs for purposes of controlling and selling these competing MVPDs' Spot Cable Advertising to be aired in the competing MVPDs' subscriber households in exchange for a share of the advertising sales revenue.

80.     In this way, although Comcast directly competes with independent MVPDs for subscribers and advertising sales, it is also simultaneously seeks to represent those same MVPDs—and in many cases is representing them—for purposes of assuming control of and selling their Spot Cable Avail inventories.

81.     As opposed to Comcast Spotlight, Viamedia's status as an independent third-party representative offers a number of pro-competitive advantages to MVPD clients. Many small MVPDs are simply more comfortable giving control of their Spot Cable Avail inventory to an independent representative that is not wholly owned and controlled by a competitor.

82.     Viamedia's independence allows it to focus on obtaining both numerous local advertisers and a fair share of advertising revenue for its MVPD clients in Interconnects, which

19

often involves monitoring and, when appropriate, challenging the decisions of Interconnects on behalf of its MVPD clients.

83.     For these reasons, on a level playing field and absent any coercion or exclusion by Comcast, a substantial number of independent MVPDs would elect to use Viamedia—or some other independent firm—as their Spot Cable Advertising Representative instead of Comcast Spotlight.

84.     Comcast has abused its control of Interconnects and NCC to avoid having to fairly compete with Viamedia (and other independent firms) on a level playing field. Instead, Comcast has threatened to exclude and has actually excluded Viamedia and its MVPD clients from accessing the Interconnects and NCC as a means of stifling competition in the Spot Cable Advertising Representation market and achieving Comcast's other anticompetitive goals.

## COMCAST'S DOMINANT ROLE IN CABLE ADVERTISING

85.     Comcast Spotlight is the largest Spot Cable Advertising Representation firm in the United States. It controls 100 percent of all Spot Cable Advertising Avails sold on Comcast's own 22 million subscriber cable system, and through its third-party representation of other MVPDs, Comcast Spotlight also controls the Spot Cable Avails for more than 13 million additional subscribers. By virtue of its contracts with the MVPDs it represents, Comcast and Comcast Spotlight make all significant decisions about how these Spot Cable Avails are sold.

86.     Comcast's dominance is even more pronounced in specific large-market DMAs. For example, in the Chicago DMA, Comcast manages the Interconnect and—as a result of the conduct described below—Comcast controls approximately 100 percent of all Spot Cable Advertising Avails available for sale in that market.

87.     In the Detroit DMA, Comcast manages the Interconnect and—as a result of the conduct described herein—Comcast controls approximately 100 percent of all Spot Cable Advertising Avails available for sale.

88.     In the Philadelphia DMA, Comcast manages the Interconnect and—as a result of the conduct described herein—Comcast controls approximately 98 percent of all Spot Cable Advertising Avails available for sale.

89.     In the Boston DMA, Comcast manages the Interconnect and—as a result of the conduct described herein—Comcast controls approximately 98 percent of all Spot Cable Advertising Avails available for sale.

90.     In the Washington, DC, DMA, Comcast manages the Interconnect and—as a result of the conduct described herein—Comcast controls approximately 100 percent of all Spot Cable Advertising Avails available for sale.

91.     In the Denver DMA, Comcast manages the Interconnect and controls approximately 93 percent of all Spot Cable Advertising Avails available for sale.

92.     In the Seattle-Tacoma DMA, Comcast manages the Interconnect and controls approximately 84 percent of all Spot Cable Advertising Avails available for sale.

93.     In the Pittsburgh DMA, Comcast manages the Interconnect and controls approximately 96 percent of all Spot Cable Advertising Avails available for sale.

94.     In the Portland, OR., DMA, Comcast manages the Interconnect and controls approximately 97 percent of all Spot Cable Advertising Avails available for sale.

95.     Increasingly, Comcast—in concert and coordination with Comcast Spotlight—has used its majority control and ownership in these Interconnects to exclude and disadvantage other MVPDs as a means of coercing them into transferring control over their Spot Cable Avail

21

inventories to Comcast by forcing them to accept representation agreements with Comcast Spotlight as a condition of having access to the Interconnects and NCC.

96. Since Comcast has come to control the majority of large regional Interconnects in the country, it has used its power to exclude independent MVPDs and their representatives and to coerce them into behaviors that benefit Comcast. In so doing, Comcast has acquired and maintained a monopoly over all Spot Cable Advertising and all Spot Advertising Representation in those DMAs where it controls the Interconnect.

97. Competition for advertisers is an important aspect of competition between and among MVPDs. As a result of its control of the Interconnects in, among other DMAs, Chicago, Detroit and Hartford, Comcast has the ability to exclude or limit its MVPD competitors from competing for certain advertising revenues.

98. Comcast has likewise used acquisitions to gain control of NCC. As a result, Comcast now owns a 60 percent stake in NCC, giving it control over this critical infrastructure for national Spot Cable Advertising and the power to exclude other MVPDs and their representatives when doing so suits Comcast's business interests.

## COMCAST'S MONOPOLIZATION AND EXCLUSIONARY ACTS

99. Before Comcast embarked upon its current coercive and exclusionary conduct, the three-tiered system for Spot Cable Advertising—encompassing regional, national, and local sales—had functioned competitively since at least the 1990s. All MVPDs and their representatives were permitted access to the regional Interconnects. This access allowed them to efficiently offer advertisers the desired combinations of Spot Cable Avails in regional, national, and local markets, while competing with one another to increase their respective subscriber bases and their own advertising revenue.

A.    **The Exclusion of Competitors From Regional Interconnects**

100.    An example of Comcast's anticompetitive use of the Interconnect and NCC infrastructure—which are essential to participation in the market for Spot Cable Avails—is its exclusion of competitors from the regional Interconnects for the Chicago and Detroit DMAs, in violation of the longstanding cooperative agreements and practices that had governed those regional Interconnects' operations since the 1990s.

101.    The Chicago Interconnect was formed in August 1998 as an industry cooperative. At that time, there were a number of independent MVPDs that participated in the Interconnect and that competed directly against both Comcast and each other for advertising sales.

102.    Through a series of acquisitions of MVPDs, however, Comcast gained a majority interest in the Chicago Interconnect, ceased doing business under the Interconnect's preexisting structure, and assumed unilateral control of regional advertising through the Chicago Interconnect. The same practices were repeated in Detroit, where Comcast's acquisition of other MVPDs permitted it to assume unilateral control of regional advertising through the Detroit Interconnect.

103.    From 2002 to 2012, Viamedia, acting on behalf of two of its then most significant MVPD clients, WOW and RCN, participated in the Interconnects for Chicago and Detroit. Throughout this time, Viamedia represented WOW and RCN for the purpose of selling their Spot Cable Advertising.

104.    In 2011, Comcast Spotlight began attempting to take WOW's and RCN's business away from Viamedia.

105.    Comcast's executives made a series of calls to WOW and RCN on behalf of Comcast Spotlight, expressing Comcast Spotlight's interest in representing WOW and RCN for the purpose of selling their Spot Cable Advertising in national, regional, and local markets.

23

106.    At the time of these calls, both WOW and RCN had longstanding contractual relationships with Viamedia. Neither company had any interest, at that time, in transferring its Spot Cable Advertising Representation from Viamedia to Comcast Spotlight.

107.    Independent MVPDs frequently advertise and promote their own video subscription and broadband services using some of their own Spot Cable inventory. WOW and RCN are among the many independent MVPDs that follow this practice. Tendering to Comcast Spotlight control over their Spot Cable Avails, therefore, would also have required that WOW and RCN provide Comcast Spotlight with the ad schedule and advance copies of their actual advertisements, giving Comcast before-market knowledge of their future pricing, promotions, and other efforts to take market share away from Comcast.

108.    As RCN put it at the time: "Comcast would prefer that RCN use Comcast Spotlight and not Viamedia . . . . [But] RCN is not comfortable having its largest and most formidable rival as its representative in the spot cable market and should be free to choose a representative for such services that does not present such an obvious conflict and competitive disadvantage." Accordingly, both WOW and RCN remained with Viamedia as their Spot Cable Advertising Representative, for the time being.

109.    Throughout 2011 and early 2012, on information and belief, Comcast repeatedly told advertising agencies that it would have sole control over all of WOW's and RCN's Spot Cable Advertising Avails "by year's end."

110.    On June 1, 2012, Comcast unilaterally ended Viamedia's access to the Chicago and Detroit Interconnects and removed WOW and RCN from participating in regional ad sales through the Interconnects. This occurred despite the fact that Viamedia had represented WOW

and RCN in both Interconnects for over ten years, during which time Viamedia paid over $23 million in fees to Comcast to participate in the Chicago and Detroit Interconnects.

111.    At first, Comcast did not state the reasons for this exclusion. It merely stated that MVPDs represented by Viamedia would not be permitted to continue to participate in or access the Interconnects in the future.

112.    When pressed by Viamedia to provide a reason for the exclusion during subsequent conversations, however, Comcast acknowledged that the exclusion was motivated by Comcast Spotlight's desire to replace Viamedia as WOW's and RCN's Spot Cable Advertising Representative.

113.    Comcast informed WOW and RCN that if they wished to regain access to the Interconnects, they would be required to cease using Viamedia as their Spot Cable Advertising Representative and would instead be required to retain Comcast Spotlight. Comcast also said that it had no intention of allowing Viamedia to participate in the Interconnects in the future.

114.    The immediate consequence of this forced exclusion from the Interconnects was that Viamedia and the MVPDs it represented were completely foreclosed from selling any Spot Cable Advertising Avails through the Interconnects for Chicago and Detroit, two of the largest markets for regional Spot Cable Advertising sales in the country.

115.    As a direct result of the exclusion, Viamedia and its MVPD clients lost tens of millions of dollars in revenue from the sale of Spot Cable Advertising through the Detroit and Chicago Interconnects.

116.    To Viamedia's knowledge, prior to the sudden and unilateral exclusion of Viamedia and its MVPD clients from the Chicago and Detroit Interconnects, no third-party representation firm or MVPD had *ever* been excluded from an Interconnect for any reason. Nor

is such an exclusion reconcilable with the economic purpose of the Interconnects or Comcast's own observation that "[t]he value of an interconnect increases as more MVPDs in an area participate."

117. In April 2014, a senior Comcast executive was called to testify before the House Subcommittee on Antitrust in connection with Comcast's efforts to acquire Time Warner Cable.

118. During the executive's testimony, Subcommittee Chairman Spencer Bachus of Alabama raised the issue of Comcast's dominance over regional Interconnects and asked the executive whether he would "provide assurances that Comcast will not exclude competitors or advertising firms from the advertising interconnects that Comcast operates." In response, the executive stated that Comcast was "not in the business of excluding" competitors from Interconnects it controlled. When further pressed by Chairman Bachus to clearly and unequivocally state that Comcast would not "exclude competitors or advertising from the Interconnects," the executive unambiguously testified that it would not.

119. At the time that this promise was made, Comcast had been excluding Viamedia and its MVPD clients from the Chicago and Detroit Interconnects for several months.

120. Following the executive's testimony, Viamedia contacted Comcast and requested that Viamedia and all of its MVPD clients be given restored access to the Interconnects, consistent with the executive's statement to Congress.

121. In response to Viamedia's requests, Comcast refused to provide any assurance that Viamedia or its MVPD clients would be permitted future to access any Comcast-controlled Interconnece. Comcast refused Viamedia's requests to access Interconnects in many DMAs.

122. With respect to the Chicago and Detroit Interconnects specifically, Comcast said that it would be willing to consider Viamedia's readmission if, and only if, Viamedia agreed to

certain commercially unreasonable terms, which would have prevented Viamedia from meaningfully competing with Comcast Spotlight.

123.     For example, Comcast demanded that it be given the right to preempt, at its sole discretion and with virtually no advance notice, any of the Spot Cable Avails previously sold or controlled by Viamedia, whether such ads were sold through the Interconnect or not. This aspect of the Comcast's proposal would have given Comcast the unilateral ability to assume control over the entire inventory of Viamedia's MVPD clients and to resell Avails that had already been sold by Viamedia to other advertisers. This requirement would have made it virtually impossible for Viamedia to sell Avails to any regional or local advertisers for fear that their ads would be preempted and resold to different advertisers by Comcast. It was a term that Comcast knew no Spot Cable Advertising Representative could reasonably accept, as it would have eliminated Viamedia's ability to compete with Comcast Spotlight or sell any local advertising on behalf of its MVPD clients. This proposal was not a genuine offer to allow Viamedia or its MVPD clients to rejoin any Interconnect.

124.     On information and belief, in 2015, Comcast informed WOW and RCN that each could resume its participation in the Comcast-controlled Interconnects if they ended their relationship with Viamedia and retained Comcast Spotlight as their sole Spot Cable Advertising Representative.

125.     Again, Comcast made clear that it would not allow WOW and RCN to participate in the Interconnects as long as Viamedia continued to represent them and controlled their Spot Cable Advertising Avails.

126.     Upon information and belief, in April of 2015 Comcast provided a formal proposal to WOW, which contemplated WOW's readmission to the Chicago and Detroit

27

Interconnects after WOW agreed to replace Viamedia with Comcast Spotlight as its sole Spot Cable Advertising Representative in those DMAs. WOW accepted this proposal.

127.     As of January 1, 2016, Comcast Spotlight now serves as WOW's sole Spot Cable Advertising representative in the Chicago and Detroit DMAs.

128.     In order to gain access to the Chicago and Detroit Interconnects, WOW was compelled to transfer to Comcast Spotlight total control of all of WOW's Spot Cable Avail inventory for the Chicago and Detroit DMAs. This transfer allows Comcast Spotlight to control all of WOW's Spot Cable Advertising in Chicago and Detroit for national, regional, and local inventory. Going forward, no advertiser will be able to reach WOW's Chicago and Detroit subscribers without dealing with Comcast Spotlight.

129.     On information and belief, were it not for Comcast's anticompetitive acts, including its exclusion of Viamedia and its MVPD clients from the Chicago and Detroit Interconnects, WOW would have continued to retain Viamedia as its Spot Cable Advertising Representative. WOW has, in fact, elected to retain Viamedia as its sales representative in those DMAs where Comcast does not control the Interconnect, and therefore does not have the power to exclude WOW from the Interconnect.

130.     On information and belief, also in early 2015, Comcast Spotlight provided a formal proposal to RCN to represent it in all Spot Cable Advertising transactions for the Chicago, Detroit, New York, Philadelphia, Boston, and Washington, DC, DMAs. This proposal also contemplated RCN's readmission to the Chicago and Detroit Interconnects if, and only if, RCN replaced Viamedia with Comcast Spotlight as its sole Spot Cable Advertising representative. RCN accepted this proposal.

131.   As of January 1, 2016, therefore, Comcast now controls all of RCN's Spot Cable Advertising national, regional, and local inventory in Chicago (the third largest DMA), Detroit (the eleventh largest DMA), New York (the largest DMA), Philadelphia (the fourth largest DMA), Boston (the seventh largest DMA), and Washington, DC (the eighth largest DMA). No advertiser will be able to reach RCN's subscribers in all markets without dealing with Comcast Spotlight.

132.   Comcast successfully used the threat of continued exclusion from the Chicago and Detroit Interconnects to coercively gain control of all of RCN's Spot Cable Advertising Avails for *six* of the 11 largest DMAs in the United States (constituting all of the markets in which RCN operates).

133.   On information and belief, were it not for Comcast's anticompetitive acts and exclusion of Viamedia and its MVPD clients from the Chicago and Detroit Interconnects, RCN would have continued to retain Viamedia as its Spot Cable Advertising Representative in these and other markets, consistent with RCN's previous statements to the FCC.

134.   On information and belief, Comcast has used similar threats and exclusionary acts to gain control of other MVPDs' Avails, allowing Comcast to consolidate its control over Spot Cable Advertising in many of the largest DMAs in the United States.

135.   As of January 1, 2016—due to the conduct described above—no MVPD is able to sell a Spot Cable Avail and no advertiser is able to purchase a Spot Cable Avail in five of the 10 largest DMAs in the United States without dealing exclusively with Comcast Spotlight.

136.   This type of exclusionary conduct has also occurred in other Interconnects that Comcast controls. For example, in 2014, Frontier Communications ("Frontier") acquired a system that provides service to approximately 200,000 subscribers in the DMA for Hartford and

southern Connecticut. Comcast Spotlight had previously been the representative for that system for Spot Cable Advertising sales in Connecticut. Frontier has been represented by Viamedia in the Portland, Oregon, Ft. Wayne, Indiana, and Seattle-Tacoma, Washington, DMAs. When Frontier transferred the Spot Cable Avails inventory for its newly acquired Connecticut subscribers to Viamedia (despite Comcast Spotlight's bid to retain the business), both Frontier and Viamedia were abruptly dropped from the Comcast-controlled Hartford Interconnect.

137. To date, Comcast has continued to refuse to allow Viamedia, acting on behalf of Frontier, access to the Hartford Interconnect. This exclusion has deprived Viamedia of the ability to participate in Interconnect sales in the Hartford DMA on behalf of Frontier, costing Viamedia and Frontier millions of dollars in lost revenue.

138. On information and belief—as it did with WOW and RCN in Chicago and Detroit—Comcast intends to condition Frontier's re-admission to the Hartford Interconnect upon Frontier firing Viamedia as its sales representative and entering into an exclusive representation agreement with Comcast Spotlight.

139. Comcast Spotlight has also contacted another MVPD client of Viamedia in Eastern Pennsylvania, whose current term of representation with Viamedia is scheduled to expire on December 31, 2016. Comcast Spotlight has told that MVPD that Comcast will guarantee the MVPD's admission into the New York City Interconnect, but only if the MVPD ends its relationship with Viamedia and switches its representation from Viamedia to Comcast Spotlight.

140. Other independent MVPDs and their representatives have expressed concerns about Comcast's practice of excluding competitors from Interconnects unless they agree to retain Comcast Spotlight. For example, Patriot Media, the company that manages the MVPD Grande Communications Networks and Choice Cable TV (and RCN), has stated in public filings that it

believes "[c]ompetition in cable advertising markets will be harmed as Comcast increases its ownership and control of entities that control national and regional advertising and seeks to extend that into local spot advertising markets."

141.    As independent MVPD CenturyLink put it: "[Comcast's] control over the crucial regional interconnects means that it can discriminate against smaller MVPDs and deny access to the interconnects unless the MVPDs comply with conditions [imposed by Comcast]." For example, Comcast can "use its control to deny access to the interconnects to force smaller MVPDs to deal with Comcast Spotlight . . . instead of independent firms like Viamedia, or risk being excluded from the interconnect."

142.    On information and belief, Comcast plans to continue its exclusionary behavior in Chicago, Detroit, and Hartford, as well as many other DMAs, with the ultimate goal of eliminating all independent competition in the Spot Cable Advertising Representation market.

### B.    The Planned Exclusion of Competitors From NCC

143.    Like the Interconnects, NCC was created as a cooperative among several MVPDs to make possible multi-regional coordination for Spot Cable Advertising and traditionally operated under an open-architecture in which all MVPDs were permitted to participate.

144.    For years, Viamedia has participated in NCC for the purpose of selling Spot Cable Advertising to national advertisers on behalf of Viamedia's MVPD clients. During this time, Viamedia has remained in good standing with NCC and has paid more than $40 million in fees to NCC related to its national Spot Cable Advertising sales.

145.    Viamedia's current agreement with NCC provides that its access to NCC will expire in December 2017. Despite repeated requests by Viamedia, however, NCC has refused to entertain a long-term extension that would ensure Viamedia's continued access to NCC beyond that date. On information and belief, Comcast—as NCC's majority and controlling owner—is

responsible for NCC's decision not to allow Viamedia's to enter a long-term extension with NCC.

146.    On information and belief, Comcast has also caused NCC to act in a discriminatory manner toward Viamedia and other independent Spot Cable Advertising Representatives in other ways. For example, Comcast has caused NCC to charge Viamedia a fee for participation that is substantially greater than the fee that Comcast itself pays or that NCC charges to other participants. Comcast has also insisted that NCC impose other onerous conditions upon Viamedia, with the planned culmination of Viamedia's complete exclusion from NCC in December 2017.

147.    As it has done with the Interconnects, Comcast now intends to shut Viamedia and its MVPD clients out of participating in national Spot Cable Advertising sales as a way of coercing independent MVPDs into transferring control of their Spot Cable Avails to Comcast Spotlight.

148.    On information and belief, Comcast and NCC, acting jointly, have approached several of Viamedia's remaining MVPD clients and have urged them to terminate their representation agreements with Viamedia if they wish to continue to have access to NCC and participate national Spot Cable Advertising sales beyond the expiration of Viamedia current access agreement.

149.    In late 2014, NCC sent a presentation to one of Viamedia's MVPD clients showing that if the MVPD failed to terminate its relationship with Viamedia in favor of using NCC as its national sales representative and Comcast Spotlight as its Spot Cable Advertising Representative for local and regional sales, it would face a substantial reduction in revenue due

to being excluded from participating in national sales through NCC. On information and belief, NCC was acting at Comcast's behest in sending this presentation to Viamedia's client.

150.    As with the Interconnects, national Spot Cable Advertising sales through NCC is a critical component of every independent MVPD's business; exclusion from NCC would have a significant adverse effect on an MVPD's profitability. Comcast's power to exclude independent MVPDs from participating in national Spot Cable Advertising through NCC gives Comcast significant power to force MVPDs to enter into exclusive Spot Cable Advertising Representative agreements with Comcast Spotlight that the MVPDs would not normally accept.

151.    On information and belief, many MVPDs that would otherwise choose to be represented by Viamedia (or some other independent third party) will be forced to transfer control of their Spot Cable Avails to Comcast Spotlight in order to avoid exclusion from NCC.

152.    As the American Cable Association stated, Comcast's control over the NCC and its corresponding "ability to restrict its competitors' access to NCC" gives Comcast a powerful "lever to raise competing MVPDs' costs, restrict its competitors' advertising capabilities, and harm consumers."

153.    Comcast's conditioning of access to the Interconnects and NCC on its rival MVPDs entering into exclusive dealing arrangements with Comcast Spotlight—and the corresponding concerted boycott of Viamedia—is an anticompetitive means of acquiring and maintaining monopoly power in the market for Spot Cable Advertising Representation.

**C.      Comcast's Refusal to Deal with Viamedia Is Irrational But For its Anticompetitive Effects**

154.    As described above, Comcast today controls and manages the Interconnects in 15 of the nation's 25 largest television markets (DMAs) and 26 of the Interconnects in the nation's top 50 DMAs.  The economic value of each Interconnect is derived from its ability to provide a

single point of access for advertisers to purchase Spot Cable Avails that are capable of reaching *all* subscribers within a DMA, which in turn increases the economic value to the advertisers and to participating MVPDs.

155.   Therefore, as the Interconnect manager, Comcast has an incentive to maximize participation in the Interconnect by eligible MVPDs (and their corresponding cable subscribers), despite the fact that Comcast also competes with other MVPDs for subscribers and Spot Cable Advertising sales, and despite the fact that Comcast also competes (including through Comcast Spotlight) with representation firms such as Viamedia.   Comcast acknowledges this by explaining, as noted above, that "[t]he value of an interconnect increases as more MVPDs in an area participate, so our incentive is to have as many MVPDs participate as possible."

156.   Consistent with this statement, Comcast further states on its website that an "Interconnect" is "[a] collection of two or more cable TV systems that work together to distribute commercials to a wider geographic area than a single system would otherwise reach, giving advertisers the option to reach *all* cable households within a market with one buy, one contact and one tape." (Emphasis added.)   Similarly, the Video Advertising Bureau, in which Comcast is on the Board, states that "An interconnect gives advertisers the option to reach *all* cable households within a given market with one buy and one contact." (Emphasis added.)

157.   As an Interconnect manager, Comcast also receives fees directly from participating MVPDs and representation firms, who compensate Comcast for managing and providing access to the Interconnects that it controls.   Viamedia has paid and offered to pay Comcast fair market value in exchange for accessing the Interconnects that Comcast manages. For example, as discussed above, prior to Comcast's refusal to deal, Viamedia paid over $23 million to Comcast in its role as Interconnect manager to participate in the Chicago and Detroit

Interconnects alone.

158.    Therefore, dealing with Viamedia would have entailed no cost to Comcast as the Interconnect manager, would have provided the Interconnect and Comcast—both as the Interconnect manager and as a participating MVPD—with immediate benefits, and would have served the interests of the Interconnect customers, namely the regional advertisers, to reach all subscribers in the market.  Comcast's refusal to deal with Viamedia is thus irrational and contrary to these economic incentives.

159.    For example, when Comcast refused to deal with and excluded Viamedia from accessing the Detroit Interconnect on June 1, 2012, and Comcast prevented WOW from participating in regional ad sales through the Interconnects because WOW was being represented by Viamedia, this reduced significantly the number of cable subscribers covered by the Detroit Interconnect from virtually all eligible cable subscribers in the Detroit DMA to approximately 80% of such subscribers.  This significantly reduced the economic value of the Interconnect and its regional advertisements, and was directly contrary to Comcast's own stated economic "incentive" as the Interconnect manager and a participating MVPD to "have as many MVPDs participating as possible" and "to reach all cable households within a market with one buy" in the Interconnects that it controls.  Further, as a result of excluding Viamedia and WOW from the Detroit Interconnect, Comcast also forfeited direct fees that it otherwise would have received pursuant to its role as the Interconnect manager.

160.    Similarly, when Comcast refused to deal with and excluded Viamedia—and by association RCN and WOW—from the Chicago Interconnect on June 1, 2012, the number of cable subscribers covered by the Chicago Interconnect was reduced significantly from virtually all eligible cable subscribers in the Chicago DMA to approximately 90% of such subscribers.

35

This significantly reduced the economic value of the Interconnect and its regional advertisements, and was directly contrary to Comcast's own stated economic "incentive" as the Interconnect manager and a participating MVPD. Further, as a result of excluding Viamedia, WOW and RCN from the Chicago Interconnect, Comcast also forfeited direct fees that it otherwise would have received pursuant to its role as the Interconnect manager.

161.    In the Hartford DMA, Comcast's refusal to deal with Viamedia by excluding it from the Hartford Interconnect in 2014 caused the subscribers owned by Frontier, an MVPD represented by Viamedia, to cease participating in the Interconnect as well. This reduced the number of eligible cable subscribers covered by the Hartford Interconnect from virtually all eligible cable subscribers to approximately 80% of such subscribers. As a result, the economic value of the Hartford Interconnect to Comcast, as the Interconnect manager, as well as the advertisers and the MVPDs participating in the Hartford DMA, including Comcast, was significantly reduced. Further, as a result of excluding Viamedia and Frontier from the Hartford Interconnect, Comcast also forfeited direct fees that it otherwise would have received pursuant to its role as the Interconnect manager.

162.    Comcast is now similarly refusing to deal with Viamedia in the Seattle, Washington, Minneapolis, Minnesota, Jacksonville, Florida and Knoxville, Tennessee DMAs, which is economically irrational for the same reasons stated above.

163.    Unsurprisingly, because it would be irrational to do so, to Viamedia's knowledge, no other third-party representation firm (or MVPD represented by a third-party representation firm) had *ever* been excluded from an Interconnect until Viamedia and its represented MVPDs were excluded by Comcast as detailed above.

164.    By contrast, in DMAs where Comcast is not the dominant player, Viamedia has

access to the Interconnect on behalf of the MVPDs it represents. For example, in the Cincinnati, Tampa, Dallas, and Waco-Temple-Bryan, Texas DMAs, where Charter Communications ("Charter") controls and manages the Interconnects, Viamedia has access to the Interconnects on behalf of its represented MVPDs. Similarly, in the New York DMA, where the Interconnect is controlled and managed by Cablevision, Viamedia has access to the Interconnect on behalf of the MVPDs it represents, and Comcast is also a participating member of the New York Interconnect on behalf of an MVPD that Comcast represents. Behind Comcast, Charter and Cablevision are the second and third largest Interconnect managers in the United States.

165.    There are no procompetitive justifications for Comcast's refusal to deal with Viamedia and its exclusion of MVPDs represented by Viamedia from the Interconnects that it controls. These MVPDs either transfer their Spot Cable Advertising Representation business from Viamedia to Comcast, a direct competitor, or cease participating in the Interconnect at all. If the MVPDs place their Spot Advertising Representation business with Comcast, this simply replaces one intermediary with another because Comcast still acts as an intermediary between the MVPDs and the advertisers who purchase regional advertising through the Interconnects.

166.    Even if there were any potentially improved efficiencies to be realized by consolidating management of an Interconnect with Comcast's provision of Spot Cable Advertising Representation services, refusing to deal with Viamedia is not necessary in order to realize any such efficiencies.

167.    Moreover, there are no material administrability problems in allowing Viamedia to participate in Interconnects that it controls. As discussed above, the other MVPDs participating in the Interconnects compete with Comcast—in its role as an MVPD—for cable subscribers as well as Spot Cable Advertising revenue, and at least some of the MVPDs that

participate in the Interconnects managed and controlled by Comcast also manage and control their own Interconnects in other DMAs. Thus, by the very nature of its role as Interconnect manager, Comcast is already dealing with competitors.

168. Refusing to deal with Viamedia as described herein is irrational but for its anticompetitive effects, namely, its potential to eliminate competition by using control of Interconnect to eventually cause Viamedia to exit the market for Spot Cable Advertising Representation services.

**D.** **Harm To Competition**

169. Comcast's and Comcast Spotlight's exclusionary conduct harms competition in several ways.

170. Comcast's conduct harms other participants in the market for Spot Cable Advertising Representation. Without access to Interconnects and NCC, which together represent more than two-thirds of the over $5 billion generated annually from Spot Cable Advertising sales, Viamedia and other independent representatives cannot compete with Comcast Spotlight for Spot Cable Advertising Representation contracts with MVPDs. Left unchecked, Comcast's tactics will ultimately force independent representatives, like Viamedia, out of the Spot Cable Advertising Representation business, and will prevent others from entering the market. In time, therefore, MVPDs will have no other option but Comcast Spotlight for their Spot Cable Advertising Representation.

171. MVPDs are also harmed by this conduct. Most MVPDs want choice in their Spot Cable Advertising Representation and many do not want to cede control over their Spot Cable Avails to Comcast, their largest competitor. In addition, as Comcast Spotlight eliminates independent competitors from representing MVPDs, it increasingly grows more able to impose higher prices and other onerous terms on MVPDs, including terms that may ultimately make it

impossible for MVPDs to compete effectively with Comcast.

172.     Comcast's dominance over Spot Cable Advertising gives it the incentive and ability to reduce its rivals' revenue by eliminating their access to regional and national sales and cutting them off from these critical sources of funds. Without firms such as Viamedia, independent MVPDs will have no choice but to acquiesce to Comcast's demands to control all of their Spot Cable Avails or face being excluded from national advertising revenue (through NCC) and regional advertising revenue (through Interconnects). This exclusion will limit rival MVPDs' ability to compete against Comcast for cable, broadband, and telephone subscribers because the MVPDs will have to either increase their subscriber fees or reduce their promotional efforts in order to compensate for their losses in advertising revenue.

173.     In addition, MVPDs obliged to enter into Spot Cable Advertising Representation agreements with Comcast Spotlight will be forced to provide Comcast with sensitive business information, such as marketing efforts (including the schedule for placement of the MVPD's promotional ads), and special offers (including their own future prices and promotions to subscribers). This sensitive business information will give Comcast an advantage over its rival MVPDs and limit the ability of independent MVPDs to compete for cable subscribers.

174.     In sum, Comcast's exclusionary conduct, coupled with the power it has amassed over Interconnects and NCC, impermissibly harms competition. It also creates a dangerous probability that Comcast has or will monopolize the market for Spot Cable Advertising Representation services in every DMA in which Comcast manages an Interconnect, and ultimately the market for Spot Cable Advertising Representation services nationwide.

**E.     Injury to Viamedia**

175.     Comcast's use of its control of the Interconnects and NCC to exclude Viamedia and its MVPD clients constitutes a restriction on competition that has handicapped Viamedia's

ability to meaningfully compete with Comcast Spotlight in the market for Spot Cable Advertising Representation.

176.    Comcast's conduct has severely damaged Viamedia and its business in many ways and will continue to do so. Viamedia has lost and will continue to lose revenues from Spot Cable Advertising sales through Interconnects, including Chicago, Detroit, and Hartford, and its valuable contracts with WOW and RCN, among others. This loss has resulted and will continue to result in lost profits to Viamedia of tens of millions of dollars, and in any event no less than $50 million.

177.    Viamedia has also lost a number of other representation clients and contracts as a result of its exclusion from the Interconnects, its threatened exclusion from NCC, and other anticompetitive conduct by Comcast. The amount of additional profits lost to Viamedia attributable to these actions of Comcast is tens of millions of dollars, and in any event no less than an additional $25 million.

178.    Comcast's exclusion of Viamedia from the Interconnects, its threatened exclusion of Viamedia from NCC, and its other anticompetitive conduct has caused other injuries to Viamedia's business. For example, Viamedia's shareholder value has fallen precipitously as a result of its inability to participate in regional Spot Cable Advertising sales, and Viamedia has lost potential investors as a further consequence of Comcast's exclusionary conduct. These injuries are the direct and proximate result of Comcast's anticompetitive actions.

## CLAIMS

### COUNT I:
### UNLAWFUL MONOPOLIZATION IN MARKETS FOR
### SPOT CABLE ADVERTISING REPRESENTATION IN
### DMAS WHERE COMCAST CONTROLS THE INTERCONNECT(S)

179.    Viamedia repeats and realleges Paragraphs 1-163 above as if fully set forth herein.

180.    The provision of Spot Cable Advertising Representation services constitutes a relevant product market and the regional DMAs in which Comcast controls the Interconnect constitute relevant geographic markets under the antitrust laws.

181.    Comcast has monopoly power in Spot Cable Advertising Representation in each of the DMAs where it controls the Interconnect.

182.    Comcast has excluded Viamedia and MVPDs represented by Viamedia from access to Interconnects controlled by Comcast in DMAs where Viamedia had previously represented MVPDs, and Comcast has further refused to allow Viamedia and MVPDs represented by Viamedia to have access to other Interconnects controlled by Comcast.

183.    By refusing to deal with Viamedia and MVPDs represented by Viamedia, by conditioning access to Interconnects upon an MVPD's agreement to deal with Comcast Spotlight, by requiring that MVPDs deal exclusively with Comcast Spotlight as a Spot Cable Advertising Representative, by requiring NCC to refuse to commit to a long term arrangement with Viamedia and to otherwise offer nondiscriminatory terms to Viamedia, and through other exclusionary and anticompetitive acts, Comcast has unlawfully acquired and maintained its monopoly power in each of the markets where it controls the Interconnect, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

184.    Comcast could not have acquired or maintained its monopoly power in markets

for Spot Cable Advertising Representation but for its restrictions on participation in the Interconnects, its coercive and exclusionary agreements and refusals to deal, and other anticompetitive conduct. Thus, its monopolization is not due to growth or development as a consequence of a superior product, business acumen, or historic accident.

185.    Comcast's monopolization has injured and will continue to injure competition in these markets.

186.    Comcast's exclusionary and anticompetitive acts effect interstate commerce and injures competition in multiple states.

187.    As a direct and proximate result of Comcast's acts of monopolization and monopoly maintenance, Viamedia has suffered antitrust injury and damages, including the loss of Spot Cable Advertising Representation clients and the revenues generated therefrom, as well as other damage to its business.

188.    Viamedia continues to suffer damage, and will continue to do so, if Comcast does not cease its monopolistic conduct.

**COUNT II:**
**UNLAWFUL ATTEMPTED MONOPOLIZATION IN MARKETS FOR**
**SPOT CABLE ADVERTISING REPRESENTATION IN**
**DMAS WHERE COMCAST CONTROLS THE INTERCONNECT(S)**

189.    Viamedia repeats and realleges Paragraphs 1-163 above as if fully set forth herein.

190.    Comcast has excluded Viamedia and MVPDs represented by Viamedia from access to Interconnects controlled by Comcast in DMAs where Viamedia had previously represented MVPDs, and Comcast has further refused to allow Viamedia and MVPDs represented by Viamedia to have access to other Interconnects controlled by Comcast.

191.    By refusing to deal with Viamedia and MVPDs represented by Viamedia, by

conditioning access to Interconnects upon an MVPD's agreement to deal with Comcast Spotlight, by requiring that MVPDs deal exclusively with Comcast Spotlight as a Spot Cable Advertising Representative, by requiring NCC to refuse to commit to a long term arrangement with Viamedia and to otherwise offer nondiscriminatory terms to Viamedia, and through other exclusionary and anticompetitive acts, Comcast has unlawfully attempted to acquire monopoly power in each of the markets where it controls the Interconnect, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

192.    Because of Comcast's monopoly control of regional Interconnects and its unilateral ability to exclude competitors from this infrastructure, which is essential to market participation, there is a dangerous probability that Comcast will be able to leverage its position to gain and maintain monopoly power in the markets for Spot Cable Advertising Representation where Comcast controls the Interconnect.

193.    Comcast has acted with the specific intent of monopolizing the markets for Spot Cable Advertising Representation in regions where Comcast controls the Interconnect.

194.    Comcast's attempted monopolization has injured and will continue to injure competition.

195.    Comcast's exclusionary conduct and anticompetitive acts effect interstate commerce and injures competition in multiple states.

196.    As a direct and proximate result of Comcast's attempted monopolization, Viamedia has suffered antitrust injury and damages, including the loss of Spot Cable Advertising Representation clients and the revenues generated therefrom, as well as other damage to its business.

197.    Viamedia will continue to suffer additional damage in the future if Comcast is

permitted to continue its monopolistic conduct.

## COUNT III:
## VIOLATION OF THE ILLINOIS ANTITRUST ACT (740 ILCS 10/3)

198.    Viamedia repeats and realleges Paragraphs 1-163 above as if fully set forth herein.

199.    Comcast exercises exclusive control over the Interconnects in many DMAs, including the Interconnect for the Chicago DMA. These Interconnects are critical infrastructure for the sale of Spot Cable Advertising time, and open access to the Interconnects is essential for any person or entity seeking to represent MVPDs for purposes of selling their Spot Cable Advertising Avails.

200.    The Interconnects cannot be practically or reasonably duplicated, and there is no alternative to the Interconnects that allows for the coordination of or participation in regional Spot Cable Advertising sales.

201.    Comcast has excluded independent representatives that compete with Comcast Spotlight and has threatened to exclude competing MVPDs from the Interconnects that Comcast controls, unless they enter into exclusive representation agreements with Comcast Spotlight as a precondition for accessing the Interconnects.

202.    Comcast has engaged in this exclusionary action despite the fact that it could, if it elected to do so, feasibly provide independent representatives and their MVPD clients with access to the Interconnects.

203.    Through its threats to make participation in the Interconnects available only to MVPDs that use Comcast Spotlight for Spot Cable Advertising Representation services, its additional coercive and exclusionary agreements, and other anticompetitive conduct, Comcast has monopolized and unlawfully attempted to acquire a monopoly for Spot Cable Advertising

Representation in Illinois in violation of Section 3 of the Illinois Antitrust Act. 740 ILCS 10/3(3).

204.    The provision of Spot Cable Advertising Representation services constitutes a relevant product or service market under the Illinois Antitrust Act.

205.    Comcast entered into coercive and exclusionary agreements related to the Interconnects with the specific intent of monopolizing the market for Spot Cable Advertising Representation in Illinois.

206.    Comcast's monopolization and attempted monopolization has injured and will continue to injure competition.

207.    As a direct and proximate result of Comcast's monopolization and attempted monopolization, Viamedia has suffered antitrust injury and damages, including the loss of Spot Cable Advertising Representation clients and the revenues generated therefrom, as well as other damage to its business.

208.    Viamedia will continue to suffer additional damage in the future if Comcast is permitted to continue its monopolistic conduct.

<u>COUNT IV:</u>
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,**
**(Mich. Comp. Laws, Sec. 445.771 *et seq*.)**

209.    Viamedia repeats and realleges Paragraphs 1-163 above as if fully set forth herein.

210.    Comcast exercises exclusive control over the Interconnects in many DMAs, including the Interconnect for the Detroit DMA. These Interconnects are critical instrumentalities for the sale of Spot Cable Advertising time and open access to the Interconnects is essential for any person or entity seeking to represent MVPDs for purposes of selling their Spot Cable

Advertising Avails.

211.    The Interconnects cannot be practically or reasonably duplicated and there is no alternative to the Interconnects that allows for the coordination of or participation in regional Spot Cable Advertising sales.

212.    Comcast has excluded independent representatives that compete with Comcast Spotlight and has threatened to exclude competing MVPDs from the Interconnects that Comcast controls, unless they enter into exclusive representation agreements with Comcast Spotlight as a precondition for accessing the Interconnects.

213.    Comcast has engaged in this exclusionary action despite the fact that it could, if it elected to do so, feasibly provide independent representatives and their MVPD clients with access to the Interconnects.

214.    Through its threats to make participation in the Interconnects available only to MVPDs that use Comcast Spotlight for Spot Cable Advertising Representation services, its additional coercive and exclusionary agreements, and other anticompetitive conduct, Comcast has monopolized and unlawfully attempted to acquire a monopoly for Spot Cable Advertising Representation in Michigan in violation of the Michigan Antitrust Reform Act. Mich. Comp. Laws, Sec. 445.773.

215.    The provision of Spot Cable Advertising Representation services constitutes a relevant product or service market under the Michigan Antitrust Reform Act.

216.    Comcast entered into coercive and exclusionary agreements related to the Interconnects with the specific intent of monopolizing the market for Spot Cable Advertising Representation in Michigan.

217.    Comcast's monopolization and attempted monopolization has injured and will

continue to injure competition.

218.    As a direct and proximate result of Comcast's monopolization and attempted monopolization, Viamedia has suffered antitrust injury and damages, including the loss of Spot Cable Advertising Representation clients and the revenues generated therefrom, as well as other damage to its business.

219.    Viamedia will continue to suffer additional damage in the future if Comcast is permitted to continue its monopolistic conduct.

## COUNT V:
## VIOLATION OF THE CONNECTICUT ANTITRUST ACT
### (Title 35, Sec. 35-27)

220.    Viamedia repeats and realleges Paragraphs 1-163 above as if fully set forth herein.

221.    Comcast exercises exclusive control over the Interconnects in many DMAs, including the Interconnect for the Hartford DMA. These Interconnects are critical infrastructure for the sale of Spot Cable Advertising time and open access to the Interconnects is essential for any person or entity seeking to represent MVPDs for purposes of selling their Spot Cable Advertising Avails.

222.    The Interconnects cannot be practically or reasonably duplicated and there is no alternative to the Interconnects that allows for the coordination of or participation in regional Spot Cable Advertising sales.

223.    Comcast has excluded independent representatives that compete with Comcast Spotlight and has threatened to exclude competing MVPDs from the Interconnects that Comcast controls, unless they enter into exclusive representation agreements with Comcast Spotlight as a precondition for accessing the Interconnects.

224.    Comcast has engaged in this exclusionary action despite the fact that it could, if it elected to do so, feasibly provide independent representatives and their MVPD clients with access to the Interconnects.

225.    Through its threats to make participation in the Interconnects available only to MVPDs that use Comcast Spotlight for Spot Cable Advertising Representation services, its additional coercive and exclusionary agreements, and other anticompetitive conduct, Comcast has unlawfully monopolized and attempted to acquire a monopoly for Spot Cable Advertising Representation in Connecticut, in violation of Title 35, Sec. 35-27 of the Connecticut General Statutes (the "Connecticut Antitrust Act").

226.    The provision of Spot Cable Advertising Representation services constitutes a relevant product or service market under the Connecticut Antitrust Act.

227.    Comcast entered into coercive and exclusionary agreements related to the Interconnects with the specific intent of monopolizing the market for Spot Cable Advertising Representation in Connecticut.

228.    Comcast's monopolization and attempted monopolization has injured and will continue to injure competition.

229.    As a direct and proximate result of Comcast's monopolization and attempted monopolization, Viamedia has suffered antitrust injury and damages, including the loss of Spot Cable Advertising Representation clients and the revenues generated therefrom, as well as other damage to its business.

230.    Viamedia will continue to suffer additional damage in the future if Comcast is permitted to continue its monopolistic conduct.

<u>COUNT VI:</u>
**TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY**

231.     Viamedia repeats and realleges Paragraphs 1-163 above as if fully set forth herein.

232.     Comcast hired at least one former Viamedia sales executive who surreptitiously listened in on Viamedia sales meetings after that executive had left Viamedia and shared access to Viamedia proprietary information with other Comcast executives, thereby creating and/or enhancing Comcast's ability to interfere with Viamedia relationships with its clients and advertisers.

233.     Based on its longstanding prior business relationship with WOW and RCN, Viamedia possessed a reasonable expectancy of continuing its profitable contractual and business relationships with WOW and RCN for purposes of providing them with Spot Cable Advertising Representation.

234.     Comcast and Comcast Spotlight knew of Viamedia's profitable contractual and business relationships with both WOW and RCN and knew of Viamedia's reasonable expectancy of continuing those relationships.

235.     Comcast and Comcast Spotlight intentionally and unjustifiably interfered with Viamedia's reasonable expectancy by deliberately excluding Viamedia and its MVPD clients from Comcast-controlled Interconnects as a means of coercing WOW and RCN into transferring their Spot Cable Advertising Representation business from Viamedia to Comcast Spotlight.

236.     Comcast and Comcast Spotlight's intentional and unjustifiable conduct caused WOW and RCN to terminate some or all of their profitable business relationships with Viamedia.

237.     As a direct and proximate result of Comcast's conduct, Viamedia's expectancy of

49

obtaining further business from WOW and RCN was diminished and lost. Viamedia has suffered significant injury and damages as a result of Comcast's actions, including lost sales and revenue relating to its representation of WOW and RCN and other damage to its business.

238. After Comcast took over the WOW and RCN markets on January 1, 2016, Comcast has continued to make it more difficult for Viamedia to operate by further interfering in Viamedia's relationships with advertisers and other MVPDs. In addition, Comcast has unlawfully contacted and tried to recruit various Viamedia sales executives to join Comcast and thereby obtain confidential proprietary information of Viamedia.

## PRAYER FOR RELIEF

**WHEREFORE**, Viamedia prays for judgment against Defendants Comcast and Comcast Spotlight as follows:

A.     Awarding Viamedia all damages to which it is entitled under state and federal antitrust laws and its other claims for relief, including treble damages, reasonable costs, and attorneys' fees pursuant to 15 U.S.C. § 2, and 15 U.S.C. §§ 15 & 26.

B.     Awarding Viamedia all damages to which it is entitled under state tort law and its other claims for relief, including punitive damages for Comcast's willful and malicious tortious conduct;

C.     Enjoining Comcast from engaging in the anticompetitive and tortious conduct alleged herein, including any effort to exclude Viamedia or its MVPD clients from participating on a fair and open basis in Interconnects and NCC in the future;

D.     Ordering such divestitures by Comcast as may be required to restore competition and to prevent the recurrence of future antitrust violations; and

E.     Granting such further relief as the Court deems just and proper.

## **JURY DEMAND**

Viamedia demands a jury trial for those issues so triable herein.


Date: November 21, 2016                           Respectfully submitted,

                                                  /s/ *Britt M. Miller*
                                                  Britt M. Miller
                                                  Matthew D. Provance
                                                  MAYER BROWN LLP
                                                  71 South Wacker Drive
                                                  Chicago, IL  60606
                                                  Tel: 312.782.0600
                                                  Facsimile:  312.701.7711
                                                  bmiller@mayerbrown.com
                                                  mprovance@mayerbrown.com
                                                          AND

                                                  Mark W. Ryan (*Pro Hac Vice*)
                                                  MAYER BROWN LLP
                                                  1999 K Street NW
                                                  Washington, DC  20001
                                                  Tel: 202.263.3000
                                                  Facsimile:  202.263.3300
                                                  mryan@mayerbrown.com


                                                  *Counsel for Plaintiff ViaMedia, Inc.*