**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VIAMEDIA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-5486 |
| | ) | |
| v. | ) | Hon. Amy J. St. Eve |
| | ) | |
| COMCAST CORPORATION and | ) | |
| COMCAST SPOTLIGHT, LP, | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants Comcast Corporation ("Comcast") and its wholly owned subsidiary Comcast Spotlight, LP ("Comcast Spotlight"),[1] (R. 40, Am. Compl., ¶ 1), have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss with prejudice Counts I-V of Plaintiff Viamedia, Inc.'s ("Viamedia") amended complaint, "to the extent the monopolization claims asserted are based on alleged refusal to deal." (R. 45.) For the following reasons, the Court grants Defendants' motion.

---

[1] The Court refers to Comcast and Comcast Spotlight collectively as "Defendants."

**BACKGROUND**[2]

In the 1990s, competing cable service providers—called, according to industry terminology, "multichannel video program distributors" ("MVPDs")—developed Interconnects, cable industry cooperatives that facilitate the sale of spot cable advertising across particular Designated Media Markets ("DMAs"). (R. 40, Am. Compl., ¶¶ 23, 34-36.) Specifically, an "Interconnect functions as the central marketplace around which all regional Spot Cable Advertising sales in [a] DMA are transacted." (*Id.* at ¶ 37.) Regional spot cable advertising sales are one of the three ways in which MVPDs sell spot cable advertising time. (*Id.* at ¶ 34.)

Initially, "Interconnects were open to all MVPDs and their representatives, and MVPDs were encouraged to participate in order to maximize the numbers of households advertisers could reach in that DMA." (*Id.* at ¶ 38.) Following the formation of the Chicago and Detroit Interconnects, Comcast acquired competing MVPDs in the Chicago and Detroit DMAs, which allowed Comcast to gain "majority interest in" and "assume unilateral control of regional advertising through" the Interconnects in the two DMAs. (*Id.* at ¶ 102.)

Between 2002 and 2012, Viamedia, a spot cable advertising representation company, participated in the Interconnects for Chicago and Detroit "on behalf of two of its then most significant MVPD clients," Wide Open West ("WOW") and RCN Corporation ("RCN"). (*Id.* at ¶ 103.) During this period, "Viamedia paid over $23 million to Comcast in its role as Interconnect manager to participate in the Chicago and Detroit Interconnects." (*Id.* at ¶ 157).

---

[2] The Court takes the facts presented in the Background from Plaintiff's Amended Complaint and presumes them as true for purposes of resolving the pending motion to dismiss under Rule 12(b)(6). *See Teamsters Local Union No. 795 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014); *Alam v. Miller Brewing Co.*, 709 F. 3d 662, 665-66 (7th Cir. 2013); *see also Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). The Court also presumes the parties' familiarity with the Court's prior opinion in this case. *See Viamedia Inc. v. Comcast Corp.*, No. 16-cv-5486, 2016 WL 6568074 (N.D. Ill. Nov. 4, 2016) (published op.).

Viamedia's participation in the Chicago and Detroit Interconnects ended, however, in June of 2012. (*Id*. at ¶ 110.) "Comcast informed WOW and RCN that if they wished to regain access to the Interconnects, they would be required to cease using Viamedia as their Spot Cable Advertising Representative and would instead be required to retain Comcast Spotlight." (*Id.* at ¶ 113.)

Viamedia alleges that, as an Interconnect manager, Comcast has an incentive to maximize participation in the Interconnect by eligible MVPDs because Comcast collects fees from Interconnect participants and "[t]he economic value of each Interconnect is derived from its ability to provide a single point of access for advertisers to purchase Spot Cable Avails that are capable of reaching *all* subscribers within a DMA." (*Id.* at ¶ 154–55, 157 (emphasis in original).) According to Viamedia, when Comcast refused to deal with Viamedia, it prevented WOW and RCN from participating in regional ad sales through the Interconnects. (*Id.* at ¶¶ 159–60.) This refusal allegedly "reduced significantly the number of cable subscribers covered by the [Chicago and Detroit] Interconnect[s]." (*Id.*) Additionally, it reduced the fees Comcast would have collected if WOW and RCN had continued to participate in the Interconnects. (*Id.*) Accordingly, Viamedia claims that Comcast's exclusion of Viamedia was "irrational and contrary to" Comcast's economic incentives. (*Id.* at ¶ 158–60.) Additionally, Viamedia alleges that dealing with Viamedia "would have entailed no cost to Comcast as the Interconnect manager, would have provided the Interconnect and Comcast . . . with immediate benefits, and would have served the interests of the Interconnect customers, namely the regional advertisers, to reach all subscribers in the market." (*Id.* at ¶ 158.)[3]

---

[3] Viamedia alleges that Comcast repeated its conduct in other DMAs outside of Chicago and Detroit. (R. 40 at ¶¶ 161–62.)

Comcast continued to exclude WOW and RCN from the Chicago and Detroit Interconnects until they retained Comcast Spotlight as their spot cable advertising representative. (*Id.* at ¶¶ 113, 124, 126.) Eventually, at least by January 1, 2016, WOW and RCN capitulated to Comcast's demands and retained Comcast Spotlight as their sole spot cable advertising representative in the Detroit and Chicago DMAs. (*Id.* at ¶¶ 126–31.) Viamedia also alleges that Comcast has used this coercive tactic in other DMAs. (*See, e.g.*, *id.* at ¶¶ 132–35.)

On May 26, 2016, Viamedia filed a six-count complaint against Defendants Comcast and Comcast Spotlight, asserting, among other things, that Defendants violated Section 2 of the Sherman Act through attempted monopolization and "unlawful monopolization in markets for spot cable advertising representation in DMAs where Comcast controls the Interconnect[]." (R. 1 at ¶¶ 164–82.) Specifically, Viamedia alleged that Defendants, "[b]y refusing to deal with Viamedia and MVPDs represented by Viamedia, by conditioning access to Interconnects upon an MVPD's agreement to deal with Comcast Spotlight, [and] by requiring that MVPDs deal exclusively with Comcast Spotlight as a Spot Cable Advertising Representative" and "by conditioning access to Interconnects upon an MVPD's agreement to deal with Comcast Spotlight," imposed upon RCN and WOW an invalid tying arrangement and engaged in impermissible exclusive dealing. (*Id.* at ¶¶ 168, 176.) In other words, Viamedia alleged that Defendants violated the Sherman Act through tying, exclusive dealing, and a refusal to deal. (R. 36, Mem. Op. & Order, 18.) Viamedia repeats those allegations in its amendment complaint. (R. 40 at ¶¶ 183, 191.)

On July 22, 2016, Defendants filed a Motion to Dismiss, (R. 22), which the Court denied in part and granted in part, *Viamedia*, 2016 WL 6568074, at *17. Specifically, the Court dismissed Viamedia's refusal to deal claim without prejudice but denied Defendants' motion

4

with respect to Viamedia's other claims. *Id.* The Court reasoned that "Viamedia has not alleged or explained how Defendants' refusal to deal with it—separate from Defendants' other conduct like conditioning MVPDs' access to Interconnects on accepting Comcast Spotlight's services even for advertising sales that do not involve an Interconnect—has no rational competitive purpose." *Id.* at 16.

Viamedia filed an Amended Complaint on November 21, 2016. (*See* R. 40.) Defendants subsequently filed a Motion to Dismiss the Refusal to Deal Claims as Restated in the Amended Complaint. (R. 45.)

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Put differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in [a plaintiff's] favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

**ANALYSIS**

The only issue before the Court is whether Comcast's alleged refusal to deal plausibly constitutes the type of anticompetitive conduct that violates Section 2 of the Sherman Act.[4] (*See* R. 45.) The Supreme Court has long held that "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). Accordingly, a business's refusal to deal is generally not actionable. *See id.*; *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004). The Supreme Court has explained that "[c]ompelling . . . firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law" for three central reasons. *Trinko*, 540 U.S. at 408-09. First, court-mandated cooperation among businesses "may lessen the incentive for the monopolist, the rival or both to invest in" the capital projects that give them a competitive advantage. *Id.* at 409. Second, "[e]nforced sharing . . . requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing-a role for which they are ill suited." *Id.* Third, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Id.*; *see also Schor v. Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) ("[A]ntitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals compete. Cooperation is a *problem* in antitrust, not one of its obligations." (emphasis in original) (citation omitted)).

Nevertheless, the Supreme Court explained that "[t]he high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Trinko*,

---

[4] The Court previously outlined the standards for monopolization and attempted monopolization under Section 2 of the Sherman Act. *See Viamedia*, 2016 WL 6568074, at *17-18.

540 U.S. at 408 (*quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985)). "Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." *Id.* "The leading case for § 2 liability based on refusal to cooperate with a rival . . . is *Aspen Skiing*." *Id.*

*Aspen Skiing* concerned the four mountains that constituted the Aspen ski area. 472 U.S. at 587–95. The defendant owned three of the mountains, and the plaintiff owned the fourth. *Id.* at 589–91. For a number of years, the owners cooperated by selling a joint ticket, providing customers access to all of the mountains. *Id.* Later, however, the defendant demanded an increasingly greater percentage of the revenue generated from the joint ticket until the cooperative relationship between the defendant and the plaintiff ended. *Id.* at 591–93; *see also Trinko*, 540 U.S. at 408–09 (analyzing *Aspen Skiing*). The plaintiff tried what the *Trinko* Court referred to as "a variety of increasingly desperate measures to re-create the joint ticket, even to the point of in effect offering to buy the defendant's tickets at retail price." *Trinko*, 540 U.S. at 408–09 (citing *Aspen Skiing*, 472 U.S. at 593–94. The defendant rebuffed these efforts. *Aspen Skiing*, 472 U.S. at 592–94; *see also Trinko*, 540 U.S. at 408–09.

The Supreme Court affirmed a jury verdict for the plaintiff. *Aspen Skiing*, 472 U.S. at 610. As the *Trinko* Court described it, the *Aspen Skiing* Court "found significance in the defendant's decision to cease participation in a cooperative venture." *Trinko* at 540 U.S. at 409 (citing *Aspen Skiing*, 472 U.S. at 608, 610–11). "The unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* (emphasis in original) (citing *Aspen Skiing*, 472 U.S. at 608, 610–11). Additionally, "the defendant's unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent." *Id.* Thus, "the evidence

7

suggested that the defendant's decision was 'irrational but for its anticompetitive effect.'" *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-cv-804, 2015 WL 5693735, at *7 (N.D. Ill. Sept. 28, 2015) (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.), and citing 3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 772, at 223 (3d ed. 2008) ("the refusal must be 'irrational' but for its anticompetitive tendencies")).

The Supreme Court has made clear that "*Aspen Skiing* is at or near the outer boundary of Section 2 liability." *Trinko*, 540 U.S. at 409. To state it more clearly, "[s]ince *Aspen* [*Skiing*], the Supreme Court has refused to extend liability to various other refusal to deal scenarios, emphasizing that *Aspen* [*Skiing*] represents a 'limited exception' to the general rule of firm independence." *Novell*, 731 F.3d at 1074 (quoting *Trinko*, 540 U.S. at 409).

"To invoke *Aspen*[] [*Skiing*'s] limited exception, the Supreme Court . . . explained, at least two features present in *Aspen* [*Skiing*] must be present in the case at hand." *Id.* First, "there must be a preexisting voluntary and presumably profitable course of dealing between the monopolist and rival." *Id.* Second, "the monopolist's discontinuation of the preexisting course of dealing must 'suggest[] a willingness to forsake short-term profits to achieve an anti-competitive end.'" *Id.* (quoting *Trinko*, 540 U.S. at 407). Importantly, courts "require proof not just that the monopolist decided to forsake short-term profits. Just as in predatory pricing cases, [courts] *also* require a showing that the monopolist's refusal to deal was part of a larger anticompetitive enterprise." *Id.* at 1075 (emphasis in the original). "Put it simply, the monopolist's conduct must be irrational but for its anticompetitive effect." *Id.* (citing, among other authorities, *Trinko*, 540 U.S. at 407, and 3B Areeda & Hoevnkamp, *supra*, ¶ 772, at 223).

In opposing the first motion to dismiss in this case, Viamedia relied on the *Aspen Skiing* exception to courts' general aversion to imposing antitrust liability on the basis of a unilateral

8

refusal to deal. (R. 28 at 10–14.) Once again, Viamedia relies on the *Aspen Skiing* exception, contending that Comcast's actions were irrational but for their anticompetitive effects. (R. 56, Pl.'s Opp., 4–10.) As the Court concluded in resolving the first motion to dismiss, Viamedia fails to meet its pleading burden.

Viamedia argues that "[t]he immediate effect of" Comcast terminating Viamedia and its clients' access to the Chicago and Detroit Interconnects "was to significantly reduce the number of eligible cable subscribers to the Interconnects in those DMAs, reducing the value of the Interconnect regional advertisers and forfeiting fees Comcast otherwise would have received as the Interconnect manager." (*Id.* at 4.) Accordingly, Viamedia contends that Comcast "was exercising its monopoly power to simply exclude Viamedia and Viamedia's clients from the Interconnect[s], to Comcast's own economic detriment." (*Id.* at 4–5.)

While these allegations, taken as true, establish that Comcast's discontinuation of its business relationship with Viamedia caused Comcast to suffer short-term losses, this is not by itself necessarily indicative of anticompetitive conduct.[5] As the Tenth Circuit recognized in *Novell*:

> [F]irms routinely sacrifice short-term profits for lots of legitimate reasons that enhance consumer welfare (think promotion discounts). Neither is it unimaginable that a monopolist might wish to withdraw from a prior course of dealing and suffer a short-term profit loss in order to pursue perfectly competitive ends—say, to pursue an innovative replacement product of its own.

731 F.3d at 1075. Accordingly, plaintiffs seeking to establish an unlawful refusal to deal must show that the defendant's actions serve no rational procompetitive purpose. *See id*; *see also VBR*

---

[5] The Court also notes that Comcast's refusal to deal with Viamedia did not, by itself, exclude MVPDs from participating in the Interconnects. Instead, it had the temporary effect of excluding such MVPDs, presumably because of their representation contracts with Viamedia. Comcast's alleged tying arrangement, however, resulted in the temporary exclusion of MVPDs.

9

*Tours*, 2015 WL 5693735, at *9 ("[T]he question is not whether [the defendant] chose the most competitive offer but whether it had *any procompetitive purpose*. . . . *Aspen Skiing*'s limited exception authorizes intervention only when a defendant's decision is 'irrational but for its anticompetitive effect.'" (quoting *Novell*, 731 F.3d at 1075)).  As, Judge Easterbrook explained, *Aspen Skiing* and arguments "demanding[ing] that holders of market power cooperate with rivals" represent "the last gasp of the old school antitrust."  Frank H. Easterbrook, *The Chicago School and Exclusionary Conduct*, 31 Harv. J.L. & Pub. Pol'y 439, 441–42 (2008).  Post-*Trinko*, "[m]any of these themes bit the dust"; no longer does "even a monopolist ha[ve a] general duty to cooperate with rivals."  *Id.* at 442.

Thus, Viamedia must adequately allege that Comcast's refusal to deal was irrational but for its anticompetitive effects.  In the Court's previous decision, it explained that, based on Plaintiff's allegations, "[a]fter Comcast's refusal to deal, for the portion of [spot cable advertising] sold through an Interconnect, MVPDs simply deal with Comcast directly."  *Viamedia*, 2016 WL 6568074, at *16.  The Court reasoned that this offered "potentially improved efficiency" because it replaced an intermediary with a direct relationship.  *Id.*  This type of vertical integration or elimination of a middleman, the Court explained, represented a "prototypical valid business purpose."  *Id.* (quoting *Port Dock & Stone Corp v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007)); *see also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 689 (4th Cir. 2016) (Wilkinson, J.) ("A single firm incorporating separate but closely related production processes can often be far more efficient than various independent entities transacting to produce the same good or bundle of goods."); *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984) ("We just said that vertical integration is not an improper objective.  But that puts the matter too tepidly; vertical integration is usually

procompetitive."); *Institutional Foods Packing, Inc. v. Creative Prods., Inc.*, No. 89 C 4499, 1992 WL 111133, at *3 (N.D. Ill. May 12, 1992).

In an effort to establish that Comcast's refusal to deal lacks any procompetitive purpose, Viamedia argues that Comcast did not engage in procompetitive disintermediation. (R. 56 at 5–7.) Instead, Viamedia contends, Comcast simply replaced one intermediary (Viamedia) with another (Comcast Spotlight). (*Id.*)

Viamedia's argument fails. Indeed, Viamedia's allegations belie its argument that the Court should treat Comcast and Comcast Spotlight as "two separate entities" that cannot achieve efficiencies that can result from vertical integration. (*See id.* at 5.) In the amended complaint, Viamedia treats Comcast and Comcast Spotlight as a single economic entity—a sensible thing to do given that Comcast Spotlight is Comcast's wholly-owned subsidiary. (*See, e.g.*, R. 40 at ¶ 165 (alleging that Comcast's refusal to deal requires that "MVPDs either transfer their Spot Cable Advertising Representation from Viamedia *to Comcast*, a direct competitor, or cease participating in the Interconnect at all." (emphasis added)); *id.* at ¶ 155 (explaining that Comcast competes, "through Comcast Spotlight" with representation firms like Viamedia); *id.* at ¶ 181 ("*Comcast* has monopoly power in Spot Cable Advertising Representation in each of the DMAs where in controls the Interconnect." (emphasis added)); *id.* at ¶ 174 (alleging that "*Comcast* has or will monopolize the market for Spot Cable Advertising Representation in every DMA in which Comcast manages the Interconnect" (emphasis added)); *id.* at ¶ 14 ("*Comcast* has acted with the specific intent to monopolize the market for representing cable television service providers . . . ." (emphasis added); *id.* at ¶ 166 ("Even if there were any potentially improved efficiencies to be realized by consolidating management of an Interconnect with Comcast's provision of Spot Cable Advertising Representation services, refusing to deal with Viamedia is

11

not necessary in order to realize any such efficiencies.").) Because Viamedia's complaint consistently treats Comcast and Comcast Spotlight as a single entity, its arguments in its opposition brief imploring the Court to do otherwise fall flat.

Viamedia's argument that Comcast has not removed a middleman because Comcast Spotlight will fill the role Viamedia used to play also is unavailing. Such replacement is a common feature of vertical integration. If a firm, for example, sells its products directly to the public at its own stores rather than through independent retail outlets, the firm is vertically integrated even though it fills the role that independent retail outlets would otherwise play. *See Jack Walters*, 737 F.2d at 770. The same goes for a computer manufacturer that makes its own steel and creates and places its own advertising—though the manufacturer has replaced rather than eliminated elements of production and distribution processes, the manufacturer nonetheless has vertically integrated. *See It's My Party*, 811 F.3d at 689. In this case, based on Viamedia's allegations, Comcast has engaged in a business practice that has a rational procompetitive purpose: it has become "a one-stop shop" in certain DMAs for MVPDs wishing to sell advertisements on a regional basis. *See id.* at 688.

Based on the above, the Court sees no reason to alter its prior conclusion that Comcast's refusal to deal potentially serves a procompetitive purpose. *See Viamedia*, 2016 WL 6568074, at *16. Viamedia's allegations in the amended complaint, which are effectively the same as its allegations in its first complaint, fail to raise a plausible inference that Comcast's refusal lacked any rational, procompetitive business purpose. In other words, Viamedia has not adequately alleged that Comcast's elimination of a middleman in the regional spot cable advertising business was irrational but for its anticompetitive effect.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion.

**DATED: February 22, 2017**  **ENTERED**

_____
AMY J. ST. EVE
United States District Court Judge