**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VIAMEDIA, INC., | **PUBLIC VERSION** |
|      Plaintiff, | |
| v. | No. 16 C 5486 |
| COMCAST CORPORATION and COMCAST SPOTLIGHT, LP, | Honorable Amy J. St. Eve |
|      Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS AND
PROFFERED TESTIMONY OF DR. HAROLD FURCHTGOTT-ROTH**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

GLOSSARY .......................................................................................................................... iv

INTRODUCTION AND SUMMARY ................................................................................... 1

LEGAL STANDARD ............................................................................................................ 3

ARGUMENT ......................................................................................................................... 3

I.     Dr. Furchtgott-Roth's Opinions Properly Address Economic Issues Related to Viamedia's Tying and Exclusive Dealing Claims and Are Admissible ........................... 4

II.    Comcast's Claims that Dr. Furchtgott-Roth's Opinions Are Inconsistent With Governing Law Are Unfounded ................................................................................. 6

    A.    Dr. Furchtgott-Roth's Opinion Rests on Comcast's Tying Conduct, Not a Mere Unilateral Refusal To Deal ................................................................... 6

    B.    Dr. Furchtgott-Roth's Opinions Regarding Tying and Exclusive Dealing Are Consistent With the Governing Law and the Record Evidence ........................... 11

III.    Dr. Furchtgott-Roth's Opinions Are Supported by Sound Methodology and Evidence ...13

    A.    Dr. Furchtgott-Roth Is Qualified To Offer an Opinion About Tying Conduct, and His Conclusions are Consistent with Economic Literature ........................... 13

    B.    Dr. Furchtgott-Roth's Opinions Regarding Separate Products Are the Result of Reliable and Accepted Methods ........................................................................ 15

    C.    Dr. Furchtgott-Roth Ruled Out Alternative Explanations for Comcast's Monopolization of the Market for Spot Cable Ad Rep Services ........................... 17

    D.    Dr. Furchtgott-Roth's Opinion Does Not "Usurp" the Jury's Role ...................... 18

CONCLUSION .................................................................................................................... 20

**TABLE OF AUTHORITIES**

**CASES**

*Aerotec International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016).......10

*AFMS LLC v. United Parcel Service Co.*, 2014 WL 12515335 (C.D. Cal. Feb. 5, 2014) ...........16

*American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010)..................................12

*Appleton Papers Inc. v. George A Whiting Paper Co.*, 955 F. Supp. 2d 947
    (E.D. Wis. 2013), *aff'd in relevant part and rev'd in part sub nom.*
    *NCR Corp. v. George A Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014) ............... 19-20

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)...............................9, 11

*Baumholser v. Amax Coal Co.*, 630 F.2d 550 (7th Cir. 1980).....................................................13

*Chaudhry v. Provident Life & Accident Ins. Co.*, 2015 WL 1756832
    (N.D. Ill. Apr. 15, 2015) ..........................................................................................................3

*Copeca, Inc. v. Western Aviation Servs. Corp.*, 653 F. Supp. 2d 141 (D.P.R. 2009) ....................9

*Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421 (9th Cir. 1995)...........................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)...........................................3

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)...............................11

*Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495 (1969)......................................12

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2016 WL 6091244
    (N.D. Ind. Oct. 19, 2016) ......................................................................................................19

*It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016) ...........................................5

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ...............................................9, 12

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794 (N.D. Ill. 2005) ...............11

*Marine Travelift Inc. v. ASCOM SpA*, 2015 WL 9008254 (E.D. Wis. Dec. 15, 2015) ...............19

*Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004)...........16

*Reifert v. South Cent. Wis. MLS Corp.*, 450 F.3d 312 (7th Cir. 2006) .........................................16

*Richman v. Sheahan*, 415 F. Supp. 2d 929 (N.D. Ill. 2006) ...........................................20

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000)......................................3, 6, 17

*Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405 (7th Cir. 2014)........................3

*Sullivan v. Alcatel-Lucent USA Inc.*, 2014 WL 3558690 (N.D. Ill. July 17, 2014)......................18

*Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137 (10th Cir. 1997).........................9

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953) ......................12

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).....11

## STATUTES AND RULE

Sherman Act, 15 U.S.C. §§ 1-7 ...............................................................................6, 12

        Section 1, 15 U.S.C. § 1...............................................................................12

        Section 2, 15 U.S.C. § 2........................................................................4, 12

Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq.*.........................................3, 4

Fed. R. Evid. 702 ...........................................................................................................4

## OTHER MATERIALS

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2011).................................10, 14

Dennis Carlton, *A General Analysis of Exclusionary Conduct and Refusal to Deal—Why Aspen and Kodak Are Misguided*, 68 Antitrust L.J. 659 (2001) .......................................11

Dennis Carlton & Michael Waldman, *How Economics Can Improve Antitrust Doctrine Towards Tie-In Sales*, 1 Competition Pol'y Int'l 27 (Spring 2005) ...................11

Michael D. Whinston, *Tying, Foreclosure, and Exclusion*, 80 Am. Econ. Rev. 837 (1990) ........14

## GLOSSARY

| TERM | DEFINITION |
|---|---|
| Comcast | Comcast Corporation and Comcast Spotlight, LP |
| Comcast Spotlight | Comcast Spotlight, LP |
| Furchtgott-Roth Dep. | ECF No. 221-04 (Deposition of Harold Furchtgott-Roth, Ph.D. (Jan. 4, 2018)) |
| Rebuttal Report | ECF No. 221-03 (Rebuttal Expert Report of Harold Furchtgott-Roth (Nov. 30, 2017)) |
| Report | ECF No. 221-01 (Expert Report of Harold Furchtgott-Roth (Oct. 16, 2017)) |
| Viamedia | Viamedia, Inc. |

Plaintiff Viamedia, Inc. respectfully opposes Comcast's Motion to Exclude Certain Opinions and Proffered Testimony of Dr. Harold Furchtgott-Roth, ECF No. 208.

## INTRODUCTION AND SUMMARY

In denying Comcast's motion to dismiss Viamedia's claims in part, this Court held that Viamedia had stated a claim of anticompetitive tying by alleging that "Comcast has conditioned access to the Interconnects in which it exercises exclusive control to MVPDs' acceptance of Comcast Spotlight's services." ECF No. 36, at 26. The Court noted that Viamedia had "plausibly alleged distinct markets for spot cable advertising representation services and Interconnect services." *Id.* at 28. And it noted that Comcast's refusal to provide Interconnect services to MVPDs represented by Viamedia was "part of [Viamedia's] tying claim" and that "[t]he potential problem with Comcast's conduct . . . is that it provided [Interconnect] access only after allegedly coercing the MVPDs to accept Comcast Spotlight's services." *Id.* at 38 n.9. While the Court concluded that Comcast may be free to refuse to deal with Viamedia as long as it does not violate any other legal duty,[1] Comcast cannot refuse to provide Interconnect Services to Viamedia's MVPD clients as part of a scheme of anticompetitive tying.

The opinions of Dr. Harold Furchtgott-Roth are relevant to each of the elements of Viamedia's tying claim. An expert in antitrust economics and telecommunications, Dr. Furchtgott-Roth applied standard economic analysis to the evidence developed in discovery to conclude that (1) Spot Cable Ad Rep Services and Interconnect Services are separate products in that they can be (and, indeed, are) provided separately in response to separate demand; (2) Comcast has substantial market power in Interconnect Services in those areas where it

---

[1] Viamedia continues respectfully to disagree with the Court's dismissal of Viamedia's refusal-to-deal theory and reserves the right to seek reconsideration or appeal of that ruling.

controls the Interconnect; and (3) Comcast's refusal to provide MVPDs Interconnect Services (either directly or through an intermediary) unless the MVPDs purchase Spot Cable Ad Rep Services from Comcast constitutes tying as a matter of economics. He further explained that this conduct (which also constitutes exclusive dealing) "has substantially reduced or foreclosed competition in the market for Spot Cable Ad Rep Services in DMAs where Comcast Spotlight operates the Interconnect." Report ¶ 90.

Comcast does not question that Dr. Furchtgott-Roth's opinion regarding Comcast's market power is admissible. But it argues that his opinions regarding other elements of Viamedia's claims should be excluded, primarily because (it contends) Dr. Furchtgott-Roth has gotten the law wrong. Comcast does not question that it deliberately excluded its only competitor from the market for Spot Cable Ad Rep Services, but it claims it did so through a lawful refusal to deal, not through unlawful tying. Comcast does not question that it forced MVPDs to purchase Spot Cable Ad Rep Services from Comcast if they wanted access to Interconnect Services, but it argues that it was free to do so to the extent MVPDs preferred to deal with the Interconnect through Viamedia. Comcast does not question that there is ample marketplace evidence that Spot Cable Ad Rep Services are both demanded and procured separately from Interconnect Services, but it argues that because Dr. Furchtgott-Roth did not perform an econometric analysis, he is barred from basing an analysis on other market data.

None of Comcast's arguments is correct—on the contrary, most of them have already been rejected by this Court in denying Comcast's motion to dismiss Viamedia's tying theory. And Comcast's remaining arguments—that Dr. Furchtgott-Roth did not consider alternative explanations for marketplace facts; that Dr. Furchtgott-Roth, though an unquestioned authority on telecommunications, microeconomics, and industrial organization, lacks sufficient expertise

in tying; that Dr. Furchtgott-Roth "usurps" the role of the jury by basing his opinions on interpretations of evidence (even though this is an everyday aspect of economic analysis)— provide no basis for exclusion of his opinions and at most provide fodder for cross-examination.

## LEGAL STANDARD

The district court's gatekeeping role under *Daubert* is limited to determining the scientific reliability and relevance of an expert witness's opinions. *See, e.g., Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Likewise, "[w]hether [an expert's] analysis aligns with the facts—as determined by the trier of fact—and the law . . . are not an appropriate basis for exclusion of expert testimony under *Daubert* as they do not go to the reliability or relevance of the testimony." *Chaudhry v. Provident Life & Accident Ins. Co.*, 2015 WL 1756832, at *6 (N.D. Ill. Apr. 15, 2015).

## ARGUMENT

Dr. Furchtgott-Roth has been a researcher, consultant, and practitioner in the fields of applied microeconomics and industrial organization for more than 30 years. During that time, he has served as chief economist of the U.S. House of Representatives Committee on Commerce (where he had substantial responsibility for drafting the landmark Telecommunications Act of 1996 that shaped the current competitive landscape of the cable industry), an academic at both think tanks and universities, and a private consultant advising businesses about a wide array of economic issues, with a focus on issues relating to competition and industrial organization. He also has extensive experience in the field of telecommunications, including as a Commissioner of

the Federal Communications Commission from 1997-2001 (where he was at the vanguard of implementing the Telecommunications Act). Dr. Furchtgott-Roth is a leading authority on competitive dynamics in the telecommunications industry. As a result of his specialized knowledge, he has offered expert testimony in dozens of antitrust and telecommunications cases.

Dr. Furchtgott-Roth's opinions in this case focused on the structure of the markets for Interconnect Services and Spot Cable Ad Rep Services, economic analysis of Comcast's conduct as established by the evidence developed in discovery, and the consequences of that conduct for competition in the marketplace. All of those opinions are grounded on sound methodology and supporting evidence, and all meet the standards for admissibility under the Federal Rules of Evidence and governing precedent.

I.      **Dr. Furchtgott-Roth's Opinions Properly Address Economic Issues Related to Viamedia's Tying and Exclusive Dealing Claims and Are Admissible**

Dr. Furchtgott-Roth's opinions are admissible under Rule 702 because his analysis of the economic issues related to Viamedia's claims under Section 2 of the Sherman Act is relevant and based on a reliable methodology and ample record evidence.

Much of Dr. Furchtgott-Roth's testimony is focused on Viamedia's tying theory. The governing legal standard requires Viamedia to show that (1) Spot Cable Ad Rep Services and Interconnect Services are separate products; (2) Comcast had sufficient economic power in Interconnect Services to "restrain free competition in the market" for Spot Cable Ad Rep Services; and (3) Comcast's tying policy affected a not insubstantial amount of commerce. *See* ECF No. 36, at 26. Dr. Furchtgott-Roth's testimony is relevant to each of these elements.

*First*, Dr. Furchtgott-Roth demonstrated that Spot Cable Ad Rep Services and Interconnect Services are separate products. In reaching his conclusions about the definition of the markets for Spot Cable Ad Rep Services and Interconnect Services, Dr. Furchtgott-Roth

-4-

considered extensive market evidence, including dozens of negotiated agreements for both kinds of services. *See* Report App'x B. He found "substantial evidence in the marketplace that MVPDs ▓▓▓▓▓▓▓▓▓▓ have demanded and procured Spot Cable Ad Rep Services separately from Interconnect Services." *Id.* ¶ 47. For example, in ▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓ receives Interconnect Services from ▓▓▓▓▓▓▓▓▓▓▓, but receives Spot Cable Ad Rep Services from ▓▓▓▓▓▓. *See id.* ¶ 48; *see also id.* ¶¶ 47-49 (citing additional examples involving ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).

*Second*, he reviewed economic evidence that Comcast refused to provide Interconnect Services to MVPDs unless those MVPDs also purchased Spot Cable Ad Rep Services from Comcast.[2] Although some MVPDs preferred to obtain Spot Cable Ad Rep Services from a provider other than the monopoly Interconnect operator, Comcast's refusal to provide Interconnect Services separately "forced MVPDs . . . to purchase both types of service from Comcast Spotlight." *Id.* ¶ 68. Dr. Furchtgott-Roth explained, in particular, that Comcast's refusal to allow Viamedia to participate in Comcast-controlled Interconnects "on behalf of its MVPD clients . . . is an integral part of Comcast's tying conduct" because it prevents those MVPDs from obtaining Interconnect Services unless they agree to purchase Spot Cable Ad Rep Services from Comcast Spotlight as well. *Id.* ¶ 70.

*Third*, he concluded that Comcast has a monopoly over Interconnect Services in those DMAs where it controls the Interconnect—a conclusion that Comcast does not challenge.

---

[2] That evidence distinguishes this case from *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016), where there was no direct evidence of coercion, and customers "denied being forced" to purchase the tied product.

*Fourth*, Dr. Furchtgott-Roth determined that Comcast's conduct "substantially reduced or foreclosed competition in the market for Spot Cable Ad Rep Services." *Id.* ¶ 90. "Due to the economic significance of Interconnects in large DMAs, MVPDs cannot forgo Interconnect Services without sacrificing substantial revenue. Therefore, by tying Spot Cable Ad Rep Services to Interconnect Services and entering into multi-year, exclusive contracts to provide both services as a bundle, Comcast Spotlight has created a formidable competitive advantage for itself over Viamedia." *Id.* ¶ 87.

Each of these opinions is based on well-accepted economics and antitrust literature, including a leading antitrust treatise that Comcast cites throughout its brief. They are based on a meticulous review of the evidence, including a detailed review of many contracts governing provision of Interconnect Services and Spot Cable Ad Rep Services. Furthermore, his opinions are fully consistent with the legal standards established in this Court's prior rulings. Accordingly, the opinions are reliable and will be of assistance to the jury. *See, e.g.*, *Smith*, 215 F.3d at 717-19.

## II. Comcast's Claims that Dr. Furchtgott-Roth's Opinions Are Inconsistent With Governing Law Are Unfounded

Comcast's arguments that Dr. Furchtgott-Roth's opinions are inconsistent with governing law cannot be squared with his analysis or this Court's prior rulings. Comcast argues that (1) the anticompetitive exclusion observed by Dr. Furchtgott-Roth was the result of a lawful refusal to deal rather than unlawful tying (Mem. 4-6); and (2) to the extent MVPDs were represented by Viamedia, Comcast was free to condition provision of Interconnect Services to those MVPDs on their agreement to purchase Spot Cable Ad Rep Services from Comcast, notwithstanding the Sherman Act rule against tying (Mem. 7-12). Both arguments are incorrect.

**A.      Dr. Furchtgott-Roth's Opinion Rests on Comcast's Tying Conduct, Not a Mere Unilateral Refusal To Deal**

**1.**      Dr. Furchtgott-Roth properly determined that, by conditioning provision of a monopoly product (Interconnect Services) to MVPDs on the purchase of a separate, competitively-provided product (Spot Cable Ad Rep Services), Comcast forced MVPDs to purchase Spot Cable Ad Rep Services from Comcast, thereby foreclosing competition.  This is tying.  As this Court has explained, although "[a]t times it appears that Viamedia's refusal to deal claim also turns on Comcast refusing to provide Interconnect services to MVPDs," that refusal "is simply part of the tying claim."  ECF No. 36, at 38 n.9.

That MVPDs obtain Comcast's Interconnect Services through Viamedia does not mean that Comcast's conduct has no relevant economic impact.  The record here shows that, when MVPDs like WOW!, RCN, and Frontier have contracted with Viamedia to provide Spot Cable Ad Rep Services, they have relied on Viamedia to maximize their total ad sales revenue, which often includes obtaining Interconnect Services on their behalf.  Indeed, negotiating with and monitoring Interconnect operators is one aspect of the "full turnkey" service that Viamedia provides its MVPD clients.[3]

Viamedia's securing of Interconnect Services on behalf of its MVPD clients is a feature of the contractual relationship MVPDs have formed with Viamedia over several years.  MVPDs

███████████████████████████████████████████████████████████████

---

[3] *See, e.g.*, Ex. 1 (Dep. of Misty Jensen, WOW! 30(b)(6) representative) at 28:16-18
(████████████████████████████████████████████████████████);
Ex. 2 (Dep. of Paul White, Frontier 30(b)(6) representative) at 40:18-25
████████████████████████████████████████████████████████.

██████████████████████████████████████████████████████.[4] By virtue of

these arrangements, Viamedia serves as the manager of the MVPDs' ad avails and has the

incentive to maximize proceeds from the sale of those avails. In many DMAs—including

Chicago, Detroit, and Hartford—maximizing spot cable ad revenue requires selling a portion of

ad inventory as DMA-wide avails through the Interconnect, which involves a suite of services

(Interconnect Services) that only the monopoly Interconnector operator can provide. *See* Report

¶¶ 39, 87-90. Thus, Viamedia and its MVPD clients create a relationship whereby Viamedia is

given responsibility for maximizing ad revenue, which in turn entails directly providing a suite

of services to the MVPD (Spot Cable Ad Rep Services) as well as procuring a separate suite of

services (Interconnect Services) from a third-party Interconnect operator on the MVPD's behalf.

Dr. Furchtgott-Roth evaluated Comcast's conduct in light of these marketplace realities,

which have been manifest in this case from the start.[5] He concluded that "an integral part" of

Comcast's conduct was its "refusal to allow Viamedia on behalf of its MVPD clients to

participate in Interconnects controlled by Comcast," which forced MVPDs to purchase Spot

Cable Ad Rep Services from Comcast Spotlight because, "if an MVPD wants Interconnect

Services, it has no option for Spot Cable Ad Rep Services other than Comcast Spotlight." *Id.*

¶ 70. That opinion is supported by sound economic logic. As Dr. Furchtgott-Roth explained at

his deposition, Viamedia ████████████████████████████████████████████

---



[4] *See, e.g.*, ECF No. 221-26 (████████████████████) at § 2.01(a) (████████
████████████████████████████████████████████████████ ; Ex. 3 (2████
██████████ ) at § 2.1(a) (████████████████████████████████████████
████████████████ .

[5] *See, e.g.*, ECF No. 1 (Compl.) ¶¶ 72-74 (discussing how "third-party representative
firms contract with MVPDs to assume responsibility for their Spot Cable Advertising" and why
"a representative firm must have access to the Interconnects . . . on behalf of it[s] clients").

███████████████████████████████████████████████

████. Furchtgott-Roth Dep. at 271:7-272:21. Though there is ample support for the fact that Viamedia procures Interconnect Services on behalf of its MVPD clients, the soundness of that factual underpinning is irrelevant to the admissibility of Dr. Furchtgott-Roth's testimony. *See Smith*, 215 F.3d at 718.

2.      Comcast's argument to the contrary ignores the doctrinal distinction between simple refusals to deal and tying. A refusal to deal claim focuses on the defendant's simple refusal to sell a product to a rival. *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595 (1985). On the other hand, a tying claim focuses on a firm's insistence that two products be purchased together or not at all. *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984). Under a tying theory, "the defendant may sell the tying product to anybody or nobody at all. What it may not do is *condition* the sale of the tying product upon the purchase of the tied product." *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1427 (9th Cir. 1995). "The harm from tying arrangements is the forced sale of the *tied* product, not the withholding of the tying product." *Id.*; *see also Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1143 (10th Cir. 1997) (explaining "proper distinction" between tying and refusal to deal).

Thus, Dr. Furchtgott-Roth's opinion that "Comcast's refusal to allow Viamedia on behalf of its MVPD clients to participate in Interconnects . . . is an integral part of Comcast's tying conduct" is well grounded in both law and economics. That the MVPDs targeted by Comcast sought to purchase the tying product through an intermediary does not transform Viamedia's tying claim into a refusal-to-deal claim. *See Copeca, Inc. v. Western Aviation Servs. Corp.*, 653 F. Supp. 2d 141, 146-47 (D.P.R. 2009) (buyer "could still be coerced into buying fuel from

[defendant], regardless of whether [defendant] imposes its condition via communications directly with [defendant] or communications to [defendant] through [an] intermediary").

3.     Comcast resists what it calls (at 10) an "'agency' theory of tying" by characterizing Interconnect Service as an "input" that Viamedia "combine[s] . . . with other inputs and resell[s]" to MVPDs.  But that characterization rests on the unproven premise that Spot Cable Ad Rep Services and Interconnect Services constitute a "single finished product." *See* 10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1748b (3d ed. 2011) ("Areeda & Hovenkamp") (cited in Comcast's brief at 10-11).  Comcast presents no support for that premise, and whether the two products are separate is a factual question that should be decided by the jury at trial.  Further, Comcast's characterization is contrary to the facts because Viamedia does not "resell" Interconnect Services.  Rather, the record shows that, when Viamedia has Interconnect access, Viamedia ███████████████████████████████████████████ ███████████████████████████████████████████████.[6]

This case is therefore nothing like the "refusal to deal theory of tying" rejected in *Aerotec International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016).  That case involved a plaintiff that serviced aircraft components manufactured by the defendant and relied on the defendant to supply it with replacement parts to provide those repair services.  *Id.* at 1175-76.  The Ninth Circuit affirmed summary judgment in favor of the defendant on plaintiff's tying claim because "there [wa]s no tie." *Id.* at 1179.  In particular, although the defendant had made

---

[6] *See, e.g.*, Ex. 4 (2003 Viamedia-Comcast Spotlight Interconnect Agreement) at § 2(a) ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████); *see also* Furchtgott-Roth Dep. at 208:15-210:12, 320:1-322:16 (describing how ████████████████████████████████████).

it more difficult for the plaintiff to obtain replacement parts for its own account, the defendant "allow[ed] airlines to purchase parts and services in separate transactions from whichever supplier they please." *Id.* Not so here, where Viamedia does not purchase Interconnect Services for its own account (as an "input" or otherwise), and Comcast conditioned its provision of Interconnect Services to RCN, WOW!, Frontier, and others on their purchase of Spot Cable Ad Rep Services from Comcast instead of Viamedia.[7]

### B. Dr. Furchtgott-Roth's Opinions Regarding Tying and Exclusive Dealing Are Consistent With the Governing Law and the Record Evidence

Dr. Furchtgott-Roth opines that "Comcast Spotlight's conduct amounts to tying" because that "conduct forced MVPDs demanding Interconnect Services to purchase both [Spot Cable Ad Rep Services and Interconnect Services] from Comcast Spotlight." Report ¶ 68. That core articulation of tying is in full agreement with the law. *See, e.g.*, ECF No. 36, at 25. Dr. Furchtgott-Roth relied upon a widely cited microeconomics textbook and the leading antitrust treatise (the very same treatise cited throughout Comcast's brief) for his introductory definition of tying. *See* Report ¶ 63 & n.78. That is a far cry from offering "a personal opinion about what [definition of tying] should apply in this case." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005).[8]

---

[7] Comcast's citation to *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), is even farther afield. In that case, end users had no separate use for the withheld product, which was neither "marketed [n]or available to the public." *Id.* at 410. Dr. Furchtgott-Roth's opinions in this case have no application to that scenario because there is no dispute that Interconnect Services are available to and demanded by MVPDs.

[8] It bears noting that Comcast's economic expert, Dr. Dennis Carlton, believes that ████ ████████ Ex. 5 (Carlton Dep.) at 74:23, and that the Supreme Court's antitrust jurisprudence is "misguided" and "mistaken," *see* Dennis Carlton & Michael Waldman, *How Economics Can Improve Antitrust Doctrine Towards Tie-In Sales*, 1 Competition Pol'y Int'l 27, 34 (Spring 2005); Dennis W. Carlton, *A General Analysis of Exclusionary Conduct and Refusal to Deal—Why Aspen and* Kodak *Are Misguided*, 68 Antitrust L.J. 659, 659-60 (2001) (concluding that the Supreme Court's decisions in *Aspen* and *Eastman Kodak Co. v. Image Technical*

Comcast argues (at 8) that it cannot be liable for unlawful tying until it had succeeded in forcing MVPDs to purchase the tied product (Spot Cable Ad Rep Services) from Comcast. Thus, in its view, it could not be "engaged in tying in Chicago and Detroit" during the period after it cut off access to Interconnect Services and before RCN and WOW! agreed to terms with Comcast. But, as Dr. Furchtgott-Roth explains, Comcast's refusal to make Interconnect Services available separately from Spot Cable Ad Rep Services effectively blocked the independent provision of Spot Cable Ad Rep Services. *See, e.g.*, Report ¶¶ 67-68, 96. Such an elimination of choice through "exploitation of . . . control over" Interconnect Services is "the essential characteristic of an invalid tying arrangement." *Jefferson Parish*, 466 U.S. at 12; *see also, e.g.*, *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953) ("Tying arrangements . . . flout the Sherman Act's policy that competition rule the marts of trade" because they "coerce[] the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market.").[9]

Furthermore, to the extent that a tying claim under Section 1 of the Sherman Act requires the consummation of an agreement (because Section 1, unlike Section 2, requires concerted action, *see American Needle, Inc. v. National Football League*, 560 U.S. 183, 189-90 (2010)), there is no such limitation on a claim under Section 2, which relies on the anticompetitive nature of Comcast's conduct, whether or not it has resulted in an agreement. In any event, as Comcast's

---

*Services, Inc.*, 504 U.S. 451 (1992), "suffer from confused economic reasoning" and "represent a dangerous direction for antitrust").

[9] Comcast repeatedly mischaracterizes Dr. Furchtgott-Roth's opinions by selecting snippets of his analysis out of context and pronouncing them the entirety of his "definition of tying." For example, Comcast points to statements in Dr. Furchtgott-Roth's reports about Comcast's exclusion of Viamedia and its clients from Interconnects and suggests that he cites those exclusions as "examples of 'tying.'" In reality, Dr. Furchtgott-Roth makes clear in his Report that Comcast's exclusion of Viamedia and its clients from Interconnects was only a "part" of Comcast's tying conduct. *See* Report ¶ 70.

brief acknowledges (at 8 n.8), there is no dispute that Comcast "entered into agreements with ██████████████" following the conduct that Viamedia alleges was coercive, and thus there is no dispute that "a 'not insubstantial' amount of interstate commerce [was] affected" by such conduct, *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 501 (1969). Comcast will be free to argue at trial that its refusal to provide Interconnect Services to MVPDs was unrelated to its policy of unlawfully tying Spot Cable Ad Rep Services to Interconnect Services. That argument has nothing to do with whether Dr. Furchtgott-Roth's opinions are admissible.

Finally, Comcast similarly argues (at 18) that it cannot be held to have engaged in exclusive dealing until it signed contracts with ██████████████. But that criticism misses the mark for the same reasons discussed immediately above. And in any event, Dr. Furchtgott-Roth's opinion relates to the nature of the economic arrangements between Comcast and certain MVPDs. *See* Report ¶ 73 ("Comcast Spotlight's exclusive dealing arrangements are apparent from the contracts it signs with its MVPD clients.").

### III. Dr. Furchtgott-Roth's Opinions Are Supported by Sound Methodology and Evidence

Comcast's remaining arguments provide no basis for exclusion of his opinions.

#### A. Dr. Furchtgott-Roth Is Qualified To Offer an Opinion About Tying Conduct, and His Conclusions are Consistent with Economic Literature

Comcast's suggestion (at 12-13) that Dr. Furchtgott-Roth is not qualified to opine on tying because he has never "taught tying to economics graduate students, published an article on tying in a peer-reviewed journal, or previously testified as an expert on tying" ignores the fact that analysis of exclusionary conduct—like Comcast's unlawful tying—is at the core of industrial organization economics, in which Dr. Furchtgott-Roth is indisputably an expert. *See Baumholser v. Amax Coal Co.*, 630 F.2d 550, 551 (7th Cir. 1980) (geologist was qualified to opine about how damages were caused by blasting operations despite "[t]he fact that he had little

actual experience in the study of blasts from coal mining operations" because his opinions were "based on general geological principles"). Moreover, as Comcast concedes (at 13), Dr. Furchtgott-Roth's academic work has included analysis of tying precedents specifically, and he has been engaged as a consultant to address potential economic concerns with proposed business arrangements, including tying concerns. *See* Furchtgott-Roth Dep. 14:7-14, 17:12-24:15. His unquestioned expertise in telecommunications makes him especially well qualified to opine on anticompetitive conduct in this context.

Comcast's assertion (at 13-14) that Dr. Furchtgott-Roth's "tying opinions do not rest on any generally accepted economic principles or methods" is likewise baseless. It is well recognized in the economic literature—including the treatise cited in Dr. Furchtgott-Roth's Report—that tie-ins can harm competition when they lead to enhanced market power in the tied-product market by excluding or destabilizing effective competitors, as Comcast's conduct did here. *See, e.g.*, 10 Areeda & Hovenkamp ¶ 1704.[10] Such monopolization is harmful even if it does not "cause immediate output reductions or price increases" because "[t]he disappearance of rival firms in the tied market . . . eliminates competitive spurs toward cost reduction, innovation, and improvements in the production of that product," which usually leads the monopolist to "choose 'the quiet life' rather than aggressive progress." *Id.* ¶¶ 1705a-1705b.

Dr. Furchtgott-Roth relied on these very principles to formulate his tying opinions in this case. In particular, he discussed how Comcast's tying conduct "ensured that MVPDs could no longer obtain Spot Cable Ad Rep Services from Viamedia if they wanted to obtain Interconnect

---

[10] *See also, e.g.*, Michael D. Whinston, *Tying, Foreclosure, and Exclusion*, 80 Am. Econ. Rev. 837, 839 (1990) ("[B]y tying, the monopolist reduces the sales of its tied good market competitor, thereby lowering his profits below the level that would justify continued operation.").

Services from Comcast Spotlight," and how that coercive choice led to a Comcast monopoly

over the tied product (Spot Cable Ad Rep Services) in the Chicago and Detroit DMAs. *See*

Report ¶¶ 60, 67-70, 86-90. Dr. Furchtgott-Roth also discussed and relied upon examples of the

extensive record evidence showing that Comcast's purpose for its tying policy was ███████████

████████████████████████████████████. *Id.* ¶¶ 65-66. He also examined in

detail Comcast's purported ████████ justifications for its tying conduct, concluding that those

putative justifications "do not make economic sense, are contradicted by evidence in the record,

and/or are not pro-competitive." *See id.* ¶¶ 97-120.

### B. Dr. Furchtgott-Roth's Opinions Regarding Separate Products Are the Result of Reliable and Accepted Methods

Comcast's claim (at 14-18) that Dr. Furchtgott-Roth's opinions regarding separate

products "lack[] any foundation in generally accepted economic methodology," is wrong because

Dr. Furchtgott-Roth's opinion is solidly grounded in marketplace evidence. As this Court has

noted, the two-products inquiry "turns . . . on the character of the demand for the two items."

ECF No. 36, at 27. Applying that correct test, Dr. Furchtgott-Roth reviewed economic

arrangements among MVPDs, Interconnect operators, and providers of Spot Cable Ad Rep

Services—as well as record evidence about those arrangements—to determine whether there is

separate demand for Interconnect Services and Spot Cable Ad Rep Services. He found

numerous examples of the two kinds of services being provided separately, and further found

that those examples "collectively account for a substantial amount of the economic activity in the

spot cable advertising marketplace." Report ¶ 50. That satisfies the test that this Court

articulated and that Comcast acknowledges: this is solid evidence that "there is sufficient

consumer demand so that it is efficient for a firm to provide" Interconnect Services separately

from Spot Cable Ad Rep Services. *See* Mem. at 14.

Comcast nevertheless claims (at 14-16) that Dr. Furchtgott-Roth was required to apply "econometric techniques" in order to offer "admissible testimony concerning product market definition." But it offers no reason, and there is none, that the economic evidence he cited was insufficient to establish that Interconnect Services and Spot Cable Ad Rep Services are separate products: his analysis was based on "[a]ctual data and a reasonable analysis." *Reifert v. South Cent. Wis. MLS Corp.*, 450 F.3d 312, 318 (7th Cir. 2006); *see* Report ¶¶ 22-42, 45-54.

In arguing that Dr. Furchtgott-Roth was required to perform a particular kind of economic analysis, Comcast relies exclusively on cases where a plaintiff failed to do enough to exclude possible substitutes from a claimed market. But that is not the issue here: on the contrary, Dr. Furchtgott-Roth explained, based on record evidence, that "MVPDs do not view other kinds of services, such as Interconnect Services, as a substitute for Spot Cable Ad Rep Services," Report ¶ 41, and Comcast never questions that this conclusion was based on sound methodology and adequate evidence.[11] Instead, the issue here is whether, as Comcast has argued, Interconnect Services are an inextricable part of Spot Cable Ad Rep Services. The marketplace evidence demonstrates that they are not.[12]

---

[11] By contrast, in *Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661, 664 (7th Cir. 2004), the question was whether "at-shelf coupon dispensers are a distinct market"; the plaintiff offered no evidence (for example, evidence concerning co-variance of prices) to exclude the possibility that other "promotional devices" were substitutes in the same market. In *AFMS LLC v. United Parcel Service Co.*, 2014 WL 12515335, at \*6-7 (C.D. Cal. Feb. 5, 2014), the proffered expert did not have any "expertise in either economics or the [relevant] industry"; his opinion related to the contours of the relevant market (not whether there was sufficient demand to provide two non-substitute products separately); and the expert did not "define or explain the methodology he used." None of that is true here.

[12] Comcast criticizes Dr. Furchtgott-Roth's citation to Viamedia's interrogatory responses, but, as Dr. Furchtgott-Roth testified at his deposition, he cited Viamedia's interrogatory responses in one of the paragraphs of his Report because he ███████████████████████████████████████████████████████████████████████████████████ Furchtgott-Roth Dep. at 90:13-91:2, 95:9-15. He further clarified several times

Comcast contends (at 16-17) that Dr. Furchtgott-Roth's separate-products analysis "does not actually focus on consumer demand" because the MVPDs discussed in his Report ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But, as explained above, prior to 2012, the arrangements among ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ensured that ▮▮▮▮▮▮▮▮ were able to obtain Spot Cable Ad Rep Services from Viamedia and Interconnect Services from Comcast. *See supra* pp. 7-9. Just as important, Comcast says nothing about the additional contractual arrangements that Dr. Furchtgott-Roth analyzed and relied on. Comcast's disagreement with Dr. Furchtgott-Roth's conclusions about what the evidence shows is not a basis for excluding his testimony. *See Smith*, 215 F.3d at 718.

### C. Dr. Furchtgott-Roth Ruled Out Alternative Explanations for Comcast's Monopolization of the Market for Spot Cable Ad Rep Services

Comcast also contends at multiple points (at 6-7, 11, 13) that Dr. Furchtgott-Roth "fail[ed] to consider obvious alternative explanations" for marketplace developments, including Viamedia's exclusion from the Chicago and Detroit DMAs. These contentions are mistaken because Dr. Furchtgott-Roth thoroughly examined Comcast's proposed justifications for its conduct, including Comcast's assertion that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Report ¶¶ 97-120. He concluded that "Comcast's proposed justifications do not make economic sense, are contradicted by evidence in the record, and/or are not pro-competitive." *Id*. ¶ 97. Specifically, Dr. Furchtgott-Roth rejected Comcast's hypothesis of ▮▮▮▮▮▮▮▮▮▮▮▮ because "[i]f, as Comcast Spotlight asserts, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ then there would have been no need for Comcast

---

(to avoid the very mischaracterization Comcast now attempts) that he ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id*. at 91:20-95:7, 101:17-102:20, 108:14-109:20, 122:17-123:6, 314:2-315:3.

Spotlight to stack the deck in its favor by using its market power to exclude its main rival: Comcast Spotlight should have been able to beat Viamedia on a level playing field." *Id.* ¶ 108.

Comcast posits (at 6) that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ is an "obvious . . . explanation[]" for Viamedia's sudden lack of competitiveness in 2012. But ▉▉▉ ▉▉▉ occurred *after* Viamedia already had been rendered less competitive in 2012, suggesting the opposite flow of causation. Comcast also claims that it enjoyed a purported ▉▉▉▉▉ ▉▉▉▉ but Dr. Furchtgott-Roth considered and rejected that alternative explanation. *See* Rebuttal Report ¶¶ 6-19, 46-52; Furchtgott-Roth Dep. at 288:3-22. Moreover, a purported ▉▉▉▉▉▉▉▉▉▉ would not explain the sudden change in competitive dynamics that occurred in 2012 following Viamedia's exclusion from the Chicago and Detroit Interconnects.[13] There is likewise no merit to Comcast's contention (at 11-12) that Dr. Furchtgott-Roth "fail[ed] to take into account" Viamedia's and Comcast's contractual arrangements with MVPDs. Dr. Furchtgott-Roth addressed those arrangements at length in his reports. *See, e.g.*, Report ¶¶ 22-53.[14]

### D. Dr. Furchtgott-Roth's Opinion Does Not "Usurp" the Jury's Role

Comcast claims (at 18-19) that Dr. Furchtgott-Roth's review of the evidence, in certain cases, "would usurp the role of the jury" because they do not "add[] any economic insight," among other reasons.[15] But Dr. Furchtgott-Roth appropriately discussed record evidence to

---

[13] Comcast cites an e-mail written by a Viamedia investor referring to Viamedia's ▉▉▉▉▉▉▉▉▉▉▉ but the author of that e-mail explained at his deposition, consistent with Dr. Furchtgott-Roth's analysis, that he ▉▉▉▉▉▉▉▉ *See* Ex. 6 (Froetscher Dep.) at 317:4-13. Comcast can try to rely on that e-mail at trial; it has nothing to do with the admissibility of Dr. Furchtgott-Roth's opinions.

[14] Comcast (at 13 n.11) criticizes Dr. Furchtgott-Roth for characterizing Comcast's testimony that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ as an ▉▉▉▉▉▉▉▉. With respect, Comcast's problem is with its executive's candor, not Dr. Furchtgott-Roth.

[15] To avoid burdening the Court, Viamedia does not here provide a citation-by-citation rebuttal to the dozens of paragraphs cited by Comcast in support of this kitchen-sink argument.

-18-

support his economic opinions—he is not "simply read[ing] and interpret[ing] documents," *see*

*Sullivan v. Alcatel-Lucent USA Inc.*, 2014 WL 3558690, at *5 (N.D. Ill. July 17, 2014). For

example, Comcast cites as "speculation" (at 18) Dr. Furchtgott-Roth's statement that "MVPDs

like WOW! and RCN . . . ███████████████████████████████████

████████████████████████████████████████████████████

███████ Report ¶ 64. But that observation was both corroborated by the record evidence

cited in support[16] and offered in service of Dr. Furchtgott-Roth's economic opinions about

whether MVPDs were coerced by Comcast's conduct in light of Comcast's monopoly power.

"What's important are the core conclusions and the underlying evidence," and at the

summary judgment stage "judges can usually sift through the rest of it without editing the

evidence in advance." *Marine Travelift Inc. v. ASCOM SpA*, 2015 WL 9008254, at *2 (E.D.

Wis. Dec. 15, 2015). Importantly, "most judges (and jurors) would understand that a[n] [expert]

does not possess mind-reading abilities." *Id*. When Dr. Furchtgott-Roth uses words like

"understood" in his Report, he is summarizing facts to explain his opinions or offering an

economic interpretation of the evidence, not offering opinions about what the facts are. *See, e.g.*,

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, 2016 WL 6091244, at *2-3

(N.D. Ind. Oct. 19, 2016) ("As to tying, an economist might also be asked to analyze whether or

how certain facts in the record meet the applicable standard for coercion."). Likewise, Dr.

Furchtgott-Roth's analysis of whether Comcast's stated justifications for its conduct "make

---

Rather, Viamedia presents illustrative responses to address the gravamen of Comcast's argument.
All of Dr. Furchtgott-Roth's testimony is admissible, and Viamedia would be happy to present a
more granular response to Comcast's Part VI.A argument if the Court would find it helpful.

[16] *See* Report ¶ 64 n.81 (citing, for example, deposition testimony by WOW! agreeing
that ██████████████████████████████████████████████████
██████████████████████████████████████████████ ).

economic sense," *see* Report ¶ 97, would aid the jury in assessing the credibility of those justifications.[17] *See Appleton Papers Inc. v. George A Whiting Paper Co.*, 955 F. Supp. 2d 947, 953 (E.D. Wis. 2013) (finding "expert testimony helpful . . . in explaining what would have made economic sense"), *aff'd in relevant part and rev'd in part sub nom. NCR Corp. v. George A Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014).[18]

Comcast also contends (at 20) that Dr. Furchtgott-Roth should not be permitted to offer opinions that touch upon the "reputational harm" that Viamedia suffered as a result of Comcast's conduct. That argument appears to be based on Dr. Furchtgott-Roth's testimony clarifying that ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Furchtgott-Roth Dep. at 317:10-318:22. Dr. Furchtgott-Roth was simply observing the economic relevance of a business's reputation in analyzing the consequences of Comcast's conduct. He does not purport to quantify reputational harm or weigh the extent to which such harm might have caused financial damage to Viamedia. Thus, the absence of some formal "method" for computing reputational harm is irrelevant to the admissibility of Dr. Furchtgott-Roth's opinions.

## CONCLUSION

For the foregoing reasons, Comcast's motion to exclude should be denied.

---

[17] For example, it will be for the jury to decide whether ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ is a credible justification for Comcast's conduct, but Dr. Furchtgott-Roth's opinion that "Comcast Spotlight . . . should be indifferent as to whether it is compensated for its services by an MVPD or by a third-party spot cable ad representative" would aid the jury in making that determination through the application of economic principles. *See* Report ¶ 106.

[18] To the extent Dr. Furchtgott-Roth's opinions are based "on assumptions that are necessarily at odds with [Comcast's] view of the evidence," "[t]hat does not mean that [he] has made impermissible credibility determinations that preclude him from testifying." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006).

Dated: February 14, 2018

Respectfully submitted,

/s/ *Richard J. Prendergast*
James M. Webster, III (*pro hac vice*)
Aaron M. Panner (*pro hac vice*)
Derek T. Ho (*pro hac vice*)
Kenneth M. Fetterman (*pro hac vice*)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
jwebster@kellogghansen.com
apanner@kellogghansen.com
dho@kellogghansen.com
kfetterman@kellogghansen.com

Richard J. Prendergast
Michael T. Layden
Collin M. Bruck
RICHARD J. PRENDERGAST, LTD.
111 W. Washington Street
Suite 1100
Chicago, Illinois 60602
(312) 641-0881
rprendergast@rjpltd.com
mlayden@rjpltd.com
cbruck@rjpltd.com

*Counsel for Plaintiff Viamedia, Inc.*

## CERTIFICATE OF SERVICE

I, Richard J. Prendergast, an attorney of record in the above-captioned case, hereby

certify that on February 14, 2018, I caused to be served a true and correct copy of Viamedia,

Inc.'s Response in Opposition to Defendants' Motion to Exclude Opinions and Proffered

Testimony of Dr. Harold Furtchgott-Roth Under Seal upon the following counsel via electronic

means:

> **Ross Benjamin Bricker**
> **Sally Kristen Sears Coder**
> **Thomas Edward Quinn**
> Jenner & Block LLP
> 353 N. Clark Street
> Chicago, IL 60654
> (312) 222-9350
> rbricker@jenner.com
> ssearscoder@jenner.com
> tquinn@jenner.com

> **Arthur Burke**
> **David B. Toscano**
> Davis, Polk & Wardwell
> 450 Lexington Street
> New York, NY 10017
> (212) 450-4000
> arthur.burke@dpw.com
> david.toscano@davispolk.com

/s/ Richard J. Prendergast

-22-

# EXHIBIT 1
# FILED UNDER SEAL

# EXHIBIT 2
# FILED UNDER SEAL

# EXHIBIT 3
# FILED UNDER SEAL

# EXHIBIT 4
# FILED UNDER SEAL

# EXHIBIT 5
# FILED UNDER SEAL

# EXHIBIT 6
# FILED UNDER SEAL