**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VIAMEDIA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16-cv-05486 |
| | ) | |
| v. | ) | Hon. Amy J. St. Eve |
| | ) | |
| COMCAST CORPORATION and | ) | |
| COMCAST SPOTLIGHT, LP, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, Circuit Judge[*]:

This antitrust suit was born when a monopolist in one market decided not to do business with a competitor from a related market. The monopolist, Comcast Corporation, denied its competitor, Viamedia, Inc., access (or access on terms Viamedia considered reasonable) to much-needed sales platforms called interconnects. Hurting as it lost revenue and customers turned to Comcast, Viamedia sued under Section 2 of the Sherman Act and various state antitrust laws. *See* Compl., R. 1; Am. Compl., R. 40.

At the motion-to-dismiss stage, the Court ruled that Comcast had no antitrust duty to deal with Viamedia and thus its refusal to deal was not cognizably anticompetitive under *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), and its progeny. *Viamedia, Inc. v. Comcast Corp.*, 218 F. Supp. 3d 674, 698–69 (N.D. Ill. 2016); *Viamedia, Inc. v. Comcast Corp.*, No. 16-CV-5486, 2017 WL 698681, at *3–6 (N.D. Ill. Feb. 22, 2017). Now, at the summary-judgment stage, the question is whether Comcast's conduct can be characterized

---

[*] Sitting by designation (R. 346).

as something more—tying, exclusive dealing, or another form of anticompetitive conduct.  It cannot.  Undisputed facts reveal that Viamedia's alternative theories are lacking as a matter of law.  Undisputed facts demonstrate that Comcast's refusal to deal with Viamedia—not coercive conduct directed at their mutual customers—is what caused Viamedia's injuries and damages.

Before the Court are Comcast's motion for summary judgment (R. 264), motion to exclude opinions proffered by Viamedia, Inc.'s damages expert, Thomas Lys, Ph.D. (R. 212), and motion to exclude certain opinions proffered by Viamedia's liability expert, Harold Furchtgott-Roth (R. 208).  For the reasons explained below, the Court grants Comcast's motion for summary judgment, grants in part Comcast's motion to exclude Dr. Furchtgott-Roth's opinions and denies the remainder as moot, grants Comcast's motion to exclude Dr. Lys's opinions, and enters judgment in Comcast's favor.

## BACKGROUND

### I.     Factual Background

Northern District of Illinois Local Rule 56.1 frames how district courts receive facts at the summary-judgment stage.  *See Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011).  Local Rule 56.1(a)(3) requires the movant to provide "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law."  L.R. 56.1(a)(3); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015).  The nonmovant must then file "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."  L.R. 56.1(b)(3)(B); *Petty v. Chicago*, 754 F.3d 416, 420 (7th Cir. 2014).  The nonmovant may also submit a separate statement of additional facts that require the denial of summary judgment,

including references to the affidavits, parts of the record, and other materials relied upon to support those facts. L.R. 56.1 (b)(3)(C); *see also Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008).

The purpose of Local Rule 56.1 statements and responses is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006); *see also United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) ("[S]ummary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact, and it was not the district court's job to sift through the record and make [a claimant's] case for him"). Unresponsive, argumentative, evasive, and unsupported denials are improper, *e.g.*, *Morrill v. Nielsen*, *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012), and district courts may disregard improper denials and deem the opponent's facts admitted, *e.g.*, *Aberman v. Bd. of Educ. of Chi.*, 242 F. Supp. 3d 672, 677 (N.D. Ill. 2017). *See also Boss v. Castro*, 816 F.3d 910, 914 (7th Cir. 2016) ("The district court's discretion to require strict compliance with Local Rule 56.1 has been upheld time and again."). Moreover, "[w]hen reviewing a summary judgment motion, courts may only consider admissible evidence." FED. R. CIV. P. 56(c); *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312-14 (7th Cir. 2017). "To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'" *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (quoting *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010)). With those principles and the Rule 56 standard in mind, the parties' respective Local Rule 56.1 statements and responses describe the following backdrop to this lawsuit.[1]

---

[1] Comcast argues that Viamedia's Statement of Additional Facts exceeds the court-ordered limit of 75 facts (*see* R. 315) by compounding multiple facts into single paragraphs, and asks the Court to strike the stated facts exceeding

## A. The Spot Cable Business and Interconnects

Cable networks, like ESPN or CNN, typically allocate small windows of air time—two to three minutes per hour—to the multichannel video programming distributors ("MVPDs") that show their programming. CSF ¶ 7.[2] These windows, according to industry parlance, are called "availabilities," "avails," or "spot cable ads." *Id.* ¶¶ 7, 9. About a quarter of the time, MVPDs retain those avails to advertise their or their affiliates' services. VSF ¶ 5. MVPDs sell the remainder to outside advertisers—and how they choose to do so is the focus of this case. *See* CSF ¶ 9.

There are many MVPDs nationwide, including Comcast, RCN Corporation, Wide Open West ("WOW!"), Charter Communications, Inc., Atlantic Broadband, and Verizon Communications. MVPDs come in different forms—cable operators, like Comcast or Charter; telecom providers, like Verizon and AT&T; overbuilders, like WOW! and RCN; and satellite providers, like DISH or DirectTV. *Id.* ¶ 8. Most MVPDs offer their services in one or more metropolitan regions, called designated market areas ("DMAs"). *Id.* ¶ 5. There are typically four or more MVPDs in a DMA. Comcast Ex. 2, Furchtgott-Roth Report ¶ 17 (R. 273-5).

In any given DMA, there are different ways in which MVPDs sell avails to advertisers. Some MVPDs sell directly through their own sales force. CSF ¶ 10. Others hire advertising-representation firms that specialize in spot cable advertising ("Ad Reps"). *Id.* ¶ 11. Viamedia is such an Ad Rep, and it has no corporate affiliation with any MVPD. *Id.* ¶ 13. Viamedia, in fact,

---

that limit. R. 339 at 25. Although Comcast has a point—Viamedia's fact-packing borders on gamesmanship—the Court, in its discretion, will not strike any of Viamedia's stated facts. *See Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 655 (7th Cir. 2011) (courts have "broad discretion" in enforcing local rules). Comcast is (though less so) guilty of the same tactic, and the additional facts Viamedia offers do not impact the Court's analysis.

[2] The Court will refer to Comcast's Rule 56.1 Statement of Undisputed Facts with Viamedia's responses (R. 327) as "CSF," and Viamedia's Rule 56.1 Statement of Additional Facts with Comcast's responses (R. 341) as "VSF." Unless otherwise noted—specifically, with a "Resp. to ¶"—a citation to a paragraph refers to the paragraph itself and not to the opposing party's response.

is the only independent Ad Rep with significant market presence. VSF ¶ 9.[3] Comcast, under the trade name Comcast Spotlight, also does business as an Ad Rep, both on its own behalf and on behalf of other MVPDs.[4] CSF ¶ 5.

When an MVPD hires an Ad Rep, the two typically enter into an "advertising purchase and sale" agreement. *Id.* ¶ 11. Under these agreements, an Ad Rep is responsible for managing and selling an MVPDs' avail inventory (or some portion of it) to advertisers. *Id.* ¶¶ 11–12; VSF ¶ 1. Ad Reps can represent their MVPD customers: (1) locally, selling only a part of an MVPD's avails in a DMA to local advertisers; (2) regionally, selling all of the MVPD's avails in a DMA; or (3) nationally. Furchtgott-Roth Report ¶ 21. In any event, Ad Reps' sales responsibilities entail ancillary responsibilities, too, including: marketing and pricing the avails; maintaining the software and hardware needed to run, insert, traffic, monitor and advertise spot cable ads; organizing inventory into schedules and ensuring each ad runs correctly during those schedules; and performing financial services, like accounting, billing, and collection. VSF ¶ 1. Ad Reps are also responsible for working with interconnects to sell avails. *Id.* These services make up "Ad Rep Services," according to Viamedia. *Id.*; *see also* Furchtgott-Roth Report ¶¶ 22–29.

An interconnect is a "one stop shop" where advertisers can purchase spot cable ads on a DMA-wide basis. CSF ¶ 16. Developed by MVPDs in the 1990s, interconnects solve a market inefficiency. Before interconnects, an advertiser wanting to reach television audiences with commercials running at the same time on the same channel across the DMA had to either rely on

---

[3] Comcast challenges this fact, proffered by Viamedia's expert Dr. Furchtgott-Roth, as unsupported because Dr. Furchtgott-Roth's opinions are inadmissible. *See* Furchtgott-Roth Report ¶ 44. Comcast, however, did not move to exclude this opinion from Dr. Furchtgott-Roth's report. *See* R. 211.

[4] Comcast Cable Communications Management, LLC is a successor to Comcast Spotlight, and it is a wholly owned subsidiary of Comcast Corporation. CSF ¶ 5. Both parties nevertheless refer to Comcast's spot cable ad rep business as Spotlight, and so will the Court.

over-the-air broadcast stations exclusively or negotiate separately with each MVPD. CSF ¶¶ 14–15, Resp. to ¶ 14. An interconnect—of which there is one per DMA—fixes that problem by pooling together avails among the DMAs' MVPDs, scheduling allocations, selling and coordinating the sale of those avails, and billing the parties. *Id.* ¶ 17, Resp. to ¶ 17. These collective services make up "Interconnect Services," according to Viamedia. *Id.*; *see also* Furchtgott-Roth Report ¶¶ 30–42.

Over the last decade or so, the largest MVPD in a DMA has come to operate that DMA's interconnect. *Id.* ¶ 18; *see also* Am. Compl. ¶¶ 13, 44. In operating the interconnect, the controlling MVPD makes investments to support and maintain the platform. The degree and nature of those investments are disputed, but, at a minimum, MVPDs invest in and maintain a sales infrastructure for the interconnects. CSF ¶ 20, Resp. to ¶ 20; *see also* Comcast Ex. 14 at 147:11–14 (David Solomon, Viamedia's Chief Revenue Officer, testifying that, "I'm sure [Comcast] ha[s] over the past 18 years . . . spent significant [sic] to establish support, build and maintain their infrastructure" over the interconnects").

Ad Reps, pursuant to the purchase and sale agreements, profit from the sale of MVPDs' avails based on an agreed revenue share, or split, with the MVPD. CSF ¶ 38. The split is the percentage division of the revenue generated from the avails' sales, with a share going to the Ad Rep and the remainder to the MVPD. *Id.* A higher split share for the Ad Rep means a worse price for the Ad Rep's services to the MVPD, and vice versa. *Id.* ¶ 39. Also important, of course, is the amount of revenue generated—an MVPD could concede a less favorable split if it thought that the Ad Rep would be able to generate more revenue. *Id.*, Resp. to ¶¶ 38, 39. Ad Reps also sometimes provide MVPDs with minimum-revenue guarantees. *Id.* ¶ 40. Revenue splits and guarantees are "critical points of competition" between Ad Rep firms vying for MVPD

business.  *Id.* ¶ 41.

As to other terms of Ad Rep-MVPD agreements, the industry standard is exclusive, region-wide, full-turnkey representation.  CSF ¶¶ 25–27.  In a full-turnkey representation, the MVPD sells all of its avails in one or more DMA (absent the portion it wants to retain for self-advertising) to a single Ad Rep.  *Id.*  The Ad Rep then enjoys the "exclusive right to manage and sell" the avails.  *Id.* ¶ 27; VSF ¶ 2.  This arrangement offers "one stop shopping" for both MVDPs and Ad Reps.  CSF ¶ 28.  Full-turnkey representation comes with other services, too; Viamedia, for example, assists MVPDs with their branding efforts, product promotions, and technical problems.  VSF ¶ 6.

Though the most prominent, full-turnkey is not the only form of Ad Rep Services.  Some MVPD customers hire Ad Reps to represent them locally, and sign over only a portion of their avails in a DMA.  *E.g.*, Furchtgott-Roth Report ¶¶ 24–25; *see also id.* ¶ 53 ("Spot Cable Ad Rep Services and Interconnect Services are separate products regardless of whether Spot Cable Ad Rep Services are provided on a full turnkey basis").  Other MVPDs may self-provide Ad Rep Services.  Furchtgott-Roth Report ¶¶ 24–25.

Interconnect operators can also work directly with an MVPD customer to sell a portion of the MVPD's avails without a third-party Ad Rep.  *See id.* ¶ 53; CSF ¶ 29.  This arrangement is called an "interconnect-only" agreement.  CSF ¶ 30.  In such an agreement, the MVPD sells a portion of its avails to the interconnect operator for sale on a DMA-wide basis.  *Id.* ¶ 29.  Interconnect-only agreements allow interconnect operators to provide Interconnect Services directly to MVPDs.  VSF ¶ 67.  To sell the remaining avails on a local (*i.e.*, not regional or DMA-wide) basis, MVPDs with an interconnect-only agreement may sell their own avails or hire an Ad Rep for "local-only" agreements.  CSF ¶¶ 29, 31, 33, 126; *see also* VSF ¶ 67.

Verizon and Frontier, Verizon's successor in certain DMAs, have previously opted for this arrangement in some DMAs. CSF ¶¶ 32–37. For its part, Comcast has been willing to enter into interconnect-only agreements; since December 2011, 14 percent of Comcast's agreements with MVPDs have been interconnect-only. *Id.* ¶ 129. Comcast entered into its most recent interconnect-only deal in September 2016. *Id.* ¶ 125; Comcast Ex. 58.

**B. Comcast's Competition with Viamedia and Control of the Interconnects**

Viamedia and Comcast compete as Ad Reps for business from MVPD clients in many DMAs. VSF ¶ 9. The record reflects that both have respective advantages. Comcast, as a large MVPD, and in some DMAs the largest (and therefore the operator of the interconnect), requires less incremental operation expenses to represent fellow MVPDs. CSF ¶ 115; Comcast Ex. 96 at 16 (internal Viamedia presentation stating "Viamedia can not [sic] compete economically within the footprint of a major cable company"); *see also* Comcast Ex. 18 at 93:5–19. Particularly relevant here, Comcast operates the interconnects in Chicago, Detroit, and Hartford, Connecticut. *Id.* ¶ 10. At the same time, some MVPDs have expressed that "all things being equal" they would prefer that a competitor, like Comcast, not represent them. VSF ¶ 7; Viamedia Ex. 69 at 8 ("RCN is not comfortable having its largest and most formidable rival as its representative in the spot cable market"). This benefits an unaffiliated Ad Rep, like Viamedia. *Id.* Viamedia's former Chief Financial Officer, Christopher Black, has also testified that Viamedia had "[l]ong term relationships with . . . certain MVPDs" and provided strong customer service. *Id.* ¶¶ 6, 8; Viamedia Ex. 8. Both Viamedia and Comcast pursue full-turnkey relationships with their MVPD clients, *Id.* ¶ 55; VSF ¶ 7, although, as noted, Comcast has entered into interconnect-only agreements with some frequency.

Ad Reps require interconnect "access" to compete effectively for MVPDs' business

because of the substantial amount of advertising revenue interconnects generate. Am. Compl. ¶ 73; CSF ¶ 111; VSF ¶ 20. The parties engage in a semantic debate about whether Ad Reps access interconnects "on behalf" of their MVPD clients, and whether the MVPD clients "feel" as though they participate in the interconnects, but the economic facts of the transaction are straightforward. For an Ad Rep to obtain access, the interconnect operator contracts with the Ad Rep to acquire a portion of ad inventory from the Ad Rep, which the Ad Rep has already acquired responsibility for selling from its MVPD-client. *See* CSF ¶ 42; Comcast Ex. 34. The interconnect operator then arranges for the sale of those avails on the interconnect, and distributes proceeds to the Ad Rep accordingly. *Id.*

This was the agreement Comcast and Viamedia entered into in 2003. *Id.* ¶¶ 42–43. Pursuant to that agreement, Comcast had the exclusive right to sell through its Chicago and Detroit interconnects a portion of an ad inventory for which Viamedia had acquired responsibility from two of its clients, RCN and WOW!. *Id.* ¶ 43. Viamedia's representations of RCN and WOW! were, as is typical, exclusive and full-turnkey, meaning that RCN and WOW! could not resell their avails through another third party in the Chicago and Detroit DMAs. *Id.* ¶¶ 44, 49. Viamedia's exclusive relationship with RCN was to expire at the end of 2015, and its exclusive relationship with WOW! was to expire at the end of 2014. CSF ¶¶ 88, 96; VSF ¶¶ 26, 32. Further, the 2003 agreement contained a non-solicitation clause, which prohibited Comcast from contacting RCN or WOW! for certain periods. CSF ¶ 45. The 2003 agreement between Comcast and Viamedia contemplated an expiration date of May 31, 2012. *Id.* ¶ 46.

Months before that expiration date, in December 2011, Comcast notified Viamedia that it would not be renewing the agreement. VSF ¶ 15; CSF ¶ 47. As a result, from June 2012 until the expiration of Viamedia's exclusive contracts with RCN and WOW!, Viamedia, RCN, and

WOW! lost out on revenue they may have made if Viamedia could have continued to use Comcast's interconnects.  *See* VSF ¶ 17.

Comcast did not renew its contract with Viamedia so that it could pursue full-turnkey relationships with RCN and WOW!.  *Id.* ¶ 15.  According to Comcast, it "prefers to do direct deals with MVPDs rather than intermediaries like Viamedia."  CSF ¶ 48.  Put another way, Comcast's strategy, starting in 2011, was "to get" MVPDs to employ Comcast on a full-turnkey basis.  VSF ¶ 15; Viamedia Ex. 57; *see also, e.g.*, Viamedia Ex. 53 (citing Comcast's "[r]ealigned business strategy for 2012 and beyond with non-renewal of Viamedia contract for allowing for full turnkey opportunities into the future.").  To that end, Comcast stopped contracting "with 'middlemen' media firms, such a Viamedia."  Viamedia Ex. 69 at 9.  One Comcast executive explained: "Working through a middleman, intermediary, like Viamedia really brought no value to the table other than their contract with their respective MVPDs," and so the company looked to deal directly with the MVPDs.  Viamedia Ex. 21 at 167.

Whatever Comcast's motivations, its strategy and Viamedia's resultant inability to access the interconnects in Chicago and Detroit cost Viamedia, RCN, and WOW! "millions of dollars in revenue" between June 2012 and 2015.  VSF ¶ 23.  This came as no surprise to Comcast.  In 2011, it knew that Viamedia had the exclusive right to sell all of WOW! and RCN's avails in Chicago and Detroit "for several years into the future,"  VSF ¶ 14, and it conducted an internal analysis that projected that its decision to not renew with Viamedia would negatively impact Comcast Spotlight, Viamedia, RCN, and WOW! in 2012, *id.* ¶ 16.  In addition to Chicago and Detroit, Comcast has denied Viamedia's request to enter into an interconnect agreement with it in the Hartford DMA, where Viamedia represents Frontier.  *Id.* ¶ 18.

In 2014, however, Comcast and Viamedia began negotiating a contract to permit

Viamedia access to the Chicago, Detroit, and Hartford interconnects.  *Id.*, Resp. to ¶ 18.  WOW! even got involved, and directly requested that Comcast allow its avails (still contracted to Viamedia) to be sold on the interconnects "immediately."  *See* VSF ¶ 19.[5]  Yet Comcast and Viamedia failed to reach terms.  Viamedia's Chief Executive Officer, Mark Lieberman, called Comcast's offer "neither fair nor reasonable."  Comcast Ex. 116.

### C. Viamedia's Subsequent Lost Business

From 2011, when Comcast notified Viamedia that it would not renew their interconnect agreement in Chicago and Detroit, until 2016, when Viamedia filed this lawsuit, Viamedia operated in 90 DMAs representing at least nine MVPDs.  CSF ¶¶ 54, 57.  In that period, Viamedia bid for and lost several MVPD clients—and it attributes many of those losses, and others, to Comcast's conduct in Chicago, Detroit, and Hartford.

#### 1. RCN

Up until 2015, Viamedia was RCN's only Ad Rep nationwide.  VSF ¶ 32.  In 2014, RCN and Viamedia began to negotiate renewing their full-turnkey agreements.  CSF ¶ 96.  During negotiations, Viamedia "stepped back its guarantees" and gave a "less favorable" offer in November of that year, which caused RCN to react negatively.  CSF ¶ 97.  RCN then, and for apparently the first time in its relationship with Viamedia, requested Viamedia's financials, which showed that the company was suffering.  VSF ¶ 33.  According to Viamedia, without interconnect access in Chicago and Detroit, it was "unable to make a competitive financial offer."  *Id.* ¶ 33.  RCN requested a bid for exclusive, full-turnkey services from Comcast in 2015.

---

[5] Viamedia paints these requests by WOW! as "directly solicited proposals."  VSF ¶ 19.  To the extent Viamedia means that WOW! sought a direct, interconnect-only deal with Comcast, it is mistaken.  The record makes clear that WOW! in 2014 was still under contract with Viamedia (and so could not "directly" engage Comcast for anything, even an interconnect-only deal), and that WOW!'s 2014 request sought "to get *Viamedia* back into the Chicago and Detroit interconnects."  Viamedia Ex. 14 at 108:25–109:4; *id.* at 105:16–19 (emphasis added).

CSF ¶ 99.  It never sought from Comcast an interconnect-only agreement.  *See id.*  Comcast ultimately offered superior terms, which, as a former RCN executive testified, made the offers "nowhere near equal" and a "not [ ] very difficult decision" for RCN to make.  *Id.* ¶ 100.   It selected Comcast as its full-turnkey Ad Rep, knowing that its decision could result in Viamedia exiting the Chicago DMA market.  *Id.* ¶ 103.

 RCN understood that it could not have its avails sold on Comcast-operated interconnects if it sought to do so through a third-party Ad Rep, like Viamedia.  *Id.*, Resp. to ¶ 104; *see also* VSF ¶ 19.  RCN wrote to the Federal Communications Commission during Comcast's proposed merger with Times Warner Cable ("TWC"), and explained that Comcast "limit[s] access to the interconnects to those firms [*i.e.*, MVPDs] that eschew the use of Viamedia and other third party representatives."  Viamedia Ex. 69.  It cited Comcast's policy, that it "does not typically contract with 'middlemen' media firms, such as Viamedia."  *Id.*

## 2.  WOW!

WOW! and Viamedia's relationship began in 2001.  VSF ¶ 26.  As of 2015, and after several contract renewals, Viamedia represented WOW! in 12 DMAs.  *Id.*  Expecting its contract with WOW! to expire at the end of 2014, WOW! solicited bids from Viamedia and Comcast in October 2013.  CSF ¶ 88.  WOW! selected Viamedia, but only for a year—to the end of 2015.  *Id.* ¶ 89.  In 2015, WOW! issued another bid to Comcast and Viamedia seeking proposals for exclusive, full-turnkey representation in eight DMAs, including Chicago and Detroit.  *Id.* ¶ 90.  WOW!, like RCN, never requested an interconnect-only deal from Comcast.  *See id.*  By the 2015 request for bids, WOW! was "very unhappy" that Viamedia had not been able to sell its avails on the Chicago and Detroit interconnects.  VSF ¶ 27.  Comcast again offered better financial terms to represent WOW! in the Chicago and Detroit DMAs, and WOW! selected

Comcast in those regions.  CSF ¶¶ 91, 92.  In so doing, WOW! recognized that its decision could force Viamedia out of the Chicago and Detroit regions.  *Id.* ¶ 94.  WOW!, however, selected Viamedia to represent it in other DMAs, like Columbus, Cleveland, and Tampa.  VSF ¶ 29.

WOW! valued having its avails sold on the interconnects and the resulting substantial revenue.  *Id.* ¶ 28.  WOW!, like RCN, understood that if it wanted its avails sold on the Comcast-operated interconnects in Chicago and Detroit, it would need to directly contract with Comcast—it could not do so through Viamedia.  *Id.*  In weighing Viamedia and Comcast, for example, WOW! listed Comcast's interconnect access as a "pro" and Viamedia's lack thereof as a "con." Viamedia Ex. 68.  Internal WOW! emails similarly reflect that the company believed it needed to have a "rep agreement" with Comcast to have its avails sold on the interconnects.  CSF ¶ 95, Resp. to ¶ 95.

### 3.  Verizon

In 2006, Viamedia and Verizon entered into a full-turnkey representation agreement for nine DMAs.  CSF ¶ 58.  In 2009, the parties extended the agreement through December 2013, but contracted to allow for Verizon to "negotiate for the sale of regional and/or national Commercial Advertising in any Other Market by means of an 'interconnect' in such DMA," including Dallas, Los Angeles, and New York.  *Id.* ¶ 59.  In May 2010, Verizon and TWC entered into an agreement, pursuant to which TWC purchased 40 percent of Verizon's avails in Dallas, Los Angeles, and New York—where TWC operated the interconnects—for sale on TWC's interconnects.  *Id.* ¶ 60.  That agreement contained a "Local Business Option."  If TWC met certain performance metrics in 2011 and 2012, it could "elect to present Verizon's local advertising sales business" beginning in 2014.  *Id.* ¶ 61.

In January 2013, pursuant to the Verizon-TWC contract, TWC notified Verizon that it

was contemplating exercising the Local Business Option and attached its performance-metric calculations. *Id.* ¶ 62. Verizon responded on February 15, 2015, with a metrics report. Under the original TWC-Verizon contract, TWC had until March 15, 2013, or 30 days after receipt of the metrics report to exercise its Local Business Option. VSF ¶ 50. On March 15, 2013, however, the parties amended the agreement and extended the date by which TWC could exercise the Local Business Option to April 5, 2013. VSF ¶ 50, Resp. to ¶ 50. TWC exercised the Local Business Option on that day. *Id.* ¶ 50. Verizon then replaced Viamedia with TWC in those DMAs. *See* CSF ¶ 65. Further, and also in 2013, Verizon informed Viamedia that it had selected other Ad Reps—including Bright House, Cox, and Comcast—to represent it in several respective DMAs. VSF ¶ 47, Resp. to ¶ 47.

Before then, Verizon and Viamedia had started to negotiate for Viamedia's continued representation after 2013. *Id.* ¶ 50. During those negotiations, Verizon expressed concerns about Viamedia's fiscal health. *Id.* ¶ 50. In each DMA that Viamedia lost Verizon's business, it failed to match the terms offered by the competing Ad Reps. CSF ¶ 69.

### 4. Frontier

Viamedia has been an Ad Rep for Frontier since 2010. VSF ¶ 37. In 2014, Frontier acquired AT&T's MVPD system in Hartford. CSF ¶ 71. Comcast, which operates the Hartford interconnect, had previously represented AT&T on a full-turnkey basis, and, under that agreement, any successor (like Frontier) had the right to assume Comcast's Ad Rep agreement. *Id.* ¶ 72. Frontier instead entered into an exclusive, full-turnkey agreement with Viamedia for the Hartford DMA, set to expire at the end of 2018. *Id.* ¶ 73; VSF ¶ 37. Comcast, however, has refused to enter into an agreement with Viamedia to allow for the sale of Frontier's avails on the Hartford interconnect. *Id.* ¶ 39. As a result, Viamedia and Frontier have not benefited from

those potential sales, and Frontier's revenues fell below the baselines guaranteed by Viamedia in 2015 and 2016. *Id.* ¶ 41.

Outside of Hartford, Viamedia bid for Frontier's business in Los Angeles and Dallas (where Comcast does not run the interconnects). CSF ¶ 77. Frontier rejected Viamedia's offer because it fell "significantly below market value." *Id.* ¶ 78. Viamedia also lost Frontier's business in Tampa (where Comcast also does not control the interconnects) to Bright House. *Id.* ¶ 79.

### 5. Atlantic Broadband

In 2014, Atlantic Broadband sought bids from Comcast and Viamedia for exclusive, full-turnkey representation in seven DMAs (none of which was Chicago, Detroit, or Hartford). *Id.* ¶ 82. At the time, Comcast already represented Atlantic Broadband in each DMA; Viamedia had never represented Broadband. *Id.* ¶¶ 84–85. Comcast offered Atlantic Broadband terms "superior" to Viamedia. *Id.* ¶ 86. Atlantic Broadband chose Comcast. *Id.* ¶ 87. Viamedia, however, believes that it was "well positioned" to compete for Atlantic Broadband's business, and could have offered better terms and a more substantial guarantee if it had been allowed access to Comcast-controlled interconnects. VSF ¶¶ 51, 53.

### 6. Other Claimed Losses

Viamedia also claims that Comcast's refusal to allow its acquired avails to be sold on the Chicago, Detroit, and Hartford interconnects has harmed it in a bevy of ways. The refusal, according to Viamedia, has forced it to negotiate debt amendments, and incur bank and legal fees. *Id.* ¶ 54. In addition, it has had to pay certain personnel expenses, like "retention bonuses and severance payments," as well as wasteful fixed expenses, like "rent on unused office space in Chicago." *Id.* In 2012, Viamedia generated $212 million in revenue and had $23.5 million in

EBITA annually, plus 460 employees who worked for 32 MVPD partners covering 4.7 million subscribers in 57 DMAs. *Id.* ¶ 56. Since 2012, however, Viamedia claims to have lost millions of investment dollars, its good reputation, talented employees, and the ability to renew or obtain new contracts with MVPD partners. *Id.* ¶ 57.

## II.     Procedural Background

Out of that factual backdrop, Viamedia filed this lawsuit on May 23, 2016. Viamedia brings claims of monopolization and attempted monopolization by Comcast in markets where it operates the interconnects in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Viamedia additionally raises state-law antitrust claims under the Illinois Antitrust Act, 740 ILCS 10/3, Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, and Connecticut Antitrust Act, Title 35, § 35-27.[6] (Viamedia also brought a claim for tortious interference with business expectancy, which it has since abandoned. *See* R. 326 at 14 n.2.) For Comcast's supposed antitrust wrongs, Viamedia seeks damages and asks the Court to "[e]njoin[ ] Comcast from engaging in the anticompetitive . . . conduct alleged, including any effort to exclude Viamedia or its MVPD clients from participating on a fair and open basis in the Interconnects." Compl. at 46; Am Compl. at 50.

### A.  The Motion-to-Dismiss Decisions

Comcast moved to dismiss the first complaint. R. 22, 23. As every claim of monopolization or attempted monopolization requires anticompetitive conduct, Viamedia proffered three in response to Comcast's motion to dismiss: tying, of Comcast's Interconnect Services to its Ad Rep Services; exclusive dealing, in that Comcast's contracts with MVPDs

---

[6] Comcast and Viamedia agree that there is no material difference between the federal antitrust claims and their state-law claims. R. 271 at 11 n.3; R. 23 at 15; R. 28 at 15. For the same reasons why Viamedia's federal antitrust law claims fail (as explained below), so too does its state-law claims.

were exclusive; and a refusal to deal, by denying interconnect agreements with Viamedia or offering commercially unacceptable terms.[7]  Viamedia, via a surreply, made clear that it was pursuing only "straightforward tying and exclusive dealing theories," plus refusal to deal or essential facilities claims; it was not pursuing a "free-standing" monopolization claim.  R. 32. The Court held that Viamedia sufficiently pled tying and exclusive dealing so as to permit discovery on those claims, but dismissed the refusal to deal claim without prejudice because it did not meet the high bar set by *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).[8]  Namely, Viamedia did not plead that Comcast's exclusion of it from the interconnects was irrational but for an anticompetitive purpose.  *See Viamedia, Inc. v. Comcast Corp.*, 218 F. Supp. 3d 674, 698–99 (N.D. Ill. 2016) (*Viamedia I*).

Viamedia amended its complaint, realleging its refusal to deal claim.  Comcast moved to dismiss this part of the amended complaint, R. 45, 46, which the Court granted.  Again, the Court ruled, Viamedia did not plead that Comcast's decision to exclude it from the interconnects was an independently anticompetitive act.  *Viamedia, Inc. v. Comcast Corp.*, No. 16-CV-5486, 2017 WL 698681, at *4–6 (N.D. Ill. Feb. 22, 2017) (*Viamedia II*).  As such, this case proceeded to discovery on Viamedia's tying and exclusive dealing claims.

### B.  Comcast's Liability and Damages Experts

During discovery, and in support of its case, Viamedia identified and proffered two expert witnesses: Dr. Furchtgott-Roth, to opine on Comcast's liability; and Dr. Lys, to opine on

---

[7] Viamedia also raised a monopoly-leveraging theory, but that claim is predicated on underlying anticompetitive activity.  *See Schor v. Abbott Labs.*, 457 F.3d 608, 611–13 (7th Cir. 2006).

[8] At the pleading stage, Viamedia also complained that Comcast had threatened to "shut Viamedia and its MVPD clients out" of using National Cable Communications LLC ("NCC"), a multi-DMA exchange.  *See* Compl. ¶ 59. Viamedia appears to no longer pursue that theory, as "NCC" is mentioned in neither its response brief nor its Statement of Additional Facts.

damages.

### 1. Dr. Furchtgott-Roth's Opinions

Dr. Furchtgott-Roth's opinions touch on "the nature and extent of Comcast's monopoly power," the distinction between Ad Rep Services and Interconnect Services, and the "exclusionary nature" of Comcast's actions and their impact on the Ad Rep Services market. According to Dr. Furchtgott-Roth, Ad Rep Services and Interconnect Services are "separate products" because there is a "sufficient demand to purchase" those services separately. Furchtgott-Roth Report ¶ 47. He cites "substantial evidence" in support, including Viamedia's own "business model" and the MVPDs that receive "unbundled" Ad Rep and Interconnect Services. By a "conservative" estimate, he submits, 21.5% of cable subscribers use an MVPD that relies on unbundled services, once subscribers to MVPDs that self-provide Ad Rep Services are removed from the mix. *Id.* ¶ 50. He includes in that group MVPDs that enter into full-turnkey agreements with third-party Ad Reps, which in turn contract with the interconnect operator to have a portion of the avails sold on the interconnects. *Id.* Dr. Furchtgott-Roth further notes that, although Interconnect Services also entail the selling of avails to advertisers, Ad Rep Services include additional "back office" services, unlike Interconnect Services, which entail "creating and maintaining schedules of advertising, inserting advertising, negotiating with and monitoring Interconnect operators, and allocating advertising inventory among multiple sales channels." *Id.* ¶ 51. In further support of his separate-products opinion, Dr. Furchtgott-Roth states that "some MVPDs unbundle" services by entering into interconnect-only agreements and "self-providing" Ad Rep Services. *Id.* ¶ 53.

Having defined separate products, Dr. Furchtgott-Roth explains his tying opinion. Interconnect Services are the tying product, and Ad Rep Services are the tied product. *Id.* ¶ 63.

Evidence of Comcast's tying policy, according to Dr. Furchtgott-Roth, is found in testimony in which a Comcast executive—who worked in the Chicago and Detroit DMAs—agreed with the proposition that "if an MVPD wants to get access to Comcast [Spotlight] controlled Interconnect, it has to hire Comcast [Spotlight] as its ad sales representative." *Id.* ¶ 64. Dr. Furchtgott-Roth also cites testimony and documents suggesting that WOW! and RCN "understood" that they had to purchase Ad Rep Services from Comcast Spotlight to obtain access to the interconnects in 2014 and 2015. *Id.* Dr. Furchtgott-Roth reasons further that Comcast had to "exclude" Viamedia from Comcast-controlled interconnects as a "necessary" part of this tying policy, as it ostensibly made clear in 2011 when it "announced" that it was not going to renew its Interconnect agreement with Viamedia as a "continuation of a strategy to have full turnkey direct relationships with the MVPDs." *Id.* ¶ 65. Similarly, Comcast Spotlight's chief operating officer testified that non-renewal with Viamedia "freed [Comcast Spotlight] up" to "have the opportunity to present and have a direct relationship with WOW and RCN." *Id.* That tying practice has "manifested" in at least ten other DMAs as well, according to Dr. Furchtgott-Roth, as Comcast has also declined Viamedia interconnect access in those DMAs. *Id.* ¶ 69. Dr. Furchtgott-Roth opines further that the same conduct "that amounts to tying also amounts to exclusive dealing." *Id.* ¶ 72.

These practices lead Dr. Furchtgott-Roth to conclude that Comcast has foreclosed competition in the market for Ad Rep Services. *Id.* ¶ 90. That is, "by tying Spot Cable Ad Rep Services to Interconnect Services and entering into multi-year, exclusive contracts to provide both services as a bundle, Comcast Spotlight has created a formidable competitive advantage for itself over Viamedia." *Id.* ¶ 87. There is additional market foreclosure, Dr. Furchtgott-Roth opines, because MVPDs recognize that interconnect access is necessary to maximize their profits

on avails, and Comcast has cut off Viamedia's access to Comcast-controlled interconnects.  *Id.*
¶ 89–90.

### 2. Dr. Lys's Opinions

Dr. Lys's Amended Report calculates the damages Viamedia has purportedly suffered as a result of Comcast's conduct.  He opines, ultimately, that Comcast has caused Viamedia $158 million in damages.  Comcast Ex. 6, Lys Am. Report ¶ 37 (R. 273-9).  Dr. Lys's opinions assume Comcast's liability for committing anticompetitive conduct. *Id.* ¶ 16.  His opinions make the additional assumptions—albeit phrased as "understanding[s]" in his Amended Report—that Comcast's anticompetitive behavior resulted in the loss of several MVPD contracts. *Id.* ¶¶ 57–59.  Specifically, Dr. Lys predicates his opinions on the "understanding" that "Comcast's anticompetitive conduct" caused Viamedia to lose the RCN and WOW! agreements in 2015, had a "material adverse effect on" Viamedia's retention of an agreement with Verizon in 2013, and caused Viamedia to fail to obtain an agreement with Atlantic Broadband in 2014. *Id.*  His opinions also assume that Comcast's exclusion of Viamedia from the interconnects in Chicago, Detroit, and Hartford caused Viamedia to lose interconnect-related revenues, *id.* ¶ 56, and that Viamedia lost "out of pocket expenses" from Comcast's conduct. *Id.* ¶ 60.  Dr. Lys divides his damages opinions into seven categories.  His ultimate conclusion analyzes Viamedia's damages relating to: (1) interconnect-revenue losses in Chicago and Detroit; (2) interconnect-revenue losses in Hartford; (3) lost future agreements with WOW! for two DMAs; (4) lost agreements with RCN for five DMAs; (5) lost agreements with Verizon for nine DMAs; (6) lost agreements with Atlantic Broadband for six DMAs; and (7) out-of-pocket expenses.

On April 4, 2018, the Court held an evidentiary hearing regarding Dr. Lys's opinions pursuant to *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579 (1993), and Federal Rule of

Evidence 702. At the hearing, Dr. Lys explained his Amended Report in greater detail. In addition, he confirmed that his Amended Report assumed causation. The facts supporting his causation assumptions had been provided by Viamedia's management, although Dr. Lys noted that he "poked" their assertions to ensure that they had some sound basis. Dr. Lys elaborated that he did not think causation in this case could be demonstrated with economic analysis, because the market is one for services, not commodities. At the hearing, Viamedia's counsel, too, confirmed that Dr. Lys was not offered as an expert on causation.[9]

## LEGAL STANDARDS

### I. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding summary-judgment motions, "facts must be viewed in the light most favorable to the nonmoving party"—but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotations omitted). That is, the nonmovant "must point to specific facts showing that there is a

---

[9] Belatedly, and despite not designating Dr. Lys as causation expert, Viamedia submitted additional opinions from Dr. Lys, including opinions regarding causation. The Court granted Comcast's motion to strike those opinions. R. 283.

genuine issue for trial, and inferences relying on mere speculation or conjecture will not suffice." *DiPerna v. Chicago Sch. of Prof'l Psychology*, 893 F.3d 1001, 1006 (7th Cir. 2018) (citation omitted); *see also Bunch v. United States*, 880 F.3d 938, 941 (7th Cir. 2018) ("The party that bears the burden of proof for an issue at trial must 'cite the facts which it believes [would] satisf[y]' that burden and 'demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant.'") (quoting *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015)). If the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, summary judgment must be granted." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797–98 (7th Cir. 2017) (citation and quotations omitted). "When ruling on a motion for summary judgment, '[t]he court should neither look the other way to ignore genuine issues of material fact, nor strain to find material fact issues where there are none.'" *Simpkins v. DuPage Hous. Auth.*, 893 F.3d 962, 964 (7th Cir. 2018) (quoting *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987)).

"In the field of antitrust law, summary judgment serves a vital function—it avoids wasteful trials and prevents lengthy litigation that may have a chilling effect on pro-competitive market forces." *Anderson News, L.L.C. v. Am. Media, Inc.*, --- F.3d. ----, 2018 WL 3716083, at *7 (2d Cir. July 19, 2018) (citation, modifications, and quotations omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). Indeed, "the very nature of antitrust litigation encourages summary disposition of such cases when permissible." *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 476 (7th Cir. 1988). That is not to say that there is heightened summary-judgment standard in antitrust cases—there is not. Nevertheless, at summary judgment, an antitrust claimant must "present evidence that tends to exclude the

possibility that the [defendant's] conduct was as consistent with competition as with illegal conduct." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 856 (7th Cir. 2011) (quoting *Nelson v. Monroe Reg'l Med. Center,* 925 F.2d 1555, 1578 (7th Cir. 1991)); *see also Matsushita*, 475 U.S. at 594; *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir. 1989).

## II.     Rule 702 and *Daubert* Standard

Courts may decide the admissibility of an expert witness's testimony in the context of a summary-judgment motion and when deciding whether the case presents a genuine issue of material fact warranting trial. *See, e.g.*, *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009); *see also Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 612 (7th Cir. 1993) (expert testimony must be admissible to be considered in a motion for summary judgment). "Any assessment of the admissibility of expert witness testimony begins with Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert*, as together they govern the admissibility of expert witness testimony." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017); *see also Owens v. Auxilium Pharm., Inc.*, 895 F.3d 971, 972 (7th Cir. 2018). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), "the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper,

ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017).

In deciding whether to admit expert testimony under Rule 702 and *Daubert*, "the district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphases in original). A district court's evaluation of expert testimony under *Daubert* does not "take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th Cir. 2011) ("The admissibility determination is not intended to supplant the adversarial process, and so even 'shaky' testimony may be admissible."). Once a court determines that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596); *see also Manpower*, 732 F.3d at 806. The "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis*, 561 F.3d at 705; *see also United States v. Saunders*, 826 F.3d 363, 368 (7th Cir. 2016) ("[F]or expert testimony to be admissible, the proponent of the evidence must establish that the expert's testimony is reliable (and relevant) by a preponderance of the evidence").

## ANALYSIS

Comcast argues that summary judgment is appropriate for numerous reasons: Viamedia cannot establish anticompetitive conduct; Viamedia cannot establish causation, in the antitrust sense or for damages purposes; and Viamedia cannot otherwise establish harm to competition.

The first two matters are dispositive, and so the Court will address only them.  Along the way, the Court will address Comcast's motions to exclude Viamedia's expert opinions where relevant to the analysis.

## I.     Viamedia Cannot Establish Anticompetitive Conduct

Under Section 2 of the Sherman Act, "[e]very person who shall monopolize, or attempt to monopolize" is subject to antitrust liability.  15 U.S.C. § 2; *see also* 15 U.S.C. § 15 (providing individual right of action).  But like its fraternal twin, Section 1, Section 2 bans less than its literal reading suggests.  "Simply possessing monopoly power and charging monopoly prices does not violate" Section 2.  *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571 (1966)).  Instead, liability under Section 2, whether for monopolization or the attempt at it, requires "anticompetitive conduct."  *Mercatus Grp.*, 641 F.3d at 854; *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000) ("The offense of monopoly under § 2" requires "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident"); *American Acad. Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320 (7th Cir. 1991) ("The offense of monopolization is the acquisition of monopoly by improper methods or, more commonly . . . the abuse of monopoly"); *State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1481 (7th Cir. 1991) ("Section 2 forbids not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power.").  Such conduct, or "exclusionary practices," comes in many forms—"tie-in sales . . . , group boycotts, exclusive dealing . . . , or predatory pricing."  *Schor*, 457 F.3d at 610.

Not usually counted among the traditional anticompetitive practices is a refusal to deal.

Under well-rooted antitrust principles, firms generally have the right to determine with whom they will do business. *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). That right extends to monopolists, as "antitrust law does not require monopolists to cooperate with rivals by selling them products that would help the rivals to compete." *Schor*, 457 F.3d at 610; *see also Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1025 (7th Cir. 2017) ("Even monopolists are almost never required to assist their competitors"); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 400 (7th Cir. 2000); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986).

In the flagship case of *Trinko*, the Supreme Court held that a telecommunications monopolist had no antitrust duty to deal with a rival, let alone a duty to deal on favorable terms. 540 U.S. 409–10. *Trinko* teaches:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited. Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion.

*Id.* at 407–08. A few years later, the Supreme Court echoed these principles. In *Linkline*, it held that another telecommunications monopolist had no duty to deal, let alone a duty to deal on favorable terms, in selling services to its competitors in the retail market. 555 U.S. at 450. *Linkline* confirmed that a monopolist can generally wield its "upstream" power "to prevent rival firms from competing effectively" in a downstream market. *Id.*; *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013) ("Even a monopolist generally has no duty to share (or continue to share) its intellectual or physical property with a rival.").

Indisputably, Comcast refused to deal with Viamedia by disallowing it access (or

refusing it "reasonable" access) to the Chicago, Detroit, and Hartford interconnects. *See, e.g.*, CSF ¶ 48, VSF ¶ 15. That was its right under *Trinko* and the law of this case. *See Viamedia I*, 218 F. Supp. 3d at 697–99; *Viamedia II*, 2017 WL 698681 at *4–6. As *Linkline* explains, the fact that Comcast may have refused to deal (or refused to deal on certain terms) to "prevent" Viamedia from "competing effectively" is largely irrelevant in the absence of a duty to deal. 555 U.S. at 450; *cf.* Furchtgott-Roth Report ¶¶ 97–120 (opining on whether Comcast's "proposed justifications" for "excluding Viamedia from the Chicago and Detroit Interconnects" are "persuasive"); Comcast Ex. 1.1, Report of Dennis W. Carlton (R. 273-2) (opining of the economic efficiencies of Comcast's conduct).

Viamedia, however, submits that Comcast's conduct constitutes more than a "mere" refusal to deal. R. 326 at 26. It argues that Comcast, in excluding Viamedia (and by extension, Viamedia's customers) from the interconnects and later taking RCN's and WOW!'s business, has engaged in the "distinct" practices of tying, exclusive dealing, or general exclusionary conduct. *See Viamedia I*, 218 F. Supp. 3d at 699. Yet discovery has demonstrated otherwise. The record leaves no genuine issue of material fact regarding the viability of Viamedia's alternative theories.

### A. There Is Insufficient Evidence that Comcast Engaged in Anticompetitive Tying

Viamedia claims that Comcast tied access to the interconnects, or Interconnect Services (the tying product), to Comcast's Ad Rep Services (the tied product). "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)). The Supreme

Court has emphasized that the "essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984); *see also Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008) ("The traditional antitrust concern with such an agreement is that if the seller of the tying product is a monopolist, the tie-in will force anyone who wants the monopolized product to buy the tied product from him as well, and the result will be a second monopoly."). Accordingly, a tie, whether expressly instituted or effectively applied, exists only where "the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one." Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1752b (3d ed. 2018).

### 1. No Evidence Tends to Exclude the Likelihood That Comcast, Rather Than Tying Services, Simply Refused to Deal with Viamedia

Viamedia has not identified a genuine issue of fact as to whether Comcast tied the sale of Interconnect Services and Ad Rep services.[10] A fundamental element of a tying claim— conditioning—is absent from Viamedia's construct. *See Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 592 (7th Cir. 2008); *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 207 (7th Cir. 1985).

No evidence shows that Comcast told MVPDs, expressly or impliedly, that they could only purchase Interconnect Services on the condition that they also purchase Ad Rep Services. *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979) ("we are reluctant to

---

[10] The Court assumes that Interconnect Services and Ad Rep services are distinct services for tying purposes, and that MVPDs "consider" themselves as receiving Interconnect Services from interconnect operators (like Comcast) even when they have hired a unaffiliated Ad Rep (like Viamedia) on a full-turnkey basis. *See, e.g.*, R. 326 at 27.

find a tying arrangement without some evidence that [the defendant]" created applied a "de facto tying clause"); Areeda & Hovenkamp, Antitrust Law ¶ 1700i ("products are not tied unless the supplier refuses to accommodate those who prefer one without the other").  To the contrary, it is undisputed that 14 percent of Comcast's agreements with MVPDs are interconnect-only.  CSF ¶¶ 123–24.  With an interconnect-only agreement, an MVPD is free to: forego employing any Ad Rep Services; hire another Ad Rep to sell a portion of their remaining avails on a non-full-turnkey basis[11]; and/or self-provide Ad Rep Services by selling its own avails.  *See* CSF ¶¶ 29, 32–36, 126.  In antitrust terms, the customer (an MVPD) can purchase the tying product (Interconnect Services) without purchasing the tied product (Ad Rep Services).  *Accord Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1427 (9th Cir. 1995) ("The harm from tying arrangements is the forced sale of the *tied* product, not the withholding of the tying product.") (emphasis in original).  That Comcast has so often entered into such standalone sales of the tying product belies any inference that Comcast tied its services.  *See Live Nation*, 811 F.3d at 685 (14 percent of non-tied sales "exceed [ ] sufficiently" whatever baseline is required "to cast doubt on any allegation of tying"); Areeda & Hovenkamp, ANTITRUST LAW ¶ 1756b2 (suggesting that "10 percent unbundling" rebuts "an otherwise established or presumed inference of a tying condition").

Viamedia tries to do away with this inconvenient fact in two ways.  First, it argues that Comcast did not sell interconnect-only deals in Chicago, Detroit, and Hartford, where Comcast denied Viamedia use of the interconnects.  This case, however, is not limited to those markets—Viamedia challenges Comcast's conduct in the markets in which it operates the interconnects

---

[11] As noted, Viamedia does not define Ad Rep Services as exclusive, full-turnkey representation.  *See, e.g.*, Furchtgott-Roth Report ¶¶ 24–25; R. 326 at 7.  Doing so would necessarily defeat its tying claim, for reasons discussed below.

generally. Am. Compl. ¶¶ 1, 180; *see also* Furchtgott-Roth Report ¶¶ 63–73. Second, Viamedia contends that substantial evidence of unbundled sales does little to defeat a tying claim in cases where there is an "announced condition," "rebuffed request for separate provision," or "publicized policy" of tying. *See* Areeda & Hovenkamp, ANTITRUST LAW ¶¶ 1756a, 1756b. True enough, but this is no such case. The record lacks evidence showing that Comcast told customers that they could not receive an interconnect-only deal—that is, Interconnect Services— standing alone.[12]

Even focusing exclusively on Chicago, Detroit, and Hartford, there is insufficient evidence of conditioning. "A high percentage, even 100 percent, of unbundled sales does not itself indicate that two products may have been tied together" because "buyers may have all bought the products bundled because they preferred them together." *Id.* ¶ 1756b2. Viewing the record in the light most favorable to Viamedia, this is precisely what it reflects. It is undisputed that both RCN and WOW! *wanted* full-turnkey representation, and whichever company they hired had to have the ability to make available to them both Interconnect Services and Ad Rep Services. CSF ¶¶ 90, 99. When "a consumer wants to purchase a bundle of the alleged tying and tied products, the seller is simply satisfying consumer demand and monopolization concerns are irrelevant." *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016).

Viamedia responds by pointing out that Comcast never *offered* RCN or WOW! an

---

[12] Viamedia does not claim a "negative tie." *See In re Dealer Mgmt. Sys. Antitrust Litig.*, --- F. Supp. 3d ----, 2018 WL 2193236, at *20 (N.D. Ill. May 14, 2018). Even if it did, the record would not support it. There is no evidence suggesting that Comcast conditioned the sale of Interconnect Services *to MVPDs* on them agreeing not to purchase Viamedia's Ad Rep Services. *Cf. Eastman Kodak*, 504 U.S. 463 n. 8 ("Assuming, *arguendo*, that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not."). As discussed further below, RCN and WOW! wanted full-turnkey representation and at least a portion of their avails sold on the Interconnects; because of Comcast's refusal to deal with Viamedia, a full-turnkey agreement with Viamedia could not offer that bundle.

interconnect-only deal.  VSF ¶ 19.  But why would it?  Firms soliciting business have no reason to offer potential customers a less substantial (and presumably less profitable and less efficient) deal than the one those customers seek.  Areeda & Hovenkamp, ANTITRUST LAW ¶ 1700i ("[F]inding two products does not mean that they are tied together.  The franchisee may have preferred a 'turnkey' franchise and never asked for the" tying product "separately"); *see also Kaufman*, 836 F.3d at 142.  RCN and WOW! sought both Interconnect Services and Ad Rep Services made available through a single full-turnkey relationship, and the "voluntary purchase of two products together" is "not a tie at all."  *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 669 (7th Cir. 1985).

Viamedia thus cannot show that Comcast ever withheld the tying product *from customers* unless they also purchase the tied product.  *Live Nation*, 811 F.3d at 684 (if "the buyer is free to decline the tied product or to purchase the two products separately, then by definition there is no unlawful tying").  The real rub of Viamedia's tying claim is, instead, that Comcast withheld the tying product *from its rival Viamedia*.  The consequence: customers that contracted with Viamedia could not obtain Comcast's Interconnect Services through their Viamedia representation, and customers wanting a full-turnkey deal that made available to them both Interconnect Services and Ad Rep Services could not get such a deal through Viamedia.  In Viamedia's words, Comcast withholds Interconnect Services from "*Viamedia's MVPD partners*"—not MVPDs, period—and therefore "constrains improperly [MVPDs'] choice" by "excluding Viamedia" as a competitor.  R. 326 at 19.

Viamedia's theory extends tying beyond the law's recognition.  The constraining of consumer choice is of course a feature of a tying arrangement, Areeda & Hovenkamp, ANTITRUST LAW ¶ 1756b2, but there must still be an actual "tie" of products or services, *Reifert*

*v. S. Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006); *Photovest*, 606 F.2d at 722. Viewing the record in Viamedia's favor, it shows none.

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016), illustrates the point. In *Aerotec*, a manufacturer, Honeywell, operated in two related markets. *Id.* at 1175. It was a monopolist in the replacement parts market, and a competitor in the repair services market. *Id.* at 1175–76. Honeywell had long dealt on prioritized and better terms with itself and its affiliated servicers than with independent ones, like Aerotec. *Id.* at 1176–77. But when a parts shortage hit, Honeywell's supply of parts to Aerotec came to a halt. This was ruinous for Aerotec; it could not live up to certain contracts and lost future work, including work that went to Honeywell. *Id.* at 1177. Aerotec sued alleging, among other things, anticompetitive tying of replacement parts to repair services (it called the parts shortage pretextual). The district court granted Honeywell summary judgment, and the Ninth Circuit affirmed. Regarding the tying claim, the Ninth Circuit reasoned that there was no evidence that Honeywell "explicitly or implicitly ties or conditions the *sale* of APU parts *to APU owners* on a requirement that the owners" use Honeywell services. *Id.* at 1179 (emphases in original). It did not matter if Honeywell had refused to deal fairly with Aerotec, which made it more difficult for Aerotec to compete and owners to receive Honeywell parts without Honeywell repair services. *Id.* at 1179–80. The Ninth Circuit "decline[d] to stretch the tying construct to accommodate the claim that . . . conduct toward third party servicers . . . acts as an effective, or 'de facto,'" tying condition. *Id.* at 1178.[13]

---

[13] Viamedia's attempt to distinguish *Aerotec* is meritless. It argues that, "unlike the plaintiff in *Aerotec*, Viamedia does not purchase Interconnect Services for its own account, but rather purchases them on behalf of MVPDs." R. 326 at 28. How one could read *Aerotec* and conclude that the plaintiff (a repair servicer) purchased replacement airplane parts "for its own account"—as opposed to "on behalf of" its airplane-owning customers—is questionable. Like Viamedia, it was precisely because the plaintiff could not make available the supposedly tying product (replacement parts) to its customers that its business suffered. *Aerotec*, 836 F.3d at 1177; *see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 4 F. Supp. 3d 1123, 1133 (D. Ariz. 2014) ("Aerotec asserts that Honeywell's practices

A similar story unfolded in *Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680 (4th Cir. 1992). In that case, Data General manufactured computer systems and offered a diagnostic tool that was critical to servicing those systems. Data General used the diagnostic tool in servicing its systems for customers, but it refused to license the diagnostic tool to competing third-party maintenance servicers. *Data Gen.*, 963 F.2d at 682–83. One servicer sued, alleging that Data General effectively tied the provision of its diagnostic tool to the sale of its services. *Id.* at 683. The district court granted Data General summary judgment and the Fourth Circuit affirmed. The Fourth Circuit held that, even if the diagnostic tool and maintenance services could be tied together, the plaintiff-servicer had not produced sufficient evidence of such a tie. *Id.* at 687–88. Evidence showed that customers demanded that their servicers be able to use the diagnostic tool, and, as the result of Data General's refusal to license, third-party servicers simply could not compete for that business. *See id.* at 687. This was not a tying condition, according to the court. *See id.* at 687–688; *see also id.* at 686 ("The fact that Data General has selectively licensed [the diagnostic tool] is not evidence of an illegal tying arrangement. Data General may lawfully license [the tool] to whomever it chooses.").

Like the third-party competitors in *Aerotec* and *Data General*, Viamedia has shown "no direct condition" of a tie. *Aerotec*, 836 F.3d at 1179; *see Data Gen.*, 36 F.2d at 687–88. It admits that Comcast has been willing to deal with MVPDs on an interconnect-only basis, and no evidence shows that a sales condition—as opposed to prevailing MVPD preference combined with Comcast's refusal to deal—is what kept RCN and WOW! from purchasing Viamedia's Ad Rep Services. *See Data Gen.*, 36 F.2d at 687–88. Rather than show a direct tying condition on

<hr>

amount to per se illegal tying, claiming that Honeywell uses its dominant position in the market for Honeywell APU parts to coerce APU owners, *who need Honeywell APU component parts for APU repairs*, to purchase MRO services from Honeywell.") (emphasis added). Whatever Viamedia means by "on its own account," it is an economically meaningless distinction in comparing *Aerotec* to this case.

MVPD customers, Viamedia takes issue with how Comcast has chosen (not) to deal with *it* and the consequences that choice has had on *its* ability to compete. But "tactics imposed on a third-party competitor" are insufficient "to create a tie with respect to a separate buyer simply because they make it less desirable to purchase from the third party." *Aerotec*, 836 F.3d at 1180; *accord Linkline*, 555 U.S. at 450 (a monopolist can generally wield its "upstream" power "to prevent rival firms from competing effectively" in a downstream market).[14]

Viamedia's insistence that comments made by RCN, WOW!, and Comcast create a genuine issue of fact as to whether there was tying is misplaced. RCN and WOW! stated that they understood that they could not have their avails sold on Comcast-operated interconnects without hiring Comcast as their "representative." VSF ¶ 18. A Comcast executive, moreover, answered "yes" when asked by the Department of Justice whether it was Comcast's "business practice" that if "an MVPD wants to get access to a Comcast controlled Interconnect, it has to hire Comcast as its ad sales representative." *See id.* ¶¶ 13, 18, 19. None of these statements, however, "tend[ ] to exclude the possibility" that Comcast's conduct "was as consistent" with a legal refusal to deal as an illegal tying of its services. *Mercatus Grp.*, 641 F.3d at 856; *see also Authenticom*, 874 F.3d 1019 (after a preliminary-injunction hearing, expressing "dubious[ness] in the extreme" that a dealers' supposed tying of two related products "amounts to tying, rather

---

[14] The Court recognizes that commentators and courts have remarked on the fact that a refusal to deal with related-market competitors—and vertical integration generally—can appear to have a tying effect in certain markets. *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1144 & n. 96 (7th Cir. 1983) (noting the similarity in the plaintiffs' claims but not "imply[ing] that a tying violation will always flow from any denial of an essential facility by a dominant firm"); *Live Nation*, 811 F.3d at 689 ("it is no surprise that vertical integration has generally been permitted despite its apparent similarity to tying"); Glen O. Robinson, *On Refusing to Deal with Rivals*, 87 CORNELL L. REV. 1177, 1178 (2002). Professor Hovenkamp, for example, has noted that "in dominated, path-dependent networks," refusals to deal with competitors can resemble "tying arrangements." *See* Herbert Hovenkamp, *The Obama Administration and Section 2 of the Sherman Act*, 90 B.U. L. REV. 1611, 1642–43 (2010); Areeda & Hovenkamp, ANTITRUST LAW ¶ 772. Here, however, there is no tying effect, as no evidence shows that MVPDs cannot obtain (from Comcast at least) the tying product alone—they just cannot obtain it through Viamedia's representation. That MVPDs typically choose not to obtain the tying product alone underscores the fact that this dispute should be resolved by the market, not the courts.

than simply participation at two levels of the market, as in *Linkline*”).

The undisputed context of those statements matters. *See Matsushita*, 475 U.S. at 586. Only two companies competed for RCN’s and WOW!’s Chicago and Detroit business in 2015, Viamedia and Comcast. They did so, at RCN’s and WOW!’s invitations, on a full-turnkey basis. CSF ¶¶ 90, 99. RCN and WOW! knew that they could not have their avails sold on the interconnects if they contracted with Viamedia; Comcast, as interconnect operator, had made clear that it did not want to do business with Viamedia. Thus, to have their avails sold on the interconnects, RCN and WOW! had to deal directly with Comcast, the only source who made could make both services available in a single full-turnkey deal. This does not mean that the MVPDs could not have received an interconnect-only deal if they had requested one—that is, that they could have received the tying product without the tied product—but the record indisputably shows they did not want that service alone, instead opting for the full-turnkey bundle. *See Will*, 776 F.2d at 669.

*Data General* is again instructive. There, the plaintiff-servicer presented evidence that in pitching its maintenance service Data General had “stated to potential customers that *only* Data General” could use the diagnostic tool—the implication being, of course, that customers had to hire Data General services to receive the benefit of the diagnostic tool. *Data Gen.*, 963 F.2d at 687 (emphasis added). But this evidence did not tend to exclude legal conduct. *Id.* Other servicers had no right to use the diagnostic tool, and so Data General’s statements were “entirely consistent” with it “lawfully extolling the superiority of its repair services.” *Id.* Similarly, in *Data General* the “customers as a matter of fact have demanded that any” servicers “be able” to use the diagnostic tool, and thus the evidence that they choose Data General over other servicers suggested simply that customers “preferred Data General services using [the diagnostic tool]

over [third-party servicers] that do not." *Id.* at 687. The same is true here. Viewing the record in Viamedia's favor, Comcast said that its "practice"—in an industry dominated by full-turnkey business, where MVPDs generally prefer not to do interconnect-only deals—is that an MVPD must employ Comcast to have its avails sold on the interconnects. *See* VSF ¶ 13. Likewise, RCN and WOW! did not complain that were unable to receive Interconnect Services from Comcast on a standalone basis. The record shows they complained, at most, that they could not receive Interconnect Services *through* Viamedia, and had to work with Comcast directly because they wanted full-turnkey representation that could make available Interconnect Services. *See, e.g.*, VSF ¶ 18. This evidence is, at a minimum, equally consistent with Comcast's refusal to deal with Viamedia as it is a tying arrangement.

None of this is to say that, as a matter of law, for a tying condition to be cognizably anticompetitive it must be applied directly and only to the end user, not its representative. *Cf. COPECA, Inc. v. Western Aviation Servs. Corp.*, 653 F. Supp. 2d 141, 147 (D.P.R. 2009) (not seeing "the relevance" that a defendant applied an alleged tie "via an intermediary" because the defendant could still "impose its condition"). It is to say, however, that at summary judgment the claimant must present evidence tending to exclude the possibility that the defendant engaged in legitimate conduct. Viamedia lacks any evidence that Comcast withheld Interconnect Services from customers (as opposed to Viamedia) unless they also purchased Ad Rep Services, and it has not otherwise pointed to evidence suggesting that Comcast's conduct was anything more than a refusal to deal with Viamedia.

Another wrinkle of Viamedia's claim is worth addressing. Although Viamedia does not define Ad Rep Services as only full-turnkey services, *see* Furchtgott-Roth Report ¶¶ 22–29, it occasionally refers to Comcast's tie as one of Interconnect Services to full-turnkey Ad Rep

Services, *see* VSF ¶ 18, CSF, Resp. to ¶ 48. That changes little. For one, the record is devoid of evidence that customers could not receive Comcast's Interconnect Services standing alone (only that they could not receive those services through Viamedia's representation). Equally important, in a full-turnkey relationship with a third-party Ad Rep the MVPD does not directly contract for Interconnect Services. It relies on its Ad Rep—to which it has assigned all of its avails in a DMA—to make sure that a portion of those avails are sold on the interconnects. *See, e.g.*, VSF ¶¶ 1–3. Focusing on that scenario, there can be no anticompetitive tie.

Professors Areeda and Hovenkamp explain why. Suppose an ingot manufacturer "refuses to sell separately but rather fabricates into products like building wall sections, which it sells directly to builders." Areeda & Hovenkamp, ANTITRUST LAW ¶ 1748a. A rival fabricator demands ingot separately "so that it too can bundle it with fabrication services in order to make and sell walls. When the defendant refuses, [the rival] claims the defendant is tying ingot to fabrication services." *Id.* The claim fails as a matter of law:

> [T]he gravamen of the complaint is not that the defendant's bundled sales have foreclosed rivals from selling unbundled fabrication to the defendant's customers. Rather, the gravamen is that the defendant's refusal to sell unbundled ingot to the defendant's rival has prevented the rival from selling the very same ingot/fabrication bundle sold by the defendant. . . . For example, the plaintiff does not want the defendant to offer ingot separately to builders; nor would doing so eliminate any relevant "foreclosure" when builders do not want "un-tied" ingot in order to arrange separately for its fabrication. Rather, the plaintiff seeks to hold the defendant liable for not selling the plaintiff ingot so that it can fabricate ingot into wall sections too.

*Id.* ¶ 1748b. The antitrust laws do not favor such attacks on vertical integration, which are resolvable only by enforcing a duty to deal with a rival. *Id.*; *see also id.* ¶ 1700j1.

Viamedia submits that this principle applies only "to situations where the only separate demand for the tying product comes from the defendant's rivals." R. 326 at 31; *see also* R. 235 at 10. Not so. "Even if the separate provision of ingot [the tying product] and fabrication [the tied product] is common in competitive analogues," there is no liability for tying "when the

plaintiff's theory of injury is not that customers of the defendant's bundle would buy the items unbundled if they could, but rather that a rival could sell the *same bundle* if only the defendant would sell it a particular input." Areeda & Hovenkamp, ANTITRUST LAW ¶ 1748b; *see also id.* ¶ 1748b n.2 (a finished-product exists even where the claimant meets the "threshold requirement of showing buyer interest because we can find some buyers desiring the items unbundled").

This is the "gravamen" of Viamedia's tying claim—that Comcast's refusal to provide it interconnect access prevents it from selling the kind of full-turnkey Ad Rep Services that WOW! and RCN desire. Although MVPDs in a full-turnkey relationship with a third-party Ad Rep may consider themselves to receive Interconnect Services from the interconnect operator, *see* VSF ¶ 3, it is undisputed that those MVPDs have one agreement with one Ad Rep that makes those Interconnect Services available to them without having to have a direct relationship with the interconnect operator. (That is, of course, Viamedia's business model.) *See, e.g., id.* ¶¶ 1, 3; *see also* Furchtgott-Roth Report ¶ 53 (describing arrangements, unlike Viamedia's practice, in which MVPDs contract separately for Ad Rep Services and Interconnect Services as "unbundle[d]" transactions). Viamedia has no antitrust right to force Comcast to help it sell such a bundle to their mutual customers. *See* Areeda & Hovenkamp, ANTITRUST LAW ¶¶ 1748a, 1748b; *accord Linkline*, 555 U.S. at 450.

Viamedia further argues that deciding Comcast did not tie services would "conflict[ ] with sound antitrust policy." R. 326 at 29. It provides no authority for its perspective on what antitrust policy should be, and understandably. Viamedia's view "demand[s] that holders of market power cooperate with rivals"—a view that "bit the dust" with *Trinko*. Frank H. Easterbrook, *The Chicago School & Exclusionary Conduct*, 31 HARV. J.L. & PUB. POL'Y 439, 441–42 (2008). Courts routinely tout the procompetitive benefits of integration, even if

middleman suffer. *See, e.g.*, *It's My Party*, 811 F.3d at 689 ("A single firm incorporating separate but closely related production processes can often be far more efficient than various independent entities transacting to produce the same good or bundle of goods."). Viamedia's contrary claim "echoes a plea for relief on behalf of a competitor, not for the sake of competition itself." *Aerotec*, 836 F.3d at 1180.[15]

## 2. Dr. Furchtgott-Roth's Opinions Regarding Comcast's Supposed Tying Are Inadmissible

Dr. Furchtgott-Roth also opines that Comcast had an effective tying policy. He asserts that Comcast's own admissions and MVPDs' statements demonstrate that Comcast had a practice of tying, and that excluding Viamedia from the interconnects was a "necessary aspect" of that tying strategy. Furchtgott-Roth Report ¶ 3.e.; *see also id.* ¶¶ 63–71. These opinions, however, are inadmissible. They would not assist the trier of fact and are contrary to the law.

Rule 702(a) and *Daubert* provide that "[a]n expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion"—in other words, "the opinion must be an *expert* opinion." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991), *amended on other grounds* 957 F.2d 301 (7th Cir. 1992); *see also* FED. R. EVID. 702(a); *Owens*, 895 F.3d at 972 (the expert's testimony must "assist the trier of fact"). "Expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Matter of the Complaint of Ingram Barge Co.*, No. 13 C 3453, 2016 WL 3763450, at *10 (N.D. Ill. July 14, 2016); *see also Dhillon v. Crown Controls Corp.*, 269 F.3d

---

[15] Viamedia makes no argument that Comcast effectively and anticompetitively ties Interconnect Services to Ad Rep Services through discounted bundling. Nor could it, as no evidence shows that Comcast ever predatorily priced—or even sold below cost—its services. *See Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 713 (7th Cir. 2003).

865, 871 (7th Cir. 2001) ("An expert must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury."); *Taylor v. Ill. Cent. R.R. Co.*, 8 F.3d 584, 585–86 (7th Cir. 1993) (affirming the exclusion of expert testimony where "any lay juror could understand th[e] issue without the assistance of expert testimony"). As such, expert testimony "cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Newman ex rel. Newman v. McNeil Consumer Healthcare*, No. 10 C 1541, 2013 WL 9936293, at *6 (N.D. Ill. Mar. 29, 2013); *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996) ("Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury."). Expert testimony, further, must be consistent with the law; otherwise it is necessarily unhelpful and risks confusing and misleading the jury. *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible. They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact.") (citations omitted).

Dr. Furchtgott-Roth's tying opinions fail these requirements. Furchtgott-Roth Report ¶¶ 63–71. His opinion that Comcast had a tying policy rests exclusively on a lay interpretation of evidence that this Opinion has already discussed. *Id.* ¶¶ 64–66. Quoting the Comcast testimony provided to the DOJ cited above, *supra* at 34–35, for example, he matter-of-factly asserts that "Comcast has admitted that it ties Spot Cable Ad Rep Services to Interconnect Services." *Id.* ¶ 64. He also relies on the MVPDs' statements to conclude that the MVPDs "understood" that they had to deal with Comcast to obtain Interconnect Services. *Id.* ¶ 64. Although Dr. Furchtgott-Roth later adopts his interpretation of those documents "[a]s a matter of economics," *id.* ¶ 68, he does not undertake any expert assessment in arriving at that conclusion.

*Elorac, Inc. v. Sanofi-Aventis Canada  Inc.*, No. 14 C 1859, 2017 WL 3592775, at \*27 (N.D. Ill.

Aug. 21, 2017) (excluding expert because "[n]o expert economic analysis is necessary on [a]

basic point, nor, in truth, did [the expert] perform any; his opinion appears to be based simply on

his review of [evidence], not a scientific analysis"); *In re Live Concert Antitrust Litig.*, 863 F.

Supp. 2d 966, 993 (C.D. Cal. 2012) (excluding expert opinions because a "key ingredient

missing" was "*economic analysis* (be it quantitative or qualitative) tying these statements by

[witnesses and observers] to" the "ultimate conclusion") (emphasis in original).  All he cites is

the undisputed and unremarkable fact that Comcast and Viamedia were the only two full-turnkey

Ad Reps in certain DMAs, like Chicago and Detroit.  *Id.* ¶ 67.

So unhelpful are Dr. Furchtgott-Roth's tying opinions that Viamedia, in arguing that

there is an issue of fact as to whether Comcast engaged in tying, does not rely on them (either

directly or via its Statement of Additional Facts).  *See* R. 326 at 18–22, 26–30.  Viamedia,

instead, simply cites directly to many of the same pieces of evidence that Dr. Furchtgott-Roth

does.  Indeed, no expertise is needed to interpret, contextualize, or synthesize that evidence.  *See*

*Davis v. Duran*, 276 F.R.D. 227, 231 (N.D. Ill. 2011) ("expert testimony is helpful to the jury if

it concerns a matter beyond the understanding of the average person").  But this betrays that

Viamedia simply seeks to use Dr. Furchtgott-Roth's tying opinion to give an expert mouthpiece

to its preferred (and unreasonable) narrative of the evidence.  *See, e.g.*, *McNeil Consumer*, 2013

WL 9936293, at \*6; *Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 07528, 2014 WL 3558690, at

\*5 (N.D. Ill. July 17, 2014) (excluding expert who "simply reads and interprets documents"

without drawing "on any expert qualifications or experience").

Dr. Furchtgott-Roth's narrative, moreover, is contrary to the law for reasons already

explained.  His opinions seek to hold Comcast liable for the mere withholding of the tying

product, not the forced sale of a tied product, and not even to a customer, but to a competitor. *See* Furchtgott-Roth Report ¶¶ 67, 69–71; *see Aerotec*, 836 F.3d at 1178–80. Those opinions are "inconsistent with the definitions of tying and coercion in the context of tying claims," and thus inadmissible. *Gumwood HP Shopping Ptrs., L.P. v. Simon Prop. Grp., Inc.*, No. 3:11-CV-268 JD, 2016 WL 6091244, at *4 (N.D. Ind. Oct. 19, 2016); *accord Norwest Bank v. K-Mart Corp.*, No. 3:94-CV-78RM, 1997 WL 33479072, at *3 (N.D. Ind. Jan. 29, 1997) (excluding opinions "close enough to this case's legal issues" so as to "create a risk of jury confusion"). The Court, accordingly, excludes Dr. Furchtgott-Roth's opinions on whether Comcast had a tying practice. *See* Report ¶¶ 3.e. 64–71.

## B. There Is Insufficient Evidence that Comcast Engaged in Anticompetitive Exclusive Dealing

Viamedia next contends that Comcast engaged in exclusive dealing. Generally, "[a]n exclusive dealing contract obliges a firm to obtain its inputs from a single source." *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996); *see also* Areeda & Hovenkamp, ANTITRUST LAW ¶ 1800a; *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017). "The objection to exclusive-dealing agreements is that they deny outlets to a competitor during the term of the agreement." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 393 (7th Cir. 1984); *see also, e.g.*, *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13-CV-01054, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016) ("Exclusive dealing claims brought under § 2 are analyzed in much the same way as § 1 claims"). As the Court has recognized, however, the law "'often approve[s]' of exclusive dealing because of its 'procompetitive benefits.'" *Viamedia I*, 218 F. Supp. 3d at 696 (N.D. Ill. 2016) (quoting *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004)). These benefits include "increasing allocative efficiency, reducing adverse selection and moral

hazard barriers to deals, and preventing free-riding." *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-CV-00804, 2015 WL 5693735, at *12 (N.D. Ill. Sept. 28, 2015) (citing *Republic Tobacco*, 381 F.3d at 736).

Viamedia does not explain its exclusive dealing claim.[16]  It is not clear if Viamedia takes issue with the exclusive and full-turnkey representations that are the undisputed industry norm, the fact that Comcast deals exclusively with MVPDs that work directly with it, or some combination of the two.  In any event, Viamedia's claim fails.

"The exclusion of competitors is cause for antitrust concern only if it impairs the health of the competitive process itself." *Roland Mach.*, 749 F.2d at 394.  "Hence" a plaintiff must be able to "prove that the probable (not certain) effect of the exclusion will be to raise prices above (and therefore reduce output below) the competitive level, or otherwise injure competition." *Id.* Viamedia has not produced any such evidence.  It does not meaningfully argue that Comcast's exclusive dealings have harmed *competition*; it cites only is exclusion as a competitor. *See* R. 326 at 22–23.  Indeed, the record lacks any evidence showing that Comcast has raised, plans to raise, or even has the ability to raise prices. *Accord Schor*, 457 F.3d at 612 ("The monopolist can take its profit just once; an effort to do more makes it worse off and is self-deterring."); *see also, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (claim of anticompetitive conduct failed, in part, because it "did not offer any evidence that the [defendant's] price . . . was higher than the price one would expect to find in a competitive market").  Nor does the record contain any evidence showing that Comcast has reduced or plans to reduce output. *See Methodist*

---

[16] Viamedia's defense of its exclusive dealing claim is near perfunctory.  It devotes just a page and a half to this claim in its 46-page brief, and in the course of that page and a half neither cites a single fact nor raises a single case save for *Viamedia I.*

*Health*, 859 F.3d at 410 (affirming summary judgment because plaintiff had not shown evidence of the "dire consequences" required to deem exclusive contracting illegal).

To the contrary, Viamedia's own expert, Dr. Furchtgott-Roth, explains the procompetitive benefits of Comcast's deals. By bundling Interconnect Services and Ad Rep Services and selling them on an exclusive basis, Comcast is "able to offer financial terms to MVPDs that are much more generous than any terms Viamedia could feasibly (much less profitably) offer." Furchtgott-Roth Report ¶ 87.[17] Elsewhere in its brief, Viamedia cites the fact that MVPDs "consider" Viamedia's lack of MVPD-affiliation in weighing Ad Rep Services. But Viamedia provides no support for the notion that the fact that MVPDs deal with a fellow MVPD for the terms of their Ad Rep Services contracts constitutes a cognizable harm to competition. MVPDs themselves made clear that such a concern matters only when "all else [is] equal"— meaning they, like any rational consumer, value price and quality foremost. *See* R. 326 at 42; VSF ¶ 7; *see also* CSF ¶ 100 (RCN representative saying that Comcast's and Viamedia's offers were "nowhere near equal" and it was "not [ ] very difficult decision" for RCN to choose Comcast). Viamedia, further, has presented no expert evidence showing that it could have offered terms "equal" to Comcast's. *See id.* ¶¶ 116–122 (Comcast, on average, offered better revenue shares to MVPDs than Viamedia).

That Comcast's exclusive deals do not harm competition is further established by the fact that they are the very deals that MVPD-consumers seek. To be sure, the law can prohibit monopolists from engaging in conduct generally permitted to those without market power.

---

[17] To the extent Dr. Furchtgott-Roth opines that Comcast has foreclosed Viamedia from the market as a result of its tying or exclusive dealing practices, *see* Furchtgott-Roth Report ¶ 90, those opinions are inadmissible because, for the reasons discussed in the text, his predicate opinions regarding the alleged tying and exclusive dealing are inadmissible as they are unhelpful to the jury and contrary to the law. In any event, Viamedia's response does not rely on Dr. Furchtgott-Roth's foreclosure opinions.

*Eastman Kodak*, 504 U.S. at 488 (Scalia, J., dissenting); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). But here it is undisputed that both RCN and WOW! *requested* "exclusive, full turnkey representation," CSF ¶¶ 90, 99, and only for a fixed period in limited geographic markets. *See Methodist Health*, 859 F.3d at 410; Areeda & Hovenkamp, ANTITRUST LAW 1802g2. Frontier wanted the same in Hartford, a deal which Viamedia won and assented to. *Id.* ¶ 73. MVPDs' desire for exclusive, full-turnkey deals is, moreover, economically sound. It is undisputed that such Ad Rep Services provide both MVPDs and advertisers a "one stop shop" for the sale and purchase of avails. CSF ¶ 28. Thus, doing as Viamedia requests— requiring a monopolist to rebuff customers' requested, and mutually beneficial, terms in order to assist competitors—would itself "impair[ ] the health of the competitive process." *Roland Mach.*, 749 F.2d at 394.

Viamedia does not dispute these facts. It admits that "full turnkey Spot Cable Ad Rep Services agreements have benefits." R. 326 at 23. It complains, instead, that it lacks "a fair playing field" on which to compete for such agreements, because of "Comcast's use of its conceded monopoly power over the Interconnects." *Id.* That is not a complaint about exclusive dealing, *see, e.g.*, *Roland Mach.*, 749 F.2d at 394, but about Comcast's refusal to deal with Viamedia. As such, Viamedia has presented evidence neither showing exclusive dealing that harms competition nor evidence tending to exclude Comcast's legal conduct.[18]

---

[18] Viamedia's response does not rely on Dr. Furchtgott-Roth's opinion about exclusive dealing. This opinion, in any event, is inadmissible. *See* Furchtgott-Roth Report ¶¶ 72–73. Constituting just two paragraphs, Dr. Furchtgott-Roth's opinion conflates tying and exclusive dealing. He asserts, "the same conduct by Comcast Spotlight that amounts to tying also amounts to exclusive dealing." *Id.* ¶ 72. Dr. Furchtgott-Roth, again, applies no expertise, analysis, or study in reaching that conclusion. *See* FED. R. EVID. 702. He merely posits the broad assertion. Further, because his predicate tying opinions are inadmissible, so too is his one-in-the-same exclusive dealing opinion. The Court therefore excludes it. *Id.* ¶¶ 71–72.

### C. Viamedia's Claim for Otherwise Anticompetitive Conduct is Procedurally Barred and Meritless

Viamedia also invokes a catchall exclusionary conduct claim, arguing that "however" Comcast's conduct is described it is anticompetitive. As Viamedia notes, the law precludes exclusionary conduct for Section 2's purposes even if that conduct does not neatly fall into one of the traditional forms of anticompetitive conduct under Section 1. *See, e.g.*, Areeda & Hovenkamp, ANTITRUST LAW ¶ 777a ("While the standard for a § 2 violation is significantly stricter in its power assessment, it is broader and less categorial in its definition of proscribed conduct.").

Viamedia, however, is procedurally barred from raising this claim. Despite extensive motion to dismiss briefing and numerous hearings in court, Viamedia has never raised this claim before. "It is well settled that a plaintiff may not advance a new argument in response to a summary judgment motion." *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 814 (7th Cir. 2011); *see also, e.g.*, *Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012); *Midco Int'l, Inc. v. Metro. Life Ins. Co.*, No. 14 CV 9470, 2017 WL 2868949, at *4 n.1 (N.D. Ill. July 5, 2017) ("a new theory" of liability "raised for the first time in response to the motion for summary judgment" that "was not plaintiff's theory at the motion-to-dismiss stage" is "waived"). Viamedia, in fact, was not just silent in failing to advance this theory earlier. It affirmatively disavowed any "free-standing" monopolization claim "unaccompanied by . . . 'any of the normal exclusionary practices.'" R. 32 at 7 (quoting *Schor*, 457 F.3d at 610–11).

The Court relied on that assertion in *Viamedia I*, concluding that Viamedia's claim was not "'free standing' because it alleges particular types of anticompetitive conduct." *Viamedia I*, 218 F. Supp. 3d at 695; *see also id.* ("Viamedia's success turns on whether it states a claim based on those three classes of anticompetitive conduct [tying, exclusive dealing, and a refusal to deal],

46

not whether a free-standing leveraging theory is independently viable.").  Now accepting

Viamedia's claim—about which Viamedia's liability expert did not clearly opine—would add a

new dimension to this two-year-old litigation after the close of all fact and expert discovery and

allow Viamedia to circumvent motion to dismiss procedures.  *See, e.g.*, *Shuffle Tech Int'l LLC v.

Sci. Games Corp.*, No. 15 CV 3702, 2017 WL 3838096, at *8 (N.D. Ill. Sept. 1, 2017) (judicial

estoppel "requires that the court accepted the earlier position such that its acceptance of the new

position would lead to inconsistent determinations").  It would, moreover, prejudice Comcast by

forcing it to defend a claim that Viamedia indicated at the motion to dismiss stage that it was not

pursuing.  *See The Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2014 WL 1979261, at *3–4

(N.D. Ill. May 15, 2014).

Setting waiver and estoppel aside, Viamedia's claim fails.[19]  It hits the same roadblock

Viamedia's tying claim did: viewing the record in light most favorable to Viamedia, no evidence

tends to exclude the fact that Comcast's conduct was merely a refusal to deal, rather than

anticompetitive conduct.  *See Mercatus Grp.*, 641 F.3d at 856.  The claim is just a "recast" of the

refusal to deal, complaining, again, about Comcast's refusal to allow Viamedia to resell MVPDs'

avails on the Interconnects and the impact that conduct has had on its ability to compete.  *Novell*,

731 F.3d at 1079; *see* R. 326 at 25 (complaining that "Comcast has used its control over the

Interconnects to squeeze its only competitor").  The "refusal to deal doctrine is not so easily

evaded." *Novell*, 731 F.3d at 1079.  Viamedia may have been rendered unable to "compete

effectively," *Linkline*, 555 U.S. at 450, *see also* Furchtgott-Roth Report ¶¶ 86–92, but even

Section 2 does not concern itself with the welfare of a competitor; it asks whether the

---

[19] Viamedia appears to use its catchall theory as protection in case the Court found that Interconnect Services and Ad Rep Services are not separate products for tying purposes.  *See* R. 326 at 25 ("In particular, unlike Section 1 tying claims, Section 2 doctrine does not require Viamedia to establish the existence of separate products").  As noted earlier, the Court has assumed that the products are separate.

monopolist's actions were cognizably anticompetitive. *Id.* at 448–450; *Trinko*, 540 U.S. at 407–08; *see also Schor*, 457 F.3d at 611–14 (rejecting monopoly claims not tied to "normal exclusionary practices"); *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986) ("Action that injures rivals *may* ultimately injure consumers, but it is also perfectly consistent with competition, and to deter aggressive conduct is to deter competition. Thus the plaintiff faces a stiff burden in any § 2 litigation."). For reasons explained above, and in *Viamedia I* and *Viamedia II*, Comcast's refusal to permit Viamedia to participate in the interconnects does not violate the Sherman Act.

## II. Even If Comcast Had Engaged in Anticompetitive Conduct, Viamedia Cannot Show that It Caused Viamedia's Antitrust Injury or Damages

Even if Viamedia had presented a question of fact as to whether Comcast engaged in tying, exclusive dealing, or other anticompetitive conduct, its case still fails. At summary judgment, a plaintiff must demonstrate an issue of fact with respect to each element of its claim—including causation. *See Dalton v. Teva N. Am.*, 891 F.3d 687, 691 (7th Cir. 2018); *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994). Viewing the record in the light most favorable to Viamedia, there is no issue of fact for the jury to decide regarding whether Comcast's anticompetitive conduct caused: (1) Viamedia's antitrust injury, or (2) its damages.

### A. Viamedia Cannot Show Antitrust Injury

To establish an antitrust injury, a plaintiff must show that the anticompetitive conduct complained of was "the cause-in-fact of the injury"—that is, "'but for' the violation, the injury would not have occurred." *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718 (7th Cir. 2006) (antitrust injury must "reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation"); *see also O.K. Sand & Gravel*, 36 F.3d

at 573 (holding that antitrust injury requires "not only that the injury is of the type intended to be protected by the antitrust laws, but that the violation was 'the cause-in-fact of the injury: that but for the violation, the injury would not have occurred'") (citing *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993)); *see also, e.g.*, *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) ("to prevail on an antitrust claim, a plaintiff must establish that 'the injuries alleged would not have occurred *but for* [the defendant's] antitrust violation' . . . adding necessity to the materiality requirement of our antitrust causation analysis.") (emphasis in original, internal citation omitted).  A plaintiff, thus, must be able to distinguish between "financial loss from the *lawful* activities of a competitor" from loss "caused by the *unlawful* acts of the defendant."  *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  In other words, if lawful competition "fully accounts for" a plaintiff's "claimed injury," the law will "deny any injury" because "the plaintiff's situation would be the same with or without the challenged restraint."  Areeda & Hovenkamp, ANTITRUST LAW ¶ 338b–c.

In assessing whether a defendant's anticompetitive conduct caused a plaintiff's antitrust injury, courts assume that the defendant acted anticompetitively.  *Id.* ¶ 338.  Here, that means assuming that Comcast engaged in tying, exclusive dealing, or other exclusionary and cognizably anticompetitive conduct.  So doing, Viamedia is nevertheless unable to present an issue of fact as to whether its alleged antitrust injuries resulted from that anticompetitive conduct as opposed to Comcast's undisputed and legal refusal to deal.

Without exception, each injury Viamedia identifies—the lost revenue from the Chicago and Detroit interconnects after Comcast refused to renew the 2003 agreement in 2012; lost contracts with MVPDs; the lost revenue from the Hartford interconnect; and the attendant

business expenses and talent loss—is fully attributable to Comcast's decision to deny Viamedia interconnect access. Dr. Furchtgott-Roth, for example, asserts that Viamedia's foreclosure from the market "flows *directly* from Viamedia's inability to access" the interconnects. Furchtgott-Roth Report ¶ 90 (emphasis added). Dr. Lys, likewise, premises all of his damages opinions on the assumption that absent Comcast's anticompetitive conduct Viamedia would have had reasonable access to the interconnects. *E.g.*, Lys Report ¶ 34(1)–(7). He even testified that his "entire damages estimate is based directly or indirectly on Viamedia's lack of access to Comcast Spotlight's interconnect in Chicago, Detroit, and Hartford." Comcast Ex. 7 at 235:18–236:20. Mark Lieberman, Viamedia's CEO, similarly complains that "Viamedia lost business and revenues as a consequence of being excluded from Comcast-operated Interconnects." Viamedia Ex. 5 at 5. By all accounts, Viamedia's refusal to deal with Comcast explains entirely Viamedia's injuries. *See MCI Commc'ns Corp.*, 708 F.2d at 1161.

*Novell* is on point. In that case, a software-providing competitor of Microsoft's, Novell, filed suit under Section 2. *Novell*, 731 F.3d at 1065 (Gorsuch, J.). In rolling out Windows 95, Microsoft had initially decided to share certain intellectual property—like namespace extensions, which allow users to search for and open documents outside of a particular application—with independent software providers. *Id.* at 1067–68. It later changed course, after concluding that not sharing the intellectual property would maximize its profits. *Id.* at 1068. This conduct impeded Novell's ability to build (and sell) software around the extensions, and its "business suffered" because it was delayed in launching its new software. *Id.* at 1069. Unable to sustain a refusal to deal case under *Aspen Skiing* and *Trinko*, Novell argued at summary judgment that Microsoft's conduct was not merely a refusal to deal but an act of business deception that sufficed independently for Section 2 purposes. *Id.* at 1079–1080. The Tenth Circuit disagreed,

concluding that Novell lacked antitrust injury to bring such a claim. *Id.* at 1080. It reasoned that even if Microsoft had been upfront about its competitive decisions, and engaged in nothing nearing a business tort, "Novell and consumers *still* would have suffered the same alleged harm"—the delayed release of products caused by Microsoft's refusal to deal. *Id.* (emphasis in original). So too here. Viamedia's own evidence decisively establishes that Comcast's refusal to deal was sufficient unto itself to cause Viamedia's injuries.

Viamedia offers no meaningful rejoinder to this plain fact. At most, Viamedia submits that as long as it has established the type of injuries with which the antitrust laws are concerned, the Court should "presume that such an injury . . . was caused by" an anticompetitive act. R. 326 at 35 (citing *Publ'n Paper*, 690 F.3d at 66). Even if that were true, Viamedia's own evidence shows that tying and exclusive dealing were not "but for" causes of Viamedia's injuries. *Publ'n Paper*, 690 F.3d at 67 (the presumption is rebuttable). Those injuries, which Viamedia concedes stem from Comcast's decision to deny Viamedia interconnect access in Chicago, Detroit, and Hartford, would have occurred with or without attendant tying and exclusive dealing. *Supra* at 50; *infra* at 53–55; Furchtgott-Roth Report ¶ 91; *see generally* Lys Am. Report. No evidence suggests otherwise. Apart from that argument, Viamedia offers little to explain how it can demonstrate that anticompetitive conduct, not an independent and already-deemed legal refusal to deal, caused its antitrust injury.[20]

It is black-letter law that Viamedia must show that it would have suffered antitrust injury but for Viamedia's anticompetitive conduct. *E.g.*, *Kochert*, 463 F.3d at 718; *MCI Commc'ns Corp.*, 708 F.2d at 1161. Critically, Viamedia does not argue or present any evidence showing that absent tying or exclusive dealing practices, Comcast would have felt any differently about

---

[20] In fact, Viamedia's short shrift of the issue prompts Comcast to argue that Viamedia has waived any argument about causation and antitrust injury. R. 339 at 4 n.3.

excluding Viamedia from the interconnects. To the contrary, the record presents ample evidence of Comcast's decision to stop dealing with middlemen and go after full-turnkey relationships with more MVPDs. As such, in the but-for world, Comcast still would have refused to deal with Viamedia; it just could not further condition services or engage in anticompetitive exclusive dealing. Viamedia makes no effort to account for that but-for world, and that is the fundamental flaw in its case.

### B. Viamedia Cannot Show Damages Resulting from Supposedly Anticompetitive Conduct

Viamedia's asserted damages suffer the same problem. Despite the complicated nature of proving damages causation in an antitrust case, *see J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981), Viamedia elected not to employ an expert to opine on causation. Instead, Viamedia submits affidavits signed by three executives: CEO Lieberman (Viamedia Ex. 5), co-founder and former president Jeff Carter (Viamedia Ex. 3), and co-founder and former CEO Todd Donnelly (Viamedia Ex. 4). Viamedia rests primarily on these affidavits (most often, Lieberman's), "Viamedia management project[ions]," and its "track record with its partners" to support its notion of what profits Viamedia would have made but for Comcast's anticompetitive conduct. R. 326 at 36.

#### 1. Viamedia's Evidence of Causation Does Not Distinguish Between Damages Caused by Competitive and Anticompetitive Conduct and Thus Fails

"When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors"—like lawful competition—"the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage." *MCI Commc'ns Corp.*, 708 F.2d at 1162; Areeda & Hovenkamp, ANTITRUST LAW ¶ 675b; *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (it is an "unremarkable premise" that a claimant is "entitled only to damages resulting from" to the claimed anticompetitive conduct).

That it is precisely what Viamedia has done. Its evidence fails to disaggregate the damages caused by Comcast's lawful refusal to deal from Comcast's supposed tying, exclusive dealing, and other exclusionary conduct. Lieberman's affidavit is exemplary. He attests that "Viamedia's exclusion from" the Chicago and Detroit "Interconnects has caused Viamedia and its MVPD partners to lose revenues they otherwise would have earned from Interconnect sales, which has, in turn, reduced Viamedia's cash flows and financial stability," causing in turn "MVPD partners to switch to other ad representation firms." Viamedia Ex. 5 at 6. It repeats similar claims for pages. *See id.* at 7 ("Due to loss of access to the Chicago and Detroit Interconnects, Viamedia was ultimately unable to make a competitive financial offer" to RCN), 11 (complaining of the purported results of Comcast's decision to "deny[ ] Viamedia the ability to continue purchasing Interconnect Services on behalf of [its] MVPD clients), 13 ("If Viamedia had never been excluded from the Interconnects Chicago, Detroit, and Hartford, I am confident that the momentum Viamedia had in the marketplace prior to 2012 . . ."). Dr. Lys's damages opinion likewise conflates the financial consequences of Comcast's refusal to deal with the results of Comcast's supposedly anticompetitive conduct. *See generally* Lys Am. Report. He, again, admitted that his "entire damages estimate is based directly or indirectly on Viamedia's lack of access" to the interconnects in Chicago, Detroit, and Hartford. Comcast Ex. 7 at 236:10–20. All of this evidence (to the extent it is admissible) attributes Viamedia's damages to Comcast's decision not to permit Viamedia interconnect access—its refusal to deal.

Under the law, Viamedia must be able to segregate the damages (to a reasonable degree, at least) caused by lawful competition from those caused by anticompetitive acts. *See MCI Commc'ns Corp.*, 708 F.2d at 1162; *see also* ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 13–14 (3d ed. 2017) ("courts require that the antitrust

violation be the sole cause of the plaintiff's damages, by insisting on a but-for world that eliminates only the defendant's unlawful conduct separately from all other sources that may also have caused the plaintiff's damages").  Considering them to be one in the same, Viamedia fails to do so.[21]  It therefore seeks to "force" Comcast "to pay treble damages for conduct that was determined to be entirely lawful."  *MCI Comm'ns*, 708 F.2d at 1162–63.

### 2.  Dr. Lys's Damages Opinions Are Inadmissible

As Dr. Lys's Report and testimony, plus Viamedia's representations at the *Daubert* hearing, make clear, the entirety of his opinion assumes that but for Comcast's supposed anticompetitive practices, Viamedia would have been able to access the interconnects and compete as it had before 2011.  *See, e.g.*, *Daubert* Hr'g Tr., R. 354, at 153:24–154:5 (Viamedia's counsel indicating that Dr. Ly's "assume[d] causation" and that the question of whether those assumptions are permissible is "a question about summary judgment").  An expert's testimony is inadmissible, however, if it does not fit "the facts of the case."  *Owens*, 895 F.3d at 971.

Dr. Lys's opinions are inadmissible, as they rest on the unfounded assumption that Viamedia could have accessed the interconnects but for Comcast's anticompetitive conduct.  *See, e.g.*, *Buscaglia v. United States*, 25 F.3d 530, 533 (7th Cir. 1994) (expert testimony may not be

---

[21] Even assuming *arguendo* that the but-for world is a place where Comcast decides to permit Viamedia on the interconnects on friendly terms, the Court is dubious that Viamedia's lay evidence of causation regarding the loss of future business (the largest part of its damages claim) would suffice.  Despite Viamedia's pronouncements about its management team's work (*e.g.*, R. 326 at 40), "Viamedia's projections" are not based on any economic price or terms analyses (at least as far as the record is concerned).  Viamedia's refrain that it need not examine prices because the Ad Rep market is a "relationship business" is convenient; there is in fact no specific evidence showing that Viamedia could have competed with Comcast on price.  *See* CSF ¶¶ 116–122 (Comcast, on average, offered better revenue shares to MVPDs than Viamedia).  Further, not a single MVPD testified that it would have selected Viamedia but for its lack of interconnect access.  Viamedia did not hire an expert to opine on causation, and lay persons are generally forbidden from doing precisely as Viamedia's management does here—testify regarding "hypotheticals or assumptions" about what might have happened in the future.  *Gumwood HP Shopping Ptrs. L.P. v. Simon Prop. Grp., Inc.*, 2017 WL 3016385, at *4 (N.D. Ind. July 17, 2017).  In short, this multimillion-dollar antitrust case is "far removed from situations in which a causation issue is so obvious that a plaintiff may forgo expert testimony."  *Dalton*, 891 F.3d at 691.  The Court, however, need not ultimately decide whether Comcast has presented sufficient evidence with respect to this part of its damages case because Viamedia has failed to meet its threshold burden to show an issue of fact as to whether the any of the damages it seeks stem from unlawful conduct.

based on "unsupported assumptions"); *see also, e.g.*, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055–1057 (8th Cir. 2000); *Rickman v. Deere & Co.*, 36 F.3d 1093 (4th Cir. 1994); *accord Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); Areeda & Hovenkamp, ANTITRUST LAW ¶ 657b ("If the plaintiff's expert's damages study cannot segregate lawful from unlawful practices, then no damages may be awarded on the basis of that study.").

### 3. Viamedia's Claim for Injunctive Relief Fails

On a final note, Viamedia also requests injunctive relief from Comcast's conduct. R. 40 at 50. As an initial and obvious matter, Viamedia is not entitled to this relief because it has not shown an issue of fact as to whether Comcast engaged in anticompetitive conduct or that any such conduct caused it injury or damages. But the Court addresses Viamedia's request—that it enjoin Comcast from "any effort to exclude Viamedia or its MVPD clients from participating on a fair and open basis in the Interconnects"—because it, too, betrays the fundamental flaw in its case.

Antitrust law does not allow the injunctive relief Viamedia seeks. *See* Areeda & Hovenkamp, ANTITRUST LAW ¶ 774c. *Trinko* and *Linkline* prohibit enforced sharing absent a duty to deal, and for good reason. Forced sharing "lessen[s] the incentive for the monopolist, the rival, or both to invest," it requires courts to act as "central planners" over the proper terms of such sharing, and it can compel the "supreme evil of antitrust: collusion." *Trinko*, 540 U.S. at 407–08; *see also* Easterbrook, *The Chicago School & Exclusionary Conduct*, at 441–42; Richard

A. Posner, ANTITRUST LAW 242 (2d ed. 2001) ("Where the refusal to deal is unilateral, the only effective remedy is an order that defendant do business with the victim of the refusal to deal. The antitrust court becomes charged with the supervision of an ongoing commercial relationship, a function that courts are not equipped to perform effectively."). Indeed, while examining claims similar to the ones Viamedia brings, the Seventh Circuit recently warned about "fail[ing] to adhere to the lessons of" *Trinko* and *Linkline*. *Authenticom*, 874 F.3d at 1021. In doing so, it vacated a preliminary injunction that forced two firms that dominated upstream markets to allow their downstream competitors access to their systems. The Seventh Circuit noted that if there is a tie, "the proper remedy would be to enjoin the tie"—not, as Viamedia requests, "to create a duty to deal." *Id.* at 1026.

Viamedia brought this case in an attempt to force—under Court order—Comcast to provide it access to the interconnects on favorable terms. Antitrust law does not oblige.

## CONCLUSION

For the foregoing reasons, the Court grants Comcast's motion for summary judgment, grants in part Comcast's motion to exclude Dr. Furchtgott-Roth's opinions and denies the remainder as moot, grants Comcast's motion to exclude Dr. Lys's opinions, and enters judgment in Comcast's favor.

**Dated: August 16, 2018**          **ENTERED**

_____
**AMY J. ST. EVE**
**United States Circuit Court Judge**
**Sitting by Designation**