**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VIAMEDIA, INC., | |
| Plaintiff, | No. 16 C 5486 |
| v. | Honorable Nancy L. Maldonado |
| COMCAST CORPORATION and COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC, | Honorable Sheila M. Finnegan |
| Defendants. | |

---

**VIAMEDIA, INC.'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

James M. Webster, III (*pro hac vice*)
Aaron M. Panner (*pro hac vice*)
Derek T. Ho (*pro hac vice*)
Kenneth M. Fetterman (*pro hac vice*)
Leslie V. Pope (*pro hac vice*)
**KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
jwebster@kellogghansen.com
apanner@kellogghansen.com
dho@kellogghansen.com
kfetterman@kellogghansen.com
lpope@kellogghansen.com

Richard J. Prendergast
Michael T. Layden
**CROKE FAIRCHILD
DUARTE & BERES LLC**
191 N. Wacker Dr., 31st Floor
Chicago, Illinois 60602
(312) 641-0881
rprendergast@crokefairchild.com.
mlayden@crokefairchild.com

*Counsel for Plaintiff Viamedia, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.     SPOT CABLE AD REP SERVICES AND INTERCONNECT SERVICES ................... 4

    A.     This case is about competition among spot cable ad reps to sell Spot Cable Ad Rep Services to MVPDs .................................................................. 4

    B.     Many MVPDs that seek spot cable ad rep services also want to participate in important sales conduits called "Interconnects" ............................. 6

        1.     Comcast and Viamedia Compete to Sell Spot Cable Ad Rep Services to MVPDs .......................................................................... 7

        2.     Comcast Used its Exclusive Control of the Supply of Interconnect Services in Chicago and Detroit To Exclude Viamedia From the Market for Spot Cable Ad Rep Services in Those DMAs ...................................................................................... 7

        3.     Comcast Used its Exclusive Control of the Supply of Interconnect Services in Hartford To Exclude Viamedia From the Market for Spot Cable Ad Rep Services in That DMA ..................... 10

        4.     Comcast's Abuse of its Control of Interconnect Services Caused Viamedia Massive Damages .................................................. 11

II.     PROCEDURAL BACKGROUND .............................................................................. 12

LEGAL STANDARD ......................................................................................................... 14

ARGUMENT ..................................................................................................................... 14

I.     THE SEVENTH CIRCUIT'S REMAND "FOR TRIAL" REQUIRES THE COURT TO DENY COMCAST'S MOTION AS TO LIABILITY ................................................... 15

II.     SPOT CABLE AD REPS ARE NOT TWO-SIDED TRANSACTION PLATFORMS AS A MATTER OF LAW ................................................................................................ 18

III.     VIAMEDIA'S TYING THEORY IS CONSISTENT WITH THE SEVENTH CIRCUIT'S DECISION ........................................................................................... 22

    A.     The Seventh Circuit Has Already Held That Viamedia's Tying Theory Is Legally Viable ...................................................................................... 22

B.     Comcast's Renewed Challenge To the Viability of Viamedia's Tying Theory Lacks Merit.................................................................................... 23

IV.     VIAMEDIA HAS PROFFERED A REASONABLE ESTIMATE OF THE DAMAGES CAUSED BY COMCAST'S TYING ................................................................. 26

C.     Viamedia's Damages Case Is Entirely Consistent With Its Liability Case........................................................................................................... 26

D.     A Reasonable Jury Could Credit Viamedia's Evidence that Comcast's Conduct Caused Viamedia's Damages .................................................... 27

1.     Viamedia Need Only Prove the Amount of Its Damages to a Reasonable Degree of Certainty ............................................... 27

2.     A Reasonable Jury Could Find That Viamedia Has Proved the Amount of Its Damages to a Reasonable Degree of Certainty ................. 28

E.     Viamedia's Damages Analysis Does Not Claim Improper Prejudgment Interest...................................................................................................... 31

CONCLUSION........................................................................................................ 32

# TABLE OF AUTHORITIES

**PAGE(s)**

## CASES

*Baldonado v. Wyeth*, 2012 WL 2254215 n.1 (N.D. Ill. June 15, 2012)........................................ 18

*Barrow v. Falck*, 11 F.3d 729 (7th Cir. 1993) ............................................................................. 18

*Carmody v. Bd. of Trustees of Univ. of Ill.*, 893 F.3d 397 (7th Cir. 2018) ............................. 23, 24

*Fishman v. Estate of Wirtz*, 807 F.2d 520 (7th Cir. 1986) ............................................................. 31

*Gicla v. United States*, 572 F.3d 407 (7th Cir. 2009) ................................................................... 22

*Gosey v. Aurora Med. Ctr.*, 2015 WL 4204015 (E.D. Wis. July 10, 2015) ................................ 17

*In re A.F. Moore & Assocs., Inc.*, 974 F.3d 836 (7th Cir. 2020) ............................................ 15, 16

*In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51 (2d Cir. 2012)............................................. 27, 28

*In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910 (N.D. Ill. 2006).................................... 28

*Isby-Israel v. Brown*, 2017 WL 11536885 (S.D. Ind. Oct. 17, 2017)............................................ 18

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981)............................................ 28

*Liriano v. Hobart Corp.*, 170 F.3d 264 (2d Cir. 1999)................................................................... 28

*Litton Sys., Inc. v. AT&, T Co.*, 700 F.2d 785 (2d Cir. 1983) ........................................................ 27

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........................ 24

*Medicines Co. v. Mylan Inc.*, 257 F. Supp. 3d 1023 (N.D. Ill. 2017)............................................ 15

*Moore v. Anderson*, 222 F.3d 280 (7th Cir. 2000)......................................................................... 15

*Ohio v. American Express*, 138 S. Ct. 2274 (2018)......................................................................... 2

*Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003 (N.D. Ill. 2020)........................................ 22

*Private Bank & Tr. v. Progressive Cas. Ins. Co.*, 409 F.3d 814 (7th Cir. 2005)......................... 14

*PrivateBank & Tr. v. Progressive Cas. Ins. Co.*, 2004 WL 1144048 (N.D. Ill. May 18, 2004) .. 14

*Pugh v. City of Attica*, 259 F.3d 619 (7th Cir. 2001)..................................................................... 14

*Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594 (1953) ............................................. 24

*Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477 (7th Cir. 1980) ........................... 28

*U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) .................................... 22

*United States v. Adams*, 746 F.3d 734 (7th Cir. 2018) .................................................................. 24

*Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020) ........................................... *passim*

*Washington v. Dep't of Revenue*, 2006 WL 8443222 (C.D. Ill. Feb. 10, 2006) .......................... 17

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ................................... 27, 28

## RULES

Fed. R. Civ. P. 56(a) ...................................................................................................................... 14

## OTHER AUTHORITIES

*Defining Antitrust Markets When Firms Operate Two-Sided Platforms*, 2005 Colum. Bus. L. Rev. 667 (2005) ........................................................................................................................... 21

10 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2010)……………………...25

## INTRODUCTION

Three years ago, the Seventh Circuit concluded that "[t]he factual disputes in this case are numerous, genuine, and material," reversed the Court's (St. Eve., J.) contrary decision granting summary judgment in Comcast's favor, and remanded the case "for any further necessary discovery and for trial." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 435, 485 (7th Cir. 2020). Comcast's motion does not so much as mention that mandate or this Court's duty to carry it out. Nor does Comcast even try to show that any discovery conducted on remand fits this case into one of the few exceptions to that duty. With regard to all subjects but Viamedia's damages, the Court can and should stop there: the Seventh Circuit held that this case must go to trial, and nothing in Comcast's motion gives the Court any reason to defy that mandate. Even taken on their own terms, Comcast's merits arguments should be rejected and this case sent at last to trial.

Multichannel video programming distributors ("MVPDs") – cable companies, satellite companies, and others – traditionally arrange with their network partners to retain a few minutes of ad time for every hour of programming. Some MVPDs sell these "spot cable availabilities" (or "avails") to advertisers on their own, while others hire an outside firm to represent them in the sale of those avails and the running of ads. This case is about the "Spot Cable Ad Rep Services" that MVPDs buy from those firms – two of which are Viamedia and Comcast.

As the Seventh Circuit explained at length, the evidence viewed in the light most favorable to Viamedia shows that Comcast has monopolized the market for those services in several metropolitan areas, known as "Designated Market Areas" ("DMAs"). Comcast has accomplished this by leveraging its monopoly control of "Interconnects" – joint sales arrangements among competing MVPDs that allow an ad to run on multiple MVPD systems across a specific DMA simultaneously. Specifically, Comcast has required MVPDs that seek to

join the Interconnects in three DMAs (Chicago, Detroit, and Hartford) to hire Comcast (not Viamedia) as their ad rep. This requirement has harmed competition in those DMAs – eliminating a choice that MVPDs once enjoyed among ad reps – and in turn, all but destroyed Viamedia's business.

The Seventh Circuit rightly held that a jury could credit the evidence supporting these facts and conclude that Comcast has violated Section 2 of the Sherman Act. Comcast's contrary arguments now are no better than those it timely made when this case first reached summary judgment five years ago.

*First*, the antitrust markets Viamedia has defined are fully consistent with the Seventh Circuit's decision and *Ohio v. American Express*, 138 S. Ct. 2274 (2018) ("*Amex*"). Comcast asserts (at, *e.g.*, 3) that Viamedia "represented" that "the markets" at issue "are 'two-sided'" and that "the Seventh Circuit concluded" the same thing. But Viamedia made no such representation, and the Seventh Circuit reached no such conclusion. Further, Comcast comes nowhere close to its burden to show that the markets relevant to Viamedia's claim are *undisputedly* two-sided transaction platforms subject to *Amex*.

*Second*, Comcast's position (at 4) that Viamedia's tying claim is "legally deficient" wraps new words around an old argument that the Seventh Circuit has already rejected. From the case's earliest days, Comcast has argued that its conduct was a lawful refusal to deal, rather than part of an unlawful tying scheme. Comcast's latest effort to launder that argument is its assertion (at 4) that the Seventh Circuit's decision in this case dooms Viamedia's tying claim as a matter of law. According to Comcast, the Seventh Circuit held that no unlawful tying occurs before a forced sale is consummated. In other words, according to Comcast, the Seventh Circuit held that tying law has nothing to say about the years during which Comcast implemented its

tying policy to – in Comcast's words – "overpower ViaMedia" and turn the screws on Viamedia's MVPD partners, and thereby force those sales in due time. But the legal proposition Comcast attributes to the Seventh Circuit flatly conflicts with the Seventh Circuit's holding that Viamedia's tying claim in Hartford – not just Detroit and Chicago – must go to trial *even though Comcast had not yet forced any sale there*.

*Third*, Comcast's criticisms of Viamedia's damages evidence fall well short of Comcast's summary-judgment burden. Notably, Comcast does not assert that its conduct caused Viamedia *no* harm – harming Viamedia was the point. The *fact* of injury (assuming liability) is thus not seriously in dispute, and settled law relaxes Viamedia's burden as to the *amount* of its damages. Comcast is free to try to persuade the jury that it did not cause damages as high as those Viamedia's expert has calculated (at 4-5) and that something else did (at 5), but a reasonable jury could credit Viamedia's contrary evidence. Further, Comcast's claim that some (not all) of Viamedia's "damages are legally improper" (at 5) is erroneous for reasons explained in Viamedia's *Daubert* briefing. Moreover, even if credited, that claim would at most merit a supplemental damages analysis to conform Viamedia's damages estimate to the Court's ruling – not summary judgment disposing of the case before the "trial" the Seventh Circuit ordered.

The Court should deny Comcast's motion.

## BACKGROUND

The Seventh Circuit exhaustively "present[ed]" the summary-judgment "evidence" "in the light reasonably most favorable to" Viamedia. *See* 951 F.3d at 436. Viamedia sets forth the essential facts below.

## I.    SPOT CABLE AD REP SERVICES AND INTERCONNECT SERVICES

### A.    This case is about competition among spot cable ad reps to sell Spot Cable Ad Rep Services to MVPDs

MVPDs license programming from television networks and distribute it to subscribers. As noted above, MVPDs typically contract with those networks for the right to sell two or three minutes of advertising time per hour – known as "spot cable" availabilities or "avails." (The remaining advertising time is sold by the programmers.) 56.1 Response ¶¶ 3-8; 951 F.3d at 437.

This case concerns services that some of those MVPDs purchase from outside firms: "Spot Cable Ad Rep Services." Some MVPDs (looking to avoid the expense and hassle of selling and running those ads) hire outside firms to manage their inventories of ad avails. In the Seventh Circuit's words, "[t]he ad rep services that Viamedia provides its customer MVPDs include" a number of different activities:

- Allocating the MVPD's inventory of spot avails among different sales channels—i.e., local ads, sold in competition with other MVPDs; DMA-wide ads; or multi-DMA/national ads;
- Researching, marketing, pricing, and selling an MVPD's inventory of spot avails to advertisers, including the approximately one-third of spot avails sold to local retailers in competition with other MVPDs;
- Interfacing with the relevant Interconnect for spot avails allocated to regional, DMA-wide ads;
- Providing technical services such as encoding video files and operating and maintaining the software needed to run, insert, traffic, monitor, and archive ads;
- Organizing the MVPD's inventory of spot avails into schedules and ensuring that each ad runs correctly during those schedules; and
- Performing financial services, such as accounting, billing, and collection.

951 F.3d at 442; *see also* 56.1 Response ¶ 5; SAF ¶¶ 1-2.

A portion (25%) of the 2-3 minutes is devoted to marketing spots to promote the sale of the MVPD's services (premium cable, broadband Internet access, telephony and, when available, home security). SAF ¶ 5. Some avails may be sold through an "Interconnect," which (as detailed below) allows an ad to be displayed to subscribers of multiple MVPDs at the same time

4

throughout a given DMA. And other avails are sold to genuinely local advertisers – a restaurant, dentist, or furniture store – to be displayed within a more targeted area (called a "local zone"). When a Spot Cable Ad Rep represents an MVPD on a "full turnkey" basis, the rep has the exclusive right to manage and sell all that MVPD's avails in the relevant DMAs. 951 F.3d at 442-43; *see also* SAF ¶ 2.

Typically, an MVPD looking to select a Spot Cable Ad Rep requests proposals from one or more reps. In due course, it enters into an agreement  56.1 Response ¶¶ 14-17.

But price is not the only factor MVPDs consider. *First*, because the nature of the service requires MVPDs to share competitively sensitive information and cooperate with their ad rep, MVPDs are reluctant, all else equal, to work with an ad rep that is affiliated with a rival MVPD. SAF ¶ 7. *Second*, ad reps compete to offer services of higher quality – for example, by offering MVPDs better technical capabilities or more effective salespeople. *See* SAF ¶¶ 6, 8. *Third*, if an MVPD has established a good relationship with an ad rep, the MVPD is less likely to choose a rival – both because switching costs can be substantial, *see* SAF ¶ 43, and because the businesses' working relationship has made the ad rep a known partner (and their competitors unknown partners of uncertain quality), *see* SAF ¶¶ 44-45. *Fourth*, some MVPDs seek to have the ad rep help promote the MVPD's brand in local marketing events. SAF ¶ 6.

**B.     Many MVPDs that seek Spot Cable Ad Rep Services also want to participate in important sales conduits called "Interconnects"**

There are (of course) many forms of advertising other than spot cable ads.  *See* 56.1 Response ¶¶ 41-42, 44.  Historically, cable companies faced a particular obstacle competing with broadcast networks and satellite providers:  unlike those firms, in areas served by multiple cable providers, no one cable company could deliver advertising to all the cable subscribers in an entire DMA.   951 F.3d at 437; 56.1 Response ¶ 19.  This case turns on cable companies' solution to this problem:  the DMA-wide "Interconnect."

Typically operated by the largest MVPD in a given DMA, an Interconnect is a platform that allows an advertiser to display an advertisement on multiple MVPD systems within a DMA simultaneously.  *See* 56.1 Response ¶¶ 15-16, 18, 21-22.  The Interconnect operator provides various services including pooling spot ad inventory from multiple MVPDs on a DMA-wide basis and selling and/or coordinating the sale of DMA-wide spot cable avails.  *See*, *e.g.*, 56.1 Response ¶ 17.  If an MVPD wants to participate in such DMA-wide advertising sales, these "Interconnect Services" are essential:  advertisers that want DMA-wide coverage are (again) unlikely to buy advertising time from an individual MVPD (particularly one with relatively limited subscribership) outside the Interconnect.  SAF ¶ 22.  For those MVPDs (and their Spot Cable Ad Reps, if any), participating in sales of spot cable advertising through Interconnects in large DMAs is a substantial source of revenue.  SAF ¶¶ 20-23.

In the prior round of summary judgment briefing (echoed in some of Comcast's evidence even now), Comcast contended that there is no difference between Interconnect Services and Spot Cable Ad Rep Services.  *E.g.*, 56.1 Response ¶ 28.  The Seventh Circuit resolved that issue for purposes of summary judgment.  It held that they "are different functionally" – "[t]o summarize, a provider of Interconnect services bundles and re-sells ads from multiple MVPDs in

6

a regional market," while "[a]n ad rep has a more direct relationship with an MVPD, directly representing it in regional and/or local ad sales, and potentially acting as its representative with an Interconnect" – and there is separate demand for the services. 951 F.3d at 469. The evidence amply supports that conclusion, *see generally* SAF ¶¶ 46-54, and Comcast does not press the contrary argument here.

### 1. Comcast and Viamedia Compete to Sell Spot Cable Ad Rep Services to MVPDs

Comcast is both an MVPD and an ad rep. *See* 56.1 Response ¶ 2. Viamedia competes with Comcast in the provision of Spot Cable Ad Rep Services. *See* Mot. at 1. Viamedia is the only significant ad rep that is "independent" – that is, Viamedia is not an MVPD with its own subscribers. 951 F.3d at 443; *see also* 56.1 Response ¶¶ 9, 13.

In many DMAs, including three of particular relevance to this case – Chicago, Detroit, and Hartford – Comcast also operates the Interconnects, and so is the only supplier of Interconnect Services. *See* 56.1 Resp. ¶ 23. As explained below, Comcast has used its exclusive control over of the supply of Interconnect Services to exclude Viamedia from the market for Spot Cable Ad Rep Services in those DMAs. *See* SAF ¶¶ 10-43.

### 2. Comcast Used its Exclusive Control of the Supply of Interconnect Services in Chicago and Detroit To Exclude Viamedia From the Market for Spot Cable Ad Rep Services in Those DMAs

**a.** For years, Viamedia provided Spot Cable Ad Rep Services to two MVPDs, WOW! and RCN – WOW! in Chicago and Detroit, RCN in Chicago. *See* SAF ¶¶ 31-32 (RCN); *id.* ¶¶ 24-26 (WOW!); *see also* 56.1 Response ¶¶ 52, 58, 103, 105 (WOW!); *id.* ¶¶ 117-124 (RCN).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



Viamedia enjoyed successful partnerships with these MVPDs for many years.

**b.**

SAF ¶ 15; *see also* 951 F.3d at 444 ("Internal Comcast PowerPoint presentations explained that Comcast viewed its 'Next phase' as 'consolidat[ing the] core business' of ad rep services, and then 'look[ing] at other businesses we can leverage (our technologies or platforms).' "). To that end, rather than "compete for RCN's and WOW!'s ad rep services business," it "tried instead to take advantage of its control over the Interconnects." *Id.* Comcast decided no longer to allow Viamedia to purchase Interconnect Services on behalf of RCN and WOW! in Chicago and Detroit. 951 F.3d at 444; *see also* SAF ¶ 15.

At the end of 2011, Comcast notified Viamedia that, after their then-existing contract was to expire in May 2012, Comcast "would refuse to permit Viamedia any further access to the

Interconnects."  951 F.3d at 444.  "In June 2012 Comcast executed on that notice," *id.*, and thereby prevented Viamedia from purchasing Interconnect Services from Comcast for WOW! and RCN.  "For the first time in any DMA since the Interconnects had been created, an Interconnect operator – Comcast – had cut off Interconnect access to an MVPD or an MVPD representative."  *Id.*

Consistent with Comcast's own internal projections, Viamedia, WOW!, RCN, and Comcast lost millions of dollars, and Comcast could offer only inferior spot avails ("because an advertiser could no longer reach all cable subscribers within the DMA through the Interconnect").  951 F.3d at 445-46.  And Comcast made clear that RCN and WOW! could not secure Interconnect Services in those DMAs after the expiration of their existing contracts with Viamedia unless they hired Comcast Spotlight to provide Spot Cable Ad Rep Services.  *See id.* at 446; SAF ¶ 18; *see also* 951 F.3d at 447 (noting that in "comments with the FCC," RCN "alert[ed] regulators that 'Comcast was not being truthful' when it said 'RCN is free to join the Comcast-managed interconnects at any time,' because 'Comcast will only allow RCN to join the interconnects if RCN employs Comcast Spotlight instead of Viamedia.'").

**c.**  In 2015,



56.1 Response ¶¶ 105-06.

Although WOW! contracted with Viamedia to provide Spot Cable Ad Rep Services in other DMAs, WOW! did not renew with Viamedia for Chicago and Detroit and instead contracted with Comcast on a full turnkey basis in those DMAs.  SAF

¶ 29. "WOW! noted that 'a key decision point' in this 'choice' was its understanding that 'in order to remain competitive, we need to be in the Interconnect.'" 951 F.3d at 449.

    **d.** RCN followed a similar pattern. ███████████████████████████

████████████████████████████████████████████████████████████████

RCN initially "had planned to renew its contract with Viamedia." 951 F.3d at 449. █████████

██████████████████████████████████████████ SAF ¶ 7.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Thereafter, in 2015, RCN decided to contract with Comcast for Spot Cable Ad Rep Services. *Id.* ¶ 37. ███████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

    Comcast thereby succeeded in securing control of the market for Spot Cable Ad Rep Services in the Chicago and Detroit DMAs. *See* 951 F.3d 429 ("By 2016, a Comcast employee congratulated a colleague regarding its new monopoly in ad rep services in the Chicago DMA: 'THE WOW AND RCN DEALS PROVIDE [COMCAST] WITH COMPLETE REPRESENTATION OF THE CHICAGO MARKET.'").

       **3.**     **Comcast Used its Exclusive Control of the Supply of Interconnect Services in Hartford To Exclude Viamedia From the Market for Spot Cable Ad Rep Services in That DMA**

    Comcast ran the same playbook in the Hartford DMA. ████████████████████████

█████████████████████████████ SAF ¶ 38. In 2014, Frontier acquired AT&T's Hartford network. Although Comcast represented AT&T in Hartford, Frontier "had

been unhappy with Comcast's customer service when it used Comcast in other DMAs, so it switched from Comcast to Viamedia." 951 F.3d at 444. "Comcast then excluded Frontier's spot avails from the Hartford Interconnect, resulting in millions of dollars in lost ad revenues for Frontier and Viamedia, as well as Comcast itself, and degrading the value of the Hartford Interconnect." *Id.* at 444-45. ████████████████████████████

████████

### 4. Comcast's Abuse of its Control of Interconnect Services Caused Viamedia Massive Damages

Comcast's conduct caused Viamedia to suffer massive financial harm – harm that has compounded over the decade since it began. Viamedia's damages expert (Dr. Michael Cragg) has offered the opinion that Comcast's conduct caused financial harm to Viamedia with present values totaling ████████████████████████ SAF ¶¶ 59-64. This range comes about from two different figures.

The first figure estimates Viamedia's lost earnings – how much profit it lost between the time Comcast excluded it and its MVPD partners from the Interconnects in Chicago and Detroit (June 1, 2012) and December 31, 2021. *Id.* ¶ 62. To estimate the magnitude of those effects, he projected that Viamedia's revenues would have grown at least as quickly as the revenue in the U.S. cable TV advertising industry (meaning advertising revenue to cable system operators) grew over the same period. *Id.* ¶ 60. ████████████████████████████

████████████████████████ Moreover, the absence of those revenues in the ordinary course had knock-on effects for the company – for example, the company ████████████ ████████████████████████ opportunities. Dr. Cragg accounts for ████████████████████████████████████████████ ████████████ *Id.* ¶ 62.

11

The second component of that range reflects lost enterprise value – how much less Viamedia was worth as of December 31, 2021 than it would have been. To estimate that figure, he relied on a set of comparable companies and transactions. This analysis yielded a range of ██████████████████████ *Id.* ¶ 63.

Dr. Cragg's approach differs from that of the expert who assessed Viamedia's damages in 2017. That expert, Professor Thomas Z. Lys, focused on the loss of individual contracts. In Dr. Cragg's view, the methodology Professor Lys used five years ago is "an incomplete measure" of Viamedia's damages, in that "Comcast's actions affected Viamedia on a number of different dimensions" not captured by the "pretty limited set of outcomes" on which Professor Lys relied. Viamedia Ex. 133, Cragg Tr. 196:12-197:17 (Sept. 1, 2022). As a result, Dr. Cragg's analysis is agnostic about whether Viamedia would have won or lost any individual relationship that it in fact won or lost in the actual world: its focus is instead on Viamedia's broader ability to grow and compete. ECF No. 588-02, ¶¶ 37-45 & Fig. 6.

## II.    PROCEDURAL BACKGROUND

Viamedia filed its complaint on May 23, 2016, alleging that Comcast violated Section 2 of the Sherman Act. The Court (St. Eve, J.) set out the central factual allegations underlying those claims in addressing Comcast's motion to dismiss:

> For [its monopolization] claim, Viamedia alleges: (1) "[t]he provision of Spot Cable Advertising Representation services constitutes a relevant product market, (2) "the regional DMAs in which Comcast controls the Interconnect constitute relevant geographic markets," (3) "Comcast has monopoly power in Spot Cable Advertising Representation in each of the DMAs where it controls the Interconnect," (4) Comcast has excluded Viamedia and its clients from accessing Comcast-controlled Interconnects, and (5) "[b]y refusing to deal with Viamedia and [multichannel video programming distributors, or "MVPDs"] represented by Viamedia [and] by conditioning access to Interconnects upon an MVPD's agreement to deal with Comcast Spotlight . . . Comcast has unlawfully acquired and maintained its monopoly power in each of the markets where it controls the Interconnect."

Mem. Op. & Order, ECF No. 36 at 13; *see also id.* (noting that the attempted-monopolization claim was "based on the same conduct"). The Court proceeded to dismiss Viamedia's claim to the extent that it relied on a refusal-to-deal theory. *See id.* at 38-39, *see also* Mem. Op. & Order, ECF No. 60. But it sent the tying theory to discovery. Mem. Op. & Order, ECF No. 36 at 25-31, 39.

The Court (also St. Eve, J.) granted summary judgment in Comcast's favor, but the Seventh Circuit later reversed and remanded "for any further necessary discovery and for trial." 951 F.3d at 435. Salient aspects of that decision are detailed below. Comcast filed a petition for a writ of certiorari, but the Supreme Court denied it. *Comcast Corp. v. Viamedia, Inc.*, 141 S. Ct. 2877 (2021).

In the three years since the Seventh Circuit remanded the case, the parties have conducted yet more fact and expert discovery – virtually all of it at Comcast's behest. Before remand, Viamedia produced roughly 389,000 documents in response to Comcast's document requests, and the parties took 36 fact depositions. On remand, Viamedia produced another roughly 323,000 documents in response to Comcast's document requests, and Comcast took 20 fact depositions – many of which were second (or even third) depositions of witnesses already deposed pre-remand; Viamedia took just one Rule 30(b)(6) deposition of Comcast (split over two designees). Just as it did at summary judgment in 2018, Viamedia relies on the testimony of two experts: the same liability expert (Dr. Harold Furchtgott-Roth) and a new damages expert (Dr. Cragg). Comcast, in contrast, has doubled its stable of experts from two to four.

Because discovery on Viamedia's refusal to deal theory threatened to further delay trial, Viamedia elected not to pursue it, and instead to proceed to trial on the theory the Seventh

Circuit held was ready for trial: tying in the Chicago, Detroit, and Hartford DMAs.[1]  *See* ECF No. 490.  This motion follows.

## LEGAL STANDARD

The Court may grant summary judgment only if Comcast "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is Comcast's burden to prove "the lack of any genuine issue of material fact" – that is, that no "reasonable jury could return a verdict for" Viamedia, even viewing the record in the light most favorable to it, and taking all inferences in its favor.  *PrivateBank & Tr. v. Progressive Cas. Ins. Co.*, 2004 WL 1144048, at *1 (N.D. Ill. May 18, 2004) (quoting *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001)), *aff'd sub nom. Private Bank & Tr. v. Progressive Cas. Ins. Co.*, 409 F.3d 814 (7th Cir. 2005).

## ARGUMENT

The Seventh Circuit held that Viamedia has legally sufficient evidence that Comcast used its (then) "undisputed" "monopoly power in the tying market of Interconnect services in" Chicago, Detroit, and Hartford to compel customers to purchase ad rep services from Comcast, and that Comcast thereby (again, at the time, "undisputed[ly]") "capture[d] a monopoly position in" the market for those services "in the same areas."  951 F.3d at 468-69.  The mandate rule is

---

[1] Comcast suggests in passing (at 15) that Viamedia "narrowed" the "tying claim" that was the subject of the Seventh Circuit's decision, but that is not true. ███████████ ███████████████████████████████ Viamedia is now pressing the same tying theory that it pressed before the Seventh Circuit and that the Seventh Circuit held must go to trial.  The relevant geographic markets for purposes of that tying theory are limited to Chicago, Detroit, and Hartford – which is why the Seventh Circuit's analysis focuses on those DMAs and not others. *See* 951 F.3d at 434 ("Viamedia asserts claims against Comcast for monopolization in three geographic markets: the Chicago, Detroit, and Hartford metropolitan areas.").

thus the end of Comcast's motion with respect to liability. Comcast's arguments are at best for trial and post-trial motions – not summary judgment.

Moreover, each of Comcast's arguments is mistaken on its own terms. Comcast primarily argues that the antitrust markets Viamedia has defined are inconsistent with *Amex*, but Spot Cable Ad Rep Services are not (and certainly are not undisputedly) two-sided transaction platforms subject to *Amex*. Comcast's backup liability argument – that Viamedia has no tying claim before 2016 – repackages arguments the Seventh Circuit has already rejected. And Comcast's attacks on Viamedia's damages analyses are grist for the trial mill or legally erroneous, not a basis for summary judgment. The Court should therefore deny Comcast's motion.

## I. THE SEVENTH CIRCUIT'S REMAND "FOR TRIAL" REQUIRES THE COURT TO DENY COMCAST'S MOTION AS TO LIABILITY

Comcast's motion should be denied as to everything other than challenges to Viamedia's damages because the Court "has no power or authority to deviate from" the Seventh Circuit's mandate that the case be tried. *Medicines Co. v. Mylan Inc.*, 257 F. Supp. 3d 1023, 1028 (N.D. Ill. 2017) (internal quotation marks omitted); *see also In re A.F. Moore & Assocs., Inc.*, 974 F.3d 836, 840 (7th Cir. 2020) ("[W]hen a court of appeals has reversed a final judgment and remanded the case, the district court is required to comply with the express or implied rulings of the appellate court." (quoting *Moore v. Anderson*, 222 F.3d 280, 283 (7th Cir. 2000)).[2]

---

[2] Viamedia consistently argued that Magistrate Judge Finnegan should conform the scope of proceedings on remand, including expert reports and dispositive motion practice, to the Seventh Circuit's decision. *E.g.*, ECF No. 486 at 7-8; ECF No. 502 at 5-7. Judge Finnegan concluded that she did not have the authority to impose such limitations. *E.g.*, ECF No. 510 at 17 ("Viamedia opposes [certain third-party discovery Comcast sought], arguing that it is too late for Comcast to challenge the market definition to which it previously stipulated. While Viamedia may be right, this issue must be decided by the district judge.") (citation omitted); *id.* at 18-19 (With regard to expert reports, "the parties must follow the usual practice. After the disclosures are served and examined, the parties may move the district judge to strike or bar all

The Court must follow both the "letter" and the "spirit" of the Seventh Circuit's mandate, *A.F. Moore*, 974 F.3d at 840 (internal quotation marks omitted), and that Court left no ambiguity about either one. It reversed the Court's grant of summary judgment and "remand[ed] this case for any further necessary discovery and for trial." 951 F.3d at 435. Moreover, it mentioned the trial for which it remanded the case no fewer than five times. *See id.*; *id.* at 467 ("In the following analysis, we ask whether Viamedia has presented evidence of forcing sufficient to create a genuine dispute for trial" (and answering in the affirmative); *id.* at 470 (regarding evidence of forced purchase, noting that "[t]he opposing arguments are suitable for a trial but are not grounds for affirmance"); *id.* at 474 ("Comcast is free to offer [its] misunderstanding theory at trial, but the theory cannot support summary judgment"); *id.* at 485 (after holding that Viamedia had "offered sufficient evidence[] that Comcast violated Section 2 of the Sherman Act," noting that although "Comcast is free to contest these issues at trial, as well as to try to prove and quantify any procompetitive justifications[, t]he factual disputes in this case are numerous, genuine, and material").

Comcast acknowledged the import of the Seventh Circuit's decision when it thought doing so was to its litigation advantage. Before the Supreme Court, Comcast emphasized repeatedly the fact that the Seventh Circuit had "sen[t] the case to trial." Pet. for Writ of Cert. at 15, *Comcast Corp. v. Viamedia, Inc.*, No. 20-319 (U.S. Sept. 4, 2020). Its certiorari petition characterized the decision that way over and over (and over). *See id.* at 8 (noting that on the majority's view, "a *jury* would have to balance [Comcast's business justification] against any 'anticompetitive effects' of not dealing with Viamedia") (cleaned up); *see also id.* at 10, 13, 20,

---

or portions of any expert's opinions. Armed with the actual opinions at issue and briefing from the parties, the district judge will be in a position to decide whether a particular opinion is permissible.").

& 21 (all similarly acknowledging remand for trial). Comcast's reply brief said the same thing –
that the decision had, in Comcast's words (and emphasis), "order[ed] a *trial*." Reply Br. for
Pet'rs at 5, *Comcast*, *supra* (Nov. 16, 2020). And Comcast's response to the Solicitor General's
invitation brief (in which the Solicitor General recommended denial) repeated the point. *See*
Suppl. Br. for Pet'rs at 7, *Comcast*, *supra* (June 7, 2020) ("[T]he panel dedicated an entire . . .
section of its opinion to the 'considerations that will be relevant on remand' necessary to balance
'the harm to competition alleged by Viamedia and the procompetitive justifications offered by
Comcast' when the case is sent to the jury 'for trial.'").

But Comcast ignores all of this in its motion. It likewise ignores the many cases in which
a court rejects a losing appellee's request for a do-over after a reversal of its summary judgment
victory. *E.g.*, *Washington v. Dep't of Revenue*, 2006 WL 8443222, at *2 (C.D. Ill. Feb. 10,
2006) (denying motion to file second summary judgment motion: "the Court of Appeals
expressly stated, 'the case is remanded for trial,'" so "a second motion for summary judgment
[was] barred as outside the mandate"); *see also Gosey v. Aurora Med. Ctr.*, 2015 WL 4204015,
at *3 (E.D. Wis. July 10, 2015) ("This court confesses some bewilderment regarding [movant's]
decision to file a second motion for summary judgment. The motion asks this court – the district
court – to review, and reverse, the decision of the Seventh Circuit. This court does not have that
authority; it is bound by the decisions of the Seventh Circuit, not the other way around."). This
case is no different: the Seventh Circuit's remand "for trial" was not a remand to let Comcast
take another run at summary judgment.

Comcast is sure to argue on reply that because the Seventh Circuit did not consider
precisely these arguments, the Court is free to credit them. But Comcast chose the bases on
which to seek summary judgment in 2018, and Comcast chose the arguments to press as bases

for affirmance on appeal (both those it raised in the trial court and those it did not). Indeed, it specifically chose *not* to contest (for example) market definition or monopoly power, and the Seventh Circuit relied on those concessions. *See* 951 F.3d at 468-69. The fact that it took an appeal for Comcast to lose the summary judgment arguments it chose to make the first time around does not give it license to try its luck with arguments it failed to press earlier: Comcast chose the arguments it made and lost, and now must wait until trial or thereafter to make others. *Cf. Isby-Israel v. Brown*, 2017 WL 11536885, at *2 (S.D. Ind. Oct. 17, 2017) (denying leave to file "a successive dispositive motion" on previously unbriefed issues after summary judgment reversal); *Washington*, 2006 WL 8443222, at *2 ("Defendant" whose summary-judgment victory was reversed on appeal "failed to advance [an argument] in its appellate argument in support of the judgment," and "[a]n argument bypassed by the litigants, and therefore not presented in the court of appeals, may not be resurrected on remand and used as a reason to disregard the court of appeals' decision." (quoting *Barrow v. Falck*, 11 F.3d 729, 730 (7th Cir. 1993)).

Because the Seventh Circuit held that this case must go to "trial," 951 F.3d at 435, the Court must send it there. The Court should go no further and deny Comcast's motion on that ground alone with regard to all subjects except Viamedia's damages.[3]

## II.  SPOT CABLE AD REP SERVICES ARE NOT TWO-SIDED TRANSACTION PLATFORMS AS A MATTER OF LAW

Comcast principally contends (at 17-27) that the markets Viamedia has defined (and the monopoly power arguments that follow from those definitions) are legally erroneous because (it

---

[3] To be clear, if the Court were to credit Comcast's arguments with regard to damages, trial would still be necessary because Viamedia seeks injunctive relief, as well. Comcast has not addressed, and so has waived, any summary judgment argument with regard to that relief. *See Baldonado v. Wyeth*, 2012 WL 2254215, at *2 n.1 (N.D. Ill. June 15, 2012) (arguments raised for the first time in reply brief are waived; summary judgment motion denied).

says) "the alleged markets for 'Interconnect Services' and for 'spot cable ad rep services' satisfy all of the elements of two-sided transaction platforms identified by the Supreme Court in *Amex*." As Viamedia has explained at greater length in its *Daubert* briefing and summarizes below, Comcast is mistaken. *See* ECF No. 614 at 12-16; ECF No. 653 at 7-10.

*Amex* addresses a type of firm known as a two-sided transaction platform. The broader term "two-sided platform" refers to a firm that "offers different products or services to two different groups who both depend on the platform to intermediate between them." *Amex*, 138 S. Ct. at 2280 (citation omitted). "The key feature of *transaction* platforms is that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Id.* (emphasis added). The paradigmatic example of a two-sided transaction is a "credit-card transaction," which cannot "occur unless both [a] merchant and [a] cardholder simultaneously agree to use the same credit-card network." *Id.* It is the fact that output of a transaction platform is measured *in transactions* – which are inherently two-sided – that requires an antitrust court to consider effects on both sides.

The services offered by spot cable ad reps and Interconnect operators are not two-sided transaction platforms at least because this condition is not satisfied. The market for Spot Cable Ad Rep Services functions like any number of others in which a principal hires an agent to sell something on its behalf. Typically, ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ *See* SAF ¶ 57. Put differently (*cf.* Mot. at 23), ████████████████████████████████████████



█████████████████████████████████████████ That is not a "simultaneous transaction" in any way relevant to *Amex* because there is no need for both sides (MVPD and advertiser) to "simultaneously agree to" transact using any platform. *Amex*, 138 S. Ct. at 2280.

Comcast's contrary position rests on the notion that an ad rep "cannot make a sale of a spot cable avail to an advertiser without simultaneously making a sale of Spot Cable Ad Rep Services to an MVPD." Mot. at 23 (cleaned up). That claim is simply wrong. ████████

██████████████████ As set forth above and in the Seventh Circuit's opinion, *see* 951 F.3d at 442, Spot Cable Ad Rep Services include many other activities the ad rep undertakes for the MVPD that do not make any sale of an avail to any advertiser.

Much the same is true of an Interconnect operator, which provides services well beyond sales of participating MVPDs' ad avails. At the outset, it is simply not the case that the Interconnect operator intermediates a transaction between the MVPD and an advertiser; rather, the Interconnect operator obtains the right to certain avails, bundles them, sells them, and then provides an agreed portion of the fees to the individual MVPDs. The advertiser doesn't enter into any transaction with the individual MVPDs for this purpose – indeed, avoiding such

bilateral transactions is the point of the Interconnect.  In any event, however, whether *Interconnect Services* are two-sided is beside the point for Viamedia's tying theory.  There is *no* dispute that Comcast is a monopoly provider of those services, and there is evidence that Comcast used that monopoly power to force MVPDs to purchase ad rep services from Comcast and not from Viamedia.  Viamedia's claim does not depend on showing that MVPDs suffered anticompetitive effects *in the market for Interconnect Services*, and it is therefore unnecessary to consider whether there are offsetting benefits for anyone else.   Viamedia will prove anticompetitive effects in the market *for Spot Cable Ad Rep Services*, and Comcast is wrong to claim that ad reps sell a two-sided transaction platform.

For all these reasons, Comcast's assertions about the intensity of competition across advertising media (*see* Mot. at 24-26) are beside the point.  Comcast claims (at 26) that because Interconnect Services are those of a two-sided transaction platform, the intensity of the competition Comcast faces in the sale of advertising is enough to keep it from exercising monopoly power in the provision of ad rep services to MVPDs.  But that's a non sequitur:  since the market for Spot Cable Ad Rep Services is separate from the market for Interconnect Services, the claim that Comcast is constrained in its dealing with MVPDs by virtue of advertising competition (a claim that is itself incorrect and unsupported by any evidence) is simply beside the point.  Ad reps compete with other ad reps (and with an MVPD's alternative of carrying out its ad sales itself) not with any kind of advertising venue.[4]

---

[4] Comcast claims that competition on one side of a two-sided transaction platform eliminates any "viable claim that the operator of the platform . . . can exercise market power on the other side of the platform."  Mot. at 26.  But the cited literature limits this proposition to circumstances in which "competitors on" the intensely competitive "side" "cannot differentiate their products and otherwise compete on an equal footing."  David S. Evans & Michael Noel, *Defining Antitrust Markets When Firms Operate Two-Sided Platforms*, 2005 Colum. Bus. L.

At best for Comcast, the two-sided-platform issue is one for trial. Comcast's position depends entirely on the jury crediting Comcast's characterization of Spot Cable Ad Rep Services as necessarily involving a "simultaneous transaction."[5] Viamedia disagrees, and is supported by the testimony of its concededly qualified liability expert. To resolve questions of fact which are the subject of a "battle of the experts" is (of course) the jury's role. *Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009); *see also Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1020 (N.D. Ill. 2020) ("The relevant market definition is generally a merits question of fact that is reserved for the jury.").

## III. VIAMEDIA'S TYING THEORY IS CONSISTENT WITH THE SEVENTH CIRCUIT'S DECISION

Comcast next claims (at 28) that, on Viamedia's theory, "Comcast engaged in tying years before it was legally possible." In other words, Comcast asserts the Seventh Circuit's decision forecloses tying liability for any conduct that preceded the consummation of the "sales" Comcast's conduct ultimately "forced" on RCN, WOW!, ████████ Mot at 27-29. That conclusion misreads the Seventh Circuit's decision.

### A. The Seventh Circuit Has Already Held That Viamedia's Tying Theory Is Legally Viable

Comcast's fundamental defense to Viamedia's tying theory has long been that it is no tying theory at all – that it just challenges a refusal to deal that (Comcast asserts) was lawful. That is so, Comcast contends, because Viamedia (not the MVPD) owns the avails in question,

---

Rev. 667, 695 (2005). That is not true of advertising competition among media as different as "broadcast television, cable television, digital, radio, print, and out-of-home formats." Mot. at 6.

[5] Comcast points (at 19) to *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019), but the cited language is most fairly read to hold that if a product is a transaction platform, then the relevant market cannot exclude one side of that platform as a matter of law – not that on summary judgment, *the Court* must decide antecedent factual disputes.

and Comcast is simply refusing to deal with Viamedia (not imposing any condition on the MVPD). Comcast made some version of that claim before every level of the federal courts.[6]

It is the law of the case that Comcast is wrong. The Seventh Circuit held (among other things) that Viamedia has legally sufficient evidence "that Comcast improperly forced the smaller MVPDs [in question] to buy its ad rep services using its monopoly in the Interconnect services market." 951 F.3d at 470. "The fact that the arrangements were structured so that" Viamedia (not the MVPDs) owned the avails in question "does not affect this analysis." *Id.* The Seventh Circuit went on to explain that the notion that Viamedia's tying theory is redundant of Viamedia's refusal to deal theory repackages "disagreement" with the Seventh Circuit "on the merits of the tying claim." *Id.* at 483. The Court cannot (of course) credit such a disagreement. *See Carmody v. Bd. of Trustees of Univ. of Ill.*, 893 F.3d 397, 407-08 (7th Cir. 2018) (explaining the law-of-the-case doctrine).

### B.     Comcast's Renewed Challenge To the Viability of Viamedia's Tying Theory Lacks Merit

In its motion, Comcast attempts to reframe the argument once again, but its position remains erroneous. Comcast contends that under the Seventh Circuit's decision, its unlawful

---

[6] *E.g.*, ECF No. 266 at 1 (In the first sentence of Comcast's 2018 summary judgment motion: "At the end of discovery, the only issue remaining in this case is a semantic debate over how to characterize Comcast's conduct. No material facts are in dispute. Viamedia and its experts engage in a variety of word games to obscure the clear distinction this Court drew between a lawful unilateral refusal to deal with Viamedia and tying or exclusive dealing with respect to MVPDs.") (emphasis omitted); Brief of Defendants-Appellees at 3-4, *Viamedia, Inc. v. Comcast Corp.*, No. 18-2852 (7th Cir. Dec. 10, 2018) ("Coerced sales of a tied product are an essential element of a tying claim. . . . Viamedia's true grievance is that Comcast declined to provide interconnect services to Viamedia so that Viamedia could bundle them with its own ad representation services."); Pet. for Writ of Cert. at 26, *Comcast*, *supra* ("By allowing the tying claim to proceed, the majority licensed plaintiffs to evade the appropriately strict limitations on refusal-to-deal claims, creating further conflicts with this Court's decisions and circuit precedent."); Suppl. Br. for Pet'rs at 11, *Comcast*, *supra* ("[T]here is no independent tying conduct here[.]").

conduct cannot have begun before Comcast actually sold ad rep services to the MVPDs in question. On this view, the Seventh Circuit held irrelevant for tying purposes the period in which Comcast refused to provide Interconnect services to MVPDs that Viamedia represented ███████████████████ Mot. at 27-28; *see also id.* at 35 n.17.

That claim is demonstrably incorrect. When the Seventh Circuit held that Viamedia had sufficient evidence to go to trial on its tying theory, the Court's holding applied not just to the Chicago and Detroit DMAs, but *also to the Hartford DMA*, in which *Comcast had not yet sold ad rep services to the MVPD* from whom it was seeking to coerce a sale (Frontier). *See* 951 F.3d at 473 ("[N]otably, in Hartford, Frontier has continued to resist signing with Comcast for ad rep services and remains cut off from the Interconnects.)"). For that reason, in its effort to cobble together some contrary rule from stray words about other things,[7] Comcast missed the most obvious refutation of its position: in remanding Viamedia's tying theory for trial, the Seventh Circuit necessarily rejected Comcast's assertion that tying does not start until its tying causes an actual sale of the tied product – *i.e.*, the sale of ad rep services. *See Carmody*, 893 F.3d at 407 ("The law of the case doctrine" extends to an issue "decided by a higher court," whether "expressly or impliedly.") (quoting *United States v. Adams*, 746 F.3d 734, 744 (7th Cir. 2018)).

The Court was correct. Tying law is concerned not just with the forced sale itself, but with the coercion that precedes it. *See Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 605 (1953) (A tying scheme "coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market.");

---

[7] For example, the language Comcast quotes regarding the "sufficiency" of the "tying claim" (at 27) illustrates a point about the applicable summary-judgment standard – not the question Comcast puts at issue. *See* 951 F.3d at 467 (rejecting district court's application of *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), to Viamedia's tying theory).

*see also* 10 Phillip E. Areeda & Herbert Hovenkamp ¶ 1752e ("[A] tying 'agreement' or 'condition' is present when the defendant has utilized customers' desire for its product *A* to constrain improperly their choice between its product *B* and that of its rivals."). As Viamedia's liability expert explains, although a tying arrangement is only complete once the defendant has forced a sale, the conditioning of the sale of one product on the sale of another – for example, by announcing a policy of refusing to provide two services separately – can have an anticompetitive economic impact before the tied-product sale has occurred. *See* ECF No. 653, at 11-12 (citing H. Furchtgott-Roth Dep. Tr. Jan. 4, 2018, at 229:14-231:4, and H. Furchtgott-Roth Dep. Tr. Oct. 16, 2022, at 61:18-62:6). Comcast's conduct had such an effect: the point of Comcast's scheme was, as the Seventh Circuit explained, to use "[t]he window of time between Viamedia's foreclosure from Interconnect access and Comcast's competitor MVPDs' return to the market to seek bids for their ad rep services . . . 'to overpower ViaMedia.'" 951 F.3d at 446 (quoting A217).

Furthermore, Comcast ignores that this is a claim under *Section 2 of the Sherman Act* – for monopolization – not for tying under Section 1. Section 2 condemns conduct that unlawfully creates or maintains a monopoly, *see* 951 F.3d at 469 – and Comcast's exclusion of the MVPDs that Viamedia represents from the Interconnects unquestionably contributed to its obtaining a complete monopoly of Spot Cable Ad Rep Services in the DMAs at issue.

Viamedia's position thus does not "disregard the Seventh Circuit's holding in this case." Mot. at 29. Quite the opposite. The Seventh Circuit held that Viamedia's tying theory must go to trial, and that holding necessarily rejects Comcast's objection to Viamedia's tying theory.[8]

---

[8] Comcast implies by typography that "Viamedia's theory of liability and claimed damages *on remand*" are different in some relevant way from the theory it pursued before remand (Mot. at 27-28), but cites nothing supporting that claim for good reason: it is wrong.

**IV.    VIAMEDIA HAS PROFFERED A REASONABLE ESTIMATE OF THE DAMAGES CAUSED BY COMCAST'S TYING**

Comcast last attacks Viamedia's damages theory, contending that it does not account for purported changes to Viamedia's liability case (at 30-35), that Comcast's conduct did not cause Viamedia's damages (at 34-41), and that Viamedia's theory improperly disguises prejudgment interest as compensatory damages (at 41-44). Viamedia has responded to all of these arguments in full in its *Daubert* briefing, and (without burdening the Court with undue repetition) summarizes those responses below.

**C.  Viamedia's Damages Case Is Entirely Consistent With Its Liability Case**

Comcast spends many pages attempting to conjure a conflict between Viamedia's liability case and its damages case. None exists.

*First*, contrary to Comcast's assertion (at 30-31), there is no conflict between the geographies Viamedia's liability case puts at issue and Dr. Cragg's analysis. Dr. Cragg's report is clear that his analysis addresses conduct that occurred in Chicago, Detroit, and Hartford, and that his damages methodology addressed "how Comcast's actions in those markets affected the business overall and the myriad of ways that Comcast's actions have hurt Viamedia." Viamedia Ex. 133, Cragg Tr. at 58:6-9. Comcast's contrary position depends on a mistaken understanding of Dr. Cragg's work. *See* ECF No. 650 at 7-8 (detailing basis for this position).

*Second*, again contrary to Comcast's position (at 31-34), there is no conflict between Viamedia's decision not to pursue its exclusive dealing theory (on appeal) or its refusal to deal theory (on remand) and Dr. Cragg's analysis. Dr. Cragg explained, relying on the Seventh

Indeed, as just explained (*supra* at 23 n.6), Comcast criticized Viamedia's theory before remand on the same basis. *See* ECF No. 266 at 12 (In the heading to Comcast's lead summary judgment argument: "All of Viamedia's Alleged Injuries Flow from Comcast's Lawful Refusal to Deal with Viamedia.").

Circuit's holding, that "[b]ecause the same general course of conduct supports both the refusal-to-deal and tying claims, the two theories necessarily allege similar injuries and damages." ECF No. 561-01, ¶ 35 (quoting 951 F.3d at 483). That reasoning applies with equal force to the long-ago-abandoned exclusive dealing claim. For that reason and the others Viamedia has explained, *see* ECF No. 650 at 8-10, the streamlining of the legal theories Viamedia will seek to prove at trial does nothing to undermine Dr. Cragg's analysis.

### D. A Reasonable Jury Could Credit Viamedia's Evidence that Comcast's Conduct Caused Viamedia's Damages

Comcast next recapitulates its claim (at 34-41) that things other than its conduct caused the harm Viamedia has suffered. At best for Comcast, it has raised an issue for trial – not for summary judgment.

#### 1. Viamedia Need Only Prove the Amount of Its Damages to a Reasonable Degree of Certainty

To prove that Comcast's conduct caused it damages, Viamedia need not show that Comcast's conduct was the sole cause of those injuries or "exhaust all possible alternative sources of injury"; it is enough, instead, if Viamedia can show that Comcast's anticompetitive conduct is a but-for and a material cause of those injuries. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969); *see In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012) ("'[T]o prove a 'causal connection' between the defendant's unlawful conduct and the plaintiff's injury, the plaintiff need only 'demonstrate that [the defendant's] conduct was a substantial or materially contributing factor' in producing that injury.'" (quoting *Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785, 823 n.49 (2d Cir. 1983)). Further, "if an act is deemed wrongful because it is believed significantly to increase the risk of a particular injury, [courts] are entitled—in the tort context at least—to presume that such an injury, if it occurred,

27

was caused by the act." *Publ'n Paper Antitrust Litig.*, 690 F.3d at 66 (applying that rule in an antitrust case). "[T]he burden then shifts to the defendant 'to bring in evidence tending to rebut the strong inference, arising from the [injury], that the [act] was in fact a but-for cause of the plaintiff's injury.'" *Id.* at 67 (quoting *Liriano v. Hobart Corp.*, 170 F.3d 264, 271 (2d Cir. 1999)) (alterations in original); *see also id.* at 68-69 (vacating contrary grant of summary judgment).

Once Viamedia establishes the fact of its injury, a relaxed standard applies to proof of the amount of those damages: it is a "basic principle" "in antitrust cases" that "damages need only be proven to a *reasonable degree of certainty*, and that there is broad latitude in establishing antitrust damages." *In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 924 (N.D. Ill. 2006) (emphasis added). "It is axiomatic that damages in [an antitrust] case are rarely susceptible of the kind of concrete, detailed proof of injury available in other contexts." *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 484 (7th Cir. 1980) (damages calculation affirmed) (citing *Zenith Radio*, 395 U.S. at 123). "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981). But Comcast is ill-positioned "to insist upon specific and certain proof of the injury which it has itself inflicted." *Id.* at 567.

### 2. A Reasonable Jury Could Find That Viamedia Has Proved the Amount of Its Damages to a Reasonable Degree of Certainty

Comcast nowhere claims that its conduct caused Viamedia *no* harm. It instead reiterates its *Daubert* claims that factors other than its conduct drove the dramatic decline in Viamedia's performance and value captured in Dr. Cragg's analysis. Assuming Comcast has evidence to

support such a claim, it is free to so argue to the jury, but that jury would be well within its

prerogative to disagree.

Comcast first reprises its reliance (at 35-37) on the fact that at the end of 2013, Viamedia

lost the business of ████████████████ and claims that Comcast's conduct did not cause

Viamedia to lose that client. But Comcast is simply mistaken to claim that Dr. Cragg has

necessarily attributed the loss of that business to Comcast's actions. That is not how Dr. Cragg's

model works: he does not calculate damages based on the loss or gain of specific clients.

Instead, he takes a macro approach. His view is that if Viamedia had continued to grow at even

a conservative estimate of how it would have grown in the but-for world, Viamedia would have

replaced that lost business over time. Comcast asserts (at 37) that this conclusion is

"unsupported by any evidence or analysis," but that is not true. *See* ECF No. 588-02, ¶¶ 39-45

(among other things, collecting contemporaneous documents consistent with his opinions); *see*

*generally* ECF No. 650, at 10-11 (more fully refuting Comcast's reliance on Viamedia's loss of

████████████████).

Comcast next contends (at 37-41) that Viamedia's struggles are its own fault████

██████████████████████████████████████ But Viamedia has marshaled

contrary evidence that a reasonable jury would be free to credit. To state the obvious, Viamedia

was independent of any MVPD affiliation. As a consequence, it could cross-sell an MVPD's

broadband and other products (not just its ad time) to advertisers – and Viamedia could not

misuse an MVPD's confidential information to compete with it for subscribers. These

competitive advantages, together with Viamedia's excellent sales force, fueled Viamedia's rapid

growth to become the largest independent ad rep. SAF ¶ 58.

29

Comcast makes much of the fact that Viamedia faced vigorous competition from MVPD-affiliated operators, and that ███████████████████████████████████████ ███████████ But Viamedia has never contended that in the but-for world, every MVPD it approached would engage it – of course it would still lose some bids (even as it won others). Nor has Viamedia contended that it would systematically offer MVPDs financial terms that, taken at face value, ███████████████████████████████ The point is instead that Spot Cable Ad Rep Services are not like commodities sold in an auction based entirely on price: They are instead differentiated services, and different MVPDs weigh different points of differentiation differently.

Comcast also points to ███████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████ To the extent Viamedia's late payments to customers hurt its ability to compete, that is not an alternative explanation for Viamedia's lack of competitiveness but instead a direct consequence of Comcast's challenged conduct in Chicago, Detroit, and Hartford, which caused the cash flow problems that in turn led to the late payments to customers.  ECF No. 220-01, ¶ 119; *see also* M. Lieberman Dep. Tr. Oct. 21, 2021, at 28:5-6 ("██████████████ ████████████████████████").

### E.    Viamedia's Damages Analysis Does Not Claim Improper Prejudgment Interest

Comcast finally asserts (at 41-44) that Dr. Cragg's analysis runs afoul of the Clayton Act's limitations regarding prejudgment interest, but that is contrary to Seventh Circuit authority and mischaracterizes Dr. Cragg's work.  *See* ECF No. 650 at 16-18.

Comcast appears to contend that the Clayton Act required Dr. Cragg to calculate damages as of the date Comcast excluded Viamedia from the Interconnects, and to discount future damages to their present value as of that date, rather than as of the end of the last full year for which data were available (as Dr. Cragg did).  But that is directly contrary to the principal authority Comcast cites.  The defendants there argued "that damages must be computed as of the date of the injury," and the Seventh Circuit disagreed: "While this rule may generally govern simple contract damages," that court explained, "it is not necessarily controlling in cases such as the one before us where the injury is continuing or where damages from the injury continue to accrue.  *Fishman v. Estate of Wirtz*, 807 F.2d 520, 551-52 (7th Cir. 1986); *see also id.* at 552 ("We know of no requirement that damages must always be computed as of the time of the injury or, if not, reduced by some appropriate discount rate to produce a value as of that date.").  For reasons Dr. Cragg has explained, that is the case here.  *See*  Viamedia Ex. 133, Cragg Tr. at 48:20-23; ECF No. 561-01, ¶¶ 82-83 & Fig. 14; *see also* ECF No. 588-02, ¶ 9 n.9 (citing many academic sources explaining the importance of retained earnings to fund a business's growth).  Comcast's apparent contention (at 41-43) that *anything* that can be labeled "opportunity cost" must be unrecoverable prejudgment interest in disguise is mistaken, and its position is contrary to authority (*see* ECF No. 650 at 17-18 (citing cases)) that Comcast ignores (*see* ECF No. 698 at 10-12).

## CONCLUSION

Comcast's motion should be denied.

Dated: February 22, 2023

Respectfully submitted,

/s/ *Richard J. Prendergast*
James M. Webster, III (*pro hac vice*)
Aaron M. Panner (*pro hac vice*)
Kenneth M. Fetterman (*pro hac vice*)
Derek T. Ho (*pro hac vice*)
Leslie V. Pope (*pro hac vice*)
**KELLOGG, HANSEN, TODD,**
 **FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
jwebster@kellogghansen.com
apanner@kellogghansen.com
kfetterman@kellogghansen.com
dho@kellogghansen.com
lpope@kellogghansen.com

Richard J. Prendergast
Michael T. Layden
Collin M. Bruck
**CROKE FAIRCHILD DUARTE**
**& BERES LLC**
191 N. Wacker Dr., 31st Floor
Chicago, Illinois 60602
(312) 641-0881
rprendergast@crokefairchild.com.
mlayden@crokefairchild.com

*Counsel for Plaintiff Viamedia, Inc.*

32

## <u>CERTIFICATE OF SERVICE</u>

I, Richard J. Prendergast, an attorney of record in the above-captioned case, hereby

certify that on February 22, 2023, I caused to be served a true and correct copy of Viamedia,

Inc.'s Response in Opposition to Defendants' Motion for Summary Judgment upon the following

counsel via electronic means:

**Ross Benjamin Bricker**
**Sally Kristen Sears Coder**
**Thomas Edward Quinn**
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
rbricker@jenner.com
ssearscoder@jenner.com
tquinn@jenner.com

**Arthur Burke**
**David B. Toscano**
Davis, Polk & Wardwell
450 Lexington Street
New York, NY 10017
(212) 450-4000
arthur.burke@dpw.com
david.toscano@davispolk.com

/s/ *Richard J. Prendergast*