**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VIAMEDIA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16 CV 05486 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| COMCAST CORPORATION and | ) | |
| COMCAST SPOTLIGHT, LP, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Viamedia, Inc. ("Viamedia") brings this action against Defendants Comcast Corporation and Comcast Cable Communications Management, LLC's (together, "Comcast") for allegedly engaging in unlawful tying in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, which Viamedia contends has resulted in monopolization of the market for advertising representation services in Chicago, Illinois; Detroit, Michigan; and Hartford, Connecticut. Viamedia seeks monetary damages, as well as equitable relief, under the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

Before the Court are Viamedia's motions to exclude expert testimony, Comcast's motions to exclude expert testimony, and Comcast's motion for summary judgment [668]. Viamedia seeks to exclude the expert opinions of Dr. Dennis Carlton [611], Dr. Andres Lerner [614], and Billy Farina [617]; Comcast seeks to exclude the expert opinions of Dr. Harold Furchgott-Roth [622] and Dr. Michael I. Cragg [639]. For the following reasons, the Court grants in full Viamedia's motion to exclude the expert opinions of Dr. Lerner [614]; denies in full Viamedia's motion to exclude the expert opinions of Dr. Carlton [611] and Comcast's motions to exclude the expert opinions of Dr. Furchgott-

Roth and Dr. Cragg [622, 639]; grants in part and denies in part Viamedia's motion to exclude the expert opinions of Mr. Farina [617]; and denies Comcast's motion for summary judgment [668].

This case's complex and extensive record warrants a comprehensive chronicling of the pertinent facts, industry background, procedural history, and issues in dispute. The Court begins with an explanation of the relevant background and the procedural history of this case. The Court then addresses various issues that overlap with both Comcast's motion for summary judgment and several of the parties' motions to exclude expert opinions, before turning to the remaining arguments in the parties' motions to exclude expert opinions.

Lastly, the Court acknowledges that the parties' motions have been fully briefed for almost three years and that this case has been before four district court judges. The Court appreciates the parties' patience.

## I.    Background

### A.  Spot Cable Ad Rep Services and Interconnect Services

Consumers of television programs often watch a dozen or more commercials each hour of programming. While some commercials air simultaneously throughout the United States (*e.g.*, big name brand commercials during the Super Bowl), many other commercials are targeted to reach consumers in a particular geographic area, airing only in a specific region, city, or even zip code. Subscription television providers—including cable, phone, and satellite companies—sell advertising inventory, or time slots, to advertisers to air commercials that will be distributed only to the providers' respective subscribers. These television providers are referred to as multichannel video programming distributors ("MVPDs"), and the advertising inventory they sell are known as spot avails ("Spot Cable Ad Avails").

A Spot Cable Ad Avail sold by an MVPD will reach only that specific MVPD's subscribers. (Dkt. 707, Viamedia's Resp. to Comcast's SOF, ¶ 8.) For example, a Spot Cable Ad Avail that the

MVPD RCN Corporation ("RCN") sells on a network like ESPN in the Chicago area will be seen only by Chicago-area RCN subscribers watching ESPN, and not, for example, by Chicago-area Xfinity/Comcast subscribers watching ESPN. (*Id.*) Thus, to reach all MVPD subscribers in a defined geographic market or region, referred to as a Designated Market Area ("DMA"),[1] advertisers need to purchase Spot Cable Ad Avails from all of the MVPDs serving that DMA. (*Id.* ¶ 9.)

Some MVPDs sell Spot Cable Ad Avails directly to advertisers using their own in-house sales team. (*Id.* ¶ 10.) Other MVPDs instead contract with an advertisement sales representative ("ad rep") to facilitate the sale of their Spot Cable Ad Avails to advertisers on the MVPDs' behalf, often in exchange for a percentage of the sales revenue, referred to as "revenue share." (*Id.* ¶ 12.) In the typical arrangement, an MVPD sells to an ad rep its Spot Cable Ad Avails in certain DMAs over a specific time period, in exchange for a promise that the ad rep will attempt to sell those Spot Cable Ad Avails and periodically remit a revenue share to the MVPD. (*Id.* ¶ 14.) That promise is sometimes buttressed by a minimum revenue guarantee, which the ad rep will cover in the event of any shortfall. (*Id.* ¶ 16.)

The services that ad reps provide to MVPDs are referred to as "Spot Cable Ad Rep Services." In addition to facilitating the sale of Spot Cable Ad Avails, ad reps can be responsible for:

- Allocating the MVPD's inventory of spot avails among different sales channels—*i.e.*, local ads sold in competition with other MVPDs, DMA-wide ads, or multi-DMA/national ads;
- Researching, marketing, pricing, and selling an MVPD's inventory of spot avails to advertisers, including the approximately one-third of Spot Cable Ad Avails sold to local retailers in competition with other MVPDs;
- Interfacing with the relevant Interconnect (defined below) for Spot Cable Ad Avails allocated to regional, DMA-wide ads;

---

[1] A DMA is a regional viewing area used to measure television ratings. The United States is divided into 210 DMAs, which represent distinct metropolitan areas. Only about 100 DMAs have an Interconnect. (Dkt. 40, Am. Compl., ¶ 24; Dkt. 686, Comcast MSJ, at *17 n.8.).

- Providing technical services such as encoding video files and operating and maintaining the software needed to run, insert, traffic, monitor, and archive advertisements;
- Organizing the MVPD's inventory of Spot Cable Ad Avails into schedules and ensuring that each advertisement runs correctly during those schedules; and
- Performing financial services, such as accounting, billing, and collection.

*Viamedia*, 951 F.3d at 442; Dkt. 718, Comcast's Resp. to Viamedia's SOAF, ¶ 1. The most common arrangement between an MVPD and an ad rep is "full turnkey" representation, whereby the MVPD awards the ad rep the exclusive right to manage and sell all of the MVPD's Spot Cable Ad Avails in a particular DMA. (Dkt. 707, Viamedia's Resp. to Comcast's SOF, ¶¶ 30–31.)

Historically, an advertiser seeking to reach every cable subscriber in a particular DMA would need to negotiate separately with each individual MVPD in that DMA to ensure that its advertisement would run simultaneously on the same cable network across the DMA (*e.g.*, Comcast and RCN subscribers in the Chicago area watching ESPN would see the same commercial at the same time). To more effectively meet the needs of regional advertisers, MVPDs created "Interconnects." (*Id.* ¶ 19.)

An Interconnect is a platform that coordinates the distribution of Spot Cable Ad Avails, thus allowing an advertiser to display an advertisement on multiple MVPD systems within a DMA simultaneously. (*Id.* ¶ 20.) An Interconnect provides advertisers with a "one-stop shop" to purchase DMA-wide, or near DMA-wide, spot cable advertising that runs on the same network during the same time slot across all participating MVPDs in the DMA. (*Id.*) The Interconnect in a particular DMA is typically controlled and operated by the largest or most dominant MVPD in that DMA. (*Id.* ¶ 22.) Interconnect operators generally provide various services ("Interconnect Services"), including pooling and coordinating the sale of Spot Cable Ad Avails from multiple MVPDs on a DMA-wide or near DMA-wide basis. (*Id.* ¶ 21.)

4

In sum, Spot Cable Ad Rep Services and Interconnect Services are "different functionally." *Viamedia*, 951 F.3d at 469. As the Seventh Circuit described, "a provider of Interconnect [S]ervices bundles and re-sells ads from multiple MVPDs in a regional market," while an ad rep "has a more direct relationship with an MVPD, directly representing it in regional and/or local ad sales, and potentially acting as its representative with an Interconnect." *Id.*

### 1. *Spot Cable Ad Avails in Chicago, Detroit, and Hartford*

Viamedia is an ad rep. From 2011 through 2016, Viamedia provided Spot Cable Ad Rep Services to various MVPDs in more than 90 DMAs. (Dkt. 707, Viamedia's Resp. to Comcast's SOF, ¶ 61.) As relevant here, Viamedia operated as an ad rep for RCN and WideOpenWest, Inc. ("WOW!") in the Chicago and Detroit DMAs, and for Frontier in the Hartford DMA. Viamedia operates as an independent ad rep, in the sense that it is not affiliated with any MVPD.

Comcast is an MVPD in various DMAs. As an MVPD, Comcast competes for subscribers with RCN, WOW!, and Frontier. In many DMAs in which it has the majority share of cable subscribers, including Chicago, Detroit, and Hartford, Comcast also operates the Interconnect. (*Id.* ¶ 23.) Additionally, Comcast, through Comcast Spotlight, is an ad rep. Comcast Spotlight sells Spot Cable Ad Avails in certain DMAs for its own Comcast-owned and operated MVPD, as well as for other non-Comcast-affiliated MVPDs, including RCN, WOW!, and Frontier. Naturally then, Comcast (through Comcast Spotlight) and Viamedia are competitors in the provision of Spot Cable Ad Rep Services to MVPDs.

### 2. *RCN and WOW! in Chicago and Detroit*

From 2003 to 2012, Viamedia provided Spot Cable Ad Rep Services to RCN in Chicago and WOW! in Chicago and Detroit. Viamedia provided those services pursuant to an exclusive full turnkey representation agreement, which precluded RCN and WOW! from selling their Spot Cable Ad Avails in Chicago or Detroit through any other ad rep. (Dkt. 707, Viamedia's Resp. to Comcast's SOF, ¶

52.) During that period, Comcast and Viamedia had a separate agreement pursuant to which Viamedia's MVPD clients in Chicago and Detroit were given access to the Interconnect. (*Id.* ¶ 51.) That agreement expired by its own terms on May 31, 2012. (*Id.* ¶ 54.) Comcast declined to renew it. (*Id.* ¶ 55.)

In December 2011, Comcast notified Viamedia that after expiration of their contract, Comcast "would refuse to permit Viamedia any further access to the Interconnects." *Viamedia*, 951. F.3d at 444. In June 2012, Comcast "executed on that notice" and cut off Interconnect access to Viamedia and its MVPD clients in the Chicago and Detroit DMAs. *Id.*

Viamedia alleges that its exclusion from the Interconnect made clear to RCN and WOW! that they would similarly be excluded from the Interconnect unless and until they hired Comcast Spotlight as their ad rep. Indeed, in December 2015, WOW! decided not to renew its contract with Viamedia in the Chicago and Detroit DMAs and hired Comcast Spotlight as its ad rep on a full turnkey basis. (Dkt. 707, Viamedia's Resp. to Comcast's SOF, ¶ 108.) "WOW! noted that 'a key decision point' in this 'choice' was its understanding that 'in order to remain competitive, we need to be in the Interconnect.'" *Viamedia*, 951 F.3d at 449. Later that year, RCN also opted out of renewing Viamedia and hired Comcast as its ad rep in Chicago. (Dkt. 707, Viamedia's Resp. to Comcast's SOF, ¶ 122.) Since then, Comcast Spotlight has been the only ad rep in Chicago or Detroit.

### 3. *Frontier in Hartford*

In 2014, Frontier hired Viamedia on a full turnkey basis to provide Spot Cable Ad Rep Services in the Hartford DMA, after noting its disappointment with Comcast's customer service in other DMAs in which Comcast represented Frontier. *Viamedia*, 951 F.3d at 444. Comcast, who operated the Interconnect in Hartford, "then excluded Frontier's [Spot Cable Ad Avails] from the Hartford Interconnect, resulting in millions of dollars in lost ad revenues for Frontier and Viamedia, as well as Comcast itself, and degrading the value of the Hartford Interconnect." *Id.*

\*   \*   \*

As previewed above and discussed further below, the sole remaining theory of liability underlying Viamedia's allegations is tying. Tying occurs when a seller conditions the sale of a product over which the seller has market power (the "tying product") on the buyer's purchase of a second, separate product (the "tied product"), despite the buyer's preference to either not purchase the tied product at all or purchase the tied product from a different seller.

Viamedia alleges that, since 2012, Comcast has leveraged its control of the Interconnects, and thus the market for Interconnect Services (*i.e.*, the tying product), in Chicago, Detroit, and Hartford to monopolize the market for Spot Cable Ad Rep Services (*i.e.*, the tied product) in those cities. Specifically, Viamedia claims that Comcast effectively forced RCN, WOW!, and Frontier to engage Comcast (and terminate their contracts with Viamedia) as their ad rep in Chicago, Detroit, and Harford as a condition of access to the Interconnects in those DMAs. In other words, Comcast required MVPDs that sought to join the Interconnect in Chicago, Detroit, and Hartford to hire Comcast as their ad rep. Such conduct, Viamedia alleges, effectively excluded Viamedia from competition in those DMAs in violation of antitrust laws.

## II. Procedural History

Viamedia initiated this action on May 23, 2016 with a six-count complaint against Comcast alleging unlawful monopolization and attempted monopolization of the market for Spot Cable Ad Rep Services, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. (Dkt. 1.) Viamedia also alleged violations of state antitrust laws in Illinois, Michigan, and Connecticut, as well as tortious interference with a business expectancy. (*Id.* ¶¶ 183–223.) Viamedia claimed that Comcast unlawfully acquired and maintained monopoly power by refusing to allow Viamedia and MVPDs represented by Viamedia access to Interconnects in the same markets in which Comcast operates the Interconnect. In particular, Viamedia alleged that Comcast conditioned MVPDs' access to Comcast-operated

Interconnects on those MVPDs' entrance into exclusive agreements to engage Comcast Spotlight as their sole ad rep, and that Comcast engaged in other exclusionary and anticompetitive conduct intended to exclude Viamedia and its MVPD clients from Comcast-operated Interconnects as a means of coercing those MVPD clients into transferring their Spot Cable Ad Rep Services business from Viamedia to Comcast Spotlight. (*Id.* ¶¶ 168, 220.)

In ruling on Comcast's motion to dismiss, the district court construed Viamedia's complaint to have asserted antitrust liability premised on three theories: refusal-to-deal, exclusive dealing, and tying.[2] At the motion to dismiss stage, the district court permitted Viamedia to proceed with its antitrust claims premised on exclusive dealing and tying theories of liability, but dismissed Viamedia's claim based on refusal-to-deal. *Viamedia, Inc. v. Comcast Corp.,* 218 F. Supp. 3d 674, 700 (N.D. Ill. Nov. 4, 2016) (St. Eve, J.). The parties then engaged in extensive fact and expert discovery through January 5, 2018 on Viamedia's exclusive dealing and tying theories only (not on refusal-to-deal) pursuant to the district court's opinion. After more than two years of fact and expert discovery, the district court granted Comcast's motion for summary judgment, granted Comcast's motion to exclude the opinion of Viamedia's damages expert, Dr. Thomas Lys, and granted in part (denying the remainder as moot) Comcast's motion to exclude certain opinions of Viamedia's liability expert, Dr. Harold Furchgott-Roth. *Viamedia, Inc. v. Comcast Corp.,* 335 F. Supp. 3d 1036, 1074 (N.D. Ill. Aug. 16, 2018) (St. Eve, J.). Viamedia appealed.

In February 2020, the U.S. Court of Appeals for the Seventh Circuit reversed the district court, concluding that the district court improperly dismissed Viamedia's refusal-to-deal theory of liability at the pleading stage. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 434–35 (7th Cir. 2020). The Seventh Circuit further opined that, as to Viamedia's tying theory, which the district court had dismissed on

---

[2] Viamedia's operative amended complaint contains the same basic allegations as its initial complaint. (*See* Dkt. 40.)

summary judgment, "Viamedia ha[d] presented evidence that Comcast's elimination of its only competitor in the [Spot Cable Ad Rep Services] market has harmed competition in violation of Section 2 [of the Sherman Act]." *Id.* at 434-35. The Supreme Court denied Comcast's petition for certiorari.

The Seventh Circuit remanded the case to the district court "for any further necessary discovery and for trial." *Id.* at 435. The district court was instructed to "take a fresh look at the expert reports in light of this opinion," as the Seventh Circuit's "resolution of Viamedia's refusal-to-deal and tying claims largely resolves its challenge to the [expert] testimony's exclusion . . . [which was] based almost entirely upon [the district court's] erroneous legal analysis." *Id.* at 451.

On remand, the parties disagreed about what further discovery was considered "necessary" per the Seventh Circuit's ruling. In an effort to reduce the potential scope of additional discovery, Viamedia abandoned its refusal-to-deal theory of liability on January 13, 2022. (Dkt. 490.) Viamedia had also elected not to pursue its exclusive dealing theory of liability on appeal earlier in the case. (Dkt. 393 at 42 n.11.)

Thus, in early 2022, Viamedia pursued tying as its only remaining theory of liability, for which the parties had already largely completed fact and expert discovery prior to the Seventh Circuit's remand. Despite the case having been narrowed, the parties engaged in extensive post-remand discovery, exchanging more than 350,000 documents and cumulatively deposing eleven party witnesses, ten third party witnesses, and six expert witnesses with the referred magistrate judge. (Dkt. 589 at *2.) The parties also produced a dozen post-remand expert reports regarding liability and damages.

Comcast then filed the instant motion for summary judgment, and the parties each filed motions to exclude expert testimony.

### III.    Comcast's Motion for Summary Judgment

The parties have moved to exclude expert testimony on various grounds, some of which overlap with the grounds on which Comcast moved for summary judgment. Because of the multiple layers and issues involved, the Court will address portions of Comcast's summary judgment motion first.

The pertinent question for this Court on summary judgment is whether Viamedia has presented evidence showing that a genuine dispute of material fact exists as to whether Comcast engaged in anticompetitive tying conduct. In its motion for summary judgment, Comcast asserts four arguments:

(1) The markets for Interconnect Services and Spot Cable Ad Rep Services are, as a matter of law, two-sided transaction platforms, and thus Viamedia has failed to satisfy its burden to prove that Comcast possesses monopoly power in a properly defined market for the tying product;

(2) Viamedia's tying claim fails as a matter of law because Viamedia cannot show any actual forced sale of Spot Cable Ad Rep Services during the relevant period;

(3) Viamedia cannot prove that its purported injuries did not flow from other factors; and

(4) Viamedia's claimed damages are untethered from its legal claims, and otherwise improper.

The Court will address each in turn.

#### A.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court

"consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted).

      B. *Defining the Relevant Product Market*

Tying refers to the conditioning of the sale of a product over which the seller has market power (*i.e.*, the tying product) on the purchase of a separate product (*i.e.*, the tied product). In "all cases" involving an allegedly unlawful tying arrangement, "the plaintiff must prove that the defendant has market power in the tying product." *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006). The plaintiff must also prove that the defendant harmed competition in the tied product market. *Reifert v. S. Cent*, 450 F.3d 312, 321 (7th Cir. 2006).

Put simply, Viamedia alleges that Comcast exploited its monopoly power in the market for Interconnect Services (*i.e.*, the tying product) to extend its monopoly to the market for Spot Cable Ad Rep Services (*i.e.*, the tied product). Interconnect Services, which are provided by Interconnect operators, include pricing and selling Spot Cable Ad Avails, marketing to advertisers and advertising agencies, audience research, preparing schedules of potential purchases of Spot Cable Ad Avails with the desired networks, and inventory allocation of Spot Cable Ad Avails. (Dkt. 707, Viamedia's Resp. to Comcast's SOF ¶ 21.) Spot Cable Ad Rep Services are defined to include a similarly diverse range of services, including marketing, pricing, and selling an MVPD's Spot Cable Ad Avails; technical services; and financial services. (*Viamedia*, 951 F.3d at 442; Dkt. 718, Comcast's Resp. to Viamedia's SOAF, ¶ 1.)

In its motion for summary judgment, Comcast argues that Viamedia's tying claim is fatally flawed because Viamedia fails to define a legally cognizable market. Comcast insists that the markets

11

for Interconnect Services and Spot Cable Ad Rep Services are both two-sided transaction platforms, and that the Supreme Court's decision in *United States v. American Express*, 585 U.S. 529, 138 S. Ct. 2274, 201 L. Ed. 2d 678 (2022) ("*Amex*") demands such a finding. Because Viamedia's market definitions are at odds with *Amex*, Comcast argues, Viamedia has offered no evidence to support that Comcast has market power in the market for Interconnect Services or has harmed competition in the market for Spot Cable Ad Rep Services.

### 1. *Two-Sided Platforms*

A two-sided platform "offers different products or services to two different groups who both depend on the platform to intermediate between them." *Amex*, 585 U.S. at 534. A two-sided platform requires more than the mere existence of two parties transacting; rather, a two-sided platform requires "indirect network effects," whereby "the value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases." *Id.* at 535. For example, a credit card platform becomes more valuable to cardholders when more merchants accept it, and more valuable to merchants when more cardholders choose to use that particular credit card for payment. *Id.* at 534–36. Similarly, drivers deem Uber more valuable when more customers use the ride-share platform to hail rides, and customers deem Uber more valuable the more drivers are available.

The Seventh Circuit concluded that "[a]n Interconnect is what economists call a 'two-sided platform' . . . [which] serves as a clearinghouse, offering 'different products or services to two different groups who both depend on the platform to intermediate between them.'" *Viamedia*, 951 F.3d at 439 (quoting *Amex*, 585 U.S. at 534). The Seventh Circuit explained:

> On one side of the Interconnect are the advertisers, who are interested in reaching the greatest number of viewers, especially within a targeted DMA. The more subscribers an MVPD can bring to the table, the more advertisers will pay to reach that expanded audience. On the other side of the Interconnect are the MVPDs and their retail customers. The more advertisers that participate, the more valuable the Interconnect

12

is to the MVPDs and their customers. Cable customers watching a ballgame or their favorite comedy may not think about the value of the advertisements they see, but MVPDs can use advertising revenue to keep monthly subscription prices lower and to run promotional discounts to bring in even more subscribers. Those new subscribers will in turn make the MVPD a more valuable and attractive advertising venue. The Interconnect can thus produce a competitively virtuous feedback loop. The value of the services that [an Interconnect] provides increases as the number of participants on both sides of the Interconnect increases. Or, as Comcast puts it: 'The value of an [I]nterconnect increases as more MVPDs in an area participate, so our incentive is to have as many MVPDs participate as possible.'

*Id.* at 439 (cleaned up). The appellate court explained that:

Whether the Interconnects are procompetitive or not depends on the competitive dynamics among its participants. In a competitive market, for example, the risk of negative feedback may serve as a check on the ability of any one participant to raise prices or otherwise exert market power. Conversely, in a less competitive market, access to the crucial Interconnects can be used to exclude competitors and harm competition. The Interconnects are so important that exclusionary conduct can become a weapon to injure competitors.

*Id.* at 439–40.

### 2. *Two-Sided* Transaction *Platforms*

A two-sided *transaction* platform is a subset, or "special type," of two-sided platform that must *always* receive two-sided treatment. *Amex*, 585 U.S. at 535. It has each of the same attributes as a two-sided platform (*i.e.*, providing different services to two different groups of customers that it connects), plus one key feature: a sale of a transaction cannot be made to one side of the platform without a sale simultaneously being made to the other. *Id.* The Supreme Court stated that two-sided transaction platforms are "better understood as supplying only one product—transactions," rather than supplying two separate products, one to each side of the platform. *Id.* at 545 (cleaned up). Because two-sided transaction platforms inherently "exhibit more pronounced indirect network effects and interconnected pricing and demand" due to the simultaneous nature of the services, only one market should be defined. *Id.* at 545–46.

In *Amex*, the Supreme Court considered the market for credit-card transactions. The United States and several States challenged an "antisteering" provision that American Express included in its contracts with merchants, claiming that it was an unreasonable restraint of trade in violation of the Sherman Act. *Amex*, 585 U.S. at 539. The contract provision prohibited merchants "from discouraging customers from using their Amex card after they have already entered the store and are about to buy something, thereby avoiding Amex's fee," which is often higher than the fee charged by competitor credit card companies. *Id.* at 534.

The Supreme Court affirmed the Second Circuit, concluding that because a credit card platform is a two-sided transaction platform, the plaintiffs' evidence on the increase in merchant fees (on one side of the platform), without looking at the impact on the price to cardholders (on the other side of the platform) "misses the mark because the product that credit-card companies sell is transactions, not services to merchants, and the competitive effects of a restraint on transactions cannot be judged by looking at merchants alone." *Id.* at 547. The Court explained that "[e]vidence of a price increase on one side of a two-sided transaction platform cannot, by itself, demonstrate an anticompetitive exercise of market power." *Id.* Rather, in order to show anticompetitive effects on the credit-card market as a whole, "the plaintiffs must prove that Amex's antisteering provisions increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, or otherwise stifled competition in the credit-card market." *Id.*

In reaching its holding that credit card platforms are two-sided transaction platforms, the Supreme Court focused on the element of simultaneity. Credit cardholders and merchants, the Supreme Court explained, "jointly consume a single product, payment card transactions"—as no such transaction can occur unless both the merchant and the cardholder agree simultaneously to use the same credit card network. *Id.* at 545 (citing Klein, Lerner, Murphy, & Plache, Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees, 73 Antitrust L. J. 571,

14

580, 583 (2006) ("Klein")). Thus, consumption of card transactions by cardholders and merchants "must be directly proportional[.]" *Id.* (quoting Klein 583).

A credit card company "'cannot sell transaction services to either cardholders or merchants individually'; [thus, it is] impossible to evaluate competition *between* credit-card companies without considering 'both sides' of the platform—merchants *and* cardholders." *Davis v. Hanna Holdings, Inc.*, 787 F. Supp. 3d 42, 64 (E.D. Pa. 2025) (quoting *Amex*, at 545.) "Because the plaintiffs in *American Express* 'stake[d] their entire case on proving that Amex's agreements increase[d] merchant fees' without considering the agreements' effects on cardholders, it was impossible for any factfinder to evaluate whether those high fees had "anticompetitive effects on the two-sided credit-card market *as a whole*'—whether by 'increas[ing] the cost of credit-card transactions above a competitive level, reduc[ing] the number of credit-card transactions, or otherwise stifl[ing] competition' among credit-card companies." *Id.* at *12 (quoting *Amex*, at 547).

### 3. *This Court Has Authority to Decide Whether the Relevant Markets are Two-Sided Transaction Platforms*

The parties do not dispute that the relevant product markets at issue offer different services to two different groups who both depend on the platform to intermediate between them. Rather, the parties dispute whether the relevant product markets in this case are two-sided *transaction* platforms. If they are, Viamedia must demonstrate that Comcast possesses market power on both sides of the platform, including the advertiser side of the business. Because Viamedia's liability expert has essentially conceded that "it's not likely the case that Comcast can exert market power" on the "extremely competitive" advertiser side of the relevant markets, (Dkt. 707, Viamedia's Resp. to Comcast's SOF, ¶ 49), it is doubtful that Viamedia could effectively prove tying if the relevant product markets are two-sided transaction platforms.

As an initial matter, the parties dispute whether resolution of this question is appropriate for this Court on remand. Viamedia argues that it is not appropriate because the Seventh Circuit (a)

15

explicitly remanded this case "for trial," conveying that it was ready for trial, and (b) acknowledged that the parties had stipulated as to the relevant product market definitions. Viamedia contends that the Seventh Circuit therefore held that a genuine dispute of material fact exists on Viamedia's tying theory of liability. Comcast reiterates that the Supreme Court's decision in *Amex* was issued *after* the parties' first round of summary judgment briefing in this case but *prior to* the Seventh Circuit's reversal and remand, and thus set forth a new standard under which to analyze challenged restraints of competition involving two-sided transaction platforms. Comcast posits that *Amex* compels this Court to determine whether the relevant markets here are, as a matter of law, two-sided transaction platforms.

A district court's decisional scope on remand is generally limited by two primary considerations. A district court may not consider on remand any issue that "could have been but was not raised on appeal," or which was "conclusively decided by this court on the first appeal[.]" *Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1138 (7th Cir. 2023). "The scope of the remand is determined not by formula, but by inference from the opinion as a whole." *Id.* at 1138 (internal citations omitted).

In its 105-page reversal opinion, the Seventh Circuit did not make any conclusive decision about whether either the market for Interconnect Services or for Spot Cable Ad Rep Services is a two-sided transaction platform. The Seventh Circuit made no mention whatsoever of two-sided *transaction* platforms. Instead, the Appellate Court merely declared that "[a]n Interconnect is what economists call a 'two-sided platform.'" *Viamedia*, 951 F.3d at 439. Because the two concepts are distinct, this Court is confident that it would not be revisiting an issue decided on appeal by deciding now on remand whether the relevant markets are two-sided transaction platforms.

Assuming arguendo that the Seventh Circuit had conclusively decided this question, it is within district courts' authority to reexamine an issue resolved in an earlier appeal if warranted by an intervening change of law or some other exceptional circumstance. The Seventh Circuit's decision in

*EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005) is instructive. There, the U.S. Equal Employment Opportunity Commission ("EEOC") sued Sears, Roebuck & Co. ("Sears") for failing to reasonably accommodate the disability of a Sears employee. Having concluded that the employee was not disabled under the Americans with Disabilities Act ("ADA"), the district court granted summary judgment in favor of Sears and terminated the case. *U.S. E.E.O.C. ex rel Keane v. Sears, Roebuck & Co., Inc.,* 1999 WL 977072, at *5 (N.D. Ill. Oct. 22, 1999) (Norgle, J.), *remanded.* On appeal, the Seventh Circuit reversed, finding genuine issues of material fact as to whether the Sears employee was disabled under the ADA, and remanded the case to the district court. *U.S. E.E.O.C. ex rel Keane v. Sears, Roebuck & Co., Inc.,* 233 F.3d 432, 440–41 (7th Cir. 2000). Following the Seventh Circuit's reversal, the Supreme Court decided *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), which established a new standard for determining whether an employee is disabled under the ADA. On remand and in response to a renewed motion for summary judgment, the district court in *Sears* applied the new *Toyota Motor* standard to conclude that no reasonable jury could find that the Sears employee was disabled under the ADA. *U.S. E.E.O.C. ex rel Keane v. Sears, Roebuck & Co., Inc.,* 2004 WL 784803, at *10 (N.D. Ill. Apr. 12, 2004) (Norgle, J.).

The EEOC, again, appealed the ruling. On appeal for a second time, the Seventh Circuit in *Sears* held that the district court had acted within its authority to consider the intervening change in law on remand, stating that "[a]n appellate mandate does not turn a district judge into a robot, mechanically carrying out orders that become inappropriate in light of subsequent factual discoveries or changes in the law." *U.S. E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (2005) (quoting *Barrow v. Falck*, 11 F.3d 729, 731 (7th Cir. 1993)). The appellate court held that "[w]hen considering a district court's authority to reexamine an issue resolved in an earlier appeal, we ask only whether the district court reasonably concluded that there has been a relevant change in the law, not whether there in fact has been such a change." *Id.*

The Court finds *Sears* instructive here. The Supreme Court decided *Amex* on June 25, 2018—more than one month after Comcast's first motion for summary judgment was fully briefed and almost two months before the district court issued its opinion granting Comcast summary judgment. (Dkt. 356.) Despite discussing the concept of two-sided markets in its reversal opinion, the Seventh Circuit did not make a single reference to two-sided *transaction* platforms and did not reach any conclusion as to whether the markets for Interconnect Services or Spot Cable Ad Rep Services are two-sided *transaction* platforms.[3] The Court, then, is well within its authority to consider those questions now on remand.

        4.   *Neither the Market for Spot Cable Ad Rep Services nor for Interconnect Services is a Two-Sided Transaction Platform*

Comcast argues that the markets for Interconnect Services and Spot Cable Ad Rep Services are two-sided transaction platforms as a matter of law because they facilitate a single, simultaneous transaction, such that there can be no sale on one side of the platform without simultaneously making a sale to the other.

In *Amex*, the Supreme Court explained that "[e]valuating both sides of a two-sided transaction platform is [] necessary to accurately assess competition" between credit-card companies because "the product that credit-card companies sell is transactions, *not services to merchants*, and the competitive effects of a restraint on transactions cannot be judged by looking at merchants alone." 585 U.S. at 546-47 (emphasis added). In contrast, the undisputed facts here show that in the market for the tied product, Spot Cable Ad Rep Services, ad reps sell a myriad of *services* to MVPDs, not transactions themselves. *See Davis*, 787 F. Supp. 3d at 64 (holding that the real estate market is a not a two-sided transaction platform because brokers sell services, not transactions, to homebuyers and home sellers). In addition to selling Spot Cable Ad Avails, for example, ad reps provide research, marketing, and

---

[3] The Court notes that Comcast did not file a motion before the Seventh Circuit to take judicial notice of *Amex*.

pricing services, interface with the Interconnect operator, provide technical services, and organize Spot Cable Ad Avails into schedules. *Viamedia*, 951 F.3d at 442; SOAF ¶¶ 1–2.

Additionally, Comcast is mistaken that an ad rep cannot make a sale of a Spot Cable Ad Avail to an advertiser without simultaneously making a sale of Spot Cable Advertising Rep Services to an MVPD. Indeed, it is possible for an ad rep to provide many of its services before, after, or even *without* an actual sale of a Spot Cable Ad Avail to advertiser. The record demonstrates that it is undisputed that ad reps typically purchase some or all of an MVPD's inventory of Spot Cable Ad Avails over a defined period of time in exchange for revenue share and, in some instances, a minimum revenue guarantee. Where a minimum revenue guarantee exists, an ad rep firm is contractually required to foot the bill—regardless of whether it sold all of the MVPD's Spot Cable Ad Avails or any Spot Cable Ad Avail at all. (*See* Dkt. 707, Viamedia's Resp. to Comcast's SOF, ¶¶ 16, 16; Dkt. 718, Comcast's Resp. to Viamedia's SOAF, ¶ 55.)

For much of the same rationale as above, the Court also concludes that the market for Interconnect Services is not a two-sided transaction platform. Interconnect operators provide not a transaction, but a multitude of services, including pricing and selling Spot Cable Ad Avails, marketing to advertisers and advertising agencies, audience research, preparing schedules of potential purchases of Spot Cable Ad Avails with the desired networks, and inventory allocation of Spot Cable Ad Avails. (Dkt. 707, Viamedia's Resp. to Comcast's SOF ¶ 21.)

Accordingly, the Court concludes that neither the market for Spot Cable Ad Rep Services nor for Interconnect Services is a two-sided transaction platform.

C. *Tying*

Comcast also moves for summary judgment on the basis that Viamedia's theory that Comcast engaged in anticompetitive tying (thus injuring competition) *before* any actual sale of Spot Cable Ad

Rep Services to an MVPD cannot be squared with binding precedent, and therefore Viamedia's allegations of tying fail as a matter of law.

The Seventh Circuit rejected this argument on appeal, finding that "[a] jury could easily find that Comcast improperly forced the smaller MVPDs to buy its ad rep services using its monopoly in the Interconnect services market." *Viamedia*, 951 F.3d at 470. The Seventh Circuit's opinion provides no indication that its holding that Viamedia presented sufficient evidence of tying does not apply to the Chicago, Detroit, or Hartford DMAs, which, it commented, were the only DMAs at issue. *See, e.g., id.* at 474 (holding that "the evidence could support a finding that in Chicago, Detroit, and Hartford, Comcast tied Interconnect services to ad rep services to exclude its competitor in ad rep services and thereby force its MVPD competitors into its not-so-tender arms"). No intervening change in law, factual discovery, or other special circumstance warrants reexamining the sufficiency of Viamedia's tying claim as a matter of law. *See Carmody v. Bd. of Trs. of the Univ. of Ill.*, 893 F.3d 397, 408 (7th Cir. 2018). Indeed, Dr. Furchgott-Roth's (Viamedia's liability expert) definition of tying, which Comcast contests, has not changed since he offered that definition in his October 2017 opening expert report during the first round of expert discovery in this case. (Dkt. 674, Cragg Am. Rep., Ex. 13 ¶ 63.) The Seventh Circuit's conclusion that Viamedia had "offered evidence to defeat summary judgment on its claim that Comcast unlawfully used its monopoly power over the Interconnects to tie those services to its advertising representation services," *Viamedia*, 951 F.3d at 435, should not be disturbed.

### D. *Alternative Explanations and Prejudgment Interest*

Comcast also argues in support of its motion for summary judgment that Viamedia's damages theory, which is premised upon Dr. Furchgott-Roth's 2017 expert report on liability, does not account for purported changes to (*i.e.*, narrowing of) Viamedia's liability case since remand and improperly fails to account for possible alternative causes of Viamedia's purported damages. In addition, Comcast

contends that Viamedia improperly seeks prejudgment interest prohibited by the Clayton Act. The Court's resolution of Comcast's motion to exclude the expert opinions of Dr. Cragg (Viamedia's damages expert) addresses both of these issues in favor of denying Comcast's motion for summary judgment on these grounds.

## IV.     Motions to Exclude Expert Opinions

Viamedia seeks to exclude the expert opinions of Dr. Dennis Carlton, Dr. Andres Lerner, and Billy Farina. Comcast seeks to exclude the expert opinions of Dr. Michael I. Cragg and Dr. Harold Furchgott-Roth.

### A.  Legal Standard

To rule on the admissibility of expert evidence, the Court must decide whether the evidence offered is reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). When determining reliability, the court's role is to assess whether the expert is qualified in the relevant field and examine the methodology he used in reaching his conclusions. *Timm v. Goodyear Dunlop Tires North America, Ltd.,* 932 F.3d 986, 993 (7th Cir. 2019). The Court should focus on the expert's methodology, not his conclusions. *Kopplin v. Wisconsin Central Ltd.,* 914 F.3d 1099, 1104 (7th Cir. 2019). An expert's testimony is relevant so long as it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." *Daubert,* 509 U.S. at 591 (citing Fed. R. Evid. 702). An expert may testify only if: (a) the expert's scientific, technical or specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied those principles and methods to the facts of the case. *See* Fed. R. Evid. 702. The burden is on the expert's proponent to establish the admissibility of the expert's opinions by a preponderance of the evidence. *Varlen Corp. v. Liberty Mutual Ins. Co.,* 924 F.3d 456, 459 (7th Cir. 2019).

B. *Comcast's Motion to Exclude the Expert Opinions of Dr. Michael I. Cragg*

Comcast moves to exclude Dr. Cragg's expert opinions.

To prevail in an antitrust case, a plaintiff "must prove that [its] damages were caused by the unlawful acts of the defendant." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (emphasis omitted). "Damages calculations in antitrust cases seek to compare plaintiffs' actual experience in the real world with what the plaintiffs' experience would have been, 'but for' the antitrust violation." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 973 (N.D. Ill. Jun. 29, 2023) (Pallmeyer, J.) (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 56 (D.D.C. 2017)) (quotation omitted). A damages expert may put forward a "just and reasonable estimate" of damages, but cannot base his calculation on mere speculation. *MCI*, 708 F.2d at 1161. "In complex cases involving 'a series of unlawful acts intertwined with one another,' courts do not require 'strict proof of what damages have been caused by which acts,' a standard that 'serves to prevent a defendant from profiting from his own wrongdoing.'" *In re Dealer Mgmt. Sys.*, 680 F. Supp. 3d at 973 (quoting *MCI*, 708 F.2d at 1161). But, damages must reflect only the losses "directly attributable to unlawful competition"; "[i]f a plaintiff has suffered financial loss from the lawful activities of a competitor, then no damages may be recovered under the antitrust laws." *Id.* (emphasis omitted).

Dr. Cragg is the second of two damages experts that Viamedia has retained in this case. After the Seventh Circuit's remand, Viamedia withdrew all opinions of its first damages expert, Dr. Lys. Using a different methodology from Dr. Lys, Dr. Cragg estimates damages by calculating Viamedia's lost cash flows from 2014 through 2021 ("Lost Earnings") and lost enterprise value as of December 31, 2021 ("Lost Enterprise Value"). To calculate damages, Dr. Cragg relies on Dr. Furchgott-Roth's opinion that Comcast's tying conduct resulted in a loss of existing and potential future representation agreements for Viamedia (including the loss of major clients in DMAs where Comcast Spotlight

22

operated the Interconnect), as well as Viamedia's exit from those markets due to the lack of potentially available clients. Dr. Cragg opines that Viamedia's financial state as a result of the conduct at issue resulted in difficulty securing new MVPD partners, tightened borrowing restrictions imposed by lenders (leading to higher borrowing costs), a lack of liquidity, an inability to make sufficient capital expenditures in order to maintain infrastructure and enhance operations (including towards new technologies or services), termination of key employees, and reputational stigma. (Dkt. 674, Cragg Am. Rep., Ex. 2 ¶¶ 12, 40–41.) As a result, Viamedia was unable to offer competitive terms to existing and potential MVPD customers, leading to declining future revenues, earnings, and cash flows.

Dr. Cragg begins his analysis in 2014 because "that is when the negative impact of such actions on Viamedia's financial results began to substantially materialize." (*Id.* ¶ 14 n.6.) He opines that as a consequence of Comcast's anticompetitive conduct, Viamedia's revenue declined from 2014 through 2021 at a compound annual rate of 18.6%, falling from $221.8 million to $42.9 million. (*Id.* ¶ 11.) In sum, Dr. Cragg estimates $184.6 million in Lost Earnings and $118.6 million to $202.7 million in Lost Enterprise Value, totaling $303.2 million to $387.3 million in damages, before trebling. (*Id.* ¶ 15.)

Comcast argues that Dr. Cragg's methodology is unreliable because it: (1) uses data from the wrong antitrust relevant market to grow Viamedia's hypothetical "but for" revenues; (2) improperly attributes all of Viamedia's financial shortfall to Comcast's alleged tying conduct, without considering alternative explanations; (3) uses a legally improper start date for the calculation of damages, which Comcast claims coincidentally maximizes damages; and (4) erroneously counts legally prohibited prejudgment interest in its damages calculation. The Court addresses each argument in turn.

### 1. *Scope of Damages*

Comcast claims that Dr. Cragg improperly calculates damages for lawful conduct beyond the scope of the alleged illegal tying conduct at issue in this case. First, Comcast asserts that Dr. Cragg's

damages estimate improperly includes damages attributable to alleged tying conduct in DMAs *in addition to* Chicago, Detroit, and Hartford. The Court is unconvinced.

Prior to remand, Dr. Furchgott-Roth opined that Comcast had "succeed[ed] in tying Spot Cable Ad Rep Services to Interconnect Services" in twelve DMAs, including Chicago, Detroit, and Hartford. (Dkt. 674, Furchgott-Roth Rep., Ex. 13 ¶ 71.) On appeal, the Seventh Circuit wrote that the parties were in agreement "on the definition of the relevant geographic markets . . ." *Viamedia*, 951 F.3d at 436; *see also id.* at 474 n.18 ("Viamedia's tying allegations and evidence focused on Comcast's conduct in Chicago, Detroit, and Hartford."). And, on January 12, 2022, in response to Comcast's contention interrogatories, Viamedia confirmed that Comcast's tying conduct in Chicago, Detroit, and Hartford caused and contributed to all of Viamedia's injuries alleged in this action. (*See* Dkt. 674, Pl.'s Suppl. Resp. to Defs.' Contention Interrogs., Ex. 7 ¶ 27, App. A ("Viamedia Contends Injuries Caused By . . . Comcast's tying conduct in some or all of the following DMAs: Chicago, Detroit, and Hartford").) Later, on July 25, 2022—*after* Viamedia had expressed its understanding that it was proceeding on these three DMAs only—Viamedia produced the amended expert report of Dr. Cragg, Viamedia's new damages expert following the Seventh Circuit's remand.

In objecting to Dr. Cragg, Comcast now points to his deposition testimony that he did not seek to "create a division" between (a) damages attributable to tying in Chicago, Detroit, and Hartford and (b) tying in the other nine DMAs. (Dkt. 642 at *16 (citing Dkt. 645, M. Cragg Dep. Tr., Ex. 38 at 57:3–58:1 (Sept. 1, 2022)).) But, throughout Dr. Cragg's amended expert report and deposition, Dr. Cragg reaffirmed his understanding that "the only DMAs at issue in the tying claim are Chicago, Hartford, and Detroit." (Dkt. 645, M. Cragg Dep. Tr., Ex. 38 at 51:1–4 (Sept. 1, 2022); *see also* Dkt. 674, Cragg Am. Rep., Ex. 2 ¶ 43 ("Due to Comcast's actions, Viamedia was unable to participate in the Chicago, Detroit, and Hartford Interconnects . . .").) Despite Comcast's complaints about Dr. Cragg's deposition testimony about specificities related to his damages calculation, the Court will give

24

Dr. Cragg the benefit of the doubt and construe his deposition testimony that he had not "parsed damages to specific actions" to mean that he had not calculated the damages attributable to tying in each of the three relevant DMAs, individually.[4]  As antitrust case law has made clear, damages attributable to tying conduct outside the geographic scope of this case, namely, Chicago, Detroit, and Hartford, are irrelevant and therefore inadmissible.

Comcast also argues that Dr. Cragg failed to analyze damages attributable to its tying claim separately from damages attributable to its now-abandoned refusal-to-deal claim.  Comcast claims that Dr. Cragg, who analyzed the "overall impact" of Comcast's actions to calculate his damages estimation, does not assess the extent to which the damages for the challenged tying conduct alone are less than the combined effect of the tying and refusal to deal together, and fails to exclude the possibility that the alleged tying conduct added nothing to the harmful effects of the lawful refusal to deal.  In particular, Comcast points to a treatise that Dr. Cragg cites in his amended report, which states:

> When the challenged acts have effects that interact, it is not possible to consider damages separately and add up damages for each individual act . . . When the harmful acts substitute for each other, the sum of damages attributable to each separately is less than their combined effect.  As an example, suppose that the defendant has used exclusionary contracts and anticompetitive acquisitions to ruin the plaintiff's business.  However, the plaintiff's business could not survive if either the contracts or the acquisitions were found to be legal.  Damages for the combination of acts are the value of the business, which would have thrived absent both the contracts and the acquisitions.  Now consider damages if only the contracts but not the acquisitions is illegal.  In the but-for analysis, the acquisitions are hypothesized to occur because they are not illegal, but not the contracts.  But plaintiff's business cannot function in that but-for situation because the acquisitions alone were sufficient to ruin the business.  Hence damages—the difference in value of the plaintiff's business in the but-for and actual situations—are zero.  The same would be true for a separate damages measurement for the acquisitions, with the contracts taken to be legal but not the

---

[4] The Court does not read Comcast to be arguing that a plaintiff is required to isolate and separately quantify damages attributable to tying in each of the relevant geographic markets, as it has presented no case law in support of this proposition.

acquisitions. Thus, the sum of damages for the individual acts is zero, but the damages if both acts are illegal are the value of the business.

(Dkt. 642 at *17 (citing Dkt. 674, Cragg Am. Rep., Ex. 2 ¶ 50, nn.128–29) (citing Mark A. Allen et al., *Reference Guide on Estimation of Economic Damages*, Reference Manual on Scientific Evidence, National Academy of Sciences, 476 (3d ed. 2011)).)

The Court does not read Dr. Cragg's report as having factored in lawful conduct to estimate damages. The sequence of events in this case is telling. Viamedia provided notice of its intent to no longer pursue its refusal-to-deal theory of liability on January 13, 2022. (Dkt. 490.) Approximately five months later, Viamedia produced Dr. Cragg's initial opening expert report on June 21, 2022, (Dkt. 645-1, Ex. 36), and then his amended expert report on July 25, 2022. (Dkt. 674, Ex. 2.) Because Viamedia withdrew its refusal-to-deal theory of liability before producing Dr. Cragg's expert reports, and because Dr. Cragg explicitly states in his amended opening report his "understanding that Viamedia removed the Refusal to Deal allegations," (*id.* ¶ 35), the Court sees no reason to believe that Dr. Cragg considered extraneous, lawful conduct in his damages computation.

The treatise to which Comcast cites fairs no better. Importantly, the treatise's hypothetical assumes two *different* courses of conduct (*i.e.*, two distinct challenged actions) yielding the same resulting injury and damages. *See also Blue Cross & Blue Shield United v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (affirming lower court's denial of damages where damages computation took into account two distinct forms of conduct, only one of which was illegal). Here, in contrast, "the same general course of conduct supports both the refusal-to-deal and tying claims, [and thus] the two theories necessarily allege similar injuries and damages." (Dkt. 674, Cragg Am. Rep., Ex. 2 ¶ 35 (quoting *Viamedia*, 951 F.3d at 483).) A but-for world analysis, then, would necessarily exclude the conduct that underlies both of those theories. *See also Viamedia*, 951 F.3d at 482 ("Viamedia has

presented evidence indicating that if Comcast not [sic] tied its sale of Interconnect services to ad rep services, RCN and WOW! likely would have continued to obtain ad rep services from Viamedia.").

Overall, Comcast characterizes Viamedia's claimed damages as "a rollercoaster ride," going "up and down" and ultimately trending upward even as the scope of Viamedia's case has narrowed. (Oral Arg. Tr. at 94:20–24 (Dec. 13, 2024).) The Court is inclined to believe that the higher damages projections can be accounted for by Dr. Cragg's use of an entirely *different* methodology than Dr. Lys to calculate estimated damages, and that Comcast's concerns can best be borne out by cross-examination of Dr. Cragg at trial.

### 2. *Alternative Explanations*

Comcast also argues that Dr. Cragg's damages methodology fails to consider potential alternative explanations that may have had an effect on Viamedia's claimed damages, as Dr. Cragg insists that Comcast's tying conduct is the only explanation for the shortfalls in Viamedia's earnings and enterprise value. In particular, Comcast claims that Dr. Cragg failed to consider Viamedia's loss of Verizon business and increased competition in the market.

The parties' disagreement over whether Dr. Cragg properly accounted for factors other than Comcast's tying conduct is an issue for cross-examination at trial, not for the instant *Daubert* motion. Comcast's reliance on *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983) is misplaced, as that case involved setting aside a jury's award of damages based on insufficient evidence. Comcast may, on cross-examination, seek to challenge the assumptions upon which Dr. Cragg relies, including that Viamedia's revenue in a but-for world would have grown at a constant rate beginning in 2014, shortly after Viamedia lost much of Verizon's business. Comcast may also inquire into Dr. Cragg's alternative damages calculations that assume that Viamedia would not have succeeded in replacing the Verizon business. (*See* Dkt. 674, Cragg Rebuttal Rep., Ex. 9 ¶ 45, 71–73, Fig. 12.) These assumptions, however, which rely in part on industry performance and growth rates, are not so

speculative as to be rendered impermissible under *Daubert*. That Dr. Cragg may not have considered all alternative explanations for the claimed damages is not a basis for exclusion under Rule 702, but instead goes to the weight of the evidence and is appropriate for cross-examination at trial.

### 3. Methodology

Next, Comcast argues that Dr. Cragg fails to reliably apply his damages methodology to the facts. First, Comcast claims that Dr. Cragg engaged in "cherry-picking" by beginning his damages period at the beginning of 2014, which coincided with a significant decrease in Viamedia's revenues as a result of losing business from Verizon. Comcast claims that Dr. Cragg's start date to calculate damages is inconsistent with when the alleged tying began and thus inflates damages. Second, Comcast argues that, in employing a "market share" approach to calculate damages, Dr. Cragg improperly calculated Viamedia's "share" of a nationwide market, as opposed to a regional market (*i.e.*, DMA) as has been employed in other aspects of this case.

The Court's role is not to decide which expert is correct, but rather to decide whether the opinions proffered are relevant and reliable within the meaning of Rule 702. *See, e.g., SEC v. SBB Research Grp., LLC*, 2024 WL 4894315, at *5 (N.D. Ill. Nov. 26, 2024) (Coleman, J.) (holding that "disagreements over which time periods to use is inappropriate to resolve at the *Daubert* juncture"); *In re Zimmer Nexgen Knee Implant Prod. Liab. Litig.*, 2015 WL 4880953, at *5 (N.D. Ill. 2015) (Pallmeyer, J.) ("[T]he accuracy of the underlying assumptions goes to the relevance and weight of the evidence, rather than its reliability."); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013) ("[T]he selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself."). Accordingly, Comcast's critiques of Dr. Cragg's opinions go to their weight, not their admissibility.

### 4. *Prejudgment Interest*

Lastly, Comcast contends that Dr. Cragg improperly counts (and compounds) prejudgment interest in his damages estimate under the assumption that Viamedia would have invested every dollar of lost profit back into the business.

"Prejudgment interest is an element of complete compensation[.]" *West Virginia v. United States*, 479 U.S. 305, 310, 93 L. Ed. 2d 639, 107 S. Ct. 702 (1987). It is often awarded in order to "compensate the plaintiff for the delay between the time the cause of action arose and the verdict." *Conte v. General Housewares Corp.*, 215 F.3d 628, 640 (6th Cir. 2000). *See also Library of Congress v. Shaw*, 478 U.S. 310, 322 (1986) (prejudgment interest is "designed to compensate for the belated receipt of money"); *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290, 1297 (7th Cir. 1987) ("Money today is simply not a full substitute for the same sum that should have been paid some time ago."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 6216664, at *1 (N.D. Cal. Oct. 25, 2016) ("Compensation deferred is compensation reduced by the time value of money . . . That is why prejudgment interest is an ingredient of full compensation.") (quoting *Matter of Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997) (emphasis omitted)).

The parties agree that the Clayton Act prohibits prejudgment interest here, as it is well established that prejudgment interest is not available to judgments for treble damages in federal antitrust cases, absent bad faith causing unnecessary delay. *See* 15 U.S.C. § 15(a); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 561–62 (7th Cir. 1986). Comcast claims that Dr. Cragg improperly includes prejudgment interest into his damages estimate. Viamedia argues that the "opportunity cost" for which it seeks damages is distinct from prejudgment interest. Having "identified that there were lost earnings that could have been put to use" and that "[t]hat lack of use is a damage to Viamedia," (Dkt. 645, M. Cragg Dep. Tr., Ex. 38 at 222:20–22 (Sept. 1, 2022)), Dr. Cragg calculates the value of Lost

Earnings assuming, in part, that in the but-for world Viamedia reinvested all remaining Lost Earnings into the company. (Dkt. 674, Cragg Am. Rep., Ex. 2 ¶ 83.) In his amended expert report, he writes:

> The sum of Viamedia's Lost Earnings represents the incremental cash flows that would have been available to Viamedia's capital providers, *i.e.*, lenders and equity owners. I understand that in antitrust cases, there is no provision for automatic pre-judgement interest, however, from an economic perspective, these Lost Earnings would have been available to service Viamedia's debt, invest in the business, or be distributed to the owners. Thus, in the but-for world, I understand that Viamedia would have not taken on the expensive subordinated debt it borrowed in 2014, 2015, and 2016 to fund its operations. In the actual world, the subordinated debt has accrued interest at rates of 15% per year in 2014-2015 and 17% per year thereafter through the present. This but-for expectation is reasonable because Viamedia took on the subordinated debt as a condition of one of its many PNC agreement amendments and, as discussed above, those amendments would not have occurred but-for Comcast's actions. Similarly, in the but-for world, any remaining cash flows would have been reinvested in the business, including in promising investments like Placemedia and other potentially corporate acquisitions.

(*Id.* ¶ 82.) Comcast claims that what Viamedia is asking for is functionally identical to prejudgment interest, and that calling it by another name does not justify its inclusion in Dr. Cragg's damages estimate.

The cost to Viamedia of not having had money when it should have is not prejudgment interest, but an actual loss incurred by Viamedia. Dr. Cragg's calculation of lost earnings accounts for the "return to growing the business that [Viamedia] has been deprived of," which he otherwise characterizes as "a return on what Viamedia could have received from its retained earnings." (Dkt. 645, M. Cragg Dep. Tr., Ex. 38 at 230:15–19 (Sept. 1, 2022).) Prejudgment interest does not serve the same purpose. In contrast, "[t]he allowance of prejudgment interest is intended to compensate a party for lost interest income over a period of time in which it was entitled to a certain sum of money but did not have use of it . . ." *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 913 F.2d 1194, 1202 (7th Cir. 1990). In other words, prejudgment interest attempts to compensate a plaintiff for reductions in value due to the passage of time, namely by equalizing the value of the money to the time of the injurious

30

conduct. The Court acknowledges that there is a dearth of binding case law on this issue, but it is convinced that prejudgment interest does not compensate for the lost opportunity cost of utilizing that money in the marketplace or reinvesting it via capital expenditures.

   *C. Viamedia's Motion to Exclude the Expert Opinions of Dr. Dennis Carlton*

   Viamedia moves to strike the post-remand expert reports and testimony of one of Comcast's liability experts, Dr. Carlton, on the basis that they are untimely,[5] and protests that Comcast should be forced to rely on the reports Dr. Carlton disclosed prior to remand. Viamedia posits that there is no basis on which to excuse the untimeliness of Dr. Carlton's post-remand expert reports because (a) the evidence on which those reports primarily rely predates the original close of discovery, and (b) the reports offer new opinions drawing on empirical work he could have conducted prior to remand.

   It is true that the Court's scheduling order originally required all expert opinions to be disclosed by January 5, 2018. It is also true that after the Seventh Circuit's reversal and remand with the instruction to conduct "any further *necessary* discovery," *Viamedia*, 951 F.3d at 435 (emphasis added), the parties disputed what expert discovery was "necessary." Magistrate Judge Finnegan rejected Viamedia's requests to restrict post-remand expert discovery, having determined that the district judge, "[a]rmed with the actual opinions at issue and briefing from the parties," would be in the best position to decide the admissibility of expert opinions. (*See* Dkt. 510 at *18–*19.)

---

[5] In general, Viamedia argues that no post-remand discovery, with the limited exception of discovery on additional damages, should be admissible. Viamedia contends that the Seventh Circuit's instruction to take a "fresh look" at the parties' expert reports was based on the need for the district court to assess whether amendments to those reports were warranted in light of the court's revival of Viamedia's refusal-to-deal theory on remand—not to allow a redo of discovery into tying. Upon abandonment of its refusal-to-deal theory of liability, Viamedia argues, the parties found themselves in substantially the same position with respect to discovery as they would have been had the district court properly denied summary judgment on tying. Viamedia claims that despite the parties having completed all discovery on tying before remand, Comcast treated post-remand discovery as an impermissible "do-over" of discovery on tying liability.

Given the amount of discovery already undertaken, the length of this litigation, and the Seventh Circuit's thoroughness in its reversal opinion, this Court will take a permissible approach to allowing expert opinions. Both parties have submitted post-remand expert reports that rely heavily on evidence disclosed prior to remand. Indeed, Viamedia disclosed an entirely new damages expert, Dr. Cragg, who relies on Dr. Furchgott-Roth's pre-remand liability reports—justifying this decision on the basis that Viamedia's old damages expert simply got it wrong by using an erroneous methodology. Viamedia cannot have its cake and eat it too. Accordingly, the Court denies Viamedia's motion to strike Dr. Carlton's post-remand expert reports and testimony, and rejects all of Viamedia's untimeliness arguments as to all experts.[6]

### D. *Viamedia's Motion to Exclude the Expert Opinions of Dr. Andres Lerner*

Viamedia moves to exclude the expert testimony of Dr. Lerner, another of Comcast's liability experts, for two reasons: (1) Dr. Lerner's opinions are untimely and exceed the scope of rebuttal; and (2) Dr. Lerner's opinions improperly rely on the premise that the markets for Spot Cable Ad Rep Services and Interconnect Services are two-sided transaction platforms.

Dr. Lerner opines that the markets for Spot Cable Ad Rep Services and Interconnect Services are two-sided transaction platforms. (*See* Dkt. 615-01, Lerner Rep., ¶ 13.) Because this Court holds that these markets are not two-sided transaction platforms, Dr. Lerner's opinions are contrary to law and thus inadmissible.

### E. *Viamedia's Motion to Exclude the Expert Opinions of Billy Farina*

Viamedia next moves to preclude the rebuttal expert witness report and testimony of Mr. Farina, who Comcast retained to opine whether certain assumptions Viamedia's damages experts

---

[6] Viamedia also claims that because Dr. Furchgott-Roth's opinions remained unchanged after remand, Dr. Carlton should be barred from disclosing a post-remand rebuttal report. Because the parties conducted significant post-remand discovery, however, it was appropriate for Dr. Carlton to update his expert reports in light of new evidence in the record that may have contextualized or reframed old opinions of his.

make to estimate damages are realistic. Viamedia challenges Mr. Farina's qualifications as they relate to his opinions, as well as the reliability and timeliness of his opinions.

First, to the extent Mr. Farina's opinions serve to rebut Dr. Lys's opinions on damages, those opinions are no longer relevant because Viamedia has withdrawn Dr. Lys as an expert. (*See, e.g.*, Oral Arg. Tr. at 55:16–19 (Dec. 13, 2024).) These opinions are thus stricken. (*See* Dkt. 674, Farina Rebuttal Rep., Ex. 145, Sec. IV (rebutting Dr. Lys's opinions related to projections of MVPD renewals).)

Second, Viamedia challenges Mr. Farina's rebuttal opinions as outside the scope of his expertise and unreliable. Comcast offers Mr. Farina as an expert on the cable advertising business. (Dkt. 662 at *11.) He opines, based on his professional experience, whether the assumptions Dr. Cragg uses about the industry are "consistent with marketplace realities," (Dkt. 662 at *13), and concludes that: (1) Dr. Cragg's assumption that Viamedia's revenue would grow at the average industry growth rate is speculative; (2) Dr. Cragg's opinion that Viamedia's financial challenges were caused solely by Comcast ignores the extent of Viamedia's mismanagement; and (3) the companies Dr. Cragg uses as comparable companies for his valuation analysis are not similar to Viamedia. (Dkt. 674, Farina Rebuttal Rep., Ex. 145.)

At base, the Court disagrees with Viamedia's characterization of Mr. Farina's opinions as "damages opinions." (*See* Dkt. 618 at *10 (Viamedia describing Mr. Farina's opinions as "damages opinions involving analyses of Viamedia's growth rates, management decisions, and comparable companies used for corporate valuations"). While Mr. Farina's challenges to the assumptions that underlie Dr. Cragg's damages model are *related* to damages, they are not opinions on any damages calculation itself. For example, he does not offer any alternative damages figure or model. It is well within reason for a rebuttal expert to apply his experience and training in the relevant industry to opine as to the correctness of assumptions used in a damages model. And because Viamedia does not

contest Mr. Farina's expertise in the field of cable advertising, the Court finds Mr. Farina well-qualified to offer his opinions.

Lastly, in Section VIII of his rebuttal expert report, Mr. Farina writes that the distinction between Spot Cable Ad Rep Services and Interconnect Services "makes no sense to [him] based on [his] experience and understanding of the industry." (Dkt. 674, Farina Rebuttal Rep., Ex. 145 ¶ 89.) His position is supported by one sentence stating that the sale of Spot Cable Ad Avails over an Interconnect and "related services provided by the [I]nterconnect operator, fall squarely within ad representation, in my experience." *Id.* Mr. Farina also writes that he is not familiar with the term "Interconnect Services." (*Id.* ¶ 90.)

Rule 702 allows for testimony by an expert whose qualifications are based on experience. Fed. R. Evid. 702 and advisory comm. nn. (2000 Amends.); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148–51, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). "An expert's opinion based solely on experience, however, still must 'be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert.'" *Driver v. AppleIllinois, LLC*, 2011 WL 4007337, at *2 (N.D. Ill. Sept. 9, 2011) (Brown, J.) (quoting *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 723 (7th Cir. 1999)). A court cannot merely "tak[e] the expert's word for it," but must ensure that a witness who relies solely or primarily on experience "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702 advisory comm. nn. (2000 Amends.)).

Mr. Farina's opinions in Section VIII about the lack of a distinction between the two relevant markets are hardly more than conclusory statements, without any explanation as to how Mr. Farina came to those opinions, let alone what he relied upon to get there. *See Driver*, 2011 WL 4007337, at *2. Accordingly, these opinions should be excluded. On the other hand, because testimony regarding the use (or lack thereof) of industry terms is within the province of an expert witness with substantial

experience in the relevant industry, the opinion that Mr. Farina is not familiar with the term "Interconnect Services" will not be excluded. *See Cage v. City of Chicago*, 979 F. Supp. 2d 787, 803 (N.D. Ill. Sept. 24, 2013) (Kendall, J.) ("[A]n expert witness may opine on the accepted meaning (or lack thereof) of a word or phrase within a particular industry based [on] his or her experience and training.").

      *F.  Comcast's Motion to Exclude the Expert Opinions of Dr. Harold Furchgott-Roth*

Comcast moves to exclude the expert testimony of Viamedia's liability expert, Dr. Furchgott-Roth on four grounds. Two of those grounds have been disposed of by the Court's earlier discussion of two-sided transaction platforms and tying as a matter of law. Remaining are Comcast's arguments that (1) Dr. Furchgott-Roth's attribution of competitive harm to Comcast's anticompetitive conduct fails to consider alternative explanations, and (2) his "No Economic Sense" test opinions are untimely and unreliable.

As this Court held with respect to Dr. Cragg's opinions, an expert's purportedly deficient account for alternative explanations is not a basis for exclusion under *Daubert*, but instead goes to the weight of the evidence. That is an issue best left for a trier of fact.

As to Dr. Furchgott-Roth's No Economic Sense test, the Court finds that Dr. Furchgott-Roth's disclosure of this test contradicts, or rebuts, Dr. Carlton's opinions, and is therefore timely. As to the appropriateness of its usage and the reliability of its application, the Court will leave those questions up to a trier of fact. *See In re Zimmer*, 2015 WL 4880953, at *5.

## V.    Conclusion

For the foregoing reasons, the Court grants in full Viamedia's motion to exclude the expert opinions of Dr. Lerner [614]; denies in full Viamedia's motion to exclude the expert opinions of Dr. Carlton [611] and Comcast's motions to exclude the expert opinions of Dr. Furchgott-Roth and Dr.

Cragg [622, 639]; grants in part and denies in part Viamedia's motion to exclude the expert opinions of Mr. Farina [617]; and denies Comcast's motion for summary judgment [668].

**IT IS SO ORDERED.**

Sharon Johnson Coleman
United States District Judge

DATED: 10/14/2025