# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VIAMEDIA, INC., <br><br>    Plaintiff, <br><br> v. <br><br> COMCAST CORPORATION and COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC, <br><br>    Defendants. | No. 16-cv-5486 <br><br> Hon. Sharon Johnson Coleman, <br>    District Judge <br><br> Hon. Laura K. McNally, <br>    Magistrate Judge |

### DECLARATION OF KENNETH E. LITTLE

1. My name is Ken Little.

2. The following facts are based on my personal knowledge. If called upon as a witness, I could and would testify competently to them.

3. I joined Viamedia, Inc.'s Board of Directors in September 2024. I did not disclose to Viamedia the information contained in this declaration concerning my interactions with Charles Thurston and Hank Oster of Comcast until after I had joined the board.

4. I have been working with interconnects since the late 1980s. At that time, while I was working for Westinghouse Broadcasting in Chicago, I personally designed and built the first Chicago interconnect. The interconnect was open to all MVPDs and their representatives without exception.

1

5. In 1993, I left Westinghouse and started working for National Cable Communications, LLC, or "NCC."[1]

6. I spent nearly 30 years at NCC. I was the Regional Vice President of the Chicago area until 1997. I was then the Executive Vice President of Technology and Operations until 2001. (In that role, I personally designed and oversaw the construction of the original Detroit interconnect.) I then became NCC's Chief Operating Officer, a position that I held until my retirement in 2020.

7. NCC is a cable television advertising and sales technology company. Among other things, NCC serves as a national representative for placement of national or regional ads on cable TV for viewing by MVPD subscribers. NCC enters into agreements with MVPDs (or their representatives, like Viamedia) to sell their advertising avails to national advertisers who are interested in advertising on a regional or national basis.

8. During my time at NCC, it had a board of directors comprised of one representative from each of the three owners of NCC – Comcast, Time Warner Cable (later Charter Communications), and Cox Communications. Comcast owns 60% of NCC; Charter and Cox each own 20% of NCC. During the period from 2010 through at least 2016, Comcast's representative on the board of directors was Charles Thurston, who was the head of Comcast Spotlight, which was Comcast's advertising arm. One of Mr. Thurston's deputies, Hank Oster, regularly worked with Mr. Thurston on NCC matters and would join Mr. Thurston at many NCC meetings and events.

---

[1] In 2019, shortly before I left the company, NCC changed its name to Ampersand. I will call it NCC throughout the declaration, however, because that was its name for most of my time there, as well as its name during the events that are the subject of this declaration.

2

9. As Chief Operating Officer, I regularly interacted with Mr. Thurston and Mr. Oster at NCC board meetings and other meetings and events. Occasionally, NCC held offsite board meetings where I would speak to Mr. Thurston and Mr. Oster. Comcast also hosted industry conferences and events that I attended. For example, Comcast hosted an annual event for local and regional advertisers in Aspen, Colorado. Comcast also hosted numerous events in New York City. I routinely interacted with Mr. Thurston and Mr. Oster at these events.

10. At least as early as 2010, Mr. Thurston began speaking to me about Viamedia. Mr. Oster later joined these conversations as well. Through 2012, I had at least a dozen conversations with them about Viamedia. These conversations never took place in board meetings; they always occurred outside the presence of other board members.

11. In those conversations, Mr. Thurston and Mr. Oster complained that Viamedia was undercutting the prices Comcast charged local advertisers for placement of local ads on cable TV watched by their respective MVPD subscribers. Mr. Thurston and Mr. Oster stated they wanted to find a way to put Viamedia out of business because they did not like having to lower their local and national ad avail prices to compete with Viamedia for the sale of ad avails to advertisers. They also told me that Comcast's plan for putting Viamedia out of business was to kick Viamedia out of the interconnects that Comcast controlled.

12. Mr. Thurston and Mr. Oster also stated that NCC should help Comcast put Viamedia out of business by excluding Viamedia from NCC sales. They encouraged NCC not to renew its contracts with Viamedia. They also encouraged NCC to drop Viamedia as a client even before its current contracts with NCC expired. They said they thought that if Comcast could get Viamedia out of the interconnects, and if NCC ceased to represent Viamedia, then Viamedia would go bankrupt.

3

13. I told Mr. Thurston and Mr. Oster that I disagreed that NCC should stop doing business with Viamedia. Viamedia had always been a profitable partner for NCC. By 2010, Viamedia and its MVPD clients generated tens of millions of dollars of revenue for NCC each year. From a business perspective, giving up that revenue was unjustifiable. So NCC never dropped Viamedia as a client.

14. In 2012, however, Comcast followed through on the plan that Mr. Thurston and Mr. Oster had explained to me. Comcast's exclusion of Viamedia and MVPDs represented by Viamedia from interconnects was big news in the industry. To my knowledge, no interconnect operator had ever previously denied an MVPD or spot cable ad representative access to an interconnect. Since the time I built the first interconnect, they always had been open to all comers.

15. The day after Viamedia's lawsuit against Comcast was made public, Mr. Oster asked for a phone call. In that call, he asked that we no longer talk (or put anything in writing) about destroying Viamedia. He also asked that I look for any documents related to our earlier conversations (there were none). Though he did not say so explicitly, the impression I received during the call was that he wanted me to destroy any such documents that existed.

16. Viamedia served a subpoena on NCC after the lawsuit was filed. I was aware of that subpoena at the time.

17. I was aware at the time that NCC was producing documents for this litigation and that NCC's CEO, Greg Schaefer, was being deposed. I was not involved in either the process of collecting documents or the process of helping Mr. Schaefer to prepare for his deposition.

18. To the best of my knowledge, I possess no documents related to the subject matter of this litigation. I have searched my personal records – including my email accounts, text

4

messages, and even old boxes in my attic – for any documents related to the subject matter of this case from the 2010-2022 time period.[2] I did not find any.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this  9  th day of January, 2026.

*Kenneth E. Little*
Ken Little

---

[2] I no longer have access to any of the accounts or systems I used to communicate when I worked for NCC. My best recollection, however, is that I never memorialized my conversations with Mr. Thurston and Mr. Oster or otherwise wrote anything down about them.

5