# Exhibit B

HIGHLY CONFIDENTIAL

Page 1

1  ** H I G H L Y   C O N F I D E N T I A L **

2  IN THE UNITED STATES DISTRICT COURT

3  FOR THE NORTHERN DISTRICT OF ILLINOIS

4  NO. 16 C 5486

5  -----------------------------------x

   VIAMEDIA, INC.,

6

              Plaintiff,

7

8

       - against -

9

10

   COMCAST CORPORATION and COMCAST

11 SPOTLIGHT, LP,

12            Defendants.

   -----------------------------------x

13              September 22, 2017

                9:46 a.m.

14

15

16       Videotaped Deposition of GREG

17 SCHAEFER, taken by Plaintiff, pursuant to

18 Subpoena, held at the offices of Sullivan &

19 Worcester LLP, 1633 Broadway, New York, New

20 York, before Todd DeSimone, a Registered

21 Professional Reporter and Notary Public of

22 the State of New York.

23

           Veritext Legal Solutions

24            Mid-Atlantic Region

       1250 Eye Street NW - Suite 350

25            Washington, D.C.  20005

HIGHLY CONFIDENTIAL

Page 6

1  nodding, those answers won't come through

2  in the transcript.  Is that okay?

3          A.      Okay.

4          Q.      Similarly, because we have a

5  court reporter trying to take everything

6  down, if you could please wait for me to

7  finish my questions before you begin your

8  answer, and I'll do my best to wait for you

9  to finish your answers before I begin the

10  next question.  Is that fair?

11          A.      Yes.

12          Q.      If you don't understand a

13  question, please just let me know and I'll

14  restate it.  Is that okay?

15          A.      Fair.

16          Q.      If you answer a question, I'm

17  going to assume that you understood.  Is

18  that okay?

19          A.      Uh-huh.

20          Q.      Your lawyer may object to some

21  of my questions today.  Unless he instructs

22  you not to answer, I ask that you please

23  answer the question.  Is that okay?

24          A.      Yes.

25          Q.      And if you need to take a break

HIGHLY CONFIDENTIAL

1    at any time, just let me know.  The only

2    request I have is that if there is a

3    question pending, please answer it and then

4    we'll go ahead and take a break.

5         A.    Okay.

6         Q.    Sound good?

7         A.    Yes.

8         Q.    Is there any reason today that

9    you can't give truthful testimony?

10        A.    No.

11               (Viamedia Exhibit 232 marked

12    for identification.)

13        Q.    Mr. Schaefer, I have handed you

14    what has been marked as Exhibit 232.

15               Have you seen this notice

16    before?

17        A.    Yes.

18        Q.    Please take a minute and look

19    at the list of topics at the end.

20               (Witness perusing document.)

21        A.    Okay.

22        Q.    Do you recognize those topics?

23        A.    Yes.

24        Q.    You reviewed them --

25        A.    Yes, I did.

HIGHLY CONFIDENTIAL

Page 8

1      Q.      -- before?

2      A.      I reviewed them extensively.

3      Q.      Great.  And if you could

4  please, again, wait for me to finish the

5  question before we move on just because we

6  are going to start talking over each other.

7             So you understand that you are

8  here to testify today about each of those

9  topics?

10     A.      Yes.

11     Q.      And you're prepared to testify

12  about the scope of NCC's knowledge about

13  each of those topics?

14     A.      Yes.

15     Q.      How did you prepare for today's

16  deposition?

17     A.      I, first of all, we needed to

18  gather a lot of information.  We reviewed

19  the topics and the information we were

20  going to gather.  I instructed my IT

21  division in Bloomfield to pull a set of

22  lists that would answer the questions, that

23  the formal request came from Kevin, my

24  attorney, and once the information was

25  gathered, I reviewed it extensively, and,

HIGHLY CONFIDENTIAL

Page 9

1    you know, had to go through old board

2    meetings to remember some of the

3    information and familiarize myself with my

4    way of thinking maybe in 2013 or '11 or

5    whatever.

6              After that, as there were

7    questions pertaining to NCC with Viamedia,

8    I went through an extensive review with all

9    of my regions as well as my SVP of sales

10   and affiliate sales to get the most up to

11   date information as to how we were doing

12   with Viamedia.

13       Q.    Did you speak with anyone else

14   in preparing for today's deposition?

15       A.    No.

16       Q.    Did you confer with your lawyer

17   at all about today's deposition?

18             MR. COLMEY:  That's just a yes

19   or no for now.  I just want to be careful.

20       A.    Yes.

21       Q.    Did you speak to any Comcast

22   employees?

23       A.    No.

24       Q.    Did you speak to any attorneys

25   from Comcast?

HIGHLY CONFIDENTIAL

Page 10

1        A.      No.

2        Q.      Did you speak to any former NCC

3   employees?

4        A.      No.

5        Q.      You mentioned an SVP of sales.

6   Who is that?

7        A.      Chip Carmody.

8        Q.      Was anyone else involved in

9   pulling the documents that were ultimately

10  produced by NCC in this case?

11       A.      No.

12       Q.      And are you being represented

13  today by counsel?

14       A.      Yes.

15       Q.      And who is that?

16       A.      Kevin Colmey, Sullivan &

17  Worcester, and Lewis Segall.

18       Q.      And are you being compensated

19  for your time here today?

20              MR. COLMEY:  I object to form.

21       Q.      You can answer.

22       A.      Yes.

23       Q.      By whom?

24       A.      I'm not sure if I understand

25  the question.

HIGHLY CONFIDENTIAL

Page 11

1     Q.    Are you being compensated for

2  your time here today separate and apart

3  from your compensation from NCC?

4     A.    No, absolutely not.

5     Q.    Great.  So what is NCC,

6  Mr. Schaefer?

7     A.    NCC is -- we are a national rep

8  firm.  It's a consortium and a partnership

9  between three of the major cable operators,

10  MVPDs, as we call them, in the United

11  States.

12         So for them, we are an O&O, and

13  for every other affiliate in the country,

14  we represent in 210 markets, we are their

15  national representative.

16     Q.    When you say a national rep

17  firm, do you mean that NCC is a national

18  spot cable ad representative?

19     A.    Yes.

20     Q.    And you referred to it as a

21  consortium.  Can you explain what you mean

22  by that?

23     A.    It is a partnership.

24     Q.    A partnership among?

25     A.    Three cable operators.

HIGHLY CONFIDENTIAL

Page 12

1          Q.      Which three cable operators?

2          A.      Comcast, Charter and Cox.

3          Q.      And you also used the phrase an

4    O&O.  Can you explain what that is?

5          A.      Owned and operated.

6          Q.      And what did you mean by you

7    are an O&O for every other affiliate in the

8    country?

9          A.      That's not what I said.  O&O,

10   owned and operated situation, for the three

11   companies that own NCC.

12         Q.      Got it, apologies.

13                 And what is your

14   representation -- what is your relationship

15   with the other affiliates you mentioned?

16         A.      We are their exclusive national

17   representative.

18         Q.      And you referred to 210

19   markets; is that correct?

20         A.      That's the television markets

21   in the United States.

22         Q.      Is that all of the markets in

23   the United States?

24         A.      Yes.

25         Q.      And does NCC have a presence in

HIGHLY CONFIDENTIAL

Page 43

1      Q.      Direct response advertising,
2  does that refer to when they are soliciting
3  phone calls?
4      A.      Yes.
5      Q.      Infomercial type stuff?
6      A.      Yes.
7      Q.      Is TelAmerica a competitor of
8  NCC's?
9      A.      Yes.
10     Q.      Only in the market for remnant
11 advertising?
12     A.      Only from the standpoint of
13 they are representing themselves as a
14 network advertiser, but, in my estimation,
15 they are taking money that could -- they
16 are taking inventory that could go to spot.
17     Q.      Do you consider them to be a
18 meaningful competitor to you in the market
19 for national spot cable advertising
20 representation?
21     A.      No.
22     Q.      You mentioned that NCC is a
23 consortium of three cable companies, and I
24 believe you said it was Comcast, Cox and
25 Charter; is that right?

HIGHLY CONFIDENTIAL

Page 44

1      A.      Yes.

2      Q.      What is the ownership

3 structure?

4      A.      You have the LLC, right?

5      Q.      We do, yeah.  We'll get to the

6 documents later.

7              But as the president and CEO of

8 NCC, what is the ownership structure?

9              MR. TOSCANO:  Objection to

10 form.

11      Q.      You can answer.

12      A.      It's 60 percent -- 60 percent

13 equity with Comcast and 20 with the other

14 two.

15      Q.      Do you know how it came to be

16 that Comcast owns 60 percent, but the other

17 two only own 20?

18      A.      I think when they bought -- my

19 recollection, because it actually happened

20 before I got there, my recollection was

21 that they bought what was then the old AT&T

22 cable systems, and at that point they

23 accumulated a large portion of the NCC

24 revenue at that point, and that's how --

25 and it was set up to be that piece of --

HIGHLY CONFIDENTIAL

Page 45

1    that piece of equity.

2         Q.      Does Comcast's status as the

3    majority owner of NCC give it additional

4    influence over the governance of NCC?

5         A.      No.

6         Q.      Does NCC have a board of

7    directors?

8         A.      Yes.

9         Q.      And what is the structure of

10   that board of directors?

11        A.      I have three bosses, three

12   board members, and they each have -- each

13   have equal vote in all major decisions that

14   I make.

15        Q.      And who are those three bosses?

16        A.      Charlie Thurston -- it was

17   Charlie Thurston.  It is now Marcien Jinks

18   as of this year.  That is Comcast.  Billy

19   Farina is Cox.  And David Klein is Charter,

20   which historically was a Time Warner

21   person, Joan Gillman, who represented Time

22   Warner, and Bright House, which ended up

23   merging under the acquisition of Charter --

24   by Charter.

25        Q.      Got it.  So just so we're

HIGHLY CONFIDENTIAL

                                        Page 167

1    fell swoop?

2         A.      Yes.

3                 MR. RATNER:  Let's go off the

4    record for a second.

5                 THE VIDEOGRAPHER:  The time on

6    the video monitor is 12:39 p.m.  We are off

7    the record.

8                 (Luncheon recess:  12:39 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL

```
                                        Page 168
 1          A F T E R N O O N    S E S S I O N
 2                  1:18 p.m.
 3    G R E G    S C H A E F E R, resumed.
 4              THE VIDEOGRAPHER:  We are back
 5    on the record.  The time on the video
 6    monitor is 1:18 p.m.
 7    CONTINUED EXAMINATION
 8    BY MR. RATNER:
 9          Q.      Mr. Schaefer, were you aware in
10    2012 that Comcast decided to no longer give
11    Viamedia access to its interconnects?
12              MR. TOSCANO:  Objection to
13    form.
14          A.      Yes.
15          Q.      How did you become aware of
16    that?
17          A.      There would have been a note
18    from somebody at Comcast advising us that
19    they were no longer in the interconnect.
20          Q.      Did you consult with anyone at
21    Comcast about that decision?
22          A.      No.
23          Q.      Did you have any insight into
24    that decision at the time it was made?
25          A.      No.
```

HIGHLY CONFIDENTIAL

Page 169

1      Q.      Only learned about it

2   afterwards?

3      A.      Yes.

4      Q.      What, at that point, did NCC do

5   to make it known to the market that

6   Viamedia was no longer in Comcast

7   interconnects?

8              MR. TOSCANO:   Objection to

9   form.

10     A.      We would have -- it would have

11  changed our presentations to the market to

12  reflect that.

13     Q.      How so?

14     A.      We would have submitted it as a

15  separate system and not the interconnect.

16     Q.      But continued offering Viamedia

17  to the market, just outside the

18  interconnect?

19     A.      Yes.

20     Q.      You took the asterisk off of

21  Viamedia on those profiles?

22             MR. TOSCANO:   Objection to

23  form.

24     A.      Well, that form appears to be

25  wrong.  I mentioned that earlier.  It's not

HIGHLY CONFIDENTIAL

Page 170

1    something that I saw at the time, and I'm

2    not even sure if that's the final product.

3              Apparently that was how they

4    designed it, and they were looking -- and

5    it looks like Dan Griffin sent it to the

6    Comcast interconnect -- a national person

7    from Comcast, because it involved market

8    profiles for Chicago, Boston, I guess at an

9    earlier iteration, and Detroit, which were

10   all Comcast run -- predominant Comcast

11   markets.

12        Q.    At that point in 2012 did NCC

13   represent any other systems that were

14   excluded from Comcast interconnects in

15   Chicago and Detroit?

16        A.    DirecTV and Dish.  I'm not sure

17   if Dish was in yet, but DirecTV

18   definitively.  Dish I believe was in by

19   2012, but not in the interconnect.

20        Q.    Aside from satellite companies,

21   did NCC represent any MVPDs at that point

22   that were not included in Comcast

23   interconnects in Chicago and Detroit?

24        A.    No.

25        Q.    Would it have been better for